COMMONWEALTH OF VIRGINIA

IN THE CIRCUIT COURT FOR THE COUNTY OF ALBEMARLE

| | |
|---|---|
| **EMILY MAIS,** | Case No. *CL 22-496* |
| *Plaintiff,* | |
| vs. | |
| **ALBEMARLE COUNTY SCHOOL BOARD,** | VERIFIED COMPLAINT<br>JURY TRIAL DEMANDED |
| Serve: Albemarle County School Board<br>410 McIntire Rd, Room 345<br>Charlottesville, VA 22902 | |
| *Defendant.* | |

## I.   INTRODUCTION

1.      Plaintiff Emily Mais was an Assistant Principal at Agnor-Hurt Elementary School, which is part of Albemarle County Public Schools ("ACPS"). She loved her job. She was forced out of that job in September 2021, however, because she questioned Defendant's implementation in the school district of a radical program that scapegoats, stereotypes, labels, and ultimately divides people based on race.

2.      Assigning negative characteristics to people, harassing them, or discriminating against them because of their race is a great moral wrong. That is racism, and it should be opposed wherever it is found.

3.      Defendant claims it wants to eliminate racism in its school system, but, unfortunately, its policies and practices do the exact opposite.

**EXHIBIT**
**1**

1

4.      Instead of training faculty members to embrace students of all races, Defendant uses a teacher training curriculum that promotes racial division and encourages racial harassment.

5.      The curriculum, based on *Courageous Conversations about Race* by Glenn Singleton, attributes negative characteristics to some people, and positive characteristics to others, based solely on their race. Glenn Singleton, *Courageous Conversations About Race: A Field Guide for Achieving Equity in Schools* (2nd ed. 2014).

6.      The curriculum embraces an ideology—sometimes called "critical race theory" or "critical theory"—that views everything and everyone through the lens of race.

7.      The Virginia Superintendent of Public Instruction has expressly recognized that *Courageous Conversations* promotes inherently divisive concepts that are harmful to students and staff members alike. On February 23, 2022, Superintendent Jillian Barlow sent a letter to Governor Glenn Youngkin and Secretary Aimee Guidera which expressly identifies *Courageous Conversations* as an example of critical race theory-based materials being used in Virginia schools.[1]

8.      For example, the curriculum teaches that acts of "racism" can only be committed by members of the "dominant race," which it defines as white people.

9.      It further teaches that "Whiteness is characterized by a sense of entitlement," and that claims of reverse racism are inherently racist. Singleton, *supra*, at 226.

10.     The curriculum sets up a classic Catch-22, in which a white person's objections to the content of the curriculum are simply evidence that he or she is a racist who needs further training on the curriculum.

---

[1] A true and correct copy of this letter is attached to this Complaint as Exhibit 1.

2

11.     Unfortunately for her, Ms. Mais was caught in that Catch-22.

12.     When Ms. Mais complained about the curriculum and protested reverse racism, she was branded a racist, severely and pervasively harassed, relentlessly humiliated, and ultimately compelled to resign from a job that she loved to preserve her mental health.

## II.      PARTIES, JURISDICTION, AND VENUE

### A.     Plaintiff Emily Mais

13.     Ms. Mais is a citizen and resident of Albemarle County, Virginia.

14.     Ms. Mais was employed by the Defendant as Assistant Principal of Agnor-Hurt Elementary School from October 2018 until her constructive discharge on September 10, 2021.

15.     All of the key events of Ms. Mais's employment, including the discrimination, harassment, and constructive discharge to which she was subjected, took place in Albemarle County.

### B.     Defendant School Board of Albemarle County, Virginia

16.     Defendant School Board of Albemarle County, Virginia ("Defendant" or the "Division") is the public corporate body, with the power to sue and be sued, that governs Albemarle County Public Schools.

17.     The Division is a political subdivision of the Commonwealth of Virginia.

18.     The Division derives its authority from the Commonwealth of Virginia and acts under the authority of the Commonwealth of Virginia.

19.     The Division employs all administrators and teachers that work in Albemarle County Public Schools.

3

20.     The Division was Ms. Mais's employer from October 2018 until September 10, 2021.

**C.     Jurisdiction and Venue**

21.     This Court has subject matter and personal jurisdiction under Va. Code §§ 17.1-513, 8.01-328.1.

22.     This Court has authority to award the requested relief, including damages, costs, and attorneys' fees under Va. Code § 2.2-3908.

23.     Venue is proper in this judicial circuit under Va. Code § 8.01-261 because Plaintiff filed this Complaint in the Circuit Court of the county where the acts supporting this Complaint took place and because the Division has its place of business in this Circuit.

**III.     FACTUAL BACKGROUND**

**A.     Emily Mais builds a successful career in educational administration.**

24.     For as long as she can remember, Ms. Mais wanted to be an elementary school teacher.

25.     Ms. Mais pursued her dream of becoming a teacher by obtaining a bachelor's degree in fine arts from Salisbury University in 2003 and a master's degree in teaching from the University of Maryland in 2005.

26.     Beginning in 2005, Ms. Mais worked as an elementary school art teacher for seven years in Maryland, near Washington, D.C.

27.     In 2009, Ms. Mais obtained a certificate in educational administration and supervision from Towson University.

28.     Beginning in 2012, Ms. Mais worked as an elementary school administrator for five years in Maryland, ultimately serving as Assistant Principal

of Greenview Knolls Elementary School in St. Mary's County, Maryland, which is in the Washington, D.C. area.

29.     Ms. Mais has always loved children, and working in elementary education fulfilled her lifelong passion of helping children grow into their best selves.

30.     One of the greatest joys of Ms. Mais's life has been watching hundreds under her teaching and administration develop a passion for learning.

31.     As a Christian, Ms. Mais believes that all human beings are created in the image and likeness of God.

32.     Ms. Mais believes that as image-bearers of God, all people are endowed with inherent dignity and entitled to equal respect.

33.     Ms. Mais believes that a person's race does not determine his or her value or abilities, and that treating people differently because of their race is wrong because it denies the equal dignity and respect that all people deserve as children of God.

34.     Ms. Mais believes that racism is morally evil.

35.     In the words of Dr. Martin Luther King, Jr., Ms. Mais believes that people should "not be judged by the color of their skin but by the content of their character."

36.     Throughout her career, Ms. Mais has worked to instill the values of fairness and equal treatment in her students.

37.     She works to instill those values in her own children.

38.     Throughout her career, Ms. Mais has received nothing but glowing performance reviews.

39.     In 2016, the Maises' daughter, Ruby, was diagnosed with Stage 4 kidney cancer, about six months before her third birthday.

40.     In 2017, after more than a year of shepherding their daughter through grueling medical treatments, the Mais family decided to relocate out of the Washington, D.C. area.

41.     In relocating, they hoped to find a simpler life where they could spend more time with their children and be part of a close-knit community.

42.     They ultimately bought a 3-acre plot and built a small house in Crozet, Virginia, in Albemarle County.

43.     Their journey was featured on the TV program "Tiny House Nation."

44.     A key reason they chose to live in Albemarle County was because the public school system had an excellent reputation.

45.     This was important to them, both because they intended for their children to attend public school, and because Ms. Mais hoped to continue her career as a public-school administrator.

46.     In October 2018, Ms. Mais began working as Assistant Principal of Agnor-Hurt Elementary School in Charlottesville, Virginia.

