COMMONWEALTH OF VIRGINIA

IN THE CIRCUIT COURT FOR THE COUNTY OF ALBEMARLE

| | |
|---|---|
| **EMILY MAIS,** | Case No. CL22000496-00 |
| *Plaintiff,* | |
| vs. | SECOND AMENDED COMPLAINT |
| **ALBEMARLE COUNTY SCHOOL BOARD,** | |
| Serve: Albemarle County School Board | JURY TRIAL DEMANDED |
| 410 McIntire Rd, Room 345 | |
| Charlottesville, VA 22902 | |
| *Defendant.* | |

## I.     INTRODUCTION

1.     Plaintiff Emily Mais was an Assistant Principal at Agnor-Hurt Elementary School, which is part of Albemarle County Public Schools ("ACPS"). She loved her job. She was forced out of that job in September 2021, however, because she questioned Defendant's implementation in the school district of a radical program that scapegoats, stereotypes, labels, and ultimately divides people based on race.

2.     Assigning negative characteristics to people, harassing them, or discriminating against them because of their race is a great moral wrong. That is racism, and it should be opposed wherever it is found.

3.     Defendant claims it wants to eliminate racism in its school system, but, unfortunately, its policies and practices do the exact opposite.

1

**EXHIBIT**

5

4.      Instead of training faculty members to embrace students of all races, Defendant uses a teacher training curriculum that promotes racial division and encourages racial harassment.

5.      The curriculum, based on *Courageous Conversations about Race* by Glenn Singleton, attributes negative characteristics to some people, and positive characteristics to others, based solely on their race. Glenn Singleton, *Courageous Conversations About Race: A Field Guide for Achieving Equity in Schools* (2nd ed. 2014).

6.      The curriculum embraces an ideology—sometimes called "critical race theory" or "critical theory"—that views everything and everyone through the lens of race.

7.      The Virginia Superintendent of Public Instruction has expressly recognized that *Courageous Conversations* promotes inherently divisive concepts that are harmful to students and staff members alike. On February 23, 2022, Superintendent Jillian Barlow sent a letter to Governor Glenn Youngkin and Secretary Aimee Guidera which expressly identifies *Courageous Conversations* as an example of critical race theory-based materials being used in Virginia schools.[1]

8.      For example, the curriculum teaches that acts of "racism" can only be committed by members of the "dominant race," which it defines as white people.

9.      It further teaches that "Whiteness is characterized by a sense of entitlement," and that claims of reverse racism are inherently racist. Singleton, *supra*, at 226.

10.     The curriculum sets up a classic Catch-22, in which a white person's objections to the content of the curriculum are simply evidence that he or she is a racist who needs further training on the curriculum.

---

[1] A true and correct copy of this letter is attached to this Complaint as Exhibit 1.

2

11.    Unfortunately for her, Ms. Mais was caught in that Catch-22.

12.    When Ms. Mais complained about the curriculum and protested reverse racism, she was branded a racist, severely and pervasively harassed, relentlessly humiliated, and ultimately compelled to resign from a job that she loved to preserve her mental health.

## II.    PARTIES, JURISDICTION, AND VENUE

### A.    Plaintiff Emily Mais

13.    Ms. Mais is a citizen and resident of Albemarle County, Virginia.

14.    Ms. Mais was employed by the Defendant as Assistant Principal of Agnor-Hurt Elementary School from October 2018 until her constructive discharge on September 10, 2021.

15.    All of the key events of Ms. Mais's employment, including the discrimination, harassment, and constructive discharge to which she was subjected, took place in Albemarle County.

### B.    Defendant School Board of Albemarle County, Virginia

16.    Defendant School Board of Albemarle County, Virginia ("Defendant" or the "Division") is the public corporate body, with the power to sue and be sued, that governs Albemarle County Public Schools.

17.    The Division is a political subdivision of the Commonwealth of Virginia.

18.    The Division derives its authority from the Commonwealth of Virginia and acts under the authority of the Commonwealth of Virginia.

19.    The Division employs all administrators and teachers that work in Albemarle County Public Schools.

3

20.     The Division was Ms. Mais's employer from October 2018 until September 10, 2021.

C.     **Jurisdiction and Venue**

21.     This Court has subject matter and personal jurisdiction under Va. Code §§ 17.1-513, 8.01-328.1.

22.     This Court has authority to award the requested relief, including damages, costs, and attorneys' fees under Va. Code § 2.2-3908.

23.     Venue is proper in this judicial circuit under Va. Code § 8.01-261 because Plaintiff filed this Complaint in the Circuit Court of the county where the acts supporting this Complaint took place and because the Division has its place of business in this Circuit.

III.     **FACTUAL BACKGROUND**

A.     **Emily Mais builds a successful career in educational administration.**

24.     For as long as she can remember, Ms. Mais wanted to be an elementary school teacher.

25.     Ms. Mais pursued her dream of becoming a teacher by obtaining a bachelor's degree in fine arts from Salisbury University in 2003 and a master's degree in teaching from the University of Maryland in 2005.

26.     Beginning in 2005, Ms. Mais worked as an elementary school art teacher for seven years in Maryland, near Washington, D.C.

27.     In 2009, Ms. Mais obtained a certificate in educational administration and supervision from Towson University.

28.     Beginning in 2012, Ms. Mais worked as an elementary school administrator for five years in Maryland, ultimately serving as Assistant Principal

of Greenview Knolls Elementary School in St. Mary's County, Maryland, which is in the Washington, D.C. area.

29.     Ms. Mais has always loved children, and working in elementary education fulfilled her lifelong passion of helping children grow into their best selves.

30.     One of the greatest joys of Ms. Mais's life has been watching hundreds under her teaching and administration develop a passion for learning.

31.     As a Christian, Ms. Mais believes that all human beings are created in the image and likeness of God.

32.     Ms. Mais believes that as image-bearers of God, all people are endowed with inherent dignity and entitled to equal respect.

33.     Ms. Mais believes that a person's race does not determine his or her value or abilities, and that treating people differently because of their race is wrong because it denies the equal dignity and respect that all people deserve as children of God.

34.     Ms. Mais believes that racism is morally evil.

35.     In the words of Dr. Martin Luther King, Jr., Ms. Mais believes that people should "not be judged by the color of their skin but by the content of their character."

36.     Throughout her career, Ms. Mais has worked to instill the values of fairness and equal treatment in her students.

37.     She works to instill those values in her own children.

38.     Throughout her career, Ms. Mais has received nothing but glowing performance reviews.

39.     In 2016, the Maises' daughter, Ruby, was diagnosed with Stage 4 kidney cancer, about six months before her third birthday.

40.   In 2017, after more than a year of shepherding their daughter through grueling medical treatments, the Mais family decided to relocate out of the Washington, D.C. area.

41.   In relocating, they hoped to find a simpler life where they could spend more time with their children and be part of a close-knit community.

42.   They ultimately bought a 3-acre plot and built a small house in Crozet, Virginia, in Albemarle County.

43.   Their journey was featured on the TV program "Tiny House Nation."

44.   A key reason they chose to live in Albemarle County was because the public school system had an excellent reputation.

45.   This was important to them, both because they intended for their children to attend public school, and because Ms. Mais hoped to continue her career as a public-school administrator.

46.   In October 2018, Ms. Mais began working as Assistant Principal of Agnor-Hurt Elementary School in Charlottesville, Virginia.

47.   As in her prior jobs, Ms. Mais received glowing performance reviews throughout her tenure at Agnor-Hurt.

48.   During her time at Agnor-Hurt, Ms. Mais began working on her doctorate in leadership and organizational change from Marymount University.

49.   In addition, the Division selected Ms. Mais as one of two administrators to represent the Division in a leadership academy hosted by the University of Virginia.

**B.   The Division enacts an "Anti-Racism" policy that is racist at its core.**

50.   On February 28, 2019, the Division adopted an "Anti-Racism Policy." Exhibit 2 to this Verified Complaint is a true and accurate copy of the Policy and Policy Regulations.

51.    The Policy states as its purpose the elimination of "all forms of racism from [Albemarle Public Schools]." It then describes how it seeks to accomplish that goal using the framework of critical theory. Ex. 2 at 1.

52.    The Policy focuses on a concept that it calls "equity."

53.    While the term equity looks and sounds like equality, according to materials on which the Policy was based, these terms "actually convey significantly different ideas."[2]

54.    Policy resources explain that "equity" calls for different, not equal, treatment, explaining that "sometimes different groups will be treated differently, but for the aim of eventually creating a level playing field that currently is not the reality." *See supra* n.2.

55.    Thus, the Policy directs that different races must be treated differently, and unequally, just because of membership in a certain racial category. *Id.* No other aspect of personhood is relevant.

56.    Through the Policy, the Division chose to embrace the ideology referred to as "anti-racism."

57.    But because that ideology endorses treating people differently because of their race, promoting racial stereotypes, and teaching that certain racial groups are inherently good or bad, embracing it laid the foundation for a racially hostile work environment within the Division.

58.    In November 2020, the Division launched a mandatory online orientation presentation for all Division staff to introduce the Policy, which Ms. Mais attended. Exhibit 3 to this Verified Complaint is a true and accurate copy of this presentation, the "ACPS Anti-Racism Policy Orientation."

---

[2] Government Alliance on Race & Equity, *Advancing Racial Equity and Transforming Government* (Sept. 2015), https://bit.ly/3GUNESK.

7

59.     During the orientation, the Division presented the Policy's various definitions of "racism" and "anti-racism" and showed a video excerpt from an interview with Ibram X. Kendi discussing his book How to Be an Anti-Racist. Ex. 3 at 9 (The Aspen Institute, *Book Talk with Ibram X. Kendi on "How to Be an Antiracist*, YouTube (Oct. 10, 2019), https://bit.ly/3GUO2Rc.)

60.     In the excerpt, Kendi defined a "racist policy" as any policy that leads to racial inequity; that is, different outcomes for people of different races. Kendi made this explicit soon after in the video, stating: "All that matters is the outcome." Kendi *Book Talk* Video, *supra*, at 20:12.

61.     In his book, Kendi expressly embraces racist discrimination as the answer to racism: "The only remedy to racist discrimination is antiracist discrimination. The only remedy to past discrimination is present discrimination. The only remedy to present discrimination is future discrimination." Ibram X. Kendi, *How to Be an Antiracist* 19 (2019).

62.     During the orientation, the Division suggested that anyone opposed to their Policy was a "racist" and should consider finding a different job.

63.     In a videotaped statement, Dr. Bernard Hairston, the Division's Assistant Superintendent, stated: "If I identify forms of racism, and I do absolutely nothing about it, then I become a practitioner of racism. Now, consider this controversial statement by some researchers: 'You are either a racist or an antiracist.' It is time for you to think about how you will own this required antiracism training and the policy." Ex. 3 at 21 (Alfred Toole, *ARP Dr. Bernard Hairston*, YouTube (Jan. 30, 2021), https://bit.ly/3yOpvKE.) [3]

---

[3] Exhibit 4 to this Verified Complaint is a true and accurate copy of a transcript of Dr. Hairston's comments.

8

64.     Dr. Hairston also stated in the same video that staff needed to think about whether they were on the "antiracism school bus, or if you need help finding your seat and keeping your seat, or if it's time for you to just get off the bus." Ex. 4.

65.     Ms. Mais understood this to mean that any staff members who took issue with any aspect of the Policy or its implementation was likely to lose her job.

**C.     The Division mandates staff training based on the racist *Courageous Conversations* curriculum.**

66.     On March 26, 2021, Ms. Mais attended a mandatory Division-wide professional development webinar session entitled, "Becoming an Anti-Racist School System: A Courageous Conversation," with Glenn Singleton, the author of *Courageous Conversations About Race*. Albemarle County Public Schools, *Anti-Racism Policy Evaluation Report 2020-21: Status Update: Training,* https://bit.ly/3mlxJEX (last visited April 8, 2022).

67.     Mr. Singleton's talk focused on his book and his theories about education, which promote racial stereotypes and advocate differential treatment based on race.

68.     The Division required Agnor-Hurt administrators to conduct a teacher training series based on the Singleton book. Exhibit 5 to this Verified Complaint is a true and accurate copy of excerpts from the PowerPoint slides used to guide this training series.

69.     The Division tasked Ashby Kindler, a former administrator, with leading the training.

70.     From the inception of the training on April 30, 2021, until Ms. Mais's constructive discharge on September 10, 2021, the Division subjected Ms. Mais to a work environment that became increasingly racially hostile over time.

71.    Although billed as "anti-racist," the curriculum and materials stereotyped, demeaned, and dismissed white people as perpetuators of systemic racism.

72.    The materials were replete with pejorative stereotypes of how white people think, speak, and act, as well as stereotypical descriptions of "whiteness," "white culture," "white talk," and "white racial identity."

73.    The materials were equally replete with pejorative stereotypes about how people of color think, speak, and act, all sending the disempowering message that people of color are inherently disadvantaged and wholly dependent upon others to effect positive change.

74.    For example, the material included a slide titled "Communication is a Racialized Tool" that promoted the following stereotypes about how people communicated based solely on their race. Ex. 5. at 4.



**Communication is a Racialized Tool**

| *White Talk* | *Color Commentary* |
|---|---|
| • Verbal: Focused on talking and offering racial meaning through word choice, voice tone, and intonation | • Nonverbal: Focused on offering racial meaning through facial expressions, body movements, and physical gestures |
| • Impersonal: Focused on the sharing of racial perspectives or experiences of someone not immediately present or involved in the conversation. | • Personal: Focused on sharing one's own personal racial narrative, perspectives, or experiences. |
| • Intellectual: Focused on what one thinks (or has read) with respect to race. | • Emotional: Focused on what one feels (or has experienced) with respect to race. |
| • Task oriented: Focused on engaging in dialogue for the purposes of getting something accomplished. | • Process oriented: Focused on engaging in dialogue for the purposes of feeling present, connected, or heard. |

10

75.    The training urged staff to move from a "colorblind" view of race to a "color conscious" scheme and explained that "treat[ing] everyone with respect," regardless of race, is not enough to be "anti-racist." Ex. 5 at 3.



76.    In addition to the racist nature of the curriculum, the Division conducted the training in a racially hostile manner.

77.    For example, it called for participants to discuss inflammatory topics, such as the role of "white privilege" in their lives, in breakout rooms where the conversation could not be monitored by a trained administrator.

78.    In these breakout rooms, white staff members attempting to participate were shut down or dismissed in front of other staff members and told they could not understand the topic because of the color of their skin.

79.    Participants were instructed to comply with the "Four Agreements" set forth in Singleton's book, which were: (1) stay engaged, (2) experience discomfort, (3) speak your truth, and (4) expect and accept non closure. Ex. 5 at 2.

80.    But when white participants attempted to "speak their truth," including Ms. Mais, other participants frequently made hurtful, dismissive, and

racially charged statements to or about white people with no intervention by or recourse from the Division.

81.    The "Four Agreements" contained in the book and as explained by the Division encouraged this kind of behavior by effectively telling staff members that they were free to say things that would harass and hurt others as long as they were "speak[ing their] truth."

82.    In practice, the only harassing and hurtful comments the Division encouraged and allowed were those directed against white faculty members.

83.    Early in the training, a teacher's aide who is black, Sheila Avery, presented herself as a representative of an unnamed group of black employees.

