IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

EMILY MAIS,

    Plaintiff,

v.                               Case No. 3:22-cv-51

ALBEMARLE COUNTY SCHOOL
BOARD,

    Defendant.

**BRIEF IN SUPPORT OF MOTION TO DISMISS
SECOND AMNEDED COMPLAINT**

## I. INTRODUCTION

In February 2019, the Albemarle County School Board (the "School Board") adopted an Anti-Racism Policy (the "Policy"). (SAC Ex. 2.) The School Board expected the Policy to assist its community members in "[e]stablishing and sustaining a school community that shares the collective responsibility to address, eliminate, and prevent actions, decisions, and outcomes that result from and perpetuate racism." (SAC Ex. 2 at 001.) The well-documented events of Summer 2020 followed, in which racial justice protests erupted across the country, including the Charlottesville region. It was in this environment, during a training at the end of the 2020-2021 school year that was designed to assist faculty and staff to "[d]evelop an understanding of race from multiple racial perspectives," that Plaintiff Emily Mais used an anachronistic term – "colored" – when discussing teacher hiring. (SAC ¶ 113; Ex. 5 at 002.)

Plaintiff, who was an Assistant Principal and administrator at Agnor-Hurt Elementary School ("Agnor-Hurt" or the "School"), "quickly apologized for her slip of the tongue." (SAC ¶ 114.) Members of the School's staff, however, reacted strongly to the term such that the school

division asked Plaintiff to participate in a mediation session.  That mediation session occurred shortly before the next school year began.  Twenty-three days later, Plaintiff resigned.

Plaintiff cannot succeed on her claims under the constitutional and statutory law of the Commonwealth, because the School Board is entitled to sovereign immunity and because she did not exhaust her administrative remedies.  Moreover, Plaintiff's allegations fundamentally describe neither the retaliation, pervasive hostility, nor constructive discharge necessary to support her state or federal claims.  Accordingly, Plaintiff's Second Amended Complaint should be dismissed with prejudice.

## II.  ALLEGATIONS AND PROCEDURAL POSTURE

### A.    The Anti-Racism Policy.

On February 28, 2019, the School Board adopted the Policy and related Regulations for Albemarle County Public Schools ("ACPS" or the "Division").  (SAC ¶ 50, Ex. 2.)  The purpose of the Policy "is to eliminate all forms of racism from the Division."  (SAC Ex. 2 at 001.)  Among other goals, the Policy reflects the School Board's commitment to "[e]stablishing and sustaining a school community that shares the collective responsibility to address, eliminate, and prevent actions, decisions and outcomes that result from and perpetuate racism," as well as "[r]especting and championing the diversity of life experiences of all community members."  (*Id.*)

The Regulations implement the Policy by identifying five action areas, including training, on which Division leadership should focus.  (SAC Ex. 2 at 004.)  The Regulations emphasize that "[a]ll Board and Division staff shall be trained in this [Policy]."  (*Id.*)  The Regulations further require that "[a]ll Division staff shall be trained about racism and about how racism produces inequitable practices and outcomes."  (*Id.*)

**B.      ACPS provided training for staff related to the Policy.**

Division leadership implemented this objective by holding a series of training seminars related to the Policy.  Among those trainings was the ACPS Anti-Racism Policy Orientation ("Policy Orientation"), which Plaintiff alleges she completed online in November 2020.  (SAC ¶ 58, Ex. 3.)  The Policy Orientation offered perspectives on racism and related definitions and invited participants to consider how those definitions were "similar to and different from your understanding of these terms?"   (SAC Ex. 3 at 009-010.)   This training emphasized that "[r]especting and championing the diversity and life experiences of all community members" is a core principle of the Policy.

The Policy Orientation included comments from Assistant Superintendent Dr. Bernard Hairston, who declared that if a person "identif[ies] forms of racism and [does] absolutely nothing about it, then [she] becomes a practitioner of racism."  (SAC ¶ 63, Ex. 4 at 005.)  Dr. Hairston explained that the Policy "requires everyone [in ACPS] to be trained" and that it was an important responsibility of any principal or department head to "be leading discussions on the *Courageous Conversations About Race* book study."  (SAC Ex. 4 at 003-004.)  Dr. Hairston further compared the Policy to a school bus and asked staff members to consider "if you are on this moving [ACPS] anti-racism school bus, or if you need help finding your seat and keeping your seat, or if it's time for you to just get off the bus."  (SAC Ex. 4 at 006.)  He concluded by asking staff to "[l]et me know if you need personalized support."  (*Id.*)

Subsequent to the Policy Orientation, the Division offered a professional development webinar entitled, "Becoming an Anti-Racist School System: A Courageous Conversation."  (SAC ¶ 66.)  The webinar outlined expectations for the *Courageous Conversations About Race* book study Dr. Hairston referenced in the Policy Orientation.  Participants in the book study would be

expected to "stay engaged," "experience discomfort," "speak your truth," and "expect and accept non-closure." (Am. Compl. Ex. 5 at 002.)

As Dr. Hairston explained in the Policy Orientation, the Division expected and required administrators to lead and conduct the book study for staff members at their respective schools. (SAC ¶ 68, Ex. 4 at 003.) As the Assistant Principal at Agnor-Hurt Elementary School, Plaintiff was subject to this expectation and requirement. (SAC ¶¶ 46, 68.) Plaintiff alleges that the Agnor-Hurt staff completed the book study through sessions held between April 30, 2021 and June 11, 2021. (*Id.* ¶¶ 70, 111.)

## C.    Agnor-Hurt staff complete the *Courageous Conversations About Race* book study.

According to Plaintiff, despite being a School administrator, she often felt unable to "speak [her] truth" during these sessions because "other participants made hurtful, dismissive, and racially charged statements to or about white people…" (SAC ¶ 80.) Plaintiff identifies a teacher's aide, Sheila Avery, as a particular source of contentious or dismissive comments. (*Id.* ¶¶ 83-86.)

As the book study sessions progressed, other employees expressed concerns to Plaintiff, in her capacity as Assistant Principal, regarding the contents and process of the trainings. (*Id.* ¶ 87.) Plaintiff alleges that she "voiced these concerns," brought to her by others, to Ashby Kindler, the training facilitator. (*Id.* ¶ 93.)

In addition to these other employees who offered concerns about the *Courageous Conversations* training, Plaintiff alleges that several parents of students in the Division expressed concerns about the Policy on May 27, 2021 during a School Board meeting. (*Id.* ¶ 96.) Plaintiff does not allege that she made any statements at the meeting. Instead, Plaintiff claims that she attended a mandatory administrator's meeting the following day, during which Dr. Hairston discussed the parents' comments. (*Id.* ¶ 101.) Dr. Hairston allegedly expressed his view that the

4

parents' concerns about the Policy made them "protectors of [racist] practices." (*Id*. ¶¶ 104-05.)
Dr. Hairston further emphasized that the Division viewed implementing the Policy and facilitating
the *Courageous Conversations About Race* book study to be a key job function of administrators
like Plaintiff. (*Id*. ¶ 106.)

During Agnor-Hurt's final *Courageous Conversations* session, on June 11, 2021, Plaintiff
claims she inadvertently used the racially charged word "colored" instead of the phrase "people of
color" during a discussion. (*Id*. ¶ 113.) Despite Plaintiff's immediate apology, other participants
in the training, including Avery, took offense to the word. (*Id*. ¶ 115.) After the training
concluded, a guidance counselor reached out to Plaintiff asking to "unpack" her use the term. (*Id*.
¶ 117.) Plaintiff does not allege that this conversation ever occurred. An equity specialist with
the Division also reached out to Plaintiff, and they did speak "briefly." (*Id*. ¶¶ 117, 121.) They
discussed "Avery's racially charged mistreatment of her," "the racially charged and divisive nature
of the training," and the fact "that allowing a staff member [Avery] to mistreat an administrator in
such a public and racially charged fashion undermined the administration of the school." (*Id*. ¶¶
121-124.) Plaintiff alleges that the Division took no action following her complaints. (*Id*. ¶ 125.)