47.     As in her prior jobs, Ms. Mais received glowing performance reviews throughout her tenure at Agnor-Hurt.

48.     During her time at Agnor-Hurt, Ms. Mais began working on her doctorate in leadership and organizational change from Marymount University.

49.     In addition, the Division selected Ms. Mais as one of two administrators to represent the Division in a leadership academy hosted by the University of Virginia.

**B.     The Division enacts an "Anti-Racism" policy that is racist at its core.**

50.     On February 28, 2019, the Division adopted an "Anti-Racism Policy." Exhibit 2 to this Verified Complaint is a true and accurate copy of the Policy and Policy Regulations.

51.     The Policy states as its purpose the elimination of "all forms of racism from [Albemarle Public Schools]." It then describes how it seeks to accomplish that goal using the framework of critical theory. Ex. 2 at 1.

52.     The Policy focuses on a concept that it calls "equity."

53.     While the term equity looks and sounds like equality, according to materials on which the Policy was based, these terms "actually convey significantly different ideas."[2]

54.     Policy resources explain that "equity" calls for different, not equal, treatment, explaining that "sometimes different groups will be treated differently, but for the aim of eventually creating a level playing field that currently is not the reality." *See supra* n.2.

55.     Thus, the Policy directs that different races must be treated differently, and unequally, just because of membership in a certain racial category. *Id*. No other aspect of personhood is relevant.

56.     Through the Policy, the Division chose to embrace the ideology referred to as "anti-racism."

57.     But because that ideology endorses treating people differently because of their race, promoting racial stereotypes, and teaching that certain racial groups are inherently good or bad, embracing it laid the foundation for a racially hostile work environment within the Division.

58.     In November 2020, the Division launched a mandatory online orientation presentation for all Division staff to introduce the Policy, which Ms. Mais attended. Exhibit 3 to this Verified Complaint is a true and accurate copy of this presentation, the "ACPS Anti-Racism Policy Orientation."

---

[2] Government Alliance on Race & Equity, *Advancing Racial Equity and Transforming Government* (Sept. 2015), https://bit.ly/3GUNESK.

7

59.    During the orientation, the Division presented the Policy's various definitions of "racism" and "anti-racism" and showed a video excerpt from an interview with Ibram X. Kendi discussing his book How to Be an Anti-Racist. Ex. 3 at 9 (The Aspen Institute, *Book Talk with Ibram X. Kendi on "How to Be an Antiracist*, YouTube (Oct. 10, 2019), https://bit.ly/3GUO2Rc.)

60.    In the excerpt, Kendi defined a "racist policy" as any policy that leads to racial inequity; that is, different outcomes for people of different races. Kendi made this explicit soon after in the video, stating: "All that matters is the outcome." Kendi *Book Talk* Video, *supra*, at 20:12.

61.    In his book, Kendi expressly embraces racist discrimination as the answer to racism: "The only remedy to racist discrimination is antiracist discrimination. The only remedy to past discrimination is present discrimination. The only remedy to present discrimination is future discrimination." Ibram X. Kendi, *How to Be an Antiracist* 19 (2019).

62.    During the orientation, the Division suggested that anyone opposed to their Policy was a "racist" and should consider finding a different job.

63.    In a videotaped statement, Dr. Bernard Hairston, the Division's Assistant Superintendent, stated: "If I identify forms of racism, and I do absolutely nothing about it, then I become a practitioner of racism. Now, consider this controversial statement by some researchers: 'You are either a racist or an antiracist.' It is time for you to think about how you will own this required antiracism training and the policy." Ex. 3 at 21 (Alfred Toole, *ARP Dr. Bernard Hairston*, YouTube (Jan. 30, 2021), https://bit.ly/3yOpvKE.) [3]

---

[3] Exhibit 4 to this Verified Complaint is a true and accurate copy of a transcript of Dr. Hairston's comments.

64.     Dr. Hairston also stated in the same video that staff needed to think about whether they were on the "antiracism school bus, or if you need help finding your seat and keeping your seat, or if it's time for you to just get off the bus." Ex. 4.

65.     Ms. Mais understood this to mean that any staff members who took issue with any aspect of the Policy or its implementation was likely to lose her job.

**C.    The Division mandates staff training based on the racist *Courageous Conversations* curriculum.**

66.     On March 26, 2021, Ms. Mais attended a mandatory Division-wide professional development webinar session entitled, "Becoming an Anti-Racist School System: A Courageous Conversation," with Glenn Singleton, the author of *Courageous Conversations About Race*. Albemarle County Public Schools, *Anti-Racism Policy Evaluation Report 2020-21: Status Update: Training*, https://bit.ly/3mlxJEX (last visited April 8, 2022).

67.     Mr. Singleton's talk focused on his book and his theories about education, which promote racial stereotypes and advocate differential treatment based on race.

68.     The Division required Agnor-Hurt administrators to conduct a teacher training series based on the Singleton book. Exhibit 5 to this Verified Complaint is a true and accurate copy of excerpts from the PowerPoint slides used to guide this training series.

69.     The Division tasked Ashby Kindler, a former administrator, with leading the training.

70.     From the inception of the training on April 30, 2021, until Ms. Mais's constructive discharge on September 10, 2021, the Division subjected Ms. Mais to a work environment that became increasingly racially hostile over time.

9

71.    Although billed as "anti-racist," the curriculum and materials stereotyped, demeaned, and dismissed white people as perpetuators of systemic racism.

72.    The materials were replete with pejorative stereotypes of how white people think, speak, and act, as well as stereotypical descriptions of "whiteness," "white culture," "white talk," and "white racial identity."

73.    The materials were equally replete with pejorative stereotypes about how people of color think, speak, and act, all sending the disempowering message that people of color are inherently disadvantaged and wholly dependent upon others to effect positive change.

74.    For example, the material included a slide titled "Communication is a Racialized Tool" that promoted the following stereotypes about how people communicated based solely on their race. Ex. 5. at 4.

**Communication is a Racialized Tool**

| White Talk | Color Commentary |
|---|---|
| • Verbal: Focused on talking and offering racial meaning through word choice, voice tone, and intonation | • Nonverbal: Focused on offering racial meaning through facial expressions, body movements, and physical gestures |
| • Impersonal: Focused on the sharing of racial perspectives or experiences of someone not immediately present or involved in the conversation. | • Personal: Focused on sharing one's own personal racial narrative, perspectives, or experiences. |
| • Intellectual: Focused on what one thinks (or has read) with respect to race. | • Emotional: Focused on what one feels (or has experienced) with respect to race. |
| • Task oriented: Focused on engaging in dialogue for the purposes of getting something accomplished. | • Process oriented: Focused on engaging in dialogue for the purposes of feeling present, connected, or heard. |

10

75.    The training urged staff to move from a "colorblind" view of race to a "color conscious" scheme and explained that "treat[ing] everyone with respect," regardless of race, is not enough to be "anti-racist." Ex. 5 at 3.



76.    In addition to the racist nature of the curriculum, the Division conducted the training in a racially hostile manner.

77.    For example, it called for participants to discuss inflammatory topics, such as the role of "white privilege" in their lives, in breakout rooms where the conversation could not be monitored by a trained administrator.

78.    In these breakout rooms, white staff members attempting to participate were shut down or dismissed in front of other staff members and told they could not understand the topic because of the color of their skin.

79.    Participants were instructed to comply with the "Four Agreements" set forth in Singleton's book, which were: (1) stay engaged, (2) experience discomfort, (3) speak your truth, and (4) expect and accept non closure. Ex. 5 at 2.