84.    The Division allowed Ms. Avery to speak on behalf of this unknown group.

85.    Throughout the training, Ms. Avery mistreated white employees who attempted to engage with the curriculum by dismissing their comments, telling them they did not/could not understand racism because they were not black, and/or that their racial, cultural, religious, class, and other backgrounds were irrelevant and not worth discussing.

86.    In essence, the training placed white employees in a no-win situation: they were being instructed to engage with the curriculum and to "speak their truth," but, if they did so honestly, they were chastised and told their race prevented them from understanding. Moreover, their comments were dismissed and they were harassed based on their race.

87.    Shortly after the training began, employees began complaining to Ms. Mais about the racially hostile environment created by the training and the training materials and the hurtful and pejorative comments made by other staff members, which demonized them for being white.

88.     For example, one staff member complained to Ms. Mais that it was extremely hurtful to listen to another staff member, in a repeated and contemptuous manner, dismiss every non-black group's experience with prejudice because they were not black.

89.     Ironically, this was a Jewish staff member whose life had been affected by the Holocaust in many ways but was not comfortable sharing her experience because of the repeated comments that only black people had experienced prejudice.

90.     This staff member said that the racially hostile environment depressed her and made her question how much longer she could tolerate attending these sessions or working for a school district that supported this ideology and insulting treatment.

91.     Another staff member complained to Ms. Mais that as a biracial (Asian / White) person, she felt out of place all her life because she is more white-presenting than her family, but she felt she could not express this struggle during training sessions because she is not black.

92.     The staff member told Ms. Mais that she feared Ms. Avery would immediately shut her down if she tried to discuss her situation because she is not black, as Ms. Avery had done to others.

93.     Ms. Mais voiced these concerns to Ms. Kindler as staff members shared concerns about the racially hostile environment.

94.     But Ms. Kindler did not (and likely could not) alter the structure or content of the training to abate the racially hostile environment, and the environment continued.

95.     Indeed, the *Courageous Conversations* curriculum itself creates this kind of hostile environment by teaching that racism is only perpetrated by white people against people of color.

13

**D.    Dr. Hairston compares white parents who express concern about the Division's "anti-racism" policy to rapist slave owners.**

96.    On May 27, 2021, several Albemarle County parents expressed concern with the Division's implementation of its "anti-racism policy," including the *Courageous Conversations* curriculum, during the public comment portion of the School Board meeting.

97.    While these parents agreed that the Division should work to eliminate racism, they expressed serious concern that the Division's "anti-racism" approach was perpetuating the very racism the Division purported to abhor.

98.    Parents also expressed concern with what they perceived to be a lack of transparency and sufficient notice to families concerning the "anti-racism" policies and curricula.

99.    For example, one ACPS parent stated that the anti-racism policy and curriculum create "division and conflict rather than promote positive relationships and mutual respect. They victimize people and force them into categories. They promote equity at the cost of equality. In the name of anti-racism, these ideas and philosophies preach an unending cycle of conflict." k12albemarle, *School Board Meeting- May 27, 2021*, YouTube (May 28, 2021), https://www.youtube.com/ watch?v=4k_4w2RuNOU.

100.    Another ACPS parent told the School Board, "I applaud ACPS for trying to engage students on issues of race and unity. However, I feel the means by which it has done so are misguided in that they overstep the role of school, violate their own policies on political engagement, create a divisive learning environment, misprioritize resources, and set an unsettling precedent of imposing political ideology via school curriculum."] *Id.* at 31:07.

101.    On May 28, 2021, Dr. Bernard Hairston, the Assistant Superintendent in charge of the Division's "anti-racism" policy, addressed the parents' comments in a mandatory administrator's meeting, which Ms. Mais attended.

102.    Dr. Hairston noted that his ancestors were slaves owned by a wealthy Virginia family.

103.    Dr. Hairston stated that he received the parents' comments as if they were slave owners who had raped his mother and sister, beaten him, and were now telling him not to talk about it.

104.    Dr. Hairston further said that the parents who spoke were promoting systemic racism, and he called them protectors of practices ("Pops").

105.    Ms. Mais understood him to mean protectors of *racist* practices.

106.    Dr. Hairston further reiterated that, for administrators like Ms. Mais, implementing the Division's "anti-racism" policy, which included the *Courageous Conversations* training for administrators and teachers as well as a *Courageous Conversations* pilot curriculum for students, was non-negotiable.

107.    Superintendent Matthew Haas and other Division senior leaders at the meeting supported Dr. Hairston's statements.

108.    None of the administrators present—including Dr. Haas—retracted, corrected, or expressed any disapproval of Dr. Hairston's comments.

109.    Dr. Hairston's comments further created a toxic and racially hostile environment by comparing white parents to rapists and slave owners and branding any white person who failed to embrace the Division's ideology as a promoter of systemic racism.

110.    His comments further demonstrated to Ms. Mais that her concerns with the *Courageous Conversations* training, and with the hostile environment created thereby, were falling on deaf ears, and that any good-faith attempt by a

white person to be constructively critical of the training would be branded a racist act and would likely adversely affect the employee's career.

### E.  Ms. Avery verbally abuses Ms. Mais in the final training session.

111.   In the final training session on June 11, 2021, Ms. Kindler presented slides concerning the racial breakdown of the Division's employees and new hires. Ex. 5 at 5-9.

112.   Responding to the slide and its presentation, Ms. Mais suggested that it would be useful to see the same statistics for the applicant pool in order to determine if the racial disparity was related more to the Division's selection process or to its ability to recruit people of color to apply for Albemarle County Public School jobs.

113.   Although Ms. Mais had the phrase "people of color" in her mind, she inadvertently used the word "colored" instead.

114.   Ms. Mais quickly apologized for her slip of the tongue.

115.   Ms. Avery ignored the apology and verbally attacked Ms. Mais for her slip of the tongue during the training and in front of all attendees, accusing Ms. Mais of speaking like old racists who told people of color to go to the back of the bus.

116.   Ms. Avery's verbal abuse was so severe that Ms. Mais received multiple communications during the training session and following it from other staff members expressing their support for her and their alarm at how unprofessional Ms. Avery's response to her was.

117.   Shortly after the training session ended, Ms. Mais received an email from Emily Holmstrom, the school's guidance counselor, asking if she would like to "unpack" what Ms. Mais had said during the training session.

118.   Ms. Mais regarded this message as a veiled threat that she would report Ms. Mais to the administration if she didn't discuss the matter with her.

119.   There should not have been anything Ms. Mais was required to "unpack," as she had immediately apologized for a simple unintentional slip of the tongue, at the time it happened.

120.   Ms. Holmstrom's husband, Lars Holmstrom, an Equity Specialist with the Division, also reached out to Ms. Mais and asked to discuss the mistake.

121.   Ms. Mais discussed the mistake briefly with him, during which she apprised him of her concerns about Ms. Avery's racially charged mistreatment of her and of other staff members during the training sessions.

122.   They discussed the dismissive and disrespectful nature of Ms. Avery's response to Ms. Mais's apology.

123.   Ms. Mais explained that allowing a staff member to mistreat an administrator in such a public and racially charged fashion undermined the administration of the school.

124.   Ms. Mais further explained her concerns with the racially charged and divisive nature of the training itself and the Division's implementation of the training.

125.   The Division ignored these complaints.

**F.   The Division requires Ms. Mais to attend an unrecorded meeting with Dr. Hairston and Ms. Avery to further berate her.**

126.   Within days of the final training, Dr. Hairston advised Ms. Mais that the husband of an unnamed participant in the June 11 training session had complained to Superintendent Haas and that Dr. Hairston was tasked with handling the situation.

127.   Dr. Hairston demanded that Ms. Mais meet with him and Ms. Avery.

128.   He also instructed Ms. Mais to have no contact with Ms. Avery until they could meet.

17

129.   This request impeded Ms. Mais's ability to do her job, as Ms. Mais was an administrator in Ms. Avery's chain of command.

130.   Because of the Division's full-throated embrace of "anti-racism," including its multiple statements that dissent from its approach would not be tolerated, Dr. Hairston's threatening statements about moving people who disagreed "off the bus," and Dr. Hairston's comparison of concerned parents to rapist slave owners, Ms. Mais was afraid of what would happen and how she would be treated at this meeting.

131.   To ensure any such mistreatment was preserved for an objective review, Ms. Mais asked that the meeting be recorded.

132.   Ms. Mais also asked for Ashby Kindler to be present since she was leading the training session in question.

133.   Dr. Hairston agreed to invite Ms. Kindler.

134.   But Dr. Hairston told Ms. Mais that Ms. Avery would also be asked if she would like to have a representative at the meeting.

135.   This made little sense. Ms. Mais had not requested Ms. Kindler to attend as her "ally" or "representative," and did not view her as such for purposes of the meeting.

136.   Indeed, had Ms. Mais been offered to bring someone to serve in the role of "ally" or "representative," she would have chosen someone else.

137.   Ms. Mais simply thought Ms. Kindler's perspective would be useful since she was running the training session.

138.   In response to Ms. Mais's request for the meeting to be recorded, Dr. Hairston told Ms. Mais that she should reach out directly to Ms. Avery to discuss the request.

139.   Ms. Mais viewed that request as odd given that Dr. Hairston had previously instructed her to avoid contact with Ms. Avery.

18

140.   Later, Dr. Hairston told Ms. Mais that he had discussed the recording request with Ross Holden, the Division's attorney, and that Mr. Holden had strongly advised that the meeting not be recorded because the contents of the meeting could be leaked to the press.

141.   Ms. Mais was surprised by this statement since she had never suggested to anyone leaking anything about the meeting to the press, and had not contemplated doing so.

142.   Ms. Mais understood from Dr. Hairston's statement, however, that the Division did not want the way that Dr. Hairston conducted this session to be subject to public scrutiny.

143.   By disclosing to Ms. Mais the substance of Mr. Holden's legal advice to the Division and using that advice as a weapon against her, Dr. Hairston waived the Division's attorney-client privilege with respect to all matters related thereto.

144.   In lieu of recording the meeting, Dr. Hairston suggested asking Ms. Kindler to take notes.

145.   Ms. Mais was concerned about this suggestion because, based on her experience, she understood that note-taking is a poor substitute for a verbatim record, as notes provide only one perspective on what was said, depend on the note-taker's ability to write down what was being said while participating in the meeting herself, do not reflect tone, body language and volume, and are subject to conscious and unconscious manipulation.

## G.   Ms. Avery and her comrades continue harassing Ms. Mais, and the Division refuses to stop it.

146.   Before the meeting, multiple employees told Ms. Mais that Ms. Avery and her friends were openly slandering Ms. Mais at work, openly cursing about her and calling her vulgar names at work, telling other employees she was a racist and

that she intentionally demeaned black people, and trying to turn other employees against her.

147.   These employees told Ms. Mais that they were afraid to defend her or to seem close to her because they would suffer retaliation and become targets of similar abusive behavior.

148.   The racially harassing and abusive comments made about Ms. Mais included calling her, "That white racist bitch" and "That two-faced racist bitch."

149.   Ms. Mais complained to her principal, Dr. Mike Irani, about this hostile and racially harassing behavior, and the broader problem that the *Courageous Conversations* curriculum and the Division's implementation of it created a racially hostile and divisive environment.

150.   He refused to take any action to address it, and the harassing behavior continued.

151.   Ms. Mais explained that the harassment was causing her substantial emotional distress, preventing her from focusing on her job, and making it impossible for her to effectively manage the employees involved in the harassment.

152.   Ms. Mais also explained that several staff members had confidentially approached her in tears because they felt they could not speak up or share their perspective.

153.   Dr. Irani did nothing in response to this information.

**H.   The Division continues to harass Ms. Mais at the unrecorded meeting.**

154.   On Friday, August 6, 2021, Ms. Mais attended the required unrecorded meeting with Dr. Hairston and Ms. Avery.

155.   Ms. Avery brought Ms. Holmstrom to the meeting as her "ally."

156.   At the meeting, Ms. Avery claimed to be speaking for a group of black employees and stated that she did not accept Ms. Mais's apology for unintentionally using the words "colored people" instead of "people of color," before quickly apologizing.

157.   Throughout the meeting, Ms. Avery chastised Ms. Mais for her slip of the tongue.

158.   Ms. Mais asked Ms. Avery if it would have been better if she had said "people of color," as she had intended, and Ms. Avery responded that she was not comfortable with that term either, even though the Division itself uses the term "people of color" in its Anti-Racism Policy.

159.   Ms. Mais offered additional apologies on multiple occasions throughout the meeting.

160.   When Ms. Mais tried to explain herself, Ms. Avery continued to berate her. Ms. Avery also stated that she assumed participants did not speak as freely in the training sessions as they would at home, giving as an example that she assumed some participants used the N-word at home but not during the training. Ms. Mais explained that she did not appreciate that assumption, as she would never use that word and did not use the word "colored" outside of the slip of the tongue for which she had already apologized, and she apologized yet again.

161.   Ms. Mais also asked if Ms. Avery had previously had any racial concerns about anything Ms. Mais had said or done, and Ms. Avery affirmed that she had not.

162.   When Ms. Mais tried to explain the detrimental effects of the training sessions on staff morale, the racial divisions the training was causing within the school, and the increasingly racially hostile environment that had resulted, the participants reacted with disbelief and dismissed her concerns.

163.   When Ms. Mais explained that many white participants were afraid to speak during the training sessions for fear that they would say the "wrong" thing and be branded as racists, Ms. Holmstrom stated that they should be afraid to speak if what they were thinking was not "appropriate," which Ms. Mais understood meant that the Division was in fact policing white participants' speech and was prepared to retaliate against any criticism of its approach.

164.   At the end of the meeting, Dr. Hairston stated that addressing the entire staff concerning Ms. Mais's mistake was the logical next step in the matter.

165.   The purpose of this address would be for Ms. Mais to apologize yet again for her slip of the tongue, even though she had already addressed the staff by apologizing in real time when the incident occurred.

166.   Ms. Mais was not comfortable with addressing the staff given that she had already apologized and made multiple attempts to explain her actions.

167.   But it was made clear to Ms. Mais that she did not have a real choice.

168.   Dr. Hairston also stated that Agnor-Hurt staff likely needed to repeat the *Courageous Conversations* training.

169.   Ms. Mais expressed concern with the notion of repeating the *Courageous Conversations* training given its detrimental effects on staff morale and the racially hostile environment it created.

170.   The participants again dismissed Ms. Mais's concerns.

171.   Near the end of the meeting, Ms. Holmstrom said that she was happy to be at the meeting because she recalled Dr. Hairston's frequent statement that failing to speak out in the face of a racist incident was to be complicit in racism.

172.   By this statement, despite Ms. Mais's multiple apologies, her agreement to apologize yet again to school employees, and her visible tears at the way she was being treated, Ms. Holmstrom continued to accuse Ms. Mais of racism with the approval of the Division over a simple slip of the tongue.

173.   The way the Division treated Ms. Mais for making a simple slip of the tongue stands in stark contrast to its treatment of Ms. Avery and Dr. Hairston.

174.   Dr. Hairston was permitted to compare white parents to rapist slave owners with the support of the Division, whereas Ms. Mais was forced to apologize repeatedly for an unintentional slip of the tongue while being told that her apologies were not accepted and were insufficient.

175.   The Division's mistreatment of Ms. Mais also stands in stark contrast to the way Ms. Avery was permitted to make racially charged comments about white people throughout the training sessions and permitted to racially harass Ms. Mais and slander her with impunity, including call her "That white racist bitch" and "That two-faced racist bitch."