A report ultimately reached Division Superintendent Dr. Matthew Haas regarding
Plaintiff's use of the racially charged term. (*Id*. ¶ 126.) Accordingly, Dr. Hairston instructed
Plaintiff that she would need to participate in a mediation session with him and Avery on August
6, 2021, at the start of the following school year. (*Id*. ¶ 127.) Plaintiff requested that Kindler, as
the facilitator of the training when the incident occurred, also be present. (*Id*. ¶ 127.) Dr. Hairston
agreed. (*Id*. ¶ 133.) Dr. Hairston did not agree to Plaintiff's request to record the meeting. (*Id*. ¶
140.)

Before the mediation session occurred—sometime between the end of the previous school year and the beginning of the next—Plaintiff alleges she learned from other employees that Avery and others were making racially harassing and abusive comments about her, including calling her "[t]hat white racist bitch," and "[t]hat two-faced racist bitch." (SAC ¶ 148.)  Plaintiff asserts that she complained to Dr. Mike Irani, Agnor-Hurt's principal, about both that behavior, as well as her broader concerns about the *Courageous Conversations* curriculum.  (*Id.*¶ 149.)  Plaintiffs alleges that the Division took no action in response.  (*Id.* ¶ 153.)

During the August 6, 2021 meeting with Dr. Hairston, Kindler, Avery, and the school guidance counselor—who attended as Avery's "ally"—Plaintiff stated that the *Courageous Conversations* training sessions were detrimental to staff morale and caused racial divisions within Agnor-Hurt.  (*Id.* ¶¶ 155, 162.)  According to Plaintiff, white participants in the trainings were afraid to speak for fear of saying the "wrong" thing.  (*Id.*¶ 163.)  The guidance counselor allegedly responded that participants should be afraid to speak if what they were thinking was not "appropriate."  (*Id.* ¶ 163.)  At the conclusion of the meeting, Dr. Hairston suggested that the logical next step was for Plaintiff to address the entire School staff about her inadvertent use of the racially charged term.  (*Id.* ¶¶ 164-65.)

Plaintiff spoke to Dr. Irani following the meeting and told him she would need to seek medical care for symptoms of emotional distressed she was experiencing.  (*Id.* ¶ 182.)  Dr. Irani encouraged her to do so.  (*Id.* ¶ 183.)  Plaintiff evidently never obtained treatment, but did take three days off from work, which the Division facilitated.  (*Id.* ¶¶ 183, 185.)

Plaintiff alleges that she continued speaking with Dr. Irani about the incident and the August 6 meeting upon her return.  (*Id.* ¶ 186.)  She further alleges that she met with Dr. Claire Keiser, the Division's Assistant Superintendent responsible for human resources, on August 19,

2021.  (SAC ¶ 192.)  Dr. Keiser told Plaintiff that Dr. Hairston had acted inappropriately in conducting the August 6 meeting without a human resources representative.  (*Id.* ¶ 194.)  Dr. Hairston was instructed not to do so again.  (*Id.*)  Dr. Keiser also "expressed empathy" for Plaintiff's situation, but did not "provide any concrete plan of action for handling [Plaintiff's] concerns."  (*Id.* ¶ 195.)  Plaintiff then met with Daphne Keiser, another Division Human Resources employee, on August 27, 2021.  During this meeting, Plaintiff expressed concerns about her own treatment, as well as the *Courageous Conversations* training.  (*Id.* ¶ 197.)  Plaintiff again received empathy, but no "concrete steps" for addressing her concerns.  (*Id.* ¶ 198.)

Plaintiff resigned two days later, on August 29, 2021.  (*Id.* ¶ 205.)

Following her resignation, Plaintiff agreed—because she did not want "to leave the Division on bad terms—to send a letter to Agnor-Hurt families at the Division's request, stating that she was leaving to explore another career opportunity.  (*Id.* ¶¶ 206-08.)  Similarly, Plaintiff agreed to apologize to the Agnor-Hurt staff in order to "leave the Division on good terms" and "to enable her to secure a job elsewhere…"  (*Id.* ¶¶ 211-12.)

Plaintiff alleges that she was not permitted to offer her preferred statement, but instead presented the Division's requested apology to the staff.  (*Id.* ¶¶ 221, 224.)  In addition, at the meeting in which Plaintiff offered this apology, Avery allegedly "presented racist talking points from the *Courageous Conversations* training, including a discussion about the relationship of [Plaintiff's] mistake to white privilege."  (*Id.* ¶ 235.)  According to Plaintiff, Avery's statement is proof that her apology "was carefully orchestrated by district officials to humiliate, shame, and traumatize [her]…"  (*Id.* ¶ 240.)

**D.    Plaintiff's Charge of Discrimination.**

On November 17, 2021, Plaintiff filed a Charge of Discrimination with the Virginia Attorney General's Office of Civil Rights.  (SAC ¶ 258.)  On January 18, 2022, The Office of the Attorney General mailed a letter to Plaintiff's counsel stating that the Office of Civil Rights ("OCR") had forwarded Plaintiff's complaint to the United States Equal Employment Opportunity Commission ("EEOC") for further review and consideration.  (SAC Ex. 7.)  By email on March 3, 2022, a representative of OCR confirmed that it had not accepted Plaintiff's complaint for a case investigation; therefore, no right to sue letter [would] be issued by OCR.  (SAC Ex. 8 at 001.)  The representative further stated that "[o]nly complaints that are accepted for case investigation by OCR receive OCR's right to sue letter."  (*Id.*)  Subsequently, the EEOC issued a "Determination and Notice of Rights" to Plaintiff, dismissing her charge and providing notice of her right to sue under federal law.  (SAC Ex. 9.)

**E.    Procedural Posture and Claims.**

Plaintiff filed the original Complaint on April 13, 2022.  On May 13, 2022, she submitted an Unopposed Motion for Leave to File Amended Complaint, which incorporated allegations related to the EEOC's issuance of the Determination and Notice of Rights.  The Court granted that Motion on May 21, 2022.  By agreement of the parties, the School Board filed its Demurrer and Plea in Bar twenty-one days later on June 10, 2022.  On July 19, 2022, Plaintiff filed a Motion for Leave to File a Second Amended Complaint. On August 10, 2022, the Court entered an Order granting Plaintiff's Motion for Leave to file the Second Amended Complaint. The Second Amended Complaint was filed on August 10, 2022 and, for the first time, asserted federal claims of discrimination pursuant to Title VII of the Civil Rights Act of 1964 in addition to the state law

claims brought in the Amended Complaint.  The School Board removed this case on September 7, 2022.