80.    But when white participants attempted to "speak their truth," including Ms. Mais, other participants frequently made hurtful, dismissive, and

11

racially charged statements to or about white people with no intervention by or recourse from the Division.

81.     The "Four Agreements" contained in the book and as explained by the Division encouraged this kind of behavior by effectively telling staff members that they were free to say things that would harass and hurt others as long as they were "speak[ing their] truth."

82.     In practice, the only harassing and hurtful comments the Division encouraged and allowed were those directed against white faculty members.

83.     Early in the training, a teacher's aide who is black, Sheila Avery, presented herself as a representative of an unnamed group of black employees.

84.     The Division allowed Ms. Avery to speak on behalf of this unknown group.

85.     Throughout the training, Ms. Avery mistreated white employees who attempted to engage with the curriculum by dismissing their comments, telling them they did not/could not understand racism because they were not black, and/or that their racial, cultural, religious, class, and other backgrounds were irrelevant and not worth discussing.

86.     In essence, the training placed white employees in a no-win situation: they were being instructed to engage with the curriculum and to "speak their truth," but, if they did so honestly, they were chastised and told their race prevented them from understanding. Moreover, their comments were dismissed and they were harassed based on their race.

87.     Shortly after the training began, employees began complaining to Ms. Mais about the racially hostile environment created by the training and the training materials and the hurtful and pejorative comments made by other staff members, which demonized them for being white.

88.     For example, one staff member complained to Ms. Mais that it was extremely hurtful to listen to another staff member, in a repeated and contemptuous manner, dismiss every non-black group's experience with prejudice because they were not black.

89.     Ironically, this was a Jewish staff member whose life had been affected by the Holocaust in many ways but was not comfortable sharing her experience because of the repeated comments that only black people had experienced prejudice.

90.     This staff member said that the racially hostile environment depressed her and made her question how much longer she could tolerate attending these sessions or working for a school district that supported this ideology and insulting treatment.

91.     Another staff member complained to Ms. Mais that as a biracial (Asian / White) person, she felt out of place all her life because she is more white-presenting than her family, but she felt she could not express this struggle during training sessions because she is not black.

92.     The staff member told Ms. Mais that she feared Ms. Avery would immediately shut her down if she tried to discuss her situation because she is not black, as Ms. Avery had done to others.

93.     Ms. Mais voiced these concerns to Ms. Kindler as staff members shared concerns about the racially hostile environment.

94.     But Ms. Kindler did not (and likely could not) alter the structure or content of the training to abate the racially hostile environment, and the environment continued.

95.     Indeed, the *Courageous Conversations* curriculum itself creates this kind of hostile environment by teaching that racism is only perpetrated by white people against people of color.

13

**D.      Dr. Hairston compares white parents who express concern about the Division's "anti-racism" policy to rapist slave owners.**

96.     On May 27, 2021, several Albemarle County parents expressed concern with the Division's implementation of its "anti-racism policy," including the *Courageous Conversations* curriculum, during the public comment portion of the School Board meeting.

97.     While these parents agreed that the Division should work to eliminate racism, they expressed serious concern that the Division's "anti-racism" approach was perpetuating the very racism the Division purported to abhor.

98.     Parents also expressed concern with what they perceived to be a lack of transparency and sufficient notice to families concerning the "anti-racism" policies and curricula.

99.     For example, one ACPS parent stated that the anti-racism policy and curriculum create "division and conflict rather than promote positive relationships and mutual respect. They victimize people and force them into categories. They promote equity at the cost of equality. In the name of anti-racism, these ideas and philosophies preach an unending cycle of conflict." k12albemarle, *School Board Meeting- May 27, 2021*, YouTube (May 28, 2021), https://www.youtube.com/watch?v=4k_4w2RuNOU.

100.    Another ACPS parent told the School Board, "I applaud ACPS for trying to engage students on issues of race and unity. However, I feel the means by which it has done so are misguided in that they overstep the role of school, violate their own policies on political engagement, create a divisive learning environment, misprioritize resources, and set an unsettling precedent of imposing political ideology via school curriculum."] *Id.* at 31:07.

101.   On May 28, 2021, Dr. Bernard Hairston, the Assistant Superintendent in charge of the Division's "anti-racism" policy, addressed the parents' comments in a mandatory administrator's meeting, which Ms. Mais attended.

102.   Dr. Hairston noted that his ancestors were slaves owned by a wealthy Virginia family.

103.   Dr. Hairston stated that he received the parents' comments as if they were slave owners who had raped his mother and sister, beaten him, and were now telling him not to talk about it.

104.   Dr. Hairston further said that the parents who spoke were promoting systemic racism, and he called them protectors of practices ("Pops").

105.   Ms. Mais understood him to mean protectors of *racist* practices.

106.   Dr. Hairston further reiterated that, for administrators like Ms. Mais, implementing the Division's "anti-racism" policy, which included the *Courageous Conversations* training for administrators and teachers as well as a *Courageous Conversations* pilot curriculum for students, was non-negotiable.

107.   Superintendent Matthew Haas and other Division senior leaders at the meeting supported Dr. Hairston's statements.

108.   None of the administrators present—including Dr. Haas—retracted, corrected, or expressed any disapproval of Dr. Hairston's comments.

109.   Dr. Hairston's comments further created a toxic and racially hostile environment by comparing white parents to rapists and slave owners and branding any white person who failed to embrace the Division's ideology as a promoter of systemic racism.

110.   His comments further demonstrated to Ms. Mais that her concerns with the *Courageous Conversations* training, and with the hostile environment created thereby, were falling on deaf ears, and that any good-faith attempt by a

15

white person to be constructively critical of the training would be branded a racist act and would likely adversely affect the employee's career.

**E.   Ms. Avery verbally abuses Ms. Mais in the final training session.**

111.   In the final training session on June 11, 2021, Ms. Kindler presented slides concerning the racial breakdown of the Division's employees and new hires. Ex. 5 at 5-9.

112.   Responding to the slide and its presentation, Ms. Mais suggested that it would be useful to see the same statistics for the applicant pool in order to determine if the racial disparity was related more to the Division's selection process or to its ability to recruit people of color to apply for Albemarle County Public School jobs.

113.   Although Ms. Mais had the phrase "people of color" in her mind, she inadvertently used the word "colored" instead.

114.   Ms. Mais quickly apologized for her slip of the tongue.

115.   Ms. Avery ignored the apology and verbally attacked Ms. Mais for her slip of the tongue during the training and in front of all attendees, accusing Ms. Mais of speaking like old racists who told people of color to go to the back of the bus.

116.   Ms. Avery's verbal abuse was so severe that Ms. Mais received multiple communications during the training session and following it from other staff members expressing their support for her and their alarm at how unprofessional Ms. Avery's response to her was.

117.   Shortly after the training session ended, Ms. Mais received an email from Emily Holmstrom, the school's guidance counselor, asking if she would like to "unpack" what Ms. Mais had said during the training session.

118.   Ms. Mais regarded this message as a veiled threat that she would report Ms. Mais to the administration if she didn't discuss the matter with her.

119.    There should not have been anything Ms. Mais was required to "unpack," as she had immediately apologized for a simple unintentional slip of the tongue, at the time it happened.

120.    Ms. Holmstrom's husband, Lars Holmstrom, an Equity Specialist with the Division, also reached out to Ms. Mais and asked to discuss the mistake.

121.    Ms. Mais discussed the mistake briefly with him, during which she apprised him of her concerns about Ms. Avery's racially charged mistreatment of her and of other staff members during the training sessions.