176.   At the end of the meeting, Ms. Mais was in tears. Based on the conduct of the other meeting attendees, it had become clear to her that no apology she offered would ever be sufficient to satisfy school leadership.

177.   After Ms. Mais left the meeting, Dr. Hairston, Ms. Avery, and Ms. Holmstrom stayed behind to talk without her.

178.   Ms. Mais went by Dr. Irani's office and, still visibly crying, told him she would catch up with him on Monday.

I.   **Ms. Mais attempts to recover from the mental and emotional distress caused by the racial and retaliatory harassment inflicted on her by the Division.**

179.   Ms. Mais spent the weekend in severe emotional distress at the way she had been treated and the continued refusal of school leadership to accept her apology and appreciate her mistake for what it obviously was: a slip of the tongue for which she had repeatedly apologized.

180.   The following Monday, Ms. Mais came into work and spoke with Dr. Irani.

23

181.    Ms. Mais told him that she was very uncomfortable with the way she was treated during the August 6 meeting and the racial hostility she continued to experience.

182.    Ms. Mais told him that she would need to seek treatment from her primary care doctor because of the emotional distress she was experiencing, which included numerous physical manifestations, such as an inability to sleep, panic attacks, breaking out in hives, rapid heartbeat, shortness of breath, hyperventilating, headaches, nausea, depression, loss of appetite, and an inability to focus on daily activities.

183.    Dr. Irani encouraged her to seek treatment. She tried to do so but did not receive an immediate response from her primary care doctor.

184.    By Wednesday morning, Ms. Mais was unable to work because of the anxiety attacks she was experiencing.

185.    Thus, Ms. Mais took three days off—Wednesday to Friday—due to the emotional distress caused by the Division's severe and pervasive harassment of her.

**J.      Ms. Mais reports her harassment to numerous Division officials, none of whom take any action to stop it.**

186.    During and after that time, Ms. Mais continued to discuss with Dr. Irani her distress over the mistreatment she experienced and was experiencing.

187.    On August 15, 2021, Ms. Mais left a voice message for Division HR employee Lorna Gerome to complain about how the Division and Dr. Hairston were handling her situation.

188.    On August 17, 2021, Ms. Mais spoke with Ms. Gerome and explained the racially charged mistreatment she had experienced and was continuing to experience, including the harassment by employees at Agnor-Hurt, and her concerns

24

that the *Courageous Conversations* training was creating a racially charged, hostile, and divisive environment.

189.   Ms. Gerome told Ms. Mais she would take the matter to Assistant Superintendent Dr. Clare Keiser.

190.   Dr. Keiser is one of two assistant superintendents in the Division, the other being Dr. Hairston.

191.   Upon information and belief, Dr. Keiser is the assistant superintendent with responsibility for human resources.

192.   On August 19, 2021, Ms. Mais met with Dr. Keiser.

193.   In that meeting, Ms. Mais explained to Dr. Keiser the racially charged mistreatment she had experienced and continued to experience and her concerns that the *Courageous Conversations* training was creating a racially charged, hostile, and divisive environment.

194.   Dr. Keiser told Ms. Mais that it had been inappropriate for Dr. Hairston to conduct the August 6, 2021, meeting without HR's involvement, and that he had been instructed to involve HR before conducting meetings of this nature in the future.

195.   While Dr. Keiser expressed empathy for the situation, she did not provide any concrete plan of action for handling Ms. Mais's concerns.

196.   On August 27, 2021, Daphne Keiser from Division HR met with Ms. Mais in person to discuss her concerns.

197.   During that in-person meeting, Ms. Mais told Ms. Keiser about the racially hostile environment, the race-based mistreatment she was experiencing, and her concern that the *Courageous Conversations* training was creating a racially hostile and divisive environment.

198.   Ms. Keiser also appeared to empathize but again did not offer any concrete steps for addressing the concerns or the harassment Ms. Mais was experiencing.

199.   Instead, Ms. Keiser, who is black, shared that she had also had difficult interactions with Dr. Hairston and that she also had concerns about the Division's approach to "anti-racism" training and the environment that it created.

200.   Ms. Keiser, however, made it clear that she was unable to address the mistreatment Ms. Mais was experiencing.

201.   Based on Ms. Mais's conversations with Dr. Irani, two HR employees, and an Assistant Superintendent, it was obvious to Ms. Mais that the Division would not take any action to correct the race-based or retaliatory mistreatment she was experiencing or the broader problems with the racist nature of the *Courageous Conversations* training.

202.   The upshot of these interactions was that the Division was requiring Ms. Mais to attempt to lead a group of employees who were empowered to curse about her, call her vulgar names, call her a "white racist bitch," attempt to turn other employees against her, and create an environment in which employees dared not appear to support her or be close to her.

203.   In short, the Division continued to permit other employees to publicly chastise and humiliate Ms. Mais over a slip of the tongue for which she repeatedly apologized.

204.   Further, the racially hostile environment of the school in which white employees were stereotyped, demeaned, harassed, and dismissed with the Division's encouragement and blessing would not be changed.

**K.   The Division constructively discharges Ms. Mais and then asks her to lie about it.**

205.   For the sake of her physical and mental health and because multiple meetings, communications, and conversations with school and district leadership demonstrated that there was no hope of improvement in the objectively intolerable

working conditions to which she was subjected, Ms. Mais resigned on August 29, 2021, effective September 10, 2021.

206.   At the Division's request, Ms. Mais agreed to send a letter to Agnor-Hurt families concerning her departure.

207.   The Division's communications officer asked Ms. Mais to say that she was leaving to explore another career opportunity, which was untrue.

208.   Because it would not be good for Ms. Mais's career to leave the Division on bad terms, she reluctantly agreed to the Division's request that she state in the letter that she was leaving to be available to her own family.

209.   It was obvious to Ms. Mais that the Division did not want families to know the real reason she was leaving.

**L.    Ms. Mais is required to undergo a ritual shaming to remain on good terms with the Division.**

210.   Despite her resignation, Ms. Mais was asked to offer yet another public apology at a staff meeting on September 9, 2021.

211.   It was important to Ms. Mais's career that she leave the Division on good terms because of her need to find future employment and her desire to continue working in education within the tightknit educational community of Albemarle County.

212.   It also was clear to Ms. Mais that the apology was expected regardless of her resignation. Thus, to remain on good terms with the Division and to enable her to secure a job elsewhere, she reluctantly agreed to offer one last apology on September 9.

213.   On September 8, 2021, Ms. Mais met with Dr. Irani, Ms. Avery, and Ms. Holmstrom to discuss what would be said at the apology meeting the following day.

27

214.   Before the September 8 pre-meeting, Ms. Mais spent anguished hours upon anguished hours working on her draft apology, all the while reliving the mistreatment she had endured.

215.   If she had to go through with the apology, Ms. Mais wanted to be open and honest with her colleagues about the totality of her experience in the hope that something good would come of it.

216.   At the September 8, 2021 pre-meeting, Ms. Mais presented her draft apology to Dr. Irani, Ms. Avery, and Ms. Holmstrom.

217.   In addition to including a clear apology, this draft also included a discussion of how difficult the incident had been for Ms. Mais, the emotional toll of having her intentions misunderstood and her explanations not accepted, and her concerns with the *Courageous Conversations* training.

218.   Before she could even get all the way through her draft, Ms. Avery cut Ms. Mais off and told her that she should not discuss her feelings because no one cared about them.

219.   Ms. Holmstrom told Ms. Mais that by discussing her feelings and her hurt, she was inappropriately acting in a racist fashion like a typical defensive white person as outlined in the *Courageous Conversations* curriculum.

220.   Dr. Irani was present for this mistreatment and refused to correct it.

221.   The message from the participants at the meeting to Ms. Mais was clear: she was not allowed to voice—even mildly—the mistreatment she had experienced and was experiencing because of her race and in retaliation for her opposition to the curriculum and the way she was being treated.

222.   Likewise, she was not allowed to express any hurt or discomfort from her serial mistreatment by district officials because, as a white person, expressing such emotions would be racist. Even though her discomfort was evident to her colleagues, many of whom quietly and fearfully empathized with her.

223.    By muzzling Ms. Mais and preventing her from sharing her true beliefs with her colleagues, the Division engineered the apology session to be nothing more than a ritual shaming of Ms. Mais for a slip of the tongue for which she had already repeatedly apologized.

224.    On September 9, 2021, Ms. Mais, as requested, presented another apology in front of staff.

225.    The apology was presented in a specially called meeting that took place after students were dismissed for the day.

226.    Upon information and belief, the Division invited all 2021-2022 Agnor-Hurt teachers to the apology meeting, including those who were not employed at the school at the time of the June 11, 2021, training session and thus did not attend that training session.

227.    Upon information and belief, the Division also invited all of the black teacher's aides at the school to the apology meeting.

228.    Upon information and belief, the Division did not invite any of the white teacher's aides at the school to the apology meeting, and did not even tell the white teacher's aides that any meeting would take place during that time period.

229.    Being required to apologize to staff members who were not even employed at the time of Ms. Mais's slip of the tongue served no useful purpose and was designed only to humiliate Ms. Mais.

230.    At the apology meeting, a group of black employees, mostly teachers' aides, wore camouflage pants and black t-shirts.

231.    This group sat with Ms. Avery near the front of the room, the area from which Ms. Mais would give her apology.

232.    These employees were permitted to attend the apology meeting, wear threatening and combative attire, and sit near the area from which Ms. Mais would speak.

233.   At the apology meeting, Dr. Irani asked Ms. Mais and Ms. Avery a series of questions with limited time to respond.

234.   As required, Ms. Mais gave her apology in response to one of the questions, but the apology was stripped of much of what Ms. Mais wanted to say.

235.   When Ms. Avery responded to Dr. Irani's questions, she parroted racist talking points from the *Courageous Conversations* training, including a discussion about the relationship of Ms. Mais's mistake to "white privilege."

236.   Ms. Avery also accused staff members of mistreating students of color.

237.   Ms. Avery cited no evidence for this claim, which was untrue and deeply offensive.

238.   Ms. Avery warned staff members that she was watching them for perceived racist behavior.

239.   Instead of accepting Ms. Mais's apology, Ms. Avery subjected her to further racial and retaliatory harassment by telling staff that they could either be on her side or Ms. Mais's side and that there was no in-between.

240.   On information and belief, from beginning to end, the apology meeting was carefully orchestrated by district officials to humiliate, shame, and traumatize Ms. Mais for an accidental slip of the tongue in order to make an example of her and to communicate to other district employees the type of punishment that would occur if anyone dared question the new reigning anti-racist orthodoxy, which is racist at its core.

241.   Following this ritual shaming of Ms. Mais, numerous white employees were visibly crying.

242.   Directly after the ritual shaming session, Mr. Lars Holmstrom began the next session, which was an overview of the training plan for Agnor-Hurt over the next two years.

243.   When a white staff member complained that it was inconsiderate to jump right into a new topic instead of giving people ample time to reflect upon such emotionally charged statements and to digest what they had just witnessed, Mr. Holmstrom said the lack of consideration the staff member was feeling was what people of color have experienced over the years because of their skin color.

244.   This again sent the message that white staff members could not voice concern about any aspect of the Division's training without being branded as racially insensitive.

245.   At the end of the meeting, one of the white employees in attendance gave Ms. Mais a hug.

246.   Ms. Mais warned her not to do so because Ms. Mais feared she would be targeted for associating with her.

247.   Later that day, Ms. Avery confronted the employee for being friendly with Ms. Mais.

**M.**   **Ms. Avery spends Ms. Mais's last day harassing her and intimidating employees who want to tell Ms. Mais goodbye.**

248.   On September 10, 2021, which was Ms. Mais's last day of employment, Ms. Avery stood near Ms. Mais's office for approximately one hour watching who came in and out to tell her goodbye.

249.   Ms. Avery was not assigned to work in that location, and there were no work-related reasons for her to camp right outside of Ms. Mais's office.

250.   At times during the morning, Ms. Avery also sat in the lounge right beside Ms. Mais's office in view of Ms. Mais's office where she could see who came and went from the office.

251.   Staff are permitted to go into the lounge for breaks, but it was not common for Ms. Avery to do so.

31

252.   Ms. Mais complained to Dr. Irani about Ms. Avery's watchful and intimidating presence.

253.   Dr. Irani did nothing.

254.   Instead of spending her last day saying goodbye to her colleagues, Ms. Mais spent the day in her office, as she could see that Ms. Avery was watching her, and she was afraid of the repercussions to anyone with whom she had a friendly interaction.

255.   After the workday, many of Ms. Mais's colleagues held an unofficial going away party for her to express their appreciation for her leadership and sympathize with her plight.

256.   The gathering was held off-campus and outside of work hours.

257.   At the gathering, many of the staff members expressed their concern about the shocking nature of Ms. Mais's ritual shaming, the abhorrent mistreatment of Ms. Mais by Ms. Avery and others, and the hostile environment at the school.

## N.   Ms. Mais administratively exhausts her claims under the Virginia Human Rights Act.

258.   On November 17, 2021, Ms. Mais filed a Charge of Discrimination with the Virginia Attorney General's Office of Civil Rights.[4]

259.   On January 18, 2022, the Office of Civil Rights closed its file and forwarded the Charge to the U.S. Equal Employment Opportunity Commission (EEOC).[5]

260.   The Office of Civil Rights confirmed to Ms. Mais's counsel that the Office will not further process the Charge and will not issue a Right to Sue letter.[6]

---

[4] The Office of Civil Rights letter confirming receipt of the Charge is attached as Exhibit 6.
[5] The closure letter is attached as Exhibit 7.
[6] The e-mail from the Office of Civil Rights is attached as Exhibit 8.

261.   On May 11, 2022, the EEOC issued a determination that it would not proceed further with any investigation and issued a Notice of Right to Sue.[7]

262.   Both the Virginia Office of Civil Rights and the EEOC have confirmed that any investigations of Ms. Mais's claims under the Virginia Human Rights Act are concluded, and Ms. Mais has therefore exhausted her administrative remedies.

263.   This lawsuit is filed within 90 days of the exhaustion of Ms. Mais's administrative remedies.

## IV.   Legal Claims

### A.   Count 1 – Violation of Article I, Section 12 of the Virginia Constitution (Free Speech)

264.   Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 263 of this complaint.

265.   The Virginia Constitution provides that "the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects." Va. Const. Art. I, § 12.

### *Speech Retaliation*

266.   Ms. Mais communicated her views concerning the content, structure, and implementation of the *Courageous Conversations* training and the Division's broader anti-racism efforts to numerous Division officials, including but not limited to her view that the training material promoted racial hostility and divisiveness.

267.   When she communicated those views, she was speaking as a private citizen on a matter of public concern and engaging in expression the Virginia Constitution protects.

---

[7] The Notice of Right to Sue is attached as Exhibit 9.

268.   Ms. Mais's interest as a private citizen discussing matters of public concern outweighs the Division's interest in the efficient provision of services.

269.   The Division retaliated against Ms. Mais for communicating her views by, among other things, allowing subordinates to harass her with impunity, subjecting her to a carefully orchestrated and hostile meeting with Dr. Hairston, forcing her to apologize over and over again for a slip of the tongue, subjecting her to a ritual shaming session in front of her peers, subjecting her to significant emotional distress, making it impossible for her to effectively do her work, and making it clear that the racial hostility and harassment she was experiencing would never be stopped.

270.   The Division's retaliatory actions would deter a person of ordinary firmness from exercising her right to free speech in the future, and, indeed, Ms. Mais was deterred from continuing to express her opinions.