Plaintiff brings ten-counts against the School Board in the Second Amended Complaint. Count 1 alleges that the School Board violated Article I, § 12 of the Constitution of Virginia by retaliating against Plaintiff's speech, compelling Plaintiff to speak, and discriminating against Plaintiff's viewpoint.  (SAC ¶¶ 264-87.)  Count 2 claims that the School Board wrongfully discharged Plaintiff in violation of public policy.  (*Id*. ¶¶ 288-95.)  Count 3 purports to state a claim for a racially hostile work environment in violation of the Virginia Human Rights Act.  (*Id*. ¶¶ 296-308.)  Similarly, Count 4 alleges constructive discharge based on race in violation of the Virginia Human Rights Act.  (*Id*. ¶¶ 309-24.)  Count 5 alleges a retaliatory hostile work environment, again in violation of the Virginia Human Rights Act.  (*Id*. ¶¶ 325-34.)  Count 6 claims a retaliatory constructive discharge in violation of the Virginia Human Rights Act.  (*Id*. ¶¶ 335-47.)  Count 7 purports to state a claim for a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").  (*Id*. ¶¶ 348-60.)  Similarly, Count 8 alleges constructive discharge based on race in violation of Title VII.  (*Id*. ¶¶ 361-76.)  Count 9 alleges a retaliatory hostile work environment in violation of Title VII.  (*Id*. ¶¶ 377-86.)  Finally, Count 10 claims a retaliatory constructive discharge in violation of Title VII.  (*Id*. ¶¶ 387-99.)

### III.  LAW AND ARGUMENT

**A.    Standard of Review.**

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a court to dismiss an action if the Complaint fails to state a claim upon which relief can be granted.  *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  In reviewing a defendant's motion under Rule 12(b)(6), a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the

light most favorable to the plaintiff. Legal conclusions, however, enjoy no such deference. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). As the court pointed out in *Iqbal,* "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (emphasis added) (internal quotations omitted).

A court should grant a motion to dismiss, however, where the allegations are nothing more than legal conclusions, or where the allegations permit a court to infer no more than a possibility of misconduct. *See Iqbal,* 556 U.S. at 678–79. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *See id.* at 678.

To state a plausible claim for relief, the Supreme Court has held that a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). To discount such unadorned conclusory allegations "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal,* 556 U.S. at 679. This approach recognizes that "'naked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief.'" *Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly,* 550 U.S. at 557).

The law is clear that "in reviewing a Rule 12(b)(6) dismissal, [courts] are not confined to the four corners of the Complaint." *U.S. ex. rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F. 3d, 131, 136 (4th Cir. 2014). Documents that are explicitly incorporated into the Complaint by reference and those attached to the Complaint as exhibits may be considered. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); Fed. R. Civ. P. 10. The Court may also

consider documents integral to the Complaint. *Goines v. Valley Community Servs. Bd.*, 822 F.3d

159, 166 (4th Cir. 2016). A document is integral to a complaint when the claims "turn on, []or are

. . . otherwise based" on the document. *Id.* Where the plaintiff attaches or incorporates a document

upon which her claim is based, or when the Complaint shows that the plaintiff has adopted the

contents of the document, it is proper to accept the contents of the documents over conflicting

allegations in the Complaint. *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 233-

35 (4th Cir. 2004).

**B.    The School Board has sovereign immunity from Plaintiff's claims.**

The doctrine of sovereign immunity is "alive and well" in the Commonwealth of Virginia.

*Patterson v. City of Danville*, ___ Va. ___, No. 210509, 2022WL2517205 (Va. July 7, 2022)

(quoting *Commonwealth ex rel. Fair Hous. Bd. v. Windsor Plaza Condo. Ass'n*, 289 Va. 34, 56,

768 S.E.2d 79, 89 (2014). *See also Messina v. Burden,* 228 Va. 301, 307, 321 S.E.2d 657, 660

(1984). "'As a general rule, the Commonwealth is immune both from actions at law for damages

and from suits in equity to restrain governmental action or to compel such action.'" *Afzall ex rel.*

*Afzall v. Commonwealth*, 273 Va. 226, 231, 639 S.E.2d 279, 282 (2007) (quoting *Alliance to Save*

*the Mattaponi v. Commonwealth*, 270 Va. 423, 455, 621 S.E.2d 78, 96 (2005)). Sovereign

immunity serves "a multitude of purposes" to include "protecting the public purse, providing for

smooth operation of government, eliminating public inconvenience and danger that might spring

from officials being fearful to act, [and] assuring that citizens will be willing to take public jobs .

. . ." *Afzall*, 273 Va. at 231, 639 S.E.2d at 282 (quotation omitted).

The Commonwealth's sovereign immunity extends to its agencies, as well as their officers.

*Rector & Visitors of the University of Virginia v. Carter*, 267 Va. 242, 244, 591 S.E.2d 76, 78

(2004). Local school boards, acting in their governmental capacities, are agencies or arms of the

state entitled to the protections of the Commonwealth's sovereign immunity. *Kellam v. School Bd. of City of Norfolk*, 202 Va. 252, 253, 117 S.E.2d 96, 97 (1960) ("The basis for a school board's immunity from liability for tortious injury has been generally found in the fact that it is a governmental agency or arm of the state and acts in a governmental capacity in the performance of its duties imposed by law.").

The Supreme Court of Virginia has held that employment decisions, including the decision to retain an individual as an employee, are an integral governmental function and sovereign immunity protects a governmental entity from liability associated with its decision to retain a specific employee. *Niese v. City of Alexandria*, 264 Va. 230, 240, 564 S.E.2d 127, 133 (2002). The Supreme Court has similarly found sovereign immunity bars a statutory claim for retaliatory discharge. *Ligon v. Cnty. of Goochland*, 279 Va. 312, 317, 689 S.E.2d 666, 669 (2010).

In this case, the School Board has sovereign immunity from Plaintiff's claims for three distinct reasons.

### 1. The School Board has sovereign immunity from Count 1 because Article I, § 12 of the Constitution of Virginia is not self-executing.

The Commonwealth and its agencies are immune from liability … in the absence of an express constitutional or statutory waiver of sovereign immunity." *Gray v. Va. Secretary of Transp.*, 276 Va. 93, 102, 662 S.E.2d 66, 71 (2008) (quoting *Billups v. Carter*, 268 Va. 701, 707, 604 S.E.2d 414, 418 (2004)). Accordingly, in order to maintain a private cause of action against a governmental entity or its officers under the Constitution of Virginia, a plaintiff must rely on a provision that is self-executing or associated legislation permitting a private cause of action. *Robb v. Shockoe Slip Foundation*, 228 Va. 678, 681, 324 S.E.2d 674, 676 (1985). Stated differently, a determination that a provision of the Constitution is self-executing is a finding that sovereign immunity has been waived. *Gray*, 276 Va. at 101-02, 662 S.E.2d at 70-71.

The Supreme Court of Virginia has outlined the analysis courts should follow in determining whether a Constitutional provision is self-executing. *Robb*, 228 Va. at 681, 324 S.E.2d at 676. "A constitutional provision is self-executing where it expressly so declares." *Id*. In addition, "constitutional provisions in bills of rights and those merely declaratory of common law are usually considered self-executing. The same is true of provisions which specifically prohibit particular conduct." *Id.* Where courts have concluded that a constitutional provision is self-executing, it is because "no further legislation is required to make it operative." *Gray*, 276 Va. at 103, 662 S.E.2d at 71. That is, the constitutional provision "supplies a sufficient rule by means of which the right given may be employed and protected, or the duty imposed may be enforced." *Robb*, 228 Va. at 682, 324 S.E.2d at 676.

A provision "is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law." *Id.* To be self-executing, therefore, the constitutional provision—or the common law right it represents—must address questions including the nature and extent of the legal or equitable remedy, standing, and the facts and circumstances by which the right is to be measured. *Id.* at 682, 676-77. When these questions remain unanswered, they "beg statutory definition" and the court should conclude that the provision is not self-executing. *Id.* at 682, 677. *Accord Gray*, 276 Va. at 106, 662 S.E.2d at 73 ("The fact that a self-executing constitutional provision is operative without the need for supplemental legislation means that the provision is enforceable in a common law action.").