122.    They discussed the dismissive and disrespectful nature of Ms. Avery's response to Ms. Mais's apology.

123.    Ms. Mais explained that allowing a staff member to mistreat an administrator in such a public and racially charged fashion undermined the administration of the school.

124.    Ms. Mais further explained her concerns with the racially charged and divisive nature of the training itself and the Division's implementation of the training.

125.    The Division ignored these complaints.

**F.    The Division requires Ms. Mais to attend an unrecorded meeting with Dr. Hairston and Ms. Avery to further berate her.**

126.    Within days of the final training, Dr. Hairston advised Ms. Mais that the husband of an unnamed participant in the June 11 training session had complained to Superintendent Haas and that Dr. Hairston was tasked with handling the situation.

127.    Dr. Hairston demanded that Ms. Mais meet with him and Ms. Avery.

128.    He also instructed Ms. Mais to have no contact with Ms. Avery until they could meet.

17

129.    This request impeded Ms. Mais's ability to do her job, as Ms. Mais was an administrator in Ms. Avery's chain of command.

130.    Because of the Division's full-throated embrace of "anti-racism," including its multiple statements that dissent from its approach would not be tolerated, Dr. Hairston's threatening statements about moving people who disagreed "off the bus," and Dr. Hairston's comparison of concerned parents to rapist slave owners, Ms. Mais was afraid of what would happen and how she would be treated at this meeting.

131.    To ensure any such mistreatment was preserved for an objective review, Ms. Mais asked that the meeting be recorded.

132.    Ms. Mais also asked for Ashby Kindler to be present since she was leading the training session in question.

133.    Dr. Hairston agreed to invite Ms. Kindler.

134.    But Dr. Hairston told Ms. Mais that Ms. Avery would also be asked if she would like to have a representative at the meeting.

135.    This made little sense. Ms. Mais had not requested Ms. Kindler to attend as her "ally" or "representative," and did not view her as such for purposes of the meeting.

136.    Indeed, had Ms. Mais been offered to bring someone to serve in the role of "ally" or "representative," she would have chosen someone else.

137.    Ms. Mais simply thought Ms. Kindler's perspective would be useful since she was running the training session.

138.    In response to Ms. Mais's request for the meeting to be recorded, Dr. Hairston told Ms. Mais that she should reach out directly to Ms. Avery to discuss the request.

139.    Ms. Mais viewed that request as odd given that Dr. Hairston had previously instructed her to avoid contact with Ms. Avery.

18

140.   Later, Dr. Hairston told Ms. Mais that he had discussed the recording request with Ross Holden, the Division's attorney, and that Mr. Holden had strongly advised that the meeting not be recorded because the contents of the meeting could be leaked to the press.

141.   Ms. Mais was surprised by this statement since she had never suggested to anyone leaking anything about the meeting to the press, and had not contemplated doing so.

142.   Ms. Mais understood from Dr. Hairston's statement, however, that the Division did not want the way that Dr. Hairston conducted this session to be subject to public scrutiny.

143.   By disclosing to Ms. Mais the substance of Mr. Holden's legal advice to the Division and using that advice as a weapon against her, Dr. Hairston waived the Division's attorney-client privilege with respect to all matters related thereto.

144.   In lieu of recording the meeting, Dr. Hairston suggested asking Ms. Kindler to take notes.

145.   Ms. Mais was concerned about this suggestion because, based on her experience, she understood that note-taking is a poor substitute for a verbatim record, as notes provide only one perspective on what was said, depend on the note-taker's ability to write down what was being said while participating in the meeting herself, do not reflect tone, body language and volume, and are subject to conscious and unconscious manipulation.

**G.    Ms. Avery and her comrades continue harassing Ms. Mais, and the Division refuses to stop it.**

146.   Before the meeting, multiple employees told Ms. Mais that Ms. Avery and her friends were openly slandering Ms. Mais at work, openly cursing about her and calling her vulgar names at work, telling other employees she was a racist and

that she intentionally demeaned black people, and trying to turn other employees against her.

147.    These employees told Ms. Mais that they were afraid to defend her or to seem close to her because they would suffer retaliation and become targets of similar abusive behavior.

148.    The racially harassing and abusive comments made about Ms. Mais included calling her, "That white racist bitch" and "That two-faced racist bitch."

149.    Ms. Mais complained to her principal, Dr. Mike Irani, about this hostile and racially harassing behavior, and the broader problem that the *Courageous Conversations* curriculum and the Division's implementation of it created a racially hostile and divisive environment.

150.    He refused to take any action to address it.

151.    Ms. Mais explained that the harassment was causing her substantial emotional distress, preventing her from focusing on her job, and making it impossible for her to effectively manage the employees involved in the harassment.

152.    Ms. Mais also explained that several staff members had confidentially approached her in tears because they felt they could not speak up or share their perspective.

153.    Dr. Irani did nothing in response to this information.

**H.    The Division continues to harass Ms. Mais at the unrecorded meeting.**

154.    On Friday, August 6, 2021, Ms. Mais attended the required unrecorded meeting with Dr. Hairston and Ms. Avery.

155.    Ms. Avery brought Ms. Holmstrom to the meeting as her "ally."

156.    At the meeting, Ms. Avery claimed to be speaking for a group of black employees and stated that she did not accept Ms. Mais's apology for unintentionally

using the words "colored people" instead of "people of color," before quickly apologizing.

157.   Throughout the meeting, Ms. Avery chastised Ms. Mais for her slip of the tongue.

158.   Ms. Mais asked Ms. Avery if it would have been better if she had said "people of color," as she had intended, and Ms. Avery responded that she was not comfortable with that term either, even though the Division itself uses the term "people of color" in its Anti-Racism Policy.

159.   Ms. Mais offered additional apologies on multiple occasions throughout the meeting.

160.   When Ms. Mais tried to explain herself, Ms. Avery continued to berate her. Ms. Avery also stated that she assumed participants did not speak as freely in the training sessions as they would at home, giving as an example that she assumed some participants used the N-word at home but not during the training. Ms. Mais explained that she did not appreciate that assumption, as she would never use that word and did not use the word "colored" outside of the slip of the tongue for which she had already apologized, and she apologized yet again.

161.   Ms. Mais also asked if Ms. Avery had previously had any racial concerns about anything Ms. Mais had said or done, and Ms. Avery affirmed that she had not.

162.   When Ms. Mais tried to explain the detrimental effects of the training sessions on staff morale, the racial divisions the training was causing within the school, and the increasingly racially hostile environment that had resulted, the participants reacted with disbelief and dismissed her concerns.

163.   When Ms. Mais explained that many white participants were afraid to speak during the training sessions for fear that they would say the "wrong" thing and be branded as racists, Ms. Holmstrom stated that they should be afraid to

speak if what they were thinking was not "appropriate," which Ms. Mais understood meant that the Division was in fact policing white participants' speech and was prepared to retaliate against any criticism of its approach.

164.    At the end of the meeting, Dr. Hairston stated that addressing the entire staff concerning Ms. Mais's mistake was the logical next step in the matter.

165.    The purpose of this address would be for Ms. Mais to apologize yet again for her slip of the tongue, even though she had already addressed the staff by apologizing in real time when the incident occurred.

166.    Ms. Mais was not comfortable with addressing the staff given that she had already apologized and made multiple attempts to explain her actions.