### Compelled Speech / Restraint on Speech

271.   The Division compelled and sought to compel Ms. Mais to affirm and express messages that violated her deeply held beliefs.

272.   Specifically, the Division advised Ms. Mais and other Division employees that the failure to fully embrace the Division's "anti-racism" program would result in employees "get[ting] off the bus," meaning ending their employment.

273.   Thus, throughout the *Courageous Conversations* training, Division employees, including Ms. Mais, were required to affirm the philosophy advanced by the training program.

274.   Further, after Ms. Mais voluntarily and forthrightly apologized for her slip of the tongue, the Division compelled her to apologize again and again, effectively making her send the message that her prior apologies were ineffective or deficient, even though Ms. Mais did not believe they were.

275.    The Division further restrained Ms. Mais's constitutionally protected speech by prohibiting her from communicating her complete views when she offered her final apology, which would have included a discussion of the hostility and divisiveness caused by the Division's training program.

276.    Government action that compels or restricts speech must satisfy strict scrutiny.

277.    The Division had no legitimate (much less compelling) interest in compelling affirmation of its racist training program, compelling Ms. Mais to communicate that her apologies were ineffective or deficient, or restraining her from offering her complete views when she apologized for the final time, nor were the Division's actions the least restrictive means of achieving any legitimate objectives.

### *Viewpoint Discrimination*

278.    The Division subjected Ms. Mais to punishment because of the views she expressed on matters of public concern—expression that is protected by the Virginia Constitution.

279.    The Division subjected Ms. Mais to punishment because of the content and viewpoints expressed in Ms. Mais's speech.

280.    The Division considered the content and viewpoint of Ms. Mais's speech when it decided to retaliate against her for it.

281.    The Division exercised unbridled discretion when it punished Ms. Mais for expressing her views regarding the *Courageous Conversations* training and the Division's broader anti-racism efforts.

282.    The Division has allowed and failed to punish speech by other Division employees that expressed different views concerning the *Courageous Conversations* training and/or the Division's broader anti-racism efforts.

283.   The Division's policies and enforcement of those policies are unconstitutionally overbroad because they restrict a significant amount of constitutionally protected speech.

284.   The overbreadth of these policies chilled the speech of Ms. Mais, who sought to engage in protected expression, including expression concerning the *Courageous Conversations* training and the Division's broader anti-racism efforts.

285.   The overbreadth of these policies chills the speech of all employees who might seek to engage in protected expression, including expression concerning the *Courageous Conversations* training and/or the Division's broader anti-racism efforts.

***Free Speech Violations***

286.   By retaliating against Ms. Mais for engaging in constitutionally protected speech, chilling Ms. Mais from engaging in constitutionally protected speech, compelling her to affirm and express views with which she disagreed, restraining her from expressing her complete views, and discriminating against Ms. Mais based on the content / viewpoint of her constitutionally protected speech, the Division violated the Virginia Constitution.

287.   The Division's constitutional violations caused Ms. Mais damage, including the loss of her job, financial losses, emotional distress, pain, and suffering.

**B.   Count 2 – Wrongful Discharge in Violation of Public Policy**

288.   Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 287 of this complaint.

289.   As set forth above, the Division repeatedly trampled on Ms. Mais's constitutional right to free expression by retaliating against her, chilling her speech, compelling her to affirm messages with which she disagreed, restraining her speech, and discriminating against her based on the content / viewpoint of her speech.

36

290.   These actions created an objectively hostile environment in which it was clear that Ms. Mais would be subjected to continuing harassment, abuse, and public humiliation because of her constitutionally protected speech, and would continually be forced to put her health at risk.

291.   The environment was so objectively intolerable that a reasonable person could not be expected to endure it and would feel compelled to resign.

292.   By creating and maintaining this environment, the Division constructively discharged Ms. Mais, who resigned because of the constructive discharge effective September 10, 2021.

293.   The Division's constructive discharge of Ms. Mais was willfully and wantonly negligent and in conscious disregard of Ms. Mais's constitutional rights, or with reckless indifference to the consequences and awareness of the injury being caused to Ms. Mais.

294.   The Division's constructive discharge of Ms. Mais violated the clear public policy of Virginia embodied in Article I, Section 12 of the Virginia Constitution.

295.   The Division's constructive discharge of Ms. Mais caused her substantial damage, including the loss of her job, financial losses, emotional distress, pain, and suffering.

## C.   Count 3 – Racially Hostile Work Environment in Violation of the Virginia Human Rights Act

296.   Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 295 of this complaint.

297.   The Virginia Human Rights Act prohibits employers from discriminating against employees in the terms and conditions of employment on the basis of race.

298.   The Division is an employer subject to the Virginia Human Rights Act because it employs more than 15 people and is a "person" as defined in Va. Code § 1-230 because it is a "government" and/or "political subdivision."

299.   The Division subjected Ms. Mais to harassment and a hostile work environment based on her race in violation of the Virginia Human Rights Act.

300.   Enduring such an environment was a condition of Ms. Mais's continued employment.

301.   The harassment to which the Division subjected Ms. Mais was unwelcome.

302.   The harassment was so severe and pervasive as to create an objectively hostile and abusive work environment.

303.   The harassment was perpetrated by employees with supervisory authority over Ms. Mais.

304.   The harassment was also perpetrated by employees without such authority, but with the express or implied permission of the Division, and the Division negligently failed to stop the harassment despite due notice of the same.

305.   Ms. Mais complained about the harassment to her principal, a Division-designated equity specialist, an Assistant Superintendent, and multiple employees in the Division's human resources office.

306.   Despite Ms. Mais's multiple complaints, the Division made no attempt to investigate or remedy the hostile work environment.

307.   The Division's refusal to address the hostile work environment was willfully and wantonly negligent and in conscious disregard of Ms. Mais's statutory rights, or with reckless indifference to the consequences and awareness of the injury being caused to Ms. Mais.

308.   Ms. Mais is entitled to compensatory and punitive damages for the Division's violation of the Virginia Human Rights Act.

**D.    Count 4 – Constructive Discharge Based on Race in Violation of the Virginia Human Rights Act**

309.   Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 308 of this complaint.

310.   The Virginia Human Rights Act prohibits employers from discriminating against employees in the terms and conditions of employment on the basis of race.

311.   The Division is an employer subject to the Virginia Human Rights Act because it employs more than 15 people and is a "person" as defined in Va. Code § 1-230 because it is a "government" and/or "political subdivision."

312.   The Division subjected Ms. Mais to harassment and a hostile work environment based on her race in violation of the Virginia Human Rights Act.

313.   Enduring such an environment was a condition of Ms. Mais's continued employment.

314.   The harassment to which the Division subjected Ms. Mais was unwelcome.

315.   The harassment was so severe and pervasive as to create an objectively hostile and abusive work environment.

316.   The harassment was perpetrated by employees with supervisory authority over Ms. Mais.

317.   The harassment was also perpetrated by employees without such authority, but with the express or implied permission of the Division, and the Division negligently failed to stop the harassment despite due notice of the same.

318.   Ms. Mais complained about the harassment to her principal, a Division-designated equity specialist, an Assistant Superintendent, and multiple employees in the Division's human resources office.

319.    Despite Ms. Mais's multiple complaints, the Division made no attempt to investigate or remedy the hostile work environment.

320.    Based on the Division's repeated inaction, there was no reasonable prospect of any improvement in the hostile environment.

321.    The environment was so objectively intolerable that a reasonable person could not be expected to endure it and would feel compelled to resign.

322.    By creating and maintaining this environment, the Division constructively discharged Ms. Mais, who resigned because of the constructive discharge effective September 10, 2021.

323.    The Division's constructive discharge of Ms. Mais was willfully and wantonly negligent and in conscious disregard of Ms. Mais's statutory rights, or with reckless indifference to the consequences and awareness of the injury being caused to Ms. Mais.

324.    Ms. Mais is entitled to compensatory and punitive damages for the Division's violation of the Virginia Human Rights Act.

E.    **Count 5 – Retaliatory Hostile Work Environment in Violation of the Virginia Human Rights Act**

325.    Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 324 of this complaint.

326.    The Virginia Human Rights Act prohibits employers from discriminating against employees because they have opposed a practice made unlawful by the Act.

327.    The Division is an employer subject to the Virginia Human Rights Act because it employs more than 15 people and is a "person" as defined in Va. Code § 1-230 because it is a "government" and/or "political subdivision."

328.   Ms. Mais engaged in protected activity by, among other things, complaining on multiple occasions to multiple supervisory-level employees of the Division about the hostile environment created by the training curriculum and her own race-based mistreatment.

329.   In response, the Division did not investigate or remedy any of the unlawful practices about which she complained.

330.   Instead, the Division upped the ante, including by subjecting her to a meeting with Dr. Hairston designed to humiliate and shame her, giving Ms. Avery and her companions free rein to abuse her and make her life miserable, preventing her colleagues from being visibly associated with her, telling her that expressions of hurt and distress were further proof of her racism, telling her that she was not permitted to discuss her feelings, and ritually shaming and intimidating her in front of her colleagues, all in retaliation for engaging in protected activity.

331.   The Division's retaliatory behavior was unwelcome.

332.   It was also so severe and pervasive as to create an objectively hostile and abusive work environment.

333.   The Division's creation and maintenance of this environment was willfully and wantonly negligent and in conscious disregard of Ms. Mais's statutory rights, or with reckless indifference to the consequences and awareness of the injury being caused to Ms. Mais.

334.   Ms. Mais is entitled to compensatory and punitive damages for the Division's violation of the Virginia Human Rights Act.

**F.   Count 6 – Retaliatory Constructive Discharge in Violation of the Virginia Human Rights Act**

335.   Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 334 of this complaint.

41

336.   The Virginia Human Rights Act prohibits employers from discriminating against employees because they have opposed a practice made unlawful by the Act.

337.   The Division is an employer subject to the Virginia Human Rights Act because it employs more than 15 people and is a "person" as defined in Va. Code § 1-230 because it is a "government" and/or "political subdivision."

338.   Ms. Mais engaged in protected activity by, among other things, complaining on multiple occasions to multiple supervisory-level employees of the Division about the hostile environment created by the training curriculum and her own race-based mistreatment.

339.   In response, the Division did not investigate or remedy any of the unlawful practices about which she complained.

340.   Instead, the Division upped the ante, including by subjecting her to a meeting with Dr. Hairston designed to humiliate and shame her, giving Ms. Avery and her companions free rein to abuse her and make her life miserable, preventing her colleagues from being visibly associated with her, telling her that expressions of hurt and distress were further proof of her racism, telling her that she was not permitted to discuss her feelings, and ritually shaming and intimidating her in front of her colleagues, all in retaliation for engaging in protected activity.

341.   The Division's retaliatory behavior was unwelcome.

342.   It was also so severe and pervasive as to create an objectively hostile and abusive work environment.

343.   Based on the Division's repeated inaction and the apparent worsening of the environment with each complaint, there was no reasonable prospect of any improvement in the hostile environment.

344.   The environment was so objectively intolerable that a reasonable person could not be expected to endure it and would feel compelled to resign.

42

345.   By creating and maintaining this retaliatory hostile work environment, the Division constructively discharged Ms. Mais, who resigned because of the constructive discharge effective September 10, 2021.

346.   The Division's constructive discharge of Ms. Mais was willfully and wantonly negligent and in conscious disregard of Ms. Mais's statutory rights, or with reckless indifference to the consequences and awareness of the injury being caused to Ms. Mais.

347.   Ms. Mais is entitled to compensatory and punitive damages for the Division's violation of the Virginia Human Rights Act.

**G.    Count 7 - Racially Hostile Work Environment in Violation of Title VII**

348.   Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 347 of this complaint.

349.   Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees in the terms and conditions of employment on the basis of race.

350.   The Division is an employer subject to Title VII because it employs more than 15 people and is a "person" as defined in 42 U.S.C. § 2000e(a) because it is a "government," "governmental agency," and/or "political subdivision."

351.   The Division subjected Ms. Mais to harassment and a hostile work environment based on her race in violation of Title VII.

352.   Enduring such an environment was a condition of Ms. Mais's continued employment.

353.   The harassment to which the Division subjected Ms. Mais was unwelcome.

354.   The harassment was so severe and pervasive as to create an objectively hostile and abusive work environment.

43

355.   The harassment was perpetrated by employees with supervisory authority over Ms. Mais.

356.   The harassment was also perpetrated by employees without such authority, but with the express or implied permission of the Division, and the Division negligently failed to stop the harassment despite due notice of the same.

357.   Ms. Mais complained about the harassment to her principal, a Division-designated equity specialist, an Assistant Superintendent, and multiple employees in the Division's human resources office.

358.   Despite Ms. Mais's multiple complaints, the Division made no attempt to investigate or remedy the hostile work environment.

359.   The Division's refusal to address the hostile work environment was willfully and wantonly negligent and in conscious disregard of Ms. Mais's statutory rights, or with reckless indifference to the consequences and awareness of the injury being caused to Ms. Mais.

360.   Ms. Mais is entitled to damages for the Division's violation of Title VII.

**H.    Count 8 – Constructive Discharge Based on Race in Violation of Title VII**

361.   Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 360 of this complaint.

362.   Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees in the terms and conditions of employment on the basis of race.

363.   The Division is an employer subject to Title VII because it employs more than 15 people and is a "person" as defined in 42 U.S.C. § 2000e(a)  because it is a "government," "governmental agency," and/or "political subdivision."

44

364.   The Division subjected Ms. Mais to harassment and a hostile work environment based on her race in violation of Title VII.

365.   Enduring such an environment was a condition of Ms. Mais's continued employment.

366.   The harassment to which the Division subjected Ms. Mais was unwelcome.

367.   The harassment was so severe and pervasive as to create an objectively hostile and abusive work environment.

368.   The harassment was perpetrated by employees with supervisory authority over Ms. Mais.

369.   The harassment was also perpetrated by employees without such authority, but with the express or implied permission of the Division, and the Division negligently failed to stop the harassment despite due notice of the same.

370.   Ms. Mais complained about the harassment to her principal, a Division-designated equity specialist, an Assistant Superintendent, and multiple employees in the Division's human resources office.

371.   Despite Ms. Mais's multiple complaints, the Division made no attempt to investigate or remedy the hostile work environment.

372.   Based on the Division's repeated inaction, there was no reasonable prospect of any improvement in the hostile environment.

373.   The environment was so objectively intolerable that a reasonable person could not be expected to endure it and would feel compelled to resign.

374.   By creating and maintaining this environment, the Division constructively discharged Ms. Mais, who resigned because of the constructive discharge effective September 10, 2021.

375.   The Division's constructive discharge of Ms. Mais was willfully and wantonly negligent and in conscious disregard of Ms. Mais's statutory rights, or

45

with reckless indifference to the consequences and awareness of the injury being caused to Ms. Mais.

376.   Ms. Mais is entitled to damages for the Division's violation of Title VII.

I.   **Count 9 – Retaliatory Hostile Work Environment in Violation of Title VII**

377.   Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 376 of this complaint.

378.   Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees because they have opposed a practice made unlawful by the Act.

379.   The Division is an employer subject to Title VII because it employs more than 15 people and is a "person" as defined in 42 U.S.C. § 2000e(a) because it is a "government," "governmental agency," and/or "political subdivision."

380.   Ms. Mais engaged in protected activity by, among other things, complaining on multiple occasions to multiple supervisory-level employees of the Division about the hostile environment created by the training curriculum and her own race-based mistreatment.