Notably, a waiver of sovereign immunity will not be implied from general language, but must be explicitly and expressly stated. *Gray*, 276 Va. at 102, 662 S.E.2d at 71 (quoting *Alliance to Save the Mattaponi*, 270 Va. at 455, 621 S.E.2d at 96). Courts strictly construe any waiver of common law sovereign immunity. *Rector and Visitors of the University of Virginia v. Carter*, 267

Va. 242, 245, 591 S.E.2d 76, 78 (2004) (observing that agencies of the Commonwealth retain their

sovereign immunity because the Virginia Tort Claims Act waives only the immunity of the

Commonwealth itself).  Applying these principles, the Supreme Court of Virginia has concluded

that often, even when a statute affirmatively waives the Commonwealth's sovereign immunity, it

does not waive that of municipal entities unless that waiver is expressly stated.  *See, e.g., Seabolt*

*v. County of Albemarle*, 283 Va. 717, 720, 724 S.E.2d 715, 716-17 (2012).

Here, Count 1 purports to rely on the free speech provisions of Article I, § 12 of the

Constitution of Virginia.  Article I, § 12 states:

> That the freedoms of speech and of the press are among the great bulwarks of
> liberty, and can never be restrained except by despotic governments; that any
> citizen may freely speak, write, and publish his sentiments on all subjects, being
> responsible for the abuse of that right; that the General Assembly shall not pass any
> law abridging the freedom of speech or of the press, nor the right of the people
> peaceably to assembly and to petition the government for the redress of grievances.

Va. Const. art. I, § 12.  The School Board is aware of only two Virginia courts that have been

asked, independent of any attached claims under the First Amendment to the United States

Constitution, whether Article I, § 12 of the Constitution of Virginia is self-executing.  Both decided

it was not.

First, in *Virginia Student Power Network v. City of Richmond*, 107 Va. Cir. 137, 2021 WL

6550451, *1 (Richmond City Cir. 2021), an organization sought to enjoin several law enforcement

agencies from using certain crowd control tactics because the use and threatened use of those

tactics allegedly violated Article I, § 12.  The court analyzed Article I, § 12 under the factors

outlined in *Robb* and observed, "[i]t is undisputed that Article I, Section 12 appears in the Bills of

Rights and contains provisions of a negative character."  *Id.* at *2.  The Court noted, however, that

Article I, § 12 expressly "limits the right of action to only those circumstances in which a party

challenges laws adopted by the General Assembly or ordinances adopted by localities."  *Id.*  Like

the plaintiff in *Virginia Student Power Network*, Plaintiff here—challenging the curricular and training decisions of a school board—does not bring such an action.

The court continued by observing that Article I, § 12 is "coextensive with the free speech provisions of the federal First Amendment." *Id.* at * 3 (quoting *Key v. Robertson*, 626 F. Supp. 2d 566, 583 (E.D. Va. 2009)). "If the First Amendment were self-executing as to all branches of the government, Congress would not have needed to enact a law [42 U.S.C. § 1983] creating a private right of action for violations of citizens' First Amendment rights." *Id.* Accordingly, just as the First Amendment requires an enabling statute, so does Article I, § 12. And, in its absence, Plaintiff's claim in Count I cannot prevail.

In *Ibañez v. Albemarle County School Board*, the Albemarle Circuit Court agreed. *Ibañez v. Albemarle County School Bd.*, No. CL21001737-00 (Albemarle Cir. June 1, 2022) (Order), attached as Exhibit 1. In that case, a number of students enrolled in ACPS and their parents sued the Division under, among other theories, Article I, § 12, alleging that the School Board's Anti-Racism Policy violated certain speech-related rights. The Court concluded that the plaintiffs did not state "a cause of action under Virginia law because their claims under the Constitution of Virginia are not self-executing…" Ex. 1.

Similarly, this District has reached the same conclusion. *Jackson v. Castevens*, No. 7:18CV00362, 2020 WL 1052524, at *4 n.6 (W.D. Va. Mar. 4, 2020) ("claims under Article I, Sections 9 and 12 of the Virginia Constitution, fail because those provisions are not self-executing and thus do not provide an independent basis for a private right of action.")

Article I, § 12 states general principles. It does not address the nature and extent of any legal or equitable remedy. The only segment of a negative character is directed explicitly to the General Assembly, which provision cannot satisfy the rigorous standard required for an express

waiver of the sovereign immunity of other governmental entities.[1]  Accordingly, Article I, § 12 is not self-executing as to the School Board and Count I is barred by sovereign immunity.

>    **2.    Wrongful discharge, as alleged in Count 2, sounds in tort from which the School Board has sovereign immunity.**

Under the doctrine of sovereign immunity in Virginia, governmental entities—like the school board—are immune from tort liability for the acts or omissions of their agents and employees, including their intentional torts.  *Carter*, 267 Va. at 244, 591 S.E.2d at 78; *Niese*, 264 Va. 230, 564 S.E.2d 127 (holding city is immune from intentional torts of its employees).

The Supreme Court of Virginia has held that a wrongful discharge claim is a cause of action in tort.  *Bowman v. State Bank of Keysville*, 229 Va. 534, 540, 331 S.E.2d 797, 801 (1985).  *See also Ligon*, 279 Va. at 317, 689 S.E.2d at 669 (holding that sovereign immunity bars a claim for retaliatory discharge).  Indeed, the Supreme Court has held that the decision to retain an employee is an integral governmental function, and sovereign immunity protects a governmental entity from liability associated with that decision.  *Niese*, 264 Va. at 240, 564 S.E.2d at 133.

As the Supreme Court recently observed in *Ligon*, "Only the General Assembly can determine as a matter of policy whether the Commonwealth's sovereign immunity should be abrogated with regard to a particular type of legal action."  *Ligon*, 279 Va. at 317; 689 S.E.2d at 668-69.  The General Assembly has not exercised its discretion to waive the sovereign immunity

---

[1] The Supreme Court of Virginia has considered the merits of several cases alleging claims under Article I, § 12 of the Constitution of Virginia.  These cases included attached federal constitutional claims, rendering any separate state-law analysis unnecessary.  *See, e.g.*, *The Globe Newspaper Co. v. Commonwealth*, 264 Va. 622, 570 S.E.2d 809 (2002) (finding that there is no First Amendment right of access to test DNA samples); *Adams Outdoor Advertising v. City of Newport News*, 236 Va. 370, 373 S.E.2d 917 (1988); *Cox Cable Hampton Roads, Inc. v. City of Norfolk*, 242 Va. 394, 410 S.E.2d 652 (1991).  The question of whether Article I, § 12 is self-executing, and particularly whether it is self-executing as to entities other than the General Assembly, does not appear to have been placed before the Supreme Court.

of governmental entities like school boards from tort claims such as the one Plaintiff presents in Count 2. Accordingly, Plaintiff's *Bowman* wrongful discharge claim in County 2 is barred by the doctrine of sovereign immunity. *Seabolt*, 283 Va. 717, 724 S.E.2d 715; *See e.g. Hooper v. North Carolina*, 379 F. Supp. 2d 804, 814 (M.D.N.C. 2005) (A claim for wrongful discharge is a tort claim and may be asserted only in the at-will employment context and is barred by sovereign immunity).

### 3. Because the Virginia Human Rights Act does not apply to it, the School Board has sovereign immunity from the claims advanced in Counts 3, 4, 5, and 6.