167.    But it was made clear to Ms. Mais that she did not have a real choice.

168.    Dr. Hairston also stated that Agnor-Hurt staff likely needed to repeat the *Courageous Conversations* training.

169.    Ms. Mais expressed concern with the notion of repeating the *Courageous Conversations* training given its detrimental effects on staff morale and the racially hostile environment it created.

170.    The participants again dismissed Ms. Mais's concerns.

171.    Near the end of the meeting, Ms. Holmstrom said that she was happy to be at the meeting because she recalled Dr. Hairston's frequent statement that failing to speak out in the face of a racist incident was to be complicit in racism.

172.    By this statement, despite Ms. Mais's multiple apologies, her agreement to apologize yet again to school employees, and her visible tears at the way she was being treated, Ms. Holmstrom continued to accuse Ms. Mais of racism with the approval of the Division over a simple slip of the tongue.

173.    The way the Division treated Ms. Mais for making a simple slip of the tongue stands in stark contrast to its treatment of Ms. Avery and Dr. Hairston.

174. Dr. Hairston was permitted to compare white parents to rapist slave owners with the support of the Division, whereas Ms. Mais was forced to apologize repeatedly for an unintentional slip of the tongue while being told that her apologies were not accepted and were insufficient.

175. The Division's mistreatment of Ms. Mais also stands in stark contrast to the way Ms. Avery was permitted to make racially charged comments about white people throughout the training sessions and permitted to racially harass Ms. Mais and slander her with impunity, including call her "That white racist bitch" and "That two-faced racist bitch."

176. At the end of the meeting, Ms. Mais was in tears. Based on the conduct of the other meeting attendees, it had become clear to her that no apology she offered would ever be sufficient to satisfy school leadership.

177. After Ms. Mais left the meeting, Dr. Hairston, Ms. Avery, and Ms. Holmstrom stayed behind to talk without her.

178. Ms. Mais went by Dr. Irani's office and, still visibly crying, told him she would catch up with him on Monday.

**I.  Ms. Mais attempts to recover from the mental and emotional distress caused by the racial and retaliatory harassment inflicted on her by the Division.**

179. Ms. Mais spent the weekend in severe emotional distress at the way she had been treated and the continued refusal of school leadership to accept her apology and appreciate her mistake for what it obviously was: a slip of the tongue for which she had repeatedly apologized.

180. The following Monday, Ms. Mais came into work and spoke with Dr. Irani.

181.   Ms. Mais told him that she was very uncomfortable with the way she was treated during the August 6 meeting and the racial hostility she continued to experience.

182.   Ms. Mais told him that she would need to seek treatment from her primary care doctor because of the emotional distress she was experiencing, which included numerous physical manifestations, such as an inability to sleep, panic attacks, breaking out in hives, rapid heartbeat, shortness of breath, hyperventilating, headaches, nausea, depression, loss of appetite, and an inability to focus on daily activities.

183.   Dr. Irani encouraged her to seek treatment. She tried to do so but did not receive an immediate response from her primary care doctor.

184.   By Wednesday morning, Ms. Mais was unable to work because of the anxiety attacks she was experiencing.

185.   Thus, Ms. Mais took three days off—Wednesday to Friday—due to the emotional distress caused by the Division's severe and pervasive harassment of her.

## J.   Ms. Mais reports her harassment to numerous Division officials, none of whom take any action to stop it.

186.   During and after that time, Ms. Mais continued to discuss with Dr. Irani her distress over the mistreatment she experienced.

187.   On August 15, 2021, Ms. Mais left a voice message for Division HR employee Lorna Gerome to complain about how the Division and Dr. Hairston were handling her situation.

188.   On August 17, 2021, Ms. Mais spoke with Ms. Gerome and explained the racially charged mistreatment she had experienced, including the harassment by employees at Agnor-Hurt, and her concerns that the *Courageous Conversations* training was creating a racially charged, hostile, and divisive environment.

189.   Ms. Gerome told Ms. Mais she would take the matter to Assistant Superintendent Dr. Clare Keiser.

190.   Dr. Keiser is one of two assistant superintendents in the Division, the other being Dr. Hairston.

191.   Upon information and belief, Dr. Keiser is the assistant superintendent with responsibility for human resources.

192.   On August 19, 2021, Ms. Mais met with Dr. Keiser.

193.   In that meeting, Ms. Mais explained to Dr. Keiser the racially charged mistreatment she had experienced and her concerns that the *Courageous Conversations* training was creating a racially charged, hostile, and divisive environment.

194.   Dr. Keiser told Ms. Mais that it had been inappropriate for Dr. Hairston to conduct the August 6, 2021, meeting without HR's involvement, and that he had been instructed to involve HR before conducting meetings of this nature in the future.

195.   While Dr. Keiser expressed empathy for the situation, she did not provide any concrete plan of action for handling Ms. Mais's concerns.

196.   On August 27, 2021, Daphne Keiser from Division HR met with Ms. Mais in person to discuss her concerns.

197.   During that in-person meeting, Ms. Mais told Ms. Keiser about the racially hostile environment, the race-based mistreatment she was experiencing, and her concern that the *Courageous Conversations* training was creating a racially hostile and divisive environment.

198.   Ms. Keiser also appeared to empathize but again did not offer any concrete steps for addressing the concerns or the harassment Ms. Mais was experiencing.

25

199.   Instead, Ms. Keiser, who is black, shared that she had also had difficult interactions with Dr. Hairston and that she also had concerns about the Division's approach to "anti-racism" training and the environment that it created.

200.   Ms. Keiser, however, made it clear that she was unable to address the mistreatment Ms. Mais was experiencing.

201.   Based on Ms. Mais's conversations with Dr. Irani, two HR employees, and an Assistant Superintendent, it was obvious to Ms. Mais that the Division would not take any action to correct the race-based or retaliatory mistreatment she was experiencing or the broader problems with the racist nature of the *Courageous Conversations* training.

202.   The upshot of these interactions was that the Division was requiring Ms. Mais to attempt to lead a group of employees who were empowered to curse about her, call her vulgar names, call her a "white racist bitch," attempt to turn other employees against her, and create an environment in which employees dared not appear to support her or be close to her.

203.   In short, the Division continued to permit other employees to publicly chastise and humiliate Ms. Mais over a slip of the tongue for which she repeatedly apologized.

204.   Further, the racially hostile environment of the school in which white employees were stereotyped, demeaned, harassed, and dismissed with the Division's encouragement and blessing would not be changed.

**K.   The Division constructively discharges Ms. Mais and then asks her to lie about it.**

205.   For the sake of her physical and mental health and because multiple meetings, communications, and conversations with school and district leadership demonstrated that there was no hope of improvement in the objectively intolerable

26

working conditions to which she was subjected, Ms. Mais resigned on August 29, 2021, effective September 10, 2021.

206.    At the Division's request, Ms. Mais agreed to send a letter to Agnor-Hurt families concerning her departure.

207.    The Division's communications officer asked Ms. Mais to say that she was leaving to explore another career opportunity, which was untrue.

208.    Because it would not be good for Ms. Mais's career to leave the Division on bad terms, she reluctantly agreed to the Division's request that she state in the letter that she was leaving to be available to her own family.

209.    It was obvious to Ms. Mais that the Division did not want families to know the real reason she was leaving.

**L.    Ms. Mais is required to undergo a ritual shaming to remain on good terms with the Division.**

210.    Despite her resignation, Ms. Mais was asked to offer yet another public apology at a staff meeting on September 9, 2021.

211.    It was important to Ms. Mais's career that she leave the Division on good terms because of her need to find future employment and her desire to continue working in education within the tightknit educational community of Albemarle County.