381.   In response, the Division did not investigate or remedy any of the unlawful practices about which she complained.

382.   Instead, the Division upped the ante, including by subjecting her to a meeting with Dr. Hairston designed to humiliate and shame her, giving Ms. Avery and her companions free rein to abuse her and make her life miserable, preventing her colleagues from being visibly associated with her, telling her that expressions of hurt and distress were further proof of her racism, telling her that she was not permitted to discuss her feelings, and ritually shaming and intimidating her in front of her colleagues, all in retaliation for engaging in protected activity.

383.    The Division's retaliatory behavior was unwelcome.

384.    It was also so severe and pervasive as to create an objectively hostile and abusive work environment.

385.    The Division's creation and maintenance of this environment was willfully and wantonly negligent and in conscious disregard of Ms. Mais's statutory rights, or with reckless indifference to the consequences and awareness of the injury being caused to Ms. Mais.

386.    Ms. Mais is entitled to damages for the Division's violation of Title VII.

## J.      Count 10 – Retaliatory Constructive Discharge in Violation of Title VII

387.    Ms. Mais repeats and realleges each of the allegations in paragraphs 1 through 386 of this complaint.

388.    Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees because they have opposed a practice made unlawful by the Act.

389.    The Division is an employer subject to Title VII because it employs more than 15 people and is a "person" as defined in 42 U.S.C. § 2000e(a) because it is a "government," "governmental agency," and/or "political subdivision."

390.    Ms. Mais engaged in protected activity by, among other things, complaining on multiple occasions to multiple supervisory-level employees of the Division about the hostile environment created by the training curriculum and her own race-based mistreatment.

391.    In response, the Division did not investigate or remedy any of the unlawful practices about which she complained.

392.   Instead, the Division upped the ante, including by subjecting her to a meeting with Dr. Hairston designed to humiliate and shame her, giving Ms. Avery and her companions free rein to abuse her and make her life miserable, preventing her colleagues from being visibly associated with her, telling her that expressions of hurt and distress were further proof of her racism, telling her that she was not permitted to discuss her feelings, and ritually shaming and intimidating her in front of her colleagues, all in retaliation for engaging in protected activity.

393.   The Division's retaliatory behavior was unwelcome.

394.   It was also so severe and pervasive as to create an objectively hostile and abusive work environment.

395.   Based on the Division's repeated inaction and the apparent worsening of the environment with each complaint, there was no reasonable prospect of any improvement in the hostile environment.

396.   The environment was so objectively intolerable that a reasonable person could not be expected to endure it and would feel compelled to resign.

397.   By creating and maintaining this retaliatory hostile work environment, the Division constructively discharged Ms. Mais, who resigned because of the constructive discharge effective September 10, 2021.

398.   The Division's constructive discharge of Ms. Mais was willfully and wantonly negligent and in conscious disregard of Ms. Mais's statutory rights, or with reckless indifference to the consequences and awareness of the injury being caused to Ms. Mais.

399.   Ms. Mais is entitled to damages for the Division's violation of Title VII.

## V.     PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, Plaintiff Emily Mais hereby demands a jury trial on all of her claims and respectfully requests that the Court enter judgment in her favor for:

1.     Back pay;

2.     Front pay;

3.     Compensatory damages, including but not limited to damages for her lost wages, emotional distress, pain, and suffering;

4.     Punitive damages;

5.     Her reasonable attorneys' fees and costs; and

6.     Such other legal and/or equitable relief as the Court may deem just and proper.

Respectfully submitted this 19th day of July, 2022.

EMILY MAIS

By Counsel

TYSON C. LANGHOFER
VA Bar No. 95204
RACHEL A. CSUTOROS
VA Bar No. 97783
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
tlanghofer@ADFlegal.org
rcsutoros@ADFlegal.org

KATE ANDERSON*
AZ Bar No. 33104
HENRY W. FRAMPTON, IV*
SC Bar No. 75314
ALLIANCE DEFENDING FREEDOM
15100 N 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kanderson@ADFlegal.org
hframpton@ADFlegal.org

RYAN BANGERT*
TX Bar No. 24045446
ALLIANCE DEFENDING FREEDOM
440 First St NW, Suite 600
Washington, DC 20001
(202) 393-8690
rbangert@ADFlegal.org

*Attorneys for Plaintiff*

\*Admitted *Pro Hac Vice*

# EXHIBIT 1



**Jillian Balow**
Superintendent of Public Instruction

February 23, 2022

The Honorable Glenn Youngkin
Governor of Virginia
P.O. Box 1475
Richmond, VA 23218

The Honorable Aimee Guidera
Secretary of Education
P.O. Box 1475
Richmond, VA 23218

**Dear Governor Youngkin and Secretary Guidera:**

Executive Order One charged the Superintendent of Public Instruction (SOPI) to begin the work of identifying and addressing inherently divisive concepts - including "Critical Race Theory and its progeny" - in public education. It defined "inherently divisive concepts" to mean "advancing any ideas in violation of Title IV and Title VI of the Civil Rights Act of 1964." Specifically, Executive Order One required the SOPI to identify policies, programs, training or curricula that fall within the definition of divisive concepts. I respectfully submit this interim report to you and the Citizens of Virginia.

This interim report rescinds certain policies, programs, and resources that promote discriminatory and divisive concepts as directed by Executive Order One. It also contains a sampling of critical race theory-based materials. However, the concepts have become widespread in the Virginia Department of Education (VDOE) and in Virginia school divisions and we will need to proactively review policies, practices, and pedagogies around the state to uphold the Civil Rights Act and comport with Executive Order One. We must continue to ensure that no student in Virginia is taught to judge or treat others differently solely on the basis of their race, skin color, ethnicity, sex or faith. As the work continues, we will engage stakeholders in an ongoing dialogue about how all resources and initiatives from the Virginia Department of Education must permit and encourage school divisions to build a culture of compassion, acceptance, opportunity, and positive change.

The Civil Rights Act codified the principles of equal protection and nondiscrimination found in the 14th Amendment, principles that all Virginians and Americans hold dear and wish to see passed on to the next generation. With this interim report, along with another at the 90-day mark, we want to spur productive dialogue across the commonwealth and create a teachable moment for us all - educators, the Citizens of Virginia, and concerned American parents.

Sincerely,

Jillian Balow

JB/jgh

Ex.1 001

## APPENDIX A: RESCISSIONS & MODIFICATIONS OF PROGRAMS, POLICIES, MATERIALS

| Action | Document/Product Title | Status | Basis | Example |
|---|---|---|---|---|
| Rescinded | All Resources Included on VDOE's EdEquityVA Website, Including EdEquityVA Resources, and Resource Repository[ii] | Rescinded 2/9/22 or in-progress to be rescinded/evaluated | • Numerous resources within EdEquityVA employ the concept that current discrimination is needed to address past discrimination. (Treating people differently based on skin color to remedy old/previous discrimination.)<br>• Numerous resources within EdEquityVA advance "equity," which is redefined to mean that there can be no differences or disproportionalities between students—and any difference in what students have or what they achieve is due to systemic racism.<br>• Suggested reading lists include Critical Race Theory authors such as Ibram X Kendi and Gloria Ladson-Billings. Both are critical race theorists who have moved CRT into education. NOTE: Some items from reading lists were pulled from the VDOE website after 11/2/21.<br>• Basic tenants of anti-racist education are adapted from a CRT author and include, "White People benefit from racism, regardless of intentions." NOTE: Tenants removed from the VDOE website after 11/2/21. | Y (attached example A and link i below) |
| Rescinded | Diversity, Equity, Inclusion Audit Tool[ii] (Superintendent's Memo 280-20) | Rescinded 2/9/22 | • Achieving equity, versus individual student achievement, is the emphasis. The guiding mission statement for the tool is, "Education Equity is achieved when we eliminate the predictability of student outcomes based on gender, zip code, ability, socioeconomic status or language spoken at home."<br>• This is a main resource for EdEquityVA and included in multiple locations online, in memos, in trainings, and as part of the "roadmap to equity." | Y (link ii below) |
| Rescinded | Navigating EdEquityVA[iii], Virginia's Roadmap to Equity (Superintendent's Memo 309-20) | Rescinded 2/9/22 | • This is the foundational document that outlines EdEquityVA.<br>• Resources permit and advance policies, programs, and activities that promote equitable outcomes for students versus opportunities. | Y (link iii below and example B) |

# APPENDIX A: RESCISSIONS & MODIFICATIONS OF PROGRAMS, POLICIES, MATERIALS

| | | | | |
|---|---|---|---|---|
| | | | • Promotes and permits teaching and leading social justice, systemic inequality, and anti-racist policies in ways that are consistent with critical race theory and without offering alternatives. <br> • Shifts school culture from excellence and opportunity to equitable outcomes for all students. | |
| Rescinded | All Resources Included on VDOE's Culturally Responsive Website[iv] | Rescinded 2/15/22 or in-progress | • This is a resource included in EdEquityVA <br> • The resources contain concepts that may be divisive and need to be reviewed in stakeholders. <br> • Divisive concepts taught in the training including (but are not limited to): "redress" bias in the system; include "culturally responsive" efficacy in teacher evaluation; mitigate power imbalances; develop policy to advance "anti-racism;" be change agents for social justice and academic equity. <br> • Generally promotes academic equity of outcomes versus equity of opportunities for all learners. <br> • Advances using current discrimination to address previous discrimination. (Treating people differently based on race – to remedy previous discrimination.) <br> • Evaluation of viable alternatives is underway and stakeholder groups will be engaged. | Y <br> (link iv below) |
| Rescinded | Superintendent's Memo #050-19 | Replaced on 11/19/21 and Rescinded 2/23/22 | • The original memo was replaced by a memo with a disclaimer about CRT. <br> • Reading lists advance the use of CRT in education. | Y <br> (attached example C) |
| Rescinded | "Teaching 9/11"[v] EdEquityVA Web Series | Rescinded 9/2/22 in response to public criticism | • Included in this list to establish VDOE and the "commitment to equity" and equitable outcomes prior to January 15, 2022. | Y <br> (link v below) <br> Time: 12:25 |
| Parts rescinded and evaluating | Virginia L.E.A.R.N.S.[vi] | Rescinded 2/15/22 | • Substantial focus on building an equitable culture to remedy the learning loss caused by COVID-19 and school closures. <br> • "Equity checkpoints" are similar or identical to EdEquityVA audit tool and other resources. It states, "Education Equity is achieved when we eliminate the predictability of student outcomes | Y <br> (link vi below) |

2

**APPENDIX A: RESCISSIONS & MODIFICATIONS OF PROGRAMS, POLICIES, MATERIALS**

| | | | | based on gender, zip code, ability, socioeconomic status or language spoken at home." | Y (example D) |
|---|---|---|---|---|---|
| Rescinded and evaluating | Virginia Math Pathways Initiative (VMPI) | Rescinded 1/25/22 | | • Rescinded per EO1 <br> • Initiative condensed three years of math into two and reduced advanced math options for some students. <br> • The National Council for Teachers of Mathematics underpins VMPI and has advocated for equitable outcomes in math for students. From a document presented in January, 2021 to the VA state board, "Dismantling inequitable structures that challenge spaces of marginality and privilege are needed to ensure that every student is well prepared with the mathematical literacy they require and deserve…" Initiative will be evaluated to ensure all VA students have access to a high quality math instruction. Some aspects of Virginia Math Pathways Initiative may be repurposed or utilized. <br> • Note: VMPI was in a pilot phase. Rescinding the initiative did not end math instruction for any Virginia student. | |

i https://www.doe.virginia.goved-equity-va/

ii https://www.virginiaisforlearners.virginia.gov/wp-content/uploads/2020/11/Navigating-EdEquityVA-Equity-Audit-Tool.pdf

iii https://www.doe.virginia.gov/edequityva/navigating-equity-book.pdf

iv https://www.virginiaisforlearners.virginia.gov/cultural-competence/

v "Teaching 9/11"

vi https://www.doe.virginia.gov/instruction/learns/

Ex.1 004

Example A

**VIRGINIA
IS FOR
LEARNERS**

VIRGINIA DEPARTMENT OF EDUCATION

FUTURE-READY LEARNING ▾   EDEQUITYVA ▾   VIRGINIA'S ROADMAP TO EQUITY ▾   EDEQUITYVA RESOURCES ▾   ABOUT ▾   NEWS ▾   CONTACT

systemic racism)

# The Basic Tenants of Anti-racist Education

A. Racism exists today, in both traditional and modern forms.

B. All members of society have been socialized to participate in racist systems

C. White people benefit from racism, regardless of intentions.

D. The racial socialization of each member of modern society occurred without consent and doesn't make anyone a bad person.

*Adapted from author Robin DiAngelo's book, White Fragility and the Urban Institute's, Structural Racism in America.*

# Terms and Definitions

Ex.1 006

Photo.jfif



FUTURE–READY LEARNING ⌄     EDEQUITYVA ⌄     VIRGINIA'S ROADMAP TO EQUITY ⌄     EDEQUITYVA RESOURCES ⌄     ABOUT ⌄

NEWS ⌄     CONTACT

Virginia's #EdEquityVA work is informed by literature, best practice, and research. Below are the resources the Office of Equity and Community Engagement references in the development of our work, as well as texts we recommend:

o **Walking the Equity Talk**: A Guide for Culturally Courageous Leadership in School Communities by John Roert Browne II

o **Culturally Responsive Teaching and the Brain** by Zaretta Hammond

o **The Dreamkeepers**: Successful Teachers of African American Children by Gloria Ladson-Billings

o **Culturally Responsive Teaching**: Theory, Research, and Practice (third edition) by Geneva Gay

o **Pushout**: The Criminalization of Black Girls in Schools by Monique W. Morris

o **We Want to Do More Than Survive**: Abolitionist Teaching and the Pursuit of Educational Freedom by Bettina Love

o **How to Be an Antiracist** by Ibram X. Kendi

o Pedagogy of the Oppressed by Paulo Freire

o Using Equity Audits to Create Equitable and Excellent Schools by Linda E. Skrla

o **Cultural Proficiency: A manual for School Leaders** by Randall B. Lindsey, Kikanza Nuri-Robins, Raymond D. Terrell, and Delores B. Lindsey

o **Race, Equity, and Education: Sixty Years from Brown** by Pedro Noguera, Jill Pierce, Roey Ahram

**Courageous Conversations About Race: A Field Guide for Achieving Equity in Schools** by Glen Singleton

o **Foundations of Critical Race Theory in Education** by Edward Taylor and David Gillborn and Gloria Ladson-Billings

o **Making It: What Today's Kids Need for Tomorrow's World**

o **Four Hundred Souls – A Community History of African America, 1619–2019**

o **Cultural Proficiency – A Manual for School Leaders, 4th Edition**

o **Breakthrough Leadership – Six Principles Guiding Schools Where Inequity Is Not an Option**

*Some of the links on the #EdEquityVA pages lead you to websites not associated with the Commonwealth of Virginia Department of Education. VDOE does not necessarily endorse the views expressed or the data and facts presented on these external sites. In addition, VDOE does not endorse or recommend any commercial products, processes, or services.*

VIRGINIA
IS FOR
LEARNERS

VIRGINIA DEPARTMENT OF EDUCATION

C  ▲ Not secure | web.archive.org/web/20210911070639/http://www.virginiaisforlearners.virginia.gov/anti-racism-in-education/

FUTURE-READY LEARNING ⌄     EDEQUITYVA ⌄     VIRGINIA'S ROADMAP TO EQUITY ⌄     EDEQUITYVA RESOURCES ⌄     ABOUT ⌄     NEWS ⌄     CONTACT

- A System Disrupted: COVID-19's Impact on Educational (in)Equity (Communities in Schools)

- Black Minds Matter: Interrupting school practices that disregard the mental health of Black youth (Teaching Tolerance)

- Educate to Liberate: Build an Anti-Racist Classroom (Edutopia)

- Anti-Racist Teaching: What Educators Really Think (Education Week)

- How to Be an Antiracist Educator (ASCD)

- Anti-racist Action for White Educators (Teaching Tolerance)

- Modern-Day School Segregation: Addressing the Lasting Impacts of Racist Choices on Virginia's Education System (The Commonwealth Institute)

- School Segregation by Boundary Line in Virginia: Scope, Significance and State Policy Solutions (Center for Education and Civil Rights and VCU School of Education)

- Training Bias Out of Teachers: Research Shows Little Promise So Far Tips for Better Anti-bias Training, (Education Week)

- Moving Schools Beyond Anti-Racist Words to Action (Education Week Teacher)

- Seizing the Moment: Race Equity Mindsets, Social and Emotional Well-Being, and Outcomes for Students (WestEd)

# Example B

# CENTERING EQUITY



The Virginia Department of Education recognizes its responsibility to advance racial, social, and economic equity in education throughout the Commonwealth of Virginia. In partnership with the Virginia State Board of Education and Virginia's Secretary of Education we are committed to identifying and dismantling all iterations of racism and inequity that permeate our public education system.