The VHRA does not permit a cause of action against the School Board nor does it contain an explicit waiver of sovereign immunity. In the context of employment, the VHRA prohibits an employer from discriminating because of an individual's race. Virginia Code § 2.2-3905(B). Yet, the VHRA defines "employer" only as "a person employing … 15 or more employees…" This definition does not encompass a School Board and certainly does not contemplate waiving sovereign immunity.[2]

Indeed, at the time the legislature amended the VHRA in 2020, it also enacted a separate code section outside of the VHRA prohibiting discrimination in employment by School Boards. See, Va. Code § 22.1-295.2(B). Yet, section 22.1-295.2 does not authorize a private cause of action against a School Board.

---

[2] Virginia Code section 1-230, which provides general rules of construction to be applied to Virginia's statutes, defines "Person" to include "any … government, political subdivision…." However, the Supreme Court of Virginia has stated that "[i]t is an ancient rule of statutory construction, one consistently applied by this Court for more than a century, that the sovereign is not bound by a statute of general application, no matter how comprehensive the language, unless named expressly or included by necessary implication." *Commonwealth ex rel. Pross v. Bd of Supervisors of Spotsylvania Cnty.,* 225 Va. 492, 494, 303 S.E.2d 887, 889 (1983).

A waiver of sovereign immunity "may not be inferred from general statutory language, but must be expressly and explicitly stated. *Doud v. Commonwealth*, 282 Va. 317, 320-21, 717 S.E.2d 124, 125-26 (2011). Given the absence of any explicit legislative waiver of sovereign immunity, Plaintiff's claims under the VHRA are barred by the doctrine of sovereign immunity. *See*, *Ligon*, 279 Va. at 317; *Himansu Patel, et al. v. The Commonwealth of Virginia*, No. CL21-6527 (Norfolk Cir. July 2, 2021) (opinion) (VHRA claims against the Commonwealth are barred by sovereign immunity), attached as Exhibit 2.

**C.    Plaintiff has not exhausted her administrative remedies under the Virginia Human Rights Act.**

The VHRA "prescribes an extensive remedial scheme that employees must follow when relying on the rights and policies articulated in the Act." *Hice v. Mazzella Lifting Technologies, Inc.*, --- F. Supp. 3d ---, No. 2:21-cv-281, 2022 WL636640, at *11 (E.D. Va., Mar. 4, 2022). To bring an employment discrimination claim under the Act, a person first files a complaint with the Office of Civil Rights of the Department of Law ("OCR") detailing the allegations. Va. Code § 2.2-3907(A). The OCR may then proceed to investigate the claim and attempt to mediate between the parties. Va. Code § 2.2-3907(B-D). Upon the conclusion of this process, and if the claim has not been resolved, the OCR issues to the claimant a notice of right to sue. Va. Code § 2.2-3907(E-H). A claimant may only file suit under the VHRA after she "has been provided a notice of [her] right to file a civil action" **by the OCR**. Va. Code § 2.2-3908(A).

In *Parikh-Chopra v. Strategic Management Services, LLC*, 2021 WL 5863546 (Fairfax. Cir. Ct. Dec. 9, 2021), Judge John Tran of the Circuit Court for the County of Fairfax analyzed this issue and concluded that a plaintiff who wishes to pursue a claim under the VHRA must first exhaust her administrative remedies. He explained that "[i]t is only when a complainant's administrative remedies have been exhausted under Va. Code § 2.2-3907 before a state agency

that a lawsuit can [be] filed following the issuance of a notice of the right to file a civil action.  The critical procedural fact is receipt of the notice of a right to sue." *Id.* at *2.  The court further explained that the federal statute (42 U.S.C. § 2000e-5), which authorizes the filing of administrative proceedings before either the EEOC or a state or local government authority cannot be conflated with "the limited procedures recognized under Virginia law."  *Id.*

Plaintiff asserts in her Second Amended Complaint that she exhausted her administrative remedies because the EEOC issued a notice of right to sue.  (SAC ¶¶ 261-62)  The procedures before the EEOC, however, should not be conflated with those before the OCR. The EEOC does not have jurisdiction to investigate or issue a Right to Sue under the VHRA.  Neither the VHRA nor the administrative regulations contemplate the OCR and EEOC issuing a right to sue on behalf of one another.  *See, e.g.* § 2.2-3902 ("The Office [OCR] may investigate complaints alleging an unlawful discriminatory practice under a federal statute or regulation and attempt to resolve it through conciliation.  Unsolved complaints shall thereafter be referred to the federal agency with jurisdiction over the complaint.  Upon such referral, the Office shall have no further jurisdiction over the complaint."); 1 VAC 45-20-98 ("If a charging party requests a notice of right to sue in accordance with § 2.2-3907(H) of the Code of Virginia, the division will immediately cease the investigation, dismiss the charge of discrimination, and issue a right to sue to the charging party.  If the matter falls under the jurisdiction of a federal law, the division will promptly notify the appropriate federal agency of the charging party's request for withdrawal and issuance of a notice of right to sue.").

Judge Tran agreed with this position in *Parikh-Chopra*, concluding that a plaintiff's EEOC Charge of Discrimination is "irrelevant" to an action under the VHRA.

> EEOC complaints are pursued under federal law.  A plaintiff who exhausts her
> administrative appeals in the EEOC is entitled to bring a lawsuit in federal court.

19

> The Virginia statutory scheme does not recognize the exhaustion of a complaint before a federal agency as a precondition to bringing a civil action in Virginia state court. . . . It is only when a complainant's administrative remedies have been exhausted under Va. Code § 2.0-3907 before a state agency that a lawsuit can [be] filed following issuance of a notice of the right to file a civil action. . . . **Only the presentment of claims and the exhaustion of the administrative remedies before the Virginia Attorney General's Office of Civil Rights satisfy the prerequisite** to filing a discrimination lawsuit in Virginia's state courts.

*Id.* (emphasis added).

Similarly, this District also recently reached the same conclusion, noting that "the Virginia Values Act [which includes Va. Code §§ 2.2-3907 and -3908] requires plaintiffs to acquire notice of the right to file a private cause of action before doing so." *McLaurin v. Liberty University*, No. 6:21-cv-00038, 2022 WL 1143534 at *6 n.5 (W.D. Va. Apr. 18, 2022).

Plaintiff has not "been provided a notice of [her] right to file a civil action" by the OCR as required in order to file suit pursuant to Virginia Code section 2.2-3908(A).  Instead, she received a Notice of Right to Sue from the EEOC.  (ECF Doc. 5, at ¶ 9(b).)  Plaintiff's receipt of a Determination and Notice of Rights from the EEOC does not satisfy the express statutory requirement that she receive a notice specifically from the OCR to bring her state law cause of action.  Accordingly, Plaintiff cannot advance any claim under the VHRA.

**D.    Plaintiff cannot state a claim for wrongful discharge in violation of public policy.**

Even if the Court were to conclude that the School Board did not have sovereign immunity from Plaintiff's wrongful discharge claim, Plaintiff nonetheless does not state such a claim.

The Commonwealth "strongly adheres to the employment-at-will doctrine." *Lockhart v. Commonwealth Educ. Systems Corp.,* 247 Va. 98, 102, 439 S.E.2d 328 (1994); *Miller v. SEVAMP, Inc.,* 234 Va. 462, 465, 362 S.E.2d 915 (1987). The Supreme Court of Virginia has adopted only a very "narrow exception to the employment-at-will rule." *Bowman*, 229 Va. at 540.  Since its decision in *Bowman*, the Court has recognized only three circumstances that may give rise to a

claim for wrongful discharge. *Rowan v. Tractor Supply Co.*, 263 Va. 209, 213-14, 559 S.E.2d
709, 711 (2002). Pertinent to this case, Plaintiff relies on the assertion that her termination violated
public policy.