212.    It also was clear to Ms. Mais that the apology was expected regardless of her resignation. Thus, to remain on good terms with the Division and to enable her to secure a job elsewhere, she reluctantly agreed to offer one last apology on September 9.

213.    On September 8, 2021, Ms. Mais met with Dr. Irani, Ms. Avery, and Ms. Holmstrom to discuss what would be said at the apology meeting the following day.

214.   Before the September 8 pre-meeting, Ms. Mais spent anguished hours upon anguished hours working on her draft apology, all the while reliving the mistreatment she had endured.

215.   If she had to go through with the apology, Ms. Mais wanted to be open and honest with her colleagues about the totality of her experience in the hope that something good would come of it.

216.   At the September 8, 2021 pre-meeting, Ms. Mais presented her draft apology to Dr. Irani, Ms. Avery, and Ms. Holmstrom.

217.   In addition to including a clear apology, this draft also included a discussion of how difficult the incident had been for Ms. Mais, the emotional toll of having her intentions misunderstood and her explanations not accepted, and her concerns with the *Courageous Conversations* training.

218.   Before she could even get all the way through her draft, Ms. Avery cut Ms. Mais off and told her that she should not discuss her feelings because no one cared about them.

219.   Ms. Holmstrom told Ms. Mais that by discussing her feelings and her hurt, she was inappropriately acting in a racist fashion like a typical defensive white person as outlined in the *Courageous Conversations* curriculum.

220.   Dr. Irani was present for this mistreatment and refused to correct it.

221.   The message from the participants at the meeting to Ms. Mais was clear: she was not allowed to voice—even mildly—the mistreatment she had experienced because of her race and in retaliation for her opposition to the curriculum and the way she was being treated.

222.   Likewise, she was not allowed to express any hurt or discomfort from her serial mistreatment by district officials because, as a white person, expressing such emotions would be racist. Even though her discomfort was evident to her colleagues, many of whom quietly and fearfully empathized with her.

223.   By muzzling Ms. Mais and preventing her from sharing her true beliefs with her colleagues, the Division engineered the apology session to be nothing more than a ritual shaming of Ms. Mais for a slip of the tongue for which she had already repeatedly apologized.

224.   On September 9, 2021, Ms. Mais, as requested, presented another apology in front of staff.

225.   The apology was presented in a specially called meeting that took place after students were dismissed for the day.

226.   Upon information and belief, the Division invited all 2021-2022 Agnor-Hurt teachers to the apology meeting, including those who were not employed at the school at the time of the June 11, 2021, training session and thus did not attend that training session.

227.   Upon information and belief, the Division also invited all of the black teacher's aides at the school to the apology meeting.

228.   Upon information and belief, the Division did not invite any of the white teacher's aides at the school to the apology meeting, and did not even tell the white teacher's aides that any meeting would take place during that time period.

229.   Being required to apologize to staff members who were not even employed at the time of Ms. Mais's slip of the tongue served no useful purpose and was designed only to humiliate Ms. Mais.

230.   At the apology meeting, a group of black employees, mostly teachers' aides, wore camouflage pants and black t-shirts.

231.   This group sat with Ms. Avery near the front of the room, the area from which Ms. Mais would give her apology.

232.   These employees were permitted to attend the apology meeting, wear threatening and combative attire, and sit near the area from which Ms. Mais would speak.

233.    At the apology meeting, Dr. Irani asked Ms. Mais and Ms. Avery a series of questions with limited time to respond.

234.    As required, Ms. Mais gave her apology in response to one of the questions, but the apology was stripped of much of what Ms. Mais wanted to say.

235.    When Ms. Avery responded to Dr. Irani's questions, she parroted racist talking points from the *Courageous Conversations* training, including a discussion about the relationship of Ms. Mais's mistake to "white privilege."

236.    Ms. Avery also accused staff members of mistreating students of color.

237.    Ms. Avery cited no evidence for this claim, which was untrue and deeply offensive.

238.    Ms. Avery warned staff members that she was watching them for perceived racist behavior.

239.    Instead of accepting Ms. Mais's apology, Ms. Avery subjected her to further racial and retaliatory harassment by telling staff that they could either be on her side or Ms. Mais's side and that there was no in-between.

240.    On information and belief, from beginning to end, the apology meeting was carefully orchestrated by district officials to humiliate, shame, and traumatize Ms. Mais for an accidental slip of the tongue in order to make an example of her and to communicate to other district employees the type of punishment that would occur if anyone dared question the new reigning anti-racist orthodoxy, which is racist at its core.

241.    Following this ritual shaming of Ms. Mais, numerous white employees were visibly crying.

242.    Directly after the ritual shaming session, Mr. Lars Holmstrom began the next session, which was an overview of the training plan for Agnor-Hurt over the next two years.

243. When a white staff member complained that it was inconsiderate to jump right into a new topic instead of giving people ample time to reflect upon such emotionally charged statements and to digest what they had just witnessed, Mr. Holmstrom said the lack of consideration the staff member was feeling was what people of color have experienced over the years because of their skin color.

244. This again sent the message that white staff members could not voice concern about any aspect of the Division's training without being branded as racially insensitive.

245. At the end of the meeting, one of the white employees in attendance gave Ms. Mais a hug.

246. Ms. Mais warned her not to do so because Ms. Mais feared she would be targeted for associating with her.

247. Later that day, Ms. Avery confronted the employee for being friendly with Ms. Mais.

**M.    Ms. Avery spends Ms. Mais's last day harassing her and intimidating employees who want to tell Ms. Mais goodbye.**

248. On September 10, 2021, which was Ms. Mais's last day of employment, Ms. Avery stood near Ms. Mais's office for approximately one hour watching who came in and out to tell her goodbye.

249. Ms. Avery was not assigned to work in that location, and there were no work-related reasons for her to camp right outside of Ms. Mais's office.

250. At times during the morning, Ms. Avery also sat in the lounge right beside Ms. Mais's office in view of Ms. Mais's office where she could see who came and went from the office.

251. Staff are permitted to go into the lounge for breaks, but it was not common for Ms. Avery to do so.

31

252.   Ms. Mais complained to Dr. Irani about Ms. Avery's watchful and intimidating presence.

253.   Dr. Irani did nothing.

254.   Instead of spending her last day saying goodbye to her colleagues, Ms. Mais spent the day in her office, as she could see that Ms. Avery was watching her, and she was afraid of the repercussions to anyone with whom she had a friendly interaction.

255.   After the workday, many of Ms. Mais's colleagues held an unofficial going away party for her to express their appreciation for her leadership and sympathize with her plight.

256.   The gathering was held off-campus and outside of work hours.

257.   At the gathering, many of the staff members expressed their concern about the shocking nature of Ms. Mais's ritual shaming, the abhorrent mistreatment of Ms. Mais by Ms. Avery and others, and the hostile environment at the school.

**N.   Ms. Mais administratively exhausts her claims under the Virginia Human Rights Act.**

258.   On November 17, 2021, Ms. Mais filed a Charge of Discrimination with the Virginia Attorney General's Office of Civil Rights.[4]

259.   On January 18, 2022, the Office of Civil Rights closed its file and forwarded the Charge to the U.S. Equal Employment Opportunity Commission.[5]

260.   The Office of Civil Rights confirmed to Ms. Mais's counsel that the Office will not further process the Charge.[6]

261.   Accordingly, Ms. Mais's administrative remedies under the Virginia Human Rights Act are exhausted.

---

[4] The Office of Civil Rights letter confirming receipt of the Charge is attached as Exhibit 6.
[5] The closure letter is attached as Exhibit 7.
[6] The e-mail from the Office of Civil Rights is attached as Exhibit 8.