Navigating EdEquityVA  - Virginia's Road Map to Equity, establishes our education equity priorities, advances tools and resources to support local school divisions, and affirms our commitment to dismantle any and all forms of inequity in Virginia's public education system.

We remain steadfast in our commitment to the principles of anti-racism, cultural proficiency, resource equity, and high expectations for all students. Further, we recognize that Anti-racist education leaders are critical partners in our efforts to advance our broader equity priorities including; developing a culturally competent educator workforce, eliminating disproportionality in student outcome data, closing opportunity and achievement gaps among marginalized student groups, increasing access to high quality early learning opportunities, and maximizing the potential of every Virginia student.

Ex.1 010

# Example C

Superintendent's Memo #050-19



### COMMONWEALTH of VIRGINIA
### Department of Education

DATE:        February 22, 2019

TO:          Division Superintendents

FROM:        James F. Lane, Ed.D., Superintendent of Public Instruction

**SUBJECT:    Resources to Support Student and Community Dialogues on Racism**

*"My message is really that racism has no place in the hearts and minds of our children."*
– Ruby Bridges, Civil Rights Activist[1]

School communities across the Commonwealth are engaging in dialogue around race, racism, and bigotry following the unacceptable and hurtful events that we learned about over the past few weeks. In this twenty-four hour news cycle, we know that our students continue to be inundated with racist images linked to Virginia's history of civil rights oppression. The recent revelations from some of our leaders have left our communities hurt and left our students seeking deeper understanding. Now more than ever, our joint commitment to supporting the social and emotional needs of Virginia's diverse student population is required. From our vantage point as educators, we must all join together to renew our commitment to equity and the elimination of racism of any kind from our public school experience.

Our commitment to advancing equity outcomes and fostering inclusive and welcoming environments for Virginia's students is resolute. As educators, we are uniquely positioned to be leaders in this effort. In the coming days, I encourage us all to take time to reflect on these events and the conditions that exist within our culture and communities that created space and place for these hurtful symbols to be perceived by some as acceptable. As education leaders – we have the opportunity and an obligation – to facilitate meaningful dialogue on racism and bigotry with our students, staff, and school communities.

Students of all backgrounds are experiencing a time in which social justice is at the forefront of their everyday lives. Having conversations related to issues such as race, racism, diversity and inclusion can be difficult and emotional experiences. The recent events in the Commonwealth bring the need for these discussions to the forefront. As educators, we can work together to shift

---

[1] Ruby was the first African-American child to desegregate the all-white William Frantz Elementary School in Louisiana during the New Orleans school desegregation crisis in 1960.

Ex.1 012

the conversation from hate and hurt toward understanding and respect in our communities. This is a critical time for schools and families to work together to foster safe and supportive environments, to teach effective conflict resolution strategies, and to help children understand and manage their emotional reactions.

The compendium of resources provided in this document is intended to help support school divisions in engaging stakeholders in constructive dialogue around these issues with the ultimate goal of enhancing a climate that is welcoming, socially supportive, just, caring, nurturing, and respectful for all students, families, and school personnel.

Additionally, in schools across the Commonwealth, issues related to racially insensitive activities and behaviors have also been the focus of media attention. We encourage division superintendents to work with your faculty and school leaders to ensure that lessons are designed with racial sensitivity and cultural competence in mind. Finally, when students or staff engage in inappropriate and unprofessional conduct, we encourage your teams to take appropriate action to make it clear that racism will not be tolerated in our public schools and know that we will support your efforts.

In response to some educators' requests to also provide guidance on supporting students in understanding and respecting their own personal boundaries and those of others, in the coming days, we will distribute an additional memorandum that provides guidance and resources to school divisions about leading discussions with our students about:

- promoting healthy relationships within our schools and our communities; and
- preventing physical, sexual, and emotional violence in student relationships.

My office will be sending an email to superintendents with additional details about our previously planned **#EdEquityVA** webinar series in the near future. The webinar series is designed to deploy resources, facilitate discourse, and share strategies that promote and advance equity outcomes for all Virginia Students. For additional information on #EdEquityVA and the resources provided below or if your team needs any support, please contact Leah Walker, Director for the Office of Equity and Community Engagement at Leah.Walker@doe.virginia.gov.

**Resources for Teachers and Parents - Facilitating Classroom discussions**
- From the **Association of Supervision and Curriculum Development (ASCD)**
  Resources for Addressing Racism and Hatred in the Classroom  A compiled list of resources to help educators effectively discuss racism and hatred in the classroom.
- From **Teaching Tolerance**
  Teach About Blackface and Other Racist Halloween Choices This online lesson plan builder guides teachers towards building lessons to facilitate student dialogue and help students analyze costumes to see how they reinforce stereotypes.
- From **Teaching Tolerance**
  Learning Plan Builder  This online lesson plan builder guides teachers towards building lessons around social justice standards aimed at prejudice reduction.
- From **Read Brightly**
  Books to help kids understand the fight for racial equality  This is a list of books aimed at helping the reader to understand our Nation's history in its fight for racial equality.
- From **The National Education Association**
  Unite Against Hate!  A list of resources for students, educators, and families as they engage in current national dialogue about racism, hate, and bias.
- From **The National Association of School Psychologists (NASP)**
  Resources on Understanding Bias and Privilege; Resources to Support Students in Stressful Times  A list of resources identified by NASP to help school and families engage in constructive dialogue about the issues of race, privilege, prejudice, and power.
- From **The Anti-Defamation League (ADL)**
  After Charlottesville: Teaching about Racism, Anti-Semitism and White Supremacy  This page provides relevant lessons, related curricula and additional anti-bias resources and strategies to teachers and parents/family members, discuss topics related to white supremacy, racism, anti-Semitism, domestic extremism, free speech, and others with young people.
- From **Facing History and Ourselves**
  Lesson Plans Resources on the Fight against Bigotry  This website provides a lesson plan designed to help students probe themes about race, racism, and history.
- From PBS **Blackface Minstrelsy in Modern America** Teaching Guide: Exploring Blackface Minstrelsy in Modern America This teaching guide helps instructors use a specific primary source set, Blackface Minstrelsy in Modern America, in the classroom. It offers discussion questions, classroom activities, and primary source analysis tools.

**Resources for School and Division Leaders**
- **From EthicsUnwrapped, McCombs School of Business, University of Texas**
- Teaching Blackface: A Lesson on Stereotypes This case study examines an incident where a teacher was placed on administrative leave for showing a video on Blackface during a lesson on segregation in his US History class.  Discussion question explore the complexities involved in teaching about stereotypes and racism.
- **From The Century Foundation's Report**
  A New Wave of School Integration: Districts and Charters Pursuing Socioeconomic Diversity  This report addresses racial and socioeconomic segregation in schools.  It highlights the work that schools are doing to promote integration.

- From **The National Association of School Psychologists (NASP)**
  Resources for Building Trauma Sensitive Schools     This online resource is aimed at
  providing educational leaders brief tips and policy recommendations for developing
  trauma-sensitive schools.

**Dr. Lane's February Reading List**
I have received several inquiries and requests for the latest literature that examines the issues
associated with racial inequities in education.  Below are several pieces that I and other members
of the VDOE staff are reading this month based on recommendations that we have received.

**White Fragility**, by Robin DiAngelo.
Antiracist educator Robin DiAngelo illuminates the phenomenon of white fragility.  Referring to
the defensive moves that white people make when challenged racially, white fragility is
characterized by emotions such as anger, fear, and guilt, and by behaviors including
argumentation and silence. These behaviors, in turn, function to reinstate white racial
equilibrium and prevent any meaningful cross-racial dialogue. In this in-depth exploration,
DiAngelo examines how white fragility develops, how it protects racial inequality, and what we
can do to engage more constructively.

**Between the World and Me**, by Ta-Nehisi Coates.
In a profound work that pivots from the biggest questions about American history and ideals to
the most intimate concerns of a father for his son, Ta-Nehisi Coates offers a powerful new
framework for understanding our nation's history and current crisis. Americans have built an
empire on the idea of "race," a falsehood that damages us all but falls most heavily on the bodies
of black women and men—bodies exploited through slavery and segregation, and, today,
threatened, locked up, and murdered out of all proportion. What is it like to inhabit a black body
and find a way to live within it? And how can we all honestly reckon with this fraught history
and free ourselves from its burden? Between the World and Me is Ta-Nehisi Coates's attempt to
answer these questions in a letter to his adolescent son. Coates shares with his son—and
readers—the story of his awakening to the truth about his place in the world through a series of
revelatory experiences, from Howard University to Civil War battlefields, from the South Side of
Chicago to Paris, from his childhood home to the living rooms of mothers whose children's lives
were taken as American plunder.  Beautifully woven from personal narrative, reimagined
history, and fresh, emotionally charged reportage, Between the World and Me clearly illuminates
the past, bracingly confronts our present, and offers a transcendent vision for a way forward.

**For White Folks That Teach in the Hood... and the Rest of Ya'll Too: Reality Pedagogy and
Urban Education (Race, Education and Democracy)**, by Christopher Emdin.
Drawing on his own experience of feeling undervalued and invisible in classrooms as a young
man of color and merging his experiences with more than a decade of teaching and researching
in urban America, award-winning educator Christopher Emdin offers a new lens on an approach
to teaching and learning in urban schools. Putting forth his theory of Reality Pedagogy, Emdin
provides practical tools to unleash the brilliance and eagerness of youth and educators alike—
both of whom have been typecast and stymied by outdated modes of thinking about urban
education.

**No BS (Bad Stats): Black People Need People Who Believe in Black People Enough Not to Believe Every Bad Thing They Hear about Black People**, by Ivory A. Toldson
What if everything you thought you knew about Black people generally, and educating Black children specifically, was based on BS (bad stats)? We often hear things like, "Black boys are a dying breed," "There are more Black men in prison than college," "Black children fail because single mothers raise them," and "Black students don't read." In *No BS*, Ivory A. Toldson uses data analysis, anecdotes, and powerful commentary to dispel common myths and challenge conventional beliefs about educating Black children. With provocative, engaging, and at times humorous prose, Toldson teaches educators, parents, advocates, and students how to avoid BS, raise expectations, and create an educational agenda for Black children that is based on good data, thoughtful analysis, and compassion. *No BS* helps people understand why Black people need people who believe in Black people enough not to believe every bad thing they hear about Black people.

**Foundations of Critical Race Theory in Education**, by Edward Taylor, David Gillborn, and Gloria Ladson-Billings
The emergence of Critical Race Theory (CRT) marked an important point in the history of racial politics in the legal academy and the broader conversation about race and racism in the United States. More recently, CRT has proven an important analytic tool in the field of education, offering critical perspectives on race, and the causes, consequences and manifestations of race, racism, inequity, and the dynamics of power and privilege in schooling. This groundbreaking anthology is the first to pull together both the foundational writings in the field and more recent scholarship on the cultural and racial politics of schooling. A comprehensive introduction provides an overview of the history and tenets of CRT in education. Each section then seeks to explicate ideological contestation of race in education and to create new, alternative accounts. In so doing, this landmark publication not only documents the progress to date of the CRT movement, it acts to further spur developments in education.

JFL/LDW

*Given inquiries related to this memo, and to ensure readers understand the full context around its publication, the following supplemental note is provided by way of additional information.*

*This memo was issued in February 2019 as a compendium of resources and different perspectives for school division leaders who were navigating community conversations related to race. It is not a resource or directive for classroom teachers, nor does it reflect recommended or required student reading.*

*The resources listed and authors referenced represent a variety of viewpoints, and their inclusion does not necessarily represent a Department endorsement of expressed views and opinions.*

*Finally, because the Department has received many related inquiries, Critical Race Theory (CRT) is not included in the Virginia Standards of Learning, which comprise the content in each*

*subject area that the commonwealth's school divisions are required to cover in their local curricula. Nowhere in the standards is there a requirement for schools to teach critical race theory, or to incorporate critical race theory when presenting required content.*

*As stated in the memo, the purpose of the document was to support division leaders as they further the shared goal of fostering schools that are welcoming and respectful of all students, families, and school staff.*

*-November 19, 2021*

# Example D





# Follow the "Math Path"



**FOUNDATIONAL MATHEMATICS CONCEPTS GRADES K-7**

- Number & Number Sense
- Computation and Estimation
- Measurement and Geometry
- Probability and Statistics
- Patterns, Functions, and Algebra

**ESSENTIAL MATHEMATICS CONCEPTS GRADES 8-10**
(2 HS Mathematics Credits)

- Data Analysis
- Mathematical Modeling
- Functions and Algebra
- Spatial Reasoning
- Probability

**ADVANCED MATHEMATICS CONCEPTS GRADES 11-12**
(2 HS Mathematics Credits)

Modules may be mixed and matched to total two credits and taken in any order except where pre-requisite knowledge may be necessary.

**1/2 Credit Course Options**

| Data Modules | • Data Science<br>• Probability and Statistics |
| Design Modules | • Geometry and Design<br>• Trigonometric Applications |
| Analysis Modules | • Applications of Advanced Algebra<br>• Precalculus: Focus on Functions |
| Modeling Modules | • Mathematical Modeling<br>• Financial Modeling |
| Computing Modules | • Discrete Mathematics for Computing<br>• Sets and Logic |

**1 Credit Course Options**

Some courses may include Dual Enrollment and Advanced Placement

- Quantitative Reasoning
- Computer Science
- Calculus
- Statistics
- International Baccalaureate

DIRECT ENTRY

COLLEGE

TRADE SCHOOL

MILITARY

**CAREER CLUSTERS**

- Agriculture
- Architecture
- Arts
- Business
- Education
- Energy
- Finance
- Government and Public Domain
- Health
- Hospitality and Tourism
- Human Services
- Information Technology
- Law
- Manufacturing
- Marketing
- STEM
- Transportation

**VIRGINIA DEPARTMENT ♥ OF EDUCATION**

Ex.1 019

# EXHIBIT 2

ACC Page 1

# ANTI-RACISM

The Albemarle County School Board ("Board") and the Albemarle County Public Schools ("Division") reject all forms of racism as destructive to the Division's mission, vision, values, and goals. The Board is committed to the following principles:

1. Establishing and sustaining a school community that shares the collective responsibility to address, eliminate, and prevent actions, decisions, and outcomes that result from and perpetuate racism.