A public policy is sufficient to allow a claim for wrongful discharge to proceed only where
(1) the law contains an explicit statement of public policy or (2) the law is designed to protect the
property rights, personal freedoms, health, safety, or welfare of the people in general. *Antunes v.
Rector & Visitors of Univ. of Va.*, No. 3:21-CV-00042, 2022 WL 4213031, at *9 (W.D. Va. Sept.
12, 2022); *City of Virginia Beach v. Harris*, 259 Va. 220, 232 (2000). The latter "must be in
furtherance of an underlying established public policy that the discharge from employment
violates." *Harris,* 259 Va. at 232.

"Even if a statute falls within one of these categories, an employee must also be a member
of the class of individuals that the specific public policy is intended to benefit in order to state a
claim for wrongful termination in violation of public policy." *Id.; Antunes*, 2022 WL 4213031, at
*9. "To qualify as a member of the class of persons protected by a statute, a plaintiff typically
must show that the statute imposed a duty on her to perform the act that led to her termination, or
that she would be the victim of a putative violation of that statute." *Anderson v. ITT Industries
Corp.*, 92 F. Supp. 2d 516, 522 (E.D. Va. 2000). Furthermore, the Supreme Court has emphasized
that "termination of an employee in violation of the policy underlying any one [statute] does not
automatically give rise to a common law cause of action for wrongful discharge." *Rowan*, 263 Va.
at 213, 559 S.E.2d at 711.

In this case, Plaintiff's putative *Bowman* claim relies entirely on her allegation that the
School Board violated her rights under Article I, § 12 of the Constitution of Virginia. As outlined
below, Plaintiff's factual allegations do not support her claim and she does not identify a state

21

statute to support her *Bowman* public policy claim.  Moreover, the Supreme Court of Virginia has never recognized a *Bowman* claim relying on provisions of the Constitution of Virginia.  In fact, the Supreme Court has emphasized that "[t]he exception we recognized [in *Bowman*] was not so broad as to make actionable those discharges of at-will employees which violate only private rights or interests."  *Miller*, 234 Va. at 467-468, 362 S.E.2d at 918. *See also*, *Antunes*, 2022 WL 4213031, at *9 (holding that a Bowman claim cannot rely on a federal statute or constitutional provision but instead must find root in a state statute.)

Virginia trial courts have applied that principle in concluding that alleged constitutional violations cannot support a *Bowman* claim.  *See Baldwin v. Baker*, 94 Va. Cir. 366 (Prince Edward Cir. 2016) (sustaining demurrer to *Bowman* claim based on Article I, Section 12); *Glaser v. Titan Corp.*, No. 159607, 1997 WL 1070646, at *2 (Fairfax Cir. July 16, 1997) (same). *See also Vaughan v. Dyncorp*, 38 Va. Cir. 516 (Fairfax Cir. Jan. 5, 1994) (concluding that "the general Constitutional provisions cited by [the plaintiff] … do not support a *Bowman* claim.").  Indeed, this District has found the reasoning of these decisions persuasive in reaching the conclusion that Article I, § 12 of the Constitution of Virginia does not support a *Bowman* claim.

> That Article I, Section 12 is not sufficiently tailored to a specific class to support a <u>Bowman</u> claim and the Supreme Court of Virginia's "consistent[ ] characterize[ation] [of] [<u>Bowman</u>] exceptions as narrow" and limited, the court finds no basis in Virginia law for expanding the scope of <u>Bowman</u> by allowing for claims to be brought pursuant to broad pronouncements in the Virginia Constitution.

*Carmack v. Virginia*, No. 1:18-CV-00031, 2019 WL 1510333, at *11 (W.D. Va. Apr. 5, 2019) (internal citation omitted).

The Supreme Court of Virginia has never recognized a *Bowman* claim relying on private rights protected in the Constitution of Virginia.  Nor has it recognized a common law wrongful

discharge cause of action for constructive discharge. Likewise, this Court should not do so, and instead, should dismiss Count 2 because it does not state a claim for relief.

**E.      The Second Amended Complaint does not allege sufficient facts to support any of Plaintiff's alleged state or federal law claims.**

The Court need not and should not reach the merits of any of Plaintiff's claims. But even were the Court to consider Plaintiff's specific factual allegations, it should find that each falls short of alleging a constitutional or statutory violation for which Plaintiff is entitled to recover.

### 1.      The Complaint does not allege a violation of Plaintiff's free speech rights.

Count 1 of the Second Amended Complaint purports to allege violations of Plaintiff's rights to freedom of speech under Article I, § 12 of the Constitution of Virginia under three different theories. First, Plaintiff alleges that the School Board retaliated against her because of her speech. Second, Plaintiff claims that she was compelled to speak or restrained from speaking. Third, Plaintiff claims to have been subjected to viewpoint discrimination. (SAC ¶¶ 267-284.)

#### a.      Plaintiff does not adequately allege compelled speech.

The Second Amended Complaint identifies two instances in which Plaintiff allegedly spoke at the request of the Division: (1) Plaintiff's sending a letter to Agnor-Hurt families following her resignation, and (2) Plaintiff's alleged statement of apology to Agnor-Hurt's staff after her resignation. In both instances, Plaintiff alleges that she offered these statements in order to "leave the Division on good terms." (SAC ¶¶ 211-12.) These allegations cannot support a claim that speech was unconstitutionally compelled by the government.

"[I]n order to make out a valid compelled-speech claim, a party much establish (1) speech; (2) to which [she] objects; that is (3) compelled by some governmental action." *Hanover County Unit of the NAACP v. Hanover County*, 461 F. Supp. 3d 280, 290 (E.D. Va. 2020). Here, the crucial question is compulsion. "'In order to compel the exercise or suppression of speech, the

governmental measure must punish, or *threaten to punish*, protected speech by governmental action that is regulatory, proscriptive, or compulsory in nature.'" *Id.* at 291-92 (quoting *Phelan v. Laramie Cty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th Cir. 2000)).

Here, Plaintiff had already submitted her resignation at the time she agreed to make the two statements identified in the Second Amended Complaint. Her subjective desire to preserve relationships is not the equivalent of a governmental threat to punish. Nor does Plaintiff allege that any staff member threatened to punish her—or even to provide a negative reference to a potential employer—had she declined to speak or had she offered her preferred statement at the staff meeting on September 9. Because Plaintiff had already resigned at the time she made her statements, she cannot state a claim for compelled speech.

### b.    Plaintiff does not allege viewpoint discrimination or retaliation.

Count I also relies on claims for alleged viewpoint discrimination and speech retaliation. Plaintiff claims that she was targeted because she expressed concerns regarding the *Courageous Conversations* curriculum such that she was both retaliated against and simultaneously chilled from further expression regarding her views on race and the required trainings. (SAC ¶¶ 266, 281.) A retaliation claim, however, requires a plaintiff to show that "a causal relationship exists between [plaintiff's] speech and the defendant's retaliatory action." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013). Similarly, "[t]he Supreme Court has made clear that the 'principle inquiry' in assessing a claim of viewpoint discrimination is whether the government has adopted a regulation of speech **because** of agreement or disagreement with the message it conveys." *Planned Parenthood of South Carolina, Inc. v. Rose*, 361 F.3d 786, 795 (4th Cir. 2004) (emphasis added).

Plaintiff, however, does not identify any allegedly retaliatory conduct prior to her use of the term "colored" during the June 11, 2021 training sessions. In fact, Plaintiff alleges that, prior

to June 11, she expressed concerns—brought to her by others—about the *Courageous Conversations* curriculum without any retaliation or negative repercussion. (SAC ¶ 93.) Plaintiff's allegations show, rather, that any allegedly retaliatory conduct was solely and directly in response to Plaintiff's use of an anachronistic and racially charged term. Plaintiff's allegations, therefore, fall short of establishing the causal relationship necessary to claims for either retaliation or viewpoint discrimination.