262.   This lawsuit is filed within 90 days of the exhaustion of Ms. Mais's administrative remedies.

## IV.   Legal Claims

### A.   Count 1 – Violation of Article I, Section 12 of the Virginia Constitution (Free Speech)

263.   Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 262 of this complaint.

264.   The Virginia Constitution provides that "the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects." Va. Const. Art. I, § 12.

### *Speech Retaliation*

265.   Ms. Mais communicated her views concerning the content, structure, and implementation of the *Courageous Conversations* training and the Division's broader anti-racism efforts to numerous Division officials, including but not limited to her view that the training material promoted racial hostility and divisiveness.

266.   When she communicated those views, she was speaking as a private citizen on a matter of public concern and engaging in expression the Virginia Constitution protects.

267.   Ms. Mais's interest as a private citizen discussing matters of public concern outweighs the Division's interest in the efficient provision of services.

268.   The Division retaliated against Ms. Mais for communicating her views by, among other things, allowing subordinates to harass her with impunity, subjecting her to a carefully orchestrated and hostile meeting with Dr. Hairston, forcing her to apologize over and over again for a slip of the tongue, subjecting her to a ritual shaming session in front of her peers, subjecting her to significant

33

emotional distress, making it impossible for her to effectively do her work, and making it clear that the racial hostility and harassment she was experiencing would never be stopped.

269.    The Division's retaliatory actions would deter a person of ordinary firmness from exercising her right to free speech in the future, and, indeed, Ms. Mais was deterred from continuing to express her opinions.

***Compelled Speech / Restraint on Speech***

270.    The Division compelled and sought to compel Ms. Mais to affirm and express messages that violated her deeply held beliefs.

271.    Specifically, the Division advised Ms. Mais and other Division employees that the failure to fully embrace the Division's "anti-racism" program would result in employees "get[ting] off the bus," meaning ending their employment.

272.    Thus, throughout the *Courageous Conversations* training, Division employees, including Ms. Mais, were required to affirm the philosophy advanced by the training program.

273.    Further, after Ms. Mais voluntarily and forthrightly apologized for her slip of the tongue, the Division compelled her to apologize again and again, effectively making her send the message that her prior apologies were ineffective or deficient, even though Ms. Mais did not believe they were.

274.    The Division further restrained Ms. Mais's constitutionally protected speech by prohibiting her from communicating her complete views when she offered her final apology, which would have included a discussion of the hostility and divisiveness caused by the Division's training program.

275.    Government action that compels or restricts speech must satisfy strict scrutiny.

276.    The Division had no legitimate (much less compelling) interest in compelling affirmation of its racist training program, compelling Ms. Mais to

communicate that her apologies were ineffective or deficient, or restraining her from offering her complete views when she apologized for the final time, nor were the Division's actions the least restrictive means of achieving any legitimate objectives.

### *Viewpoint Discrimination*

277.   The Division subjected Ms. Mais to punishment because of the views she expressed on matters of public concern—expression that is protected by the Virginia Constitution.

278.   The Division subjected Ms. Mais to punishment because of the content and viewpoints expressed in Ms. Mais's speech.

279.   The Division considered the content and viewpoint of Ms. Mais's speech when it decided to retaliate against her for it.

280.   The Division exercised unbridled discretion when it punished Ms. Mais for expressing her views regarding the *Courageous Conversations* training and the Division's broader anti-racism efforts.

281.   The Division has allowed and failed to punish speech by other Division employees that expressed different views concerning the *Courageous Conversations* training and/or the Division's broader anti-racism efforts.

282.   The Division's policies and enforcement of those policies are unconstitutionally overbroad because they restrict a significant amount of constitutionally protected speech.

283.   The overbreadth of these policies chilled the speech of Ms. Mais, who sought to engage in protected expression, including expression concerning the *Courageous Conversations* training and the Division's broader anti-racism efforts.

284.   The overbreadth of these policies chills the speech of all employees who might seek to engage in protected expression, including expression concerning the *Courageous Conversations* training and/or the Division's broader anti-racism efforts.

***Free Speech Violations***

285.   By retaliating against Ms. Mais for engaging in constitutionally protected speech, chilling Ms. Mais from engaging in constitutionally protected speech, compelling her to affirm and express views with which she disagreed, restraining her from expressing her complete views, and discriminating against Ms. Mais based on the content / viewpoint of her constitutionally protected speech, the Division violated the Virginia Constitution.

286.   The Division's constitutional violations caused Ms. Mais damage, including the loss of her job, financial losses, emotional distress, pain, and suffering.

## B.   Count 2 – Wrongful Discharge in Violation of Public Policy

287.   Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 286 of this complaint.

288.   As set forth above, the Division repeatedly trampled on Ms. Mais's constitutional right to free expression by retaliating against her, chilling her speech, compelling her to affirm messages with which she disagreed, restraining her speech, and discriminating against her based on the content / viewpoint of her speech.

289.   These actions created an objectively hostile environment in which it was clear that Ms. Mais would be subjected to continuing harassment, abuse, and public humiliation because of her constitutionally protected speech, and would continually be forced to put her health at risk.

290.   The environment was so objectively intolerable that a reasonable person could not be expected to endure it and would feel compelled to resign.

291.   By creating and maintaining this environment, the Division constructively discharged Ms. Mais, who resigned because of the constructive discharge effective September 10, 2021.

292.   The Division's constructive discharge of Ms. Mais was willfully and wantonly negligent and in conscious disregard of Ms. Mais's constitutional rights, or with reckless indifference to the consequences and awareness of the injury being caused to Ms. Mais.

293.   The Division's constructive discharge of Ms. Mais violated the clear public policy of Virginia embodied in Article I, Section 12 of the Virginia Constitution.

294.   The Division's constructive discharge of Ms. Mais caused her substantial damage, including the loss of her job, financial losses, emotional distress, pain, and suffering.

## C.   Count 3 – Racially Hostile Work Environment in Violation of the Virginia Human Rights Act

295.   Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 294 of this complaint.

296.   The Virginia Human Rights Act prohibits employers from discriminating against employees in the terms and conditions of employment on the basis of race.

297.   The Division is an employer subject to the Virginia Human Rights Act because it employs more than 15 people and is a "person" as defined in Va. Code § 1-230 because it is a "government" and/or "political subdivision."

298.   The Division subjected Ms. Mais to harassment and a hostile work environment based on her race in violation of the Virginia Human Rights Act.

299.    Enduring such an environment was a condition of Ms. Mais's continued employment.

300.    The harassment to which the Division subjected Ms. Mais was unwelcome.

301.    The harassment was so severe and pervasive as to create an objectively hostile and abusive work environment.

302.    The harassment was perpetrated by employees with supervisory authority over Ms. Mais.

303.    The harassment was also perpetrated by employees without such authority, but with the express or implied permission of the Division, and the Division negligently failed to stop the harassment despite due notice of the same.

304.    Ms. Mais complained about the harassment to her principal, a Division-designated equity specialist, an Assistant Superintendent, and multiple employees in the Division's human resources office.

305.    Despite Ms. Mais's multiple complaints, the Division made no attempt to investigate or remedy the hostile work environment.

306.    The Division's refusal to address the hostile work environment was willfully and wantonly negligent and in conscious disregard of Ms. Mais's statutory rights, or with reckless indifference to the consequences and awareness of the injury being caused to Ms. Mais.