2. Eliminating inequitable practices and cultivating the unique gifts, talents, and interests of every child to end the predictive value of social or cultural factors, such as race, class, or gender, on student success (ACPS Equity & Access Initiative: A Call to Action, 2017).

3. Respecting and championing the diversity and life experiences of all community members to support the school division's mission, vision, values, goals, and objectives.

4. Acknowledging that racism is often compounded by other forms of discrimination, including, but not limited to, those protective classes referenced in policy AC, *Nondiscrimination.*

Purpose

Personal and institutional racism have historically existed and continues to exist in the Division. Combating racism in our schools is a legal and moral imperative.

In this Division, there are significant disparities between racial groups in student academic performance, achievement, and participation in academic programs. These include disparities in graduation rates, gifted identification, course participation, special education identification, standardized test scores, and suspension rates. Disparities also exist between the racial demographics of the students in the Division and the staff the Division hires.

These equity gaps exist because of inequitable access to opportunities that have significant intergenerational effects and perpetuate economic, social, and educational inequity. However, racial inequities were created over time and can be eliminated. Similarly, personal prejudice is learned and can be unlearned. Educators play a vital role in reducing racism and inequity by recognizing the manifestations of racism, creating culturally inclusive learning and working environments, and dismantling educational systems that directly or indirectly perpetuate racism and privilege through teaching, policy, and practice.

The purpose of this policy is to eliminate all forms of racism from the Division in conjunction with related Board policies.

Ex.2 001

ACC Page 2

Definitions adapted from the *Government Alliance on Race and Equity* at
www.racialequityalliance.org)

Anti-racism: the practice of identifying, challenging, and changing the values, structures, and behaviors that perpetuate systemic racism.

Individual racism: pre-judgment, bias, or discrimination by an individual based on race. Individual racism includes both privately held beliefs, conscious and unconscious, and external behaviors and actions towards others.

Institutional racism: occurs within institutions and organizations, such as schools, that adopt and maintain policies, practices, and procedures that often unintentionally produce inequitable outcomes for people of color and advantages for white people.

Structural (or systemic) racism: encompasses the history and current reality of institutional racism across all institutions and society. It refers to the history, culture, ideology, and interactions of institutions and policies that perpetuate a system of inequity that is detrimental to communities of color.

Adopted: February 28, 2019

Cross Refs:     AC, *Nondiscrimination*
                GB, *Equal Employment Opportunity*
                IGAK, *Equity Education*
                INB, *Teaching about Controversial Issues*
                JB, *Equal Educational Opportunities*
                JFC, *Student Conduct*
                JFHA, *Prohibition against Harassment and Retaliation*

Ex.2 002

# ANTI-RACISM POLICY REGULATIONS

These regulations are designed to dismantle the individual, institutional, and structural racism that exists in the Division. The Board directs the following action:

<u>Policy Communication</u>

1. Each school shall post a public statement against racism in a location visible to students, staff, and visitors entering the school. The Division will also post a public statement in high traffic locations at its main offices and on the Division website. The public statement shall read: "Albemarle County Public Schools is committed to establishing and sustaining an equitable community that achieves the School Division's equity mission to end the predictive value of race and ensure each individual student's and staff's success. The Albemarle County School Board and School Division reject all forms of racism as destructive to their mission, vision, values, and goals."

2. The Board shall establish an organization or committee of students in the Division to promote equity and diversity and to serve as leaders and spokespersons within their schools and the Division.

3. This policy shall be included in student handbooks provided to students and families.

4. This policy shall be translated into other languages and be made available for families.

<u>Leadership and Administration</u>

The Board shall address systemic racism as follows:

1. Develop and conduct a systemic Equity Needs Assessment for the Division to identify processes and practices that cause or contribute to inequitable outcomes. The Assessment shall also include an inventory of what equity-related data is currently collected by the Division. Following the assessment, strategies will be developed and implemented to address the identified issues.

2. To address disparities in course participation (including AP/honors participation):

a. All school staff making class recommendations shall provide a written electronic explanation for the recommendation to students and/or families.

b. School counselors shall be responsible for educating students and families as equitable partners in the selection process and course sequencing.

c. Middle and high schools will offer opportunities for supplementary coursework, such as summer bridge programs or tutoring during or after school, to students interested in moving to higher level courses.

3. The Board shall implement alternative discipline processes, such as restorative justice, to reduce racial disparities in discipline and suspension.

     a. To ensure consistency in student discipline, each school shall collect and, at least annually, report data on all disciplinary actions. The data shall include the student's race/ethnicity, gender, socio-economic status, special education, and English Language Learner status, as well as a written explanation of the behavior leading to discipline and the specific corrective action taken.

     b. When school administrators determine a student has committed a racist act, the student will be provided the opportunity to learn about the impact of their actions on others through such practices as restorative justice, mediation, role play or other explicit policies or training resources.

<u>Curriculum and Instruction</u>

1. Curriculum and instructional materials for all grades shall reflect cultural and racial diversity and include a range of perspectives and experiences, particularly those of historically underrepresented groups of color.

2. All curriculum materials shall be examined for racial bias by the Division's Department of Student Learning. Where materials reflect racial bias, teachers utilizing the materials will acknowledge the bias and communicate it to students and parents.

3. The Board and Division shall implement an anti-racist curriculum and provide educational resources for students at every grade level.

4. Student in-class and extra-curricular programs and activities shall be designed to provide opportunities for cross-cultural and cross-racial interactions to foster respect for cultural and racial diversity. The Board shall support interschool activities that will allow students to experience the diversity within the Division.

<u>Training</u>

1. All Board and Division staff shall be trained in this anti-racism policy.

2. All teachers and administrators shall be trained in cultural awareness and/or culturally responsive teaching practices. Culturally responsive teaching practices shall be incorporated into Board approved appraisal systems, including the teacher appraisal system and the administrator performance appraisal.

3. All Division staff shall be trained about racism and about how racism produces inequitable practices and outcomes.

Policy Enforcement

1. Staff shall collect, review, and provide an annual report to the School Board on data regarding racial disparities in areas including, but not limited to, student achievement, enrollment, suspension/discipline, graduation rates, and gifted identification. The report shall also include evidence of growth in each area outlined by the anti-racism policy (i.e., communication, leadership and administration, curriculum and instruction). The written reports shall also be made available to the public, to the student diversity committee, and to school equity teams.

2. The assistant superintendent for school and community empowerment shall be responsible for implementation and evaluation of Division strategies for implementation.  Adequate resources shall be appropriated.

3. The Division shall ensure there are various, including anonymous, means for students and staff to report racism and other forms of discrimination.

# EXHIBIT 3



# How to Engage with this Orientation

- Please note that there are 3 sections to this orientation: Purpose, Definitions, and Principles.

- Place this slideshow in "Presentation Mode" when working through this orientation.

- Review the information in each section and use the reflective questions to help you think about the ideas that are shared.

- There are audio buttons on each slide that can be used to have the content read outloud.

- At times, this orientation will invite you to leave the slide show to visit educational video clips from an outside source. Once you have finished watching these clips, please remember to return to the slide show to continue with the orientation.

- After you have been through the whole orientation, complete the verification form

Ex.3 002

2



Ex.3 003



# Statement of Purpose

"In this Division, there are significant disparities between racial groups in student academic performance, achievement, and participation in academic programs. These include disparities in graduation rates, gifted identification, course participation, special education identification, standardized test scores, and suspension rates. Disparities also exist between the racial demographics of the students in the Division and the staff the Division hires...The purpose of this policy is to eliminate all forms of racism from the Division in conjunction with related Board policies."

5

Ex.3 005











Ex.3 010



Definition # 2: Individual Racism

Prejudgment, bias, or discrimination by an individual based on race -- Individual racism includes both privately held beliefs, conscious and unconscious, and external behaviors and actions towards others.

Ex.3 011



Video Clip on Individual Racism

Watch 00:10 – 02:20

New York Times "A Conversation On Race"
https://www.youtube.com/watch?v=S-AwS.kaLege&list=L1b4-soXdtk8HIuk
SSA167.referdex.904  uploaded 2017.

Ex.3 012

12







Definition #4: Structural/Systemic Racism

Encompasses the history and current reality of institutional racism across all institutions and society -- It refers to the history, culture, ideology, and interactions of institutions and policies that perpetuate a system of inequity that is detrimental to communities of color.

Ex.3 016



Ex.3 017





Ex.3 019



# Section 3:
## Anti-Racism Policy Principles

- **Watch** our Assistant Superintendent, Dr. Bernard Hairston, discuss the principles of the Anti-Racism Policy.

- Read the summary of the principles from the policy.

- Think about the reflection question at the end of this section.

Ex.3 020







1. Building school communities that share the responsibility to recognize and end racism.

2. Eliminating inequitable practices and supporting the unique gifts, talents, and interests of every child. This will help end the gaps we see when we look at differences in student success based on race, class, and gender (based on ACPS Equity & Access Initiative: A Call to Action, 2017).

3. Respecting and championing the diversity and life experiences of all community members to support the school division's mission, vision, values, goals, and objectives.

4. Acknowledging that racism is often connected to other forms of discrimination such as discrimination based on religion, sex, and age. These are examples of the protected classes listed in policy AC, Nondiscrimination.

23

Ex.3 023











# EXHIBIT 4

1    VIRGINIA:   IN THE CIRCUIT COURT

2        FOR THE COUNTY OF ALBEMARLE

3

CARLOS and TATIANA IBAÑEZ; R.I.       )
4   AND V.I., minors, by and through    )
their parents, Carlos and             )
5   Tatiana Ibanez, as the minors'      )   NO. CL21001737-00
next friend; et al.,                  )
6                                       )
Plaintiffs,                  )   YouTube Recording
7                                       )
v.                                     )
8                                       )
ALBEMARLE COUNTY SCHOOL BOARD;         )
9   et al.,                              )
)
10       Defendants.                  )
)

11

12

13

14

15        TRANSCRIPT OF YOUTUBE RECORDINGS

16   OF PRESENTATION BY DR. BERNARD HAIRSTON,
Assistant Superintendent,
Albemarle County Public Schools

17

18   Uploaded to YouTube on January 30, 2021

19
ARIZONA REPORTING SERVICE, INC.
20   Audio Transcription Specialists
2928 North Evergreen Street
21   Phoenix, Arizona  85014-5508
azrs@az-reporting.com

22

23
Transcribed by:
24   Katherine A. McNally
CERTIFIED TRANSCRIBER
25   CERT**D-323

Ex.4 001

1          [Commencement of YouTube recording of

2               Dr. Bernard Hairston.]

3                 *    *    *    *    *

4          DR. BERNARD HAIRSTON:  Hello.  I'm Dr. Bernard

5    Hairston, the second African American to hold the

6    position of assistant superintendent in the long history

7    of Albemarle County Public Schools.  Think about it and

8    ask yourself, Why only two?  And why 51 years between

9    the first and second hiring?

10         The School Board entrusted me with the

11   responsibility to develop and oversee the implementation

12   of this antiracism policy.  I have asked myself why.

13   And my answer is because I'm black.  I've experienced

14   racism in Albemarle County Public Schools; accepted

15   being a practitioner of individual, institutional, and

16   structural racism as a decision maker in Albemarle

17   County Public Schools.  And I have no problem speaking

18   the truth and a track record of pushing against our

19   status quo thinking and doing business in Albemarle

20   County Public Schools.  Thus, concluding the School

21   Board must be serious about confronting this

22   institutional system built on advancing whiteness.

23         These are personal clues to my understanding of

24   the four principles embedded in the antiracism policy.

25   This orientation officially invites you to the table as

ARIZONA REPORTING SERVICE, INC.    (602) 274-9944
azrs@az-reporting.com                Phoenix, AZ

Ex.4 002

1   decision makers.  You are the behaviors.  You are the

2   attitudes.  You are the pop, protectors of everyday

3   practices and the necessary agents of change in this

4   journey to shift us to a more inclusive working and

5   learning environment, exclusive of racism.

6          For my white colleagues who are bus drivers to

7   principals, this what it's about, acknowledging that you

8   don't know what you don't know about race.  You are

9   often invisible because you can be.

10          To my colleagues of color who are office

11  associates to teachers, it is about how you advance and

12  respect the learning curves of different points of view;

13  about race simply by pushing just hard enough, but not

14  so hard you close doors.

15          Now, ask yourself to what degree does race

16  complicate your life if you are white versus a person of

17  color?

18          This work is about all of us acknowledging our

19  part as change agents by honoring the third and fourth

20  principles of the antiracism policy.

21          The School Board and our superintendents

22  [indiscernible] are actively engaged in learning to

23  become antiracist leaders.  Also, every principal and

24  every department head should be leading discussions on

25  the courageous conversations about race book study.

1          This policy requires everyone to be trained in
2   Albemarle County Public Schools.
3          Now, reflect on the black males that ascribed
4   individual racism in a previous slide and if they
5   experienced discrimination based on their skin color.
6   Consider the language in the School Board's
7   nondiscrimination policy AC.  It states:  Albemarle
8   County Public Schools shall not discriminate on the
9   basis of sex, gender, race, color, or any other
10  characteristic protected by law in the educational
11  programs it operates.
12         Now, consider if discrimination and racism occur
13  regularly among students and adults of color in
14  Albemarle County Public Schools; and if so, what
15  structures and practices exist to protect the behaviors.
16  We see what we look for.
17         Now, not too long ago, I was engaged in a
18  conversation with a group of my white colleagues about
19  achievement gaps between students of color and white
20  students.  The low level in which I perceived their
21  concern angered me to the core of my soul, resulting in
22  this statement:  If these were your children, your
23  relatives, people who look like you, the urgency for
24  addressing these longstanding inequitable practices and
25  downright embarrassing results would be different.

Ex.4 004

1          There was silence.  Little to no eye contact.
2     But what is most concerning is that no one in that group
3     has spoken to me about that exchange.
4          Now, ask yourself why.  But, more importantly,
5     ask what you would have done in my role in that
6     situation or their role.
7          Now, consider the possible connection to the
8     second principle of the antiracism policy.  It's time to
9     wrap up.
10          I can own what I do with the words written in
11    this policy for applying the definition of antiracism.
12    I can hold myself accountable for identifying,
13    challenging, and changing the value structures and
14    behaviors that perpetual systemic racism in this school
15    division.
16          This simple statement drives my accountability:
17    If I identify forms of racism, and I do absolutely
18    nothing about it, then I become a practitioner of
19    racism.
20          Now, consider this controversial statement by
21    some researchers:  You are either a racist or an
22    antiracist.  It is time for you to think about how you
23    will own this required antiracism training and the
24    policy.
25          I leave you with this thought.  Be real, my

1   colleagues, and ask yourself if you are on this moving

2   Albemarle County Public School antiracism school bus, or

3   if you need help finding your seat and keeping your

4   seat, or if it's time for you to just get off the bus.

5   Let me know if you need personalized support.

6          Thank you for listening and your efforts to make

7   Albemarle County Public Schools a more equitable and

8   inclusive environment to learn and work.