### c.    Plaintiff's speech was not protected by Article I, § 12.

Plaintiff makes the conclusory allegation that, at all times relevant to her Second Amended Complaint, she was speaking as a private citizen on a matter of public concern. (SAC ¶ 267.) On the contrary, Plaintiff's allegations and the exhibits attached to the Second Amended Complaint show that Plaintiff's statements regarding the *Courageous Conversations* curriculum and the Policy were made in executing her essential job responsibilities as an administrator at Agnor-Hurt and, accordingly, were not protected by the free speech provisions of the Constitution of Virginia.

If a public employee speaks "pursuant to [his or her] official duties," the Supreme Court has held that the Free Speech Clause of the First Amendment generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). *See also Pickering v. Board of Ed. of Township High School Dist., 205, Will Cty.*, 391 U.S. 563 (1968).

Here, the pleadings and attached exhibits are clear that Plaintiff, at all times relevant to her free speech claims, was speaking in her capacity as an employee of the Division. For example, the Division expected and required administrators to lead and conduct the *Courageous Conversations* book study. (SAC ¶ 68, Ex. 4 at 003.) Similarly, the Division viewed implementing

25

the Policy and facilitating the book study as key job functions of its administrators.  (Am. Compl. ¶ 106.)  Moreover, Plaintiff does not allege any occasion on which she contacted the School Board, Division leadership, or other administrators to express her views outside of working hours in her capacity as a citizen, rather than as the Assistant Principal of Agnor-Hurt.

Because Plaintiff has alleged no occasions in which she spoke in her capacity as a private citizen, rather than as an employee and administrator of ACPS, she has not alleged that she was protected by constitutional free speech provisions.  Her claims in Count I should be dismissed.

> **2.    Counts 3 and 7 do not state a claim for a racially hostile work environment in violation of the Virginia Human Rights Act or Title VII.[3]**

Plaintiff insists that she was personally subjected to a racially hostile work environment. Instead, Plaintiff's allegations describe only an isolated incident and her subjective frustrations with the School Board's implementation and training under the Policy.

A hostile work environment can only exist "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  To establish a hostile work environment claim, a claimant must show that "there is (1) unwelcome conduct; (2) that is based on the plaintiff's [race]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Guessous v. Fairview Property Investments, LLC*, 828 F.3d 208, 221 (4th Cir. 2016).

---

[3] The School Board relies primarily on cases interpreting and applying Title VII of the Civil Rights Act of 1964 because the Supreme Court of Virginia has not addressed hostile work environment and constructive discharge claims in this context under the VHRA.  *See Epperson v. Dep't of Corrections*, 77 Va. Cir. 325, *5 (Dec. 9, 2008) (adopting the Fourth Circuit's analysis in *Bristow v. Daily Press, Inc.*, 770 F.2d 1251 (4th Cir. 1985) and observing that the Supreme Court of Virginia has never addressed the issue).

As to the third element of a hostile work environment claim, harassment is severe and pervasive only if the workplace is "pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 316 (4th Cir. 2008). Whether conduct is sufficiently severe and pervasive requires a plaintiff to show that the harassment was severe and pervasive as to her personally ***and*** objectively abusive to a reasonable person in the plaintiff's position. *Briggs v. Waters*, 484 F. Supp. 2d 466, 485-86 (E.D. Va. 2007) (citing *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331 (4th Cir. 2003)). "This determination is made by looking at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (internal quotation omitted). The status of the alleged harasser—as a supervisor or co-equal of the plaintiff—may also be a significant factor. *Id* at 278.

As the Fourth Circuit has observed in considering hostile work environment claims under Title VII, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Evans v. International Paper Co.,* 936 F.3d 183, 192 (4th Cir. 2019) (internal quotation omitted). "The mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Id.*

Here, Plaintiff alleges that an unidentified co-worker told her that at an unspecified time on an unspecified number of occasions, one of Plaintiff's subordinates called her "[t]hat white racist bitch," and "[t]hat two-faced racist bitch." (SAC ¶ 148.) These comments allegedly occurred between June 11, 2011, after the prior school year ended, and the August 6, 2021 meeting,

before the next school year began.  These isolated comments by a subordinate employee do not satisfy the severe and pervasive prong of a hostile work environment claim.  Nor does the fact that the Division chose not to act on Plaintiff's concerns about the Policy and the *Courageous Conversations* curriculum show that she was personally the victim of racial discrimination.  It simply reflects the Division's policy decisions regarding its curriculum and teacher training.

Accordingly, Plaintiff's allegations in Count 3 and 7 do not sufficiently allege a racially hostile work environment.  Her claim should be dismissed with prejudice.

### 3.    Plaintiff's constructive discharge claims in Counts 4, 6, 8 and 10 do not state a cause of action upon which relief can be granted.

A constructive discharge claim requires a plaintiff to show "something more" than the showing required for a hostile work environment claim.  *Evans*, 936 F.3d at 193 (internal quotation omitted).  "To establish constructive discharge, an employee must meet a high standard.  [Sh]e must allege facts demonstrating that [s]he resigned and 'that [s]he was discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign.'"  *Ofoche v. Apogee Medical Group, Virginia, P.C.*, 815 F. App'x 690, 692 (4th Cir. 2020) (quoting *Green v. Brennan*, 136 S. Ct. 1769, 1777 (2016)).  "A feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."  *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) (citing *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360-61 (2nd Cir. 1993)).  An employee is not guaranteed a working environment free of stress.  *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985).

> Intolerability is not established by showing merely that a reasonable person, confronted with the same choices as the employee would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign.  Instead, intolerability is assessed by the objective standard of whether a

28

reasonable person in the employee's position would have felt *compelled* to resign .
. . that is whether he [or she] would have had *no choice* but to resign.

*Perkins v. Int'l Paper Co.*, 936 F.3d 196, 212 (4th Cir. 2019) (emphasis in original) (internal
citations and quotations omitted).  The conditions complained of must be more severe than even
the severe and pervasive harassment necessary to state a claim for a hostile work environment.  *Id.*

In assessing intolerability, the frequency of the conditions at issue is important.  *Evans*,
936 F.3d at 193.  "The more continuous the conduct, the more likely it will establish the required
intolerability.  On the other hand, when the conduct is isolated or infrequent, it is less likely to
establish the requisite intolerability."  *Id.*  Allegations of ostracization and even required
counseling are insufficient to support a claim for constructive discharge.  *Id.* (citing *Munday v.
Waste Mgmt. of N. Am.*, 126 F.3d 239, 244 (4th Cir. 1997)).

Applying these standards, Plaintiff's allegations do not meet the high standard for
constructive discharge.  Plaintiff does not allege that she could no longer effectively perform her
job responsibilities.  Plaintiff, rather, states that she was able to take time off to recover from
alleged physical symptoms of stress—for which she did not obtain medical treatment—without
repercussions.  She was not ostracized, but was rather able to consistently contact her supervisor,
Division leaders, and human resources professionals.  Moreover, Plaintiff resigned only 23 days
after the August 6 meeting, a time period during which she alleges no incidents of harassing
conduct forcing such a decision.

Plaintiff may have subjectively determined that resignation was her wisest course of action,
but that decision alone cannot carry a claim for constructive discharge.  Her claims in Counts 4, 6,
8, and 10 do not state a cause of action and should be dismissed with prejudice.