307.    Ms. Mais is entitled to compensatory and punitive damages for the Division's violation of the Virginia Human Rights Act.

**D.    Count 4 – Constructive Discharge Based on Race in Violation of the Virginia Human Rights Act**

308.    Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 307 of this complaint.

309.   The Virginia Human Rights Act prohibits employers from discriminating against employees in the terms and conditions of employment on the basis of race.

310.   The Division is an employer subject to the Virginia Human Rights Act because it employs more than 15 people and is a "person" as defined in Va. Code § 1-230 because it is a "government" and/or "political subdivision."

311.   The Division subjected Ms. Mais to harassment and a hostile work environment based on her race in violation of the Virginia Human Rights Act.

312.   Enduring such an environment was a condition of Ms. Mais's continued employment.

313.   The harassment to which the Division subjected Ms. Mais was unwelcome.

314.   The harassment was so severe and pervasive as to create an objectively hostile and abusive work environment.

315.   The harassment was perpetrated by employees with supervisory authority over Ms. Mais.

316.   The harassment was also perpetrated by employees without such authority, but with the express or implied permission of the Division, and the Division negligently failed to stop the harassment despite due notice of the same.

317.   Ms. Mais complained about the harassment to her principal, a Division-designated equity specialist, an Assistant Superintendent, and multiple employees in the Division's human resources office.

318.   Despite Ms. Mais's multiple complaints, the Division made no attempt to investigate or remedy the hostile work environment.

319.   Based on the Division's repeated inaction, there was no reasonable prospect of any improvement in the hostile environment.

320.    The environment was so objectively intolerable that a reasonable person could not be expected to endure it and would feel compelled to resign.

321.    By creating and maintaining this environment, the Division constructively discharged Ms. Mais, who resigned because of the constructive discharge effective September 10, 2021.

322.    The Division's constructive discharge of Ms. Mais was willfully and wantonly negligent and in conscious disregard of Ms. Mais's statutory rights, or with reckless indifference to the consequences and awareness of the injury being caused to Ms. Mais.

323.    Ms. Mais is entitled to compensatory and punitive damages for the Division's violation of the Virginia Human Rights Act.

**E.    Count 5 – Retaliatory Hostile Work Environment in Violation of the Virginia Human Rights Act**

324.    Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 323 of this complaint.

325.    The Virginia Human Rights Act prohibits employers from discriminating against employees because they have opposed a practice made unlawful by the Act.

326.    The Division is an employer subject to the Virginia Human Rights Act because it employs more than 15 people and is a "person" as defined in Va. Code § 1-230 because it is a "government" and/or "political subdivision."

327.    Ms. Mais engaged in protected activity by, among other things, complaining on multiple occasions to multiple supervisory-level employees of the Division about the hostile environment created by the training curriculum and her own race-based mistreatment.

328.   In response, the Division did not investigate or remedy any of the unlawful practices about which she complained.

329.   Instead, the Division upped the ante, including by subjecting her to a meeting with Dr. Hairston designed to humiliate and shame her, giving Ms. Avery and her companions free rein to abuse her and make her life miserable, preventing her colleagues from being visibly associated with her, telling her that expressions of hurt and distress were further proof of her racism, telling her that she was not permitted to discuss her feelings, and ritually shaming and intimidating her in front of her colleagues, all in retaliation for engaging in protected activity.

330.   The Division's retaliatory behavior was unwelcome.

331.   It was also so severe and pervasive as to create an objectively hostile and abusive work environment.

332.   The Division's creation and maintenance of this environment was willfully and wantonly negligent and in conscious disregard of Ms. Mais's statutory rights, or with reckless indifference to the consequences and awareness of the injury being caused to Ms. Mais.

333.   Ms. Mais is entitled to compensatory and punitive damages for the Division's violation of the Virginia Human Rights Act.

## F.   Count 6 – Retaliatory Constructive Discharge in Violation of the Virginia Human Rights Act

334.   Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 333 of this complaint.

335.   The Virginia Human Rights Act prohibits employers from discriminating against employees because they have opposed a practice made unlawful by the Act.

41

336.   The Division is an employer subject to the Virginia Human Rights Act because it employs more than 15 people and is a "person" as defined in Va. Code § 1-230 because it is a "government" and/or "political subdivision."

337.   Ms. Mais engaged in protected activity by, among other things, complaining on multiple occasions to multiple supervisory-level employees of the Division about the hostile environment created by the training curriculum and her own race-based mistreatment.

338.   In response, the Division did not investigate or remedy any of the unlawful practices about which she complained.

339.   Instead, the Division upped the ante, including by subjecting her to a meeting with Dr. Hairston designed to humiliate and shame her, giving Ms. Avery and her companions free rein to abuse her and make her life miserable, preventing her colleagues from being visibly associated with her, telling her that expressions of hurt and distress were further proof of her racism, telling her that she was not permitted to discuss her feelings, and ritually shaming and intimidating her in front of her colleagues, all in retaliation for engaging in protected activity.

340.   The Division's retaliatory behavior was unwelcome.

341.   It was also so severe and pervasive as to create an objectively hostile and abusive work environment.

342.   Based on the Division's repeated inaction and the apparent worsening of the environment with each complaint, there was no reasonable prospect of any improvement in the hostile environment.

343.   The environment was so objectively intolerable that a reasonable person could not be expected to endure it and would feel compelled to resign.

344.   By creating and maintaining this retaliatory hostile work environment, the Division constructively discharged Ms. Mais, who resigned because of the constructive discharge effective September 10, 2021

42

345.    The Division's constructive discharge of Ms. Mais was willfully and wantonly negligent and in conscious disregard of Ms. Mais's statutory rights, or with reckless indifference to the consequences and awareness of the injury being caused to Ms. Mais.

346.    Ms. Mais is entitled to compensatory and punitive damages for the Division's violation of the Virginia Human Rights Act.

## V.    PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, Plaintiff Emily Mais hereby demands a jury trial on all of her claims and respectfully requests that the Court enter judgment in her favor for:

1.      Back pay;

2.      Front pay;

3.      Compensatory damages, including but not limited to damages for her lost wages, emotional distress, pain, and suffering;

4.      Punitive damages;

5.      Her reasonable attorneys' fees and costs; and

6.      Such other legal and/or equitable relief as the Court may deem just and proper.

Respectfully submitted this 12th day of April, 2022.

Tyson C. Langhofer
VA Bar No. 95204
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
tlanghofer@ADFlegal.org

43

RYAN BANGERT*
TX Bar No. 24045446
KATE ANDERSON*
AZ Bar No. 33104
HENRY W. FRAMPTON, IV*
SC Bar No. 75314
ALLIANCE DEFENDING FREEDOM
15100 N 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbangert@ADFlegal.org
kanderson@ADFlegal.org
hframpton@ADFlegal.org

*Attorneys for Plaintiff*

*Pro Hac Vice* applications forthcoming

44

## Declaration Under Penalty of Perjury

I, Emily Mais, a citizen of the United States and a resident of the State of Virginia, hereby declare under penalty of perjury that I have read the foregoing and that the foregoing is true and correct to the best of my knowledge.

Executed this __12__ day of April, 2022, at Lansdowne, Virginia.

DEBRA LYNN HARDIN
Notary Public
Commonwealth of Virginia
Registration No. 7872920
My Commission Expires Jul 31, 2024

_____
Emily Mais

_____
Debra Hardin