9          We can do this together.

10         [Conclusion of YouTube recording of

11              Dr. Bernard Hairston.]

12              *     *     *     *     *

13

14

15

16

17

18

19

20

21

22

23

24

25

Ex.4 006

1                    C E R T I F I C A T E

2

3          I, Katherine McNally, Certified

4    Transcriptionist, do hereby certify that the foregoing

5    pages 1 to 6 constitute a full, true, and accurate

6    transcript, from electronic recording, of the

7    proceedings had in the foregoing matter, all done to the

8    best of my skill and ability.

9

10         SIGNED and dated this 27th day of January 2022.

11

12

13                    _Katherine A. McNally_

14                    _____
                      Katherine McNally

15                    Certified Electronic Transcriber
                      CET**D-323

16

17

18

19

20

21

22

23

24

25

ARIZONA REPORTING SERVICE, INC.     (602) 274-9944
azrs@az-reporting.com                    Phoenix, AZ

Ex.4 007

# EXHIBIT 5



# Book Study Norms and Expectations

## Four Agreements
(The Process, pg 27))

1. Stay engaged
2. Experience discomfort
3. Speak your truth
4. Expect and accept non closure

## Six Conditions
(The Content, pg 27-28)

1. Focus on personal, local and immediate

2. Isolate race

3. Develop an understanding of race from multiple racial perspectives

4. Monitor agreements, conditions, and establish parameters for discussion

5. Establish an organizational vision around a contemporary, working definition of race

6. Examine the presence and role of "Whiteness" and its impact on the conversation

8

Ex.5 002

## Prompt #1: From a scale 1-5, what is your level of readiness/comfort to engage in conversations about race?

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| I don't see color. I was raised to treat everyone with respect. | I acknowledge that racism exists, but I am still uncomfortable in engaging in conversations about race. It's easier for me to talk about other inequities (i.e., gender bias, social economic status, etc) | I am aware of my racial identity and how its influenced my ability to navigate society. I still experience discomfort when talking about race, but I am getting better at sitting with the discomfort I feel. | I am comfortable talking about race, but I acknowledge I still have some gaps. I want to be better equipped at speaking out when I witness a micro-aggression and acts of racism. | I am completely comfortable talking about race and calling out acts of racism. However, I want to be better equipped at identifying and implementing policies and programs that are anti-racist. |

10

Ex.5 003

## Communication is a Racialized Tool

| White Talk | Color Commentary |
|---|---|
| • Verbal: Focused on talking and offering racial meaning through word choice, voice tone, and intonation | • Nonverbal: Focused on offering racial meaning through facial expressions, body movements, and physical gestures |
| • Impersonal: Focused on the sharing of racial perspectives or experiences of someone not immediately present or involved in the conversation. | • Personal: Focused on sharing one's own personal racial narrative, perspectives, or experiences. |
| • Intellectual: Focused on what one thinks (or has read) with respect to race. | • Emotional: Focused on what one feels (or has experienced) with respect to race. |
| • Task oriented: Focused on engaging in dialogue for the purposes of getting something accomplished. | • Process oriented: Focused on engaging in dialogue for the purposes of feeling present, connected, or heard. |

11

Ex.5 004



Ex.5 005





"Chef" by Charles Haynes is licensed under CC BY-SA 2.0

Ex.5 007



Ex.5 008



Ex.5 009

# EXHIBIT 6



# COMMONWEALTH of VIRGINIA

### Office of the Attorney General

Mark R. Herring
Attorney General

202 North Ninth Street
Richmond, Virginia 23219
804-786-2071
Fax 804-786-1991
Virginia Relay Services
800-828-1120
7-1-1

December 1, 2021

Alliance Defending Freedom
c/o Tyson Langhofer, Esq.
44180 Riverside Parkway
Lansdowne, VA  20176

RE:   **Emily Mais v. Albemarle County Public Schools/**
**Agnor-Hunt Elementary School**

Dear Mr. Langhofer:

This letter is to inform you that the Office of the Attorney General, Office of Civil Rights ("OCR") has received the complaint form filed on behalf of Emily Mais for review.  Upon the completion of our review, the OCR's Intake section will advise you of the status of Emily Mais' complaint.

Thank you for bringing your client's concerns to the attention of the Office of Civil Rights. If you have any questions or concerns, you may call contact the OCR at (804) 225-2292.

Sincerely,

/s/ Timothy Wilson

Timothy Wilson
Intake Manager
Office of Civil Rights

TW/jb

Ex.6 001

# EXHIBIT 7





# COMMONWEALTH of VIRGINIA

*Office of the Attorney General*

Jason S. Miyares
Attorney General

January 18, 2022

202 North Ninth Street
Richmond, Virginia 23219
804-786-2071
Fax 804-786-1991
Virginia Relay Services
800-828-1120
7-1-1

Alliance Defending Freedom
c/o Tyson Langhofer, Esq.
44180 Riverside Parkway
Lansdowne, Virginia 20176

**RE: Emily Mais**

Dear Mr. Langhofer:

The Office of the Attorney General, Office of Civil Rights has forwarded your complaint to the U.S. Equal Employment Opportunity Commission – Richmond Local Office for further review and consideration.

You may contact that agency at the address and telephone number listed below:

**U.S. Equal Employment Opportunity Commission**
**Richmond Local Office**
**400 North 8th Street, Suite #350**
**Richmond, Virginia 23219**
**(804) 771-2200**

If you have further questions, do not hesitate to contact our office.

Sincerely,

Timothy Wilson
Intake Manager
Office of Civil Rights

tw

Ex.7 001

# EXHIBIT 8

| From: | Wilson, Timothy L. |
|---|---|
| To: | Hal Frampton |
| Cc: | Jessica Perske; Rodriguez, Francesca; Kate Anderson |
| Subject: | RE: Complaint of Emily Mais |
| Date: | Thursday, March 3, 2022 9:00:36 AM |
| Attachments: | image001.jpg |
| | image002.jpg |
| | image003.jpg |
| | image004.png |
| Importance: | High |

**\*EXTERNAL\***

Mr. Frampton,

Per the previous email below, OCR did not accept your client's complaint for a case investigation; therefore, no right to sue letter will be issued by OCR.  Only complaints that are accepted for case investigation by OCR receive OCR's  right to sue letter.  Thus, your client may receive a right to sue letter from the EEOC. I hope this information helps.

Sincerely,

**From:** Hal Frampton <hframpton@adflegal.org>
**Sent:** Thursday, March 3, 2022 10:24 AM
**To:** Wilson, Timothy L. <TWilson@oag.state.va.us>
**Cc:** Jessica Perske <jperske@adflegal.org>; Rodriguez, Francesca <FRodriguez@oag.state.va.us>; Kate Anderson <kanderson@adflegal.org>
**Subject:** RE: Complaint of Emily Mais

Thank you very much.  Just so I'm clear about the work-sharing arrangement, OCR didn't transfer the case to the EEOC because OCR lacked jurisdiction, correct? It just transferred the case for the EEOC to handle the primary investigation. So when the EEOC renders a decision, we will still get a notice of right to sue from both the EEOC and from OCR? I apologize for all the questions – I just want to make sure we don't waive any rights under Virginia law.

Hal

**From:** Wilson, Timothy L. <TWilson@oag.state.va.us>
**Sent:** Thursday, March 3, 2022 9:57 AM
**To:** Hal Frampton <hframpton@adflegal.org>
**Cc:** Jessica Perske <jperske@adflegal.org>; Rodriguez, Francesca <FRodriguez@oag.state.va.us>; Kate Anderson <kanderson@adflegal.org>
**Subject:** RE: Complaint of Emily Mais
**Importance:** High

**\*EXTERNAL\***

Good morning Mr. Frampton,

Ex.8 001

Your are correct with your first belief.  Per the letter dated January 18. 2022, there being no OCR case acceptance for an investigation, no right to sue letter was issued; and your client's complaint was closed in OCR's inventory on the same day.

Sincerely

**From:** Hal Frampton <hframpton@adflegal.org>
**Sent:** Wednesday, March 2, 2022 4:15 PM
**To:** Wilson, Timothy L. <TWilson@oag.state.va.us>
**Cc:** Jessica Perske <jperske@adflegal.org>; Rodriguez, Francesca <FRodriguez@oag.state.va.us>; Kate Anderson <kanderson@adflegal.org>
**Subject:** RE: Complaint of Emily Mais

Good afternoon Mr. Wilson,

I saw that Ms. Mais's complaint was referred to the EEOC.  I hope this is not a silly question, but I'm curious if this was simply a transfer for the EEOC to handle processing of the Charge under the OCR/EEOC worksharing agreement, or did OCR reach a substantive decision on the Charge?  I did not see a right to sue letter, so I assume it's the former, but I wanted to make sure.  Many thanks for you assistance with this process.

Sincerely,
Hal Frampton

**From:** Wilson, Timothy L. <TWilson@oag.state.va.us>
**Sent:** Monday, January 10, 2022 9:34 AM
**To:** Hal Frampton <hframpton@adflegal.org>
**Cc:** Jessica Perske <jperske@adflegal.org>; Rodriguez, Francesca <FRodriguez@oag.state.va.us>
**Subject:** RE: Complaint of Emily Mais
**Importance:** High

**\*EXTERNAL\***

Good morning Mr. Frampton,

Your client's complaint is still waiting to be reviewed in the order it was received.  As soon as I see anything that can help expedite the process, I will let you know ASAP!  At the moment, it has not been dismissed during the initial review after it was filed.  Thank you for your continued patience.  We are making some progress with alleviating our backlog that existed prior to the filing of your client's complaint.  If you have any further questions or concerns, please do not hesitate to contact me.

Sincerely,

Ex.8 002

**Timothy L. Wilson**
**Administration/Operations Manager**
**Office of the Attorney General**
202 North 9th Street
Richmond, Virginia 23219
(804) 225-2292 Office
(804) 944-1254 Mobile
TWilson@oag.state.va.us
http://www.ag.virginia.gov



---

**From:** Hal Frampton <hframpton@adflegal.org>
**Sent:** Friday, January 7, 2022 8:29 AM
**To:** Wilson, Timothy L. <TWilson@oag.state.va.us>
**Cc:** Jessica Perske <jperske@adflegal.org>
**Subject:** RE: Complaint of Emily Mais

Good morning, Mr. Wilson,

I'm just checking whether there is any update concerning the Emily Mais v. Albemarle County Public Schools matter.  Many thanks!

Hal



Hal Frampton
Senior Counsel
+1 571 707 4655 (Office)
480-444-0028 (Fax)
hframpton@adflegal.org
ADFlegal.org

---

**From:** Wilson, Timothy L. <TWilson@oag.state.va.us>
**Sent:** Monday, November 22, 2021 11:15 AM
**To:** Tyson Langhofer <tlanghofer@adflegal.org>
**Cc:** Kate Anderson <kanderson@adflegal.org>; Hal Frampton <hframpton@adflegal.org>; Jessica Perske <jperske@adflegal.org>; Rodriguez, Francesca <FRodriguez@oag.state.va.us>
**Subject:** RE: Complaint of Emily Mais
**Importance:** High

**\*EXTERNAL\***

Ex.8 003

Received for November 22, 2021.

Good morning Mr. Langhofer,

The Office of the Attorney General, Office of Civil Rights ("OCR") will date-stamp the completed complaint form upon receipt during office hours or the next business day.  OCR will accept fax or scanned copies of the complaint form **in abeyance** until the hard copy with your client's "wet" signature in blue or black ink is received by U.S. mail along with your law office's cover letter of representation.  There is no need to resubmit attachments, just send the hard copy complaint form and representation letter on your firm's letterhead.

Sincerely,

**Timothy L. Wilson**
**Administration/Operations Manager**
**Office of Civil Rights**
**Office of the Attorney General**
202 North 9th Street
Richmond, Virginia 23219
(804) 225-2292 Office
(804) 944-1254 Mobile
TWilson@oag.state.va.us
http://www.ag.virginia.gov



-

**From:** Tyson Langhofer <tlanghofer@adflegal.org>
**Sent:** Monday, November 22, 2021 9:59 AM
**To:** Human_Rights <Human_Rights@oag.state.va.us>
**Cc:** Kate Anderson <kanderson@adflegal.org>; Hal Frampton <hframpton@adflegal.org>; Jessica Perske <jperske@adflegal.org>
**Subject:** Complaint of Emily Mais

Dear Office of Civil Rights:

Please find attached an employment discrimination complaint on behalf of our client, Emily Mais.  Please confirm receipt, and please direct all further correspondence concerning the complaint to our attention.  It is our understanding that this complaint will automatically be dual filed with the U.S. Equal Employment Opportunity Commission; however, if that is not the case, please let us know.

Ex.8 004

 Tyson Langhofer

Sr. Counsel, Director of Center for Academic Freedom

+1 571 707 4655 (Office)

+1 480 388 8205 (Direct Dial)

202-347-3622 (Fax)

tlanghofer@adflegal.org

ADFlegal.org

This e-mail message from Alliance Defending Freedom and any accompanying documents or embedded messages is intended for the named recipients only. Because Alliance Defending Freedom is a legal entity engaged in the practice of law, this communication contains information, which may include metadata, that is confidential, privileged, attorney work product, or otherwise protected from disclosure under applicable law. If you have received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, be advised that any review, disclosure, use, dissemination, distribution, or reproduction of this message or its contents is strictly prohibited. If you have received this message in error, please immediately notify the sender and permanently delete the message. PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT COMMUNICATION/ATTORNEY WORK PRODUCT.

Ex.8 005

# EXHIBIT 9

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Richmond Local Office
400 N. Eight Street, Suite 350
Richmond, VA 23219
(804) 362-6910
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 05/11/2022

To: Emily Mais

Charge No: 438-2022-00641

EEOC Representative and email:        Charles Hernandez
                                      Investigator
                                      charles.hernandez@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 438-2022-00641.

On behalf of the Commission,

For:   **Charles Hernandez**   Digitally signed by Charles Hernandez
                               Date: 2022.05.11 12:26:01 -04'00'

Daron L. Calhoun
Director

cc: Tyson Langhofer              Jeremy D. Capps
    Alliance Defending Freedom   Harman, Claytor, Corrigan,& Wellman
    tlanghofer@adflegal.org      jcapps@hccw.com

Ex. 9 001

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 438-2022-00641 to the District Director at Thomas M. Colclough, 129 West Trade Street Suite 400

Charlotte, NC 28202.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

Ex. 9 002

Enclosure with EEOC Notice of Closure and Rights (01/22)

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

VIRGINIA: IN THE CIRCUIT COURT FOR THE COUNTY OF ALBEMARLE

**EMILY MAIS**,

*Plaintiff*,

v.

**ALBEMARLE COUNTY SCHOOL BOARD**,

*Defendant.*

Case No. CL22000496-00

### [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

Presently before the Court is Plaintiff's Motion for Leave to File Second Amended Complaint. The Court has reviewed the motion and agrees that Plaintiff has demonstrated good cause for filing a second amended complaint. Therefore, Plaintiff's motion is hereby GRANTED, and, in accordance with Va. Sup. Ct. R. 1:8, the Second Amended Complaint attached to Plaintiff's motion shall be deemed filed as of the date hereof.

And it is so ORDERED.

Entered this _____ day of _____, 2022.

_____

Hon. _____

Judge, 16th Judicial Circuit

I ask for this:


Rachel A. Csutoros
Virginia Bar No. 97783
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
rcsutoros@ADFlegal.org