> **4.    Counts 5 and 9 do not allege facts to support a retaliatory hostile work environment.**

Count 5 of the Second Amended Complaint claims a retaliatory work environment in violation of the VHRA.  The VHRA, however, does not create a cause of action for retaliation.

The VHRA makes it unlawful for an employer to:

> a.    Fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's race, color, . . .; or
>
> b.    Limit, segregate, or classify employees or applicants for employment in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect an individual's status as an employee, because of such individual's race, color, . . . .

Va. Code § 2.2-3905(B)(1).  Unlike Title VII, the VHRA does not address retaliation.  While § 2.2-3905 mirrors 42 U.S.C. § 2000e-2, with respect to unlawful employment practices that constitute discriminatory conduct, the VHRA does not contain a section comparable to 42 U.S.C. § 2000e-3(a) which prohibits retaliation.[4]

Furthermore, the VHRA contains a limited retaliation provision applicable only to "labor organizations."

> It is an unlawful discriminatory practice for: . . .
>
> (i) An employer to discriminate against any employees or applicants for employment, (ii) an employment agency or a joint apprenticeship committee controlling an apprenticeship or other training program to discriminate against any

---

[4] "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

individual, or **(iii) a labor organization to discriminate** against any member thereof or applicant for membership **because such individual has opposed any practice made an unlawful discriminatory practice by this chapter or because such individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.**

Va. Code s. 2.2-3905(B)(7) (emphasis added).[5]

That the General Assembly did not intend for the VHRA to cover claims for retaliation is evidenced by the fact that it simultaneously enacted § 40.1-27.3. That statute provides, in relevant part:

An employer shall not discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee:

1.    Or a person acting on behalf of the employee in good faith reports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official;

2.    Is requested by a governmental body or law-enforcement official to participate in an investigation, hearing, or inquiry;

3.    Refuses to engage in a criminal act that would subject the employee to criminal liability;

4.    Refuses an employer's order to perform an action that violates any federal or state law or regulation and the employee informs the employer that the order is being refused for that reason; or

5.    Provides information to or testifies before any governmental body or law-enforcement official conducting an investigation, hearing, or inquiry into any alleged violation by the employer of federal or state law or regulation.

---

[5] "Labor organization" is defined as "an organization engaged in an industry, or an agent of such organization, that exists for the purpose, in whole or in part, of dealing with employers on behalf of employees concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment. 'Labor organization' includes employee representation committees, groups, or associations in which employees participate." Va. Code § 2.2-3905(A).

Va. Code § 40.1-27.3 (A).[6]  If the VHRA covered claims of retaliation, section 40.1-27.3 would

be superfluous.  *Shoemaker v. Funkhouser*, 299 Va. 471, 487-88, 856 S.E.2d 174, 183 (2021)

(noting that the Supreme Court of Virginia "disfavor[s] a construction of statutes that renders any

part of the statute useless or superfluous").

Moreover, to state a retaliation claim - whether under Title VII or the VHRA (to the extent

such a claim existed) - Plaintiff must allege that she "engaged in protected activity" and that the

School Board "took the adverse action because of the protected activity."  *Bryant v. Aiken Regional*

*Medical Centers, Inc.,* 333 F.3d 536, 543 (4th Cir. 2013).  That is, the protected activity must be

the **"but for" cause** of the adverse employment action.  *University of Texas Southwestern Medical*

*Center v. Nassar*, 570 U.S. 338, 362-63 (2013) (emphasis added).

---

[6] Plaintiff could not amend her complaint to allege retaliation in violation of section 40.1-27.3,
because that section does not apply to political subdivisions of the Commonwealth, like the School
Board.  Section 40.1-27.3 prohibits an "employer" from retaliating.  Section 40.1-2 defines
employer as:

> [A]n individual, partnership, association, corporation, legal representative,
> receiver, trustee, or trustee in bankruptcy doing business in or operating within this
> Commonwealth who employs another to work for wages, salaries, or on
> commission and shall include any similar entity acting directly or indirectly in the
> interest of an employer in relation to an employee.

That definition applies to the entirety of Title 40.1.  Some statutory provisions within the Title
contain an alternative definition of employer that includes political subdivisions.  *See, e.g.* Va.
Code § 40.1-28.9 ("'Employer' includes any individual, partnership, association, corporation, or
business trust or any person or group of persons acting directly or indirectly in the interest of an
employer in relation to an employee. 'Employer' includes the Commonwealth, any of its agencies,
institutions, or political subdivisions, and any public body"); Va. Code § 40.1-29.2 ("'Person'
means an individual, partnership, association, corporation, business trust, legal representative, any
organized group of persons, or the Commonwealth, any of its constitutional officers, agencies,
institutions, or political subdivisions, or any public body. This definition constitutes a waiver of
sovereign immunity by the Commonwealth.").  Section 40.1-27.3 does not alter the definition of
employer and, therefore, does not apply to the School Board.

Here, as explained above in responding to Plaintiff's speech retaliation and viewpoint discrimination claims, *supra*, Plaintiff does not allege hostile conduct as a result of her protected expression. Plaintiff, rather, was instructed to participate in—in fact, lead as an administrator— the implementation of and training regarding the Policy. She alleges that the training created a hostile environment, but that environment was neither particular nor retaliatory to her. Moreover, to the extent Plaintiff experienced actions targeted at her, they followed her own use of the term "colored", not her expression of objections to the Policy and its implementation. Accordingly, Plaintiff cannot succeed on her claim for retaliation in Counts 5 and 9 of the Second Amended Complaint.[7]

## IV.  CONCLUSION

For the foregoing reasons, the School Board respectfully requests that the Court grant its Motion to Dismiss and dismiss the Second Amended Complaint in its entirety with prejudice.

<div style="margin-left:40%">

ALBEMARLE COUNTY SCHOOL
BOARD

By Counsel

</div>

/s/ Jeremy D. Capps
David P. Corrigan (VSB No. 26341)
Jeremy D. Capps (VSB No. 43909)
Melissa Y. York (VSB No. 77493)
Blaire H. O'Brien (VSB No. 83961)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com
myork@hccw.com
bobrien@hccw.com

---

[7] As set out above, Plaintiff also has not alleged facts showing a hostile work environment in violation of VHRA or Title VII, and Counts 5 and 9 must be dismissed for this reason as well. See, *supra*, Section III. E. 2., pp. 26-28.

# C E R T I F I C A T E

I hereby certify that on the 7th day of October, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Tyson C. Langhofer, Esq.
VSB No. 95204
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
571-707-4655 - Phone
tlanghofer@ADFlegal.org

Ryan Bangert, Esq.
Alliance Defending Freedom
440 First Street, NW
Suite 600
Washington, DC 20001
202-393-8690 - Phone
rbangert@ADFlegal.org

Kate Anderson, Esq.
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
480-444-0020 - Phone
kanderson@ADFlegal.org

Henry W. Frampton, IV
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
480-444-0020 - Phone
hframpton@ADFlegal.org

Rachel A. Csutoros, Esq.
VSB No. 97783
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
571-707-4655 - Phone
rcsutoros@ADFlegal.org

Hailey M. Vrdolyak, Esquie
Alliance Defending Freedom
44180 Riverside Parkway
Landsdowne, VA 20176

David A. Cortman, Esq.
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176

/s/ Jeremy D. Capps
David P. Corrigan (VSB No. 26341)
Jeremy D. Capps (VSB No. 43909)
Melissa Y. York (VSB No. 77493)
Blaire H. O'Brien (VSB No. 83961)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com
myork@hccw.com
bobrien@hccw.com