**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| **EMILY MAIS,** | |
| *Plaintiff,* | Case No. 3:22-cv-51 |
| vs. | Honorable Norman K. Moon |
| **ALBEMARLE COUNTY SCHOOL BOARD,** | |
| *Defendant.* | **RESPONSE TO DEFENDANT'S MOTION TO DISMISS** |

Table of Contents

Table of Authorities ................................................................................................. iv

Introduction ............................................................................................................. 1

Facts ......................................................................................................................... 3

I.    The Board introduces its "Anti-Racism" Policy and threatens to kick employees who disagree "Off the Bus." ......................................................... 3

II.   The Board mandates racially hostile staff training on *Courageous Conversations about Race.* ................................................................................. 4

III.  Ms. Mais faces racial harassment following the June training session. .......... 6

IV.  Ms. Mais continued to raise concerns with the Board but only received more harassment and ritual shaming................................................................. 8

Legal Standard ....................................................................................................... 10

Argument ............................................................................................................... 11

I.    Ms. Mais has alleged facts sufficient to state a claim. ................................... 11

     A.    The Board created a racially hostile work environment in violation of Title VII and the VHRA. ....................................................... 11

     B.    The Board constructively discharged Ms. Mais, which violates the VHRA and Title VII. ......................................................................... 17

     C.    The Board created a retaliatory hostile work environment that violates the VHRA and Title VII. ........................................................ 19

     D.    The Board violated Ms. Mais's free-speech rights by retaliating against her and compelling and restricting her speech based on viewpoint............................................................................................... 21

          1.    Speech Retaliation ......................................................................... 22

          2.    Compelled and Restricted Speech .................................................. 25

          3.    Viewpoint discrimination............................................................... 26

     E.  The Board wrongfully discharged Ms. Mais in violation of public policy. .............................................................................................. 27

II.   The Board's technical defenses fail. .................................................................. 28

    A.  The Board does not have sovereign immunity here.................................... 28

        1.   The Free Speech Clause of the Virginia Constitution is self-
             executing and waives sovereign immunity. ....................................... 29

        2.   The VHRA waives sovereign immunity. ............................................. 32

    B.  Ms. Mais has exhausted all of her administrative remedies under
        the VHRA......................................................................................................... 33

    C.  The VHRA prohibits retaliation. ................................................................ 34

Conclusion .......................................................................................................................... 35

Certificate of Service......................................................................................................... 36

iii

TABLE OF AUTHORITIES

## Cases

*Adams Outdoor Advertising v. City of Newport News*,
373 S.E.2d 917 (Va. 1988)............................................................................ 29, 30

*Adams v. Trustees of University of North Carolina-Wilmington*,
640 F.3d 550 (4th Cir. 2011) .............................................................................. 23

*Amirmokri v. Baltimore Gas and Electric Co.*,
60 F.3d 1126 (4th Cir. 1995) .............................................................................. 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................... 10, 11

*Blue Horseshoe Tattoo, V, Ltd. v. City of Norfolk*,
72 Va. Cir. 388 (2007) ........................................................................................ 30

*Bowman v. State Bank of Keysville*,
331 S.E.2d 797 (Va. 1985)................................................................................... 27

*Boyer-Liberto v. Fontainebleau Corp.*,
786 F.3d 264 (4th Cir. 2015) ............................................................. 12, 14, 16, 20

*Bryant v. Aiken Regional Medical Centers, Inc.*,
333 F.3d 536 (4th Cir. 2003) ........................................................................ 20, 21

*Burlington Northern & Santa Fe Railway Co. v. White*,
548 U.S. 53 (2006) .............................................................................................. 20

*CBOCS West, Inc. v. Humphries*,
553 U.S. 442 (2008) ............................................................................................ 34

*Chapman v. Oakland Living Center, Inc.*,
48 F.4th 222 (4th Cir. 2022) .............................................................................. 16

*City of Virginia Beach v. Harris*,
523 S.E.2d 239 (Va. 2000)................................................................................... 32

*Commonwealth ex rel. Pross v. Board of Supervisors of Spotsylvania County*,
303 S.E.2d 887 (Va. 1983)................................................................................... 33

*Cressman v. Thompson*,
798 F.3d 938 (10th Cir. 2015) ............................................................................ 25

*Cromer v. Brown,*
   88 F.3d 1315 (4th Cir. 1996) ............................................................... 22, 23

*Davison v. Loudoun County Board of Supervisors,*
   267 F. Supp. 3d 702 (E.D. Va. 2017) ......................................................... 30

*DiGiacinto v. Rector & Visitors of George Mason University,*
   704 S.E.2d 365 (Va. 2011) ......................................................................... 29

*Doud v. Commonwealth,*
   717 S.E.2d 124 (Va. 2011) ......................................................................... 32

*Draego v. City of Charlottesville,*
   No. 3:16-CV-00057, 2016 WL 6834025  (W.D. Va. Nov. 18, 2016) ........................ 30

*Dunn v. Millirons,*
   176 F. Supp. 3d 591 (W.D. Va. 2016) ......................................................... 24

*Elliott v. Commonwealth,*
   593 S.E.2d 263 (Va. 2004) ................................................................... 21, 31

*Fitzpatrick v. Bitzer,*
   427 U.S. 445 (1976) ................................................................................... 28

*Flint v. Action Personnel, Inc.,*
   No. 7:13-CV-00406, 2013 WL 6729528 (W.D. Va. Dec. 19, 2013) ........................ 16

*Garcetti v. Ceballos,*
   547 U.S. 410 (2006) ................................................................................... 22

*Globe Newspaper Co. v. Commonwealth,*
   570 S.E.2d 809 (Va. 2002) ......................................................................... 30

*Gray v. Virginia Secretary of Transportation,*
   662 S.E.2d 66 (Va. 2008) ................................................................. 29, 30, 31

*Green v. Brennan,*
   578 U.S. 547 (2016) ................................................................................... 17

*Grimes v. Canadian American Transportation,*
   72 F. Supp. 2d 629 (W.D. Va. 1999) ......................................................... 34

*Guessous v. Fairview Property Investments, LLC,*
   828 F.3d 208 (4th Cir. 2016) ..................................................................... 11

*Harris v. Forklift Systems, Inc.,*
   510 U.S. 17 (1993) ..................................................................................... 16

*Hoyle v. Freightliner, LLC,*
 650 F.3d 321 (4th Cir. 2011) ................................................................. 16

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
 515 U.S. 557 (1995) ............................................................................... 25

*Jackson v. Birmingham Board of Education,*
 544 U.S. 167 (2005) ........................................................................... 34, 35

*Janus v. American Federation of State, County, and Municipal Employees,*
 *Council 31,*
 138 S. Ct. 2448 (2018) ........................................................................... 22

*Lee v. York County School Division,*
 418 F. Supp. 2d 816 (E.D. Va. 2006) ..................................................... 31

*Lee v. York County School Division,*
 484 F.3d 687 (4th Cir. 2007) ................................................................. 23

*Ligon v. County of Goochland,*
 689 S.E.2d 666 (Va. 2010) ..................................................................... 33

*McVey v. Stacy,*
 157 F.3d 271 (4th Cir. 1998) ................................................................. 22

*Miller v. SEVAMP, Inc.,*
 362 S.E.2d 915 (Va. 1987) ..................................................................... 28

*Mills v. Steger,*
 64 F. App'x 864 (4th Cir. 2003) ............................................................. 25

*Ocheltree v. Scollon Productions, Inc.,*
 335 F.3d 325 (4th Cir. 2003) ................................................................. 16

*Patel v. Commonwealth,*
 No. CL21-6527 (Norfolk Cir. July 2, 2021) ........................................... 33

*Pennsylvania State Police v. Suders,*
 542 U.S. 129 (2004) ............................................................................... 17

*Phillips v. Lynchburg Fire Department,*
 No. 6:16-cv-00063, 2017 WL 2424715 (W.D. Va. June 5, 2017) ............... 8

*Pickering v. Board of Education of Township High School District 205,*
 391 U.S. 563 (1968) ............................................................................... 23

*Piver v. Pender County Board of Education,*
    835 F.2d 1076 (4th Cir. 1987) ............................................................................. 23

*Robb v. Shockoe Slip Foundation,*
    324 S.E.2d 674 (Va. 1985) ............................................................... 29, 30, 31

*Rosenberger v. Rector & Visitors of University of Virginia,*
    515 U.S. 819 (1995) .............................................................................................. 27

*Scarborough v. Frederick County School Board,*
    517 F. Supp. 3d 569 (W.D. Va. 2021) .................................................................. 30

*Smith v. Center Ford, Inc.,*
    71 F. Supp. 2d 530 (E.D. Va. 1999) ..................................................................... 34

*Spriggs v. Diamond Auto Glass,*
    242 F.3d 179 (4th Cir. 2001) ................................................... 12, 16, 17, 19

*Stroman v. Colleton County School District,*
    981 F.2d 152 (4th Cir. 1992) ................................................................................ 24

*Swift & Co. v. City of Newport News,*
    52 S.E. 821 (Va. 1906) ......................................................................................... 29

*Tinker v. Des Moines Independent Community School District,*
    393 U.S. 503 (1969) .............................................................................................. 22

*Tobey v. Jones,*
    706 F.3d 379 (4th Cir. 2013) ............................................................................... 25

*Virginia Student Power Network v. City of Richmond,*
    107 Va. Cir. 137 (2021 ......................................................................................... 31

*Weatherly v. Alabama State University,*
    No. 2:10CV192-WHA, 2011 WL 6140917 (M.D. Ala. Dec. 8, 2011) ...................... 17

*West Virginia State Board of Education v. Barnette,*
    319 U.S. 624 (1943) .............................................................................................. 25

*Williams v. Cerberonics,*
    871 F.2d 452 (4th Cir. 1989) ............................................................................... 21

*Willis v. City of Virginia Beach,*
    90 F. Supp. 3d 597 (E.D. Va. 2015) ..................................................................... 30

*Woods v. City of Greensboro,*
    855 F.3d 639 (4th Cir. 2017) ................................................... 10, 11, 17

**Statutes**

Va. Code § 1-230 ......................................................................... 32, 33

Va. Code § 15.2-1512.4 ...................................................................... 28

Va. Code § 2.2-3905(A)...................................................................... 32

Va. Code § 2.2-3905(B)................................................................... 32, 34

**Other Authorities**

Va. Code Comm'n, *HD10 - The Revision of Title 1 and Title 7.1 of the Code of
   Virginia* (2005), bit.ly/3WA50Na ................................................... 32

**Constitutional Provisions**

Va. Const. art. I, § 12............................................................. passim

### INTRODUCTION

Former assistant principal Emily Mais was mocked, cursed, undermined, ritually shamed, and ultimately run out of a job that she loved. The problem? A work environment that regards "Whiteness" as a cardinal sin and opposition to critical race theory as evidence of racism.

Ms. Mais's complaint details the hostile environment: the Albemarle County School Board's overt embrace of race discrimination in the name of "anti-racism," teacher training that promoted crude racial stereotypes, and an administration that ignored complaints of a hostile environment while supporting one administrator who openly compared concerned parents to rapist slave owners, sending the message that dissent would not be tolerated.

And dissent was not tolerated, as illustrated by Ms. Mais's allegations of her own mistreatment. She reported concerns about the hostile work environment, but she was ignored. Then, she experienced that environment first-hand when she mistakenly used the word "colored," instead of "people of color," while discussing a training slide. Even though she immediately and repeatedly apologized, the Board allowed staff members to call her racist names, bully her friendly co-workers, and harass and belittle her until it was impossible for her to do her job. The mistreatment only escalated when Ms. Mais complained about it to human resources and district administrators.

These specific allegations—more than 50 pages of them—plainly state claims for a racially and retaliatory hostile work environment, capped by a constructive discharge, under Title VII and its state-law analogue. They also plainly state a free-speech claim under the Virginia Constitution. Before and after her slip of the tongue, Ms. Mais desperately tried to tell her superiors about the harm its "anti-racism" efforts were causing, only to find her efforts met by ever-increasing harassment and retaliation. Race discrimination in education is obviously a matter

1

of public concern, and Ms. Mais has amply alleged that the Board retaliated against her for talking about it, compelled her to speak its message, and discriminated against her because of her viewpoint, all in violation of the Virginia Constitution. Because the free-speech clause of the Virginia Constitution is a public policy of the Commonwealth, the Board's constructive discharge of Ms. Mais is also actionable as a common-law termination in violation of public policy.

In response, the Board relies on technical defenses: sovereign immunity, administrative exhaustion, and an argument that Virginia anti-discrimination law does not prohibit retaliation. None of these are availing, and none apply to Ms. Mais's federal claims.

First, the Board does not have sovereign immunity because the Virginia Constitution is self-executing and waives that immunity. The VHRA also waives sovereign immunity by expressly defining the class of regulated employers to include government entities like the Board. Second, the Board's exhaustion defense, which applies only to the VHRA claims, fails because Ms. Mais has no further administrative steps to take. Both the VHRA and U.S. Equal Employment Opportunity Commission (EEOC) have closed their files, and the EEOC has issued a Notice of Right to Sue. Finally, by prohibiting race discrimination, the VHRA also prohibits retaliation. As the Supreme Court has held, retaliation is a species of unlawful discrimination. So, statutes that prohibit discrimination like 42 U.S.C. § 1981, 42 U.S.C. § 1982, and Title IX—and the VHRA—also prohibit retaliation.

In sum, Ms. Mais has filed a 400+ paragraph, 50+ page complaint detailing the Board's racist and retaliatory actions, its squelching of her free-speech rights, and its creation of a work environment so hostile that she had no reasonable choice but to quit. These allegations easily state claims under federal and state law. Ms. Mais asks this Court to deny the Board's motion to dismiss.

FACTS

## I.   The Board introduces its "Anti-Racism" Policy and threatens to kick employees who disagree "Off the Bus."

In February 2019, the Board adopted its "Anti-Racism Policy" (Policy), which required that "different groups must be treated differently" based on race.[1] Pl.'s 2nd Am. Compl. ("Compl.") ¶¶ 50–55. As detailed in the Complaint, this Policy laid the foundation for the racially hostile environment that led to Ms. Mais's constructive discharge. *Id.* ¶ 57.

In November 2020, the Board held a mandatory online orientation presentation on the Policy for all staff. *Id.* ¶ 58. Ms. Mais attended. *Id.* The presentation included part of an Ibram X. Kendi interview on his book, *How to be an Antiracist*, in which Kendi asserted both that different racial groups should be treated differently because "[a]ll that matters is the outcome," and that any policy that does not produce equal outcomes is inherently racist. *Id.* ¶¶ 59–60.

During the orientation, Dr. Bernard Hairston, the Assistant Superintendent responsible for implementing the Policy, echoed Kendi's sentiments, telling staff that the Board was serious about confronting the school system as an "institutional system built on advancing whiteness." Compl. ¶ 63; Compl. Ex. 4 at 2:22. He specifically admonished white employees to acknowledge their lack of knowledge about race. Compl. Ex. 4 at 3:7–8.

Dr. Hairston also told staff that the Policy was "required," and that it was their responsibility to "own" it. *Id.* at 5:22–23; Compl. ¶ 63. He told them to think about whether they were on the "antiracism school bus, or if you need help finding your seat and keeping your seat, **or if it's time for you to just get off the bus**."

---

[1] This is an abbreviated account of the facts, which are more fully set forth in the complaint. *See* Compl. ¶¶ 24–257.

Compl. Ex. 4 at 6:2-4 (emphasis added); Compl. ¶ 64. To Ms. Mais, these words were clear: embrace the Policy or risk your job. Compl. ¶ 65.

## II.  The Board mandates racially hostile staff training on *Courageous Conversations about Race.*

In March 2021, as part of implementing the "anti-racism" policy, the Board held a mandatory professional development webinar with Glenn Singleton, the author of *Courageous Conversations About Race.* Compl. ¶ 66. Ms. Mais attended. *Id.* Further implementing the Policy, the Board then required district schools, including Agnor-Hurt Elementary where Ms. Mais worked, to conduct a teacher training series based on Singleton's book. *Id.* ¶ 68. Among other things, this book and corresponding training materials promoted pejorative stereotypes of how people of color think, speak, and act; demonized white people; and advocated for treating people differently based on their race. *Id.* ¶¶ 67–73.

For example, one training slide entitled "Communication is a Racialized Tool" promoted the following stereotypes about how people communicated based solely on their race. Compl. Ex. 5 at 4.

**Communication is a Racialized Tool**

| *White Talk* | *Color Commentary* |
|---|---|
| Verbal: Focused on talking and offering racial meaning through word choice, voice tone, and intonation | Nonverbal: Focused on offering racial meaning through facial expressions, body movements, and physical gestures |
| Impersonal: Focused on the sharing of racial perspectives or experiences of someone not immediately present or involved in the conversation. | Personal: Focused on sharing one's own personal racial narrative, perspectives, or experiences. |
| Intellectual: Focused on what one thinks (or has read) with respect to race. | Emotional: Focused on what one feels (or has experienced) with respect to race. |
| Task oriented: Focused on engaging in dialogue for the purposes of getting something accomplished. | Process oriented: Focused on engaging in dialogue for the purposes of feeling present, connected, or heard. |

4

Another training slide urged staff to move from a "colorblind" view of race to a "color conscious" scheme and explained that "treat[ing] everyone with respect," regardless of race, is not enough. Compl. ¶ 75 & Ex. 5 at 3. Rather, to be "anti-racist," one must treat people differently based race. Compl. ¶¶ 54–55, 60–61.

Adding to the overtly racist content, the trainings were conducted in a racially hostile manner. In unmonitored breakout rooms, participants were forced to discuss contentious racial topics like "white privilege" and how it influences their lives. Compl. ¶ 77. In this mandatory environment, when white participants shared, they were often confronted by other staff members, and told that they could not understand the topic because of their race. *Id.* ¶ 78.

Early in the training, Sheila Avery, a teacher's aide, presented herself as the voice for a group of unnamed black employees. Throughout the training, Ms. Avery mistreated white employees who attempted to engage with the curriculum by dismissing their comments, telling them they did not/could not understand racism because they were not black, and/or that their racial, cultural, religious, class, and other backgrounds were irrelevant and not worth discussing. *Id.* ¶ 85. For example, a Jewish staff member told Ms. Mais it was hurtful to hear other employees' experiences dismissed because they were not black, and that she was uncomfortable sharing about her experience as a religious minority because it would also be dismissed. *Id.* ¶¶ 88–90. Similarly, a biracial (white/Asian) employee told Ms. Mais that she did not feel safe sharing her own struggles because others in the group would shut down her comments, telling her she is not black. *Id.* ¶¶ 91–92. This kind of hostility echoed the training materials themselves, which taught that only white people are capable of racist acts. *Id.* ¶ 95. And Board administrators permitted the hostility to continue, never addressing or stopping the racially divisive and harmful statements directed at white and other non-black employees, despite Ms. Mais reporting them. *Id.* ¶¶ 93–94.

The racial hostility extended all the way up to Dr. Hairston, the Assistant Superintendent in charge of implementing the Board's "anti-racism" efforts. *Id.* ¶ 101. When parents expressed concerns that the Board's "anti-racism" efforts were fostering racism instead of eliminating it, Dr. Hairston compared those parents to white slave owners who had raped his mother and sister, beaten him, and then ordered him not to talk about it. *Id.* ¶ 103. Superintendent Matt Haas was present for these remarks and did not correct them, and the Board never apologized for nor retracted these statements. *Id.* ¶¶ 107–08. The message from the Board was clear: any white person who doesn't agree with the Board's "anti-racist" efforts is the moral equivalent of a slave owner, a rapist, a physical abuser. *Id.* ¶ 109.

In June 2021, at the final *Courageous Conversations* training session, in response to a slide about racial disparities in hiring, Ms. Mais commented that it would be useful to see the racial statistics of those in the applicant pool, not just those hired. *Id.* ¶¶ 111–12. She was getting at whether the dearth of minority hires was more of a recruitment problem (i.e., failing to recruit a diverse applicant pool) or a selection problem (i.e., failing to select qualified minority applicants). *Id.* ¶ 112. Ms. Mais intended to use the phrase "people of color" but accidentally said "colored." *Id.* ¶ 113. She immediately apologized for this inadvertent slip of the tongue. *Id.* ¶ 114. Ms. Avery did not accept this apology and in that meeting publicly berated and harassed Ms. Mais, her superior, and accused her of racism in front of the other staff members. *Id.* ¶ 115. The abuse was so severe that multiple staff members who were in that training reached out to Ms. Mais afterwards to express support for her and alarm at how unprofessionally she was treated. *Id.* ¶ 116.

### III.   Ms. Mais faces racial harassment following the June training session.

After the incident, and despite her apology in the moment, the school guidance counselor, Emily Holmstrom, and the Board's Equity Specialist, Lars Holmstrom, separately demanded to meet with Ms. Mais. *Id.* ¶¶ 117–20. During the

meeting with Lars Holmstrom, Ms. Mais raised concerns that the *Courageous Conversations* trainings were creating a racially hostile work environment and that Ms. Avery should not be allowed to verbally attack her during a staff training. *Id.* ¶¶ 121–24. The administrators ignored these complaints. *Id.* ¶ 125.

Dr. Hairston then demanded to meet with Ms. Mais. *Id.* ¶ 127. He invited Ms. Avery and Ms. Holmstrom to the meeting, which occurred on August 6, 2021. *Id.* ¶¶ 154–55. Ms. Mais asked that the meeting be recorded, but Dr. Hairston refused, telling her that the meeting would not be recorded because the Board did not want its contents leaked to the press. *Id.* ¶¶ 131, 140. Ms. Mais never threatened to take any of her concerns to the press and had only ever raised her concerns with her superiors.

During the meeting with Dr. Hairston, Ms. Mais again repeatedly apologized. But Ms. Avery repeated that she did not accept Ms. Mais's apology, that she spoke on behalf of an unnamed group of black employees, and she berated Ms. Mais throughout the meeting. *Id.* ¶¶ 156–60. Dr. Hairston did nothing. And, despite Ms. Mais's repeated apologies and explanations, Ms. Holmstrom continued referring to her slip of the tongue as an act of racism. Dr. Hairston allowed this characterization, suggesting he agreed with it. *Id.* ¶¶ 171–72.

At the meeting, Ms. Mais complained of the racially charged work environment, but Dr. Hairston ignored her. *Id.* ¶¶ 162–63, 169–70. And at the end of the meeting, Dr. Hairston demanded that Ms. Mais make a formal and public apology to school staff for her slip of the tongue, even though she had already, repeatedly apologized. *Id.* ¶¶ 164–67. Ms. Avery was never asked to apologize. *Id.* So too, Dr. Hairston never retracted or apologized for his racially charged statement comparing concerned parents to white rapist slave owners. *Id* ¶ 108.

Throughout the time between the June training and Ms. Mais's constructive discharge, Ms. Avery and other employees harassed Ms. Mais. They talked rudely

about Ms. Mais to other staff members, calling her "that white racist bitch" and "that two-faced racist bitch," and falsely accusing her of intentionally demeaning black people *Id.* ¶¶ 146–48. Co-workers came to Ms. Mais in tears about what they were hearing and told her they were afraid to even be associated with her because they did not want to become targets of Ms. Avery's group. *Id.* ¶¶ 147, 152.

Ms. Mais again complained about this racial harassment to her principal, Mike Irani, explaining that it was causing her severe emotional distress, but he did nothing. *Id.* ¶¶ 149–53. The harassment eventually became so bad that Ms. Mais began experiencing intense anxiety and distress—including physical symptoms like nausea, hyperventilation, panic attacks, headaches, rapid heartbeat, and shortness of breath—because of it. *Id.* ¶¶ 179–85. She had to take time off work and seek medical attention for her symptoms.[2] *Id.* ¶¶ 182–85.

## IV. Ms. Mais continued to raise concerns with the Board but only received more harassment and ritual shaming.

Ms. Mais complained of the racial hostility to numerous administrators, including members of the human resources department and an Assistant Superintendent in charge of human resources. In total, she complained to seven administrators: Mr. Holmstrom, Dr. Hairston, Dr. Irani, Ms. Gerome, Ms. Kindler Dr. Keiser, and Ms. Keiser. *Id.* ¶¶ 93, 120–24, 149–52, 162–63, 188, 192–93, 196–97. But the Board still took no action to resolve the issues; instead, it allowed the racially charged environment in its schools to continue, and the racial harassment against Ms. Mais to persist. *Id.* ¶¶ 186–204. Ms. Mais even explained that she could

---

[2] Contrary to Defendant's claim, Ms. Mais received treatment from a licensed counselor and her primary care physician for the symptoms associated with her mistreatment. Charge of Discrimination at 9, attached hereto as Exhibit A. *See Phillips v. Lynchburg Fire Dep't*, No. 6:16-cv-00063, 2017 WL 2424715, at *8 (W.D. Va. June 5, 2017) (court may consider contents of Charge of Discrimination on motion to dismiss).

not effectively serve as an administrator if subordinates had free rein to harass her, but the Board did nothing. *Id.* ¶ 151.

It became clear that Ms. Mais was in an untenable situation: no apology would ever be enough, she would never be able to effectively supervise employees who were allowed to harass her at will, and the Board's racial hostility toward her would continue. Thus, she had no reasonable choice but to resign effective September 10, 2021. *Id.* ¶ 205.

In announcing her departure, the Board demanded that Ms. Mais send a letter to Agnor-Hurt families telling them that she was leaving to pursue another career opportunity. This was blatantly false. *Id.* ¶¶ 206–07. Ms. Mais left the job that she loved because of the intolerable and racially hostile working conditions in the Board. Yet, she sent the letter because she feared that if she did not, the Board would make it difficult for her to obtain employment elsewhere. *Id.* ¶ 208.

Then on the eve of her departure, the Board required Ms. Mais to undergo one last ritual shaming—another public apology—this time at a special staff meeting on September 9, 2021. *Id.* ¶ 210. Ahead of the staff meeting, Ms. Mais presented her draft apology to Dr. Irani, Ms. Avery, and Ms. Holmstrom. *Id.* ¶ 213. Ms. Mais's desired statement contained a clear apology, and a comment about how difficult the situation had been for Ms. Mais and her concerns with the impact of *Courageous Conversations* on the school community. *Id.* ¶ 217. But as soon as she started to share that second portion of her draft statement, Ms. Avery and Ms. Holmstrom cut her off. *Id.* ¶¶ 218–19. They told her she was acting like a racist, defensive white person, and that nobody cared about her feelings. *Id.* Dr. Irani did not correct this mistreatment, and it was clear Ms. Mais's statement was not acceptable as written. *Id.* ¶ 220.

Ms. Mais was only allowed to share the Board-approved version of her apology at the September 9, 2021, staff meeting. *Id.* ¶ 234. The Board selectively

invited staff members to include some that were not even employed by the Board when Ms. Mais made the slip of the tongue. *Id.* ¶ 226. The Board also invited all the black teacher's aides but not the white teacher's aides, *id.* ¶¶ 227–28, and allowed a group of black employees, led by Ms. Avery, to wear matching combative, threatening attire (black t-shirts and camouflage pants) and sit right in front of Ms. Mais while she presented her apology. *Id.* ¶¶ 230–32. After Ms. Mais delivered her apology, the Board allowed Ms. Avery to respond. She used racist talking points from *Courageous Conversations*, baselessly accused white staff of mistreating students of color, threatened white staff that she was watching them, and warned staff that they were either on her side or Ms. Mais's side. *Id.* ¶¶ 235–39. She even confronted an employee afterwards for seeming too friendly to Ms. Mais. *Id.* ¶ 247.

Finally, on Ms. Mais's last day, Ms. Avery sat outside Ms. Mais's office, watching who went in and out. *Id.* ¶¶ 248–51. Ms. Mais complained to Dr. Irani about this harassment (against her and other staff members), but again he did nothing. *Id.* ¶¶ 252–53.

## Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). And "a court must accept as true all of the allegations contained in a complaint." *Id.*

The Fourth Circuit has warned against the "premature dismissal" of discrimination claims "because civil rights plaintiffs often plead facts that are consistent with both legal and illegal behavior, and civil rights cases are more likely to suffer from information-asymmetry, pre-discovery." *Woods v. City of Greensboro*, 855 F.3d 639, 652 (4th Cir. 2017). Thus, when a discrimination complaint "catalogs numerous factual allegations beyond conclusory recitals of law," dismissal is

inappropriate. *Id.* Here, Ms. Mais has alleged more than enough facts to survive a motion to dismiss.

**ARGUMENT**

## I.   **Ms. Mais has alleged facts sufficient to state a claim.**

The Board argues that Ms. Mais has failed to state a claim on each cause of action. But Ms. Mais only needs to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. Her detailed allegations easily clear this bar.

### A.   **The Board created a racially hostile work environment in violation of Title VII and the VHRA.**

To establish a racially hostile work environment claim, a plaintiff must show "there is (1) unwelcome conduct; (2) that is based on the plaintiff's [race]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016) (cleaned up). The Board does not challenge Ms. Mais's pleading as to elements one, two, or four of her racially hostile work environment claim. Def.'s Br. in Supp. of Mot. to Dismiss 2nd Am. Compl. ("MTD") at 26–28. It is therefore established for the purposes of this motion that Ms. Mais was exposed to conduct that was unwelcome, based on her race, and imputable to the Board.[3] The Board only challenges whether the conduct was sufficiently severe or pervasive.

But the Board's argument ignores most of Ms. Mais's allegations on this

---

[3] In addition to being conceded, these points are clearly alleged. Ms. Mais's mistreatment was unwelcome and is imputable to the Board because Ms. Mais brought it to their attention. Likewise, the mistreatment is attributable to Ms. Mais's race given the overtly racist language used and given that her tongue-slip resulted in months of abuse, whereas black employees like Ms. Avery and Dr. Hairston could make racially charged comments without punishment.

11

point, instead focusing solely on the "white racist bitch" and "two-faced racist bitch" comments. MTD at 27–28. This disregards Ms. Mais's specific allegations that the overall environment was racially hostile, as well as many instances of harassment directed against her and sanctioned by the Board. Those detailed allegations make out Ms. Mais's hostile environment claim.

As to the overall environment, courts determine whether a racially hostile environment exists "by looking at *all* the circumstances" not just the ones the Board decided to highlight. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (emphasis added) (citation omitted); *see also Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) ("The degree of hostility or abuse to which [plaintiff] was exposed can only be determined by examining the totality of the circumstances."). That's because courts are "concerned with the 'environment' of workplace hostility, and whatever the contours of one's environment, they surely may exceed the individual dynamic between the complainant and his supervisor." *Id*. Thus, the Board's myopic focus on comments made to Ms. Mais—to the exclusion of her allegations concerning the overall environment—flies in the face of the rulings in *Boyer-Liberto* and *Spriggs*.

Ms. Mais has sufficiently alleged an environment replete with severe or pervasive racial hostility. Indeed, the difference between the Board's handling of Ms. Mais's slip-of-the-tongue and its handling of Dr. Hairston's and Ms. Avery's comments is emblematic of the hostility toward white employees and parents. Although Ms. Mais apologized for her mistake immediately, she was harassed, hauled into meeting after meeting, and ritually shamed in front of her colleagues. All the while Ms. Avery and her group could call Ms. Mais racist names with impunity. And Dr. Hairston could compare white parents to racist slave owners with the Board's approval.

With its "Anti-Racism Policy" and related efforts, the Board created a racially charged school environment. The Board's Policy implemented an ideology that enforced racial stereotypes, and encouraged overt racism, saying things like "different [racial] groups will be treated differently." Compl. ¶¶ 54–57. The Policy orientation advocated for racial discrimination by, for example, including the video excerpt from Ibram X. Kendi saying the same. *Id*. ¶ 61. The materials promoted by the Board to further the Policy contained descriptions that dehumanize white and black people with crude stereotypes of how they think, feel, and act based on their skin color. *Id*. ¶¶ 8–10, 71–74. And through the words of Dr. Hairston, the Board made clear that anyone who opposed the Policy or the ideology behind it would need to "get off the bus." *Id*. ¶¶ 62–64.

The Board further perpetuated this divisive environment by requiring all teachers to undergo a racialized training that again promoted racial stereotypes, demonized whites as the only people capable of racism, and taught that "Whiteness is characterized by a sense of entitlement." Compl. ¶¶ 8–9, 72–74. Then during unmoderated breakout sessions staff members were required to discuss divisive topics like "white privilege" while participating white staff members were silenced, dismissed, and harassed by their colleagues because of the color of their skin. *Id*. ¶¶ 77–78, 80–86. Employees complained to Ms. Mais about this racial hostility, and she escalated them, but nothing changed. *Id*. ¶¶ 87–94. In fact, this racial hostility was so pervasive that it extended all the way to the top of the administration.

As Ms. Mais alleged, in a mandatory administrators' meeting that she attended, Dr. Hairston compared white parents who raised concerns about the "anti-racism" teachings to white slave owners who beat him, raped his mother and sister, and then told him not to talk about it. *Id*. ¶¶ 101–03. Neither Superintendent Haas, Hairston himself, nor the Board ever apologized for or retracted these severely hostile comments, underscoring the entrenched and pervasive nature of the

hostile environment. *Id*. ¶¶ 107–08. The court should properly consider this evidence of the severe and pervasive racial hostility, even if the Board's arguments ignore it. *See Boyer-Liberto*, 786 F.3d at 277 (courts must look at "all the circumstances" to determine severe or pervasive hostile work environment).

Likewise, this court should consider all hostility directed at Ms. Mais, not just the two comments the Board addresses. But even those comments were more severe and pervasive than the Board admits. MTD at 27–28. The statements that Ms. Mais is a "white racist bitch" and "two-faced racist bitch" were not "isolated." MTD at 28. Rather, as Ms. Mais alleged, Ms. Avery and her group repeatedly used these terms to describe Ms. Mais from June 11, 2021, until her constructive discharge three months later. Compl. ¶¶ 148–53, 188, 193, 197, 201–04.

But these comments merely scratch the surface of the racial hostility Ms. Mais endured at work. The complaint alleges at least twelve additional manifestations of the hostility.

- *First*, after Ms. Mais's slip of the tongue, and even though she immediately apologized during the training, Ms. Avery harshly berated her in front of staff members. *Id*. ¶¶ 115–16.

- *Second*, the Board refused to discipline Ms. Avery for this or any other inappropriate behavior. *Id*. ¶¶ 115–116, 120–125.

- *Third*, Ms. Mais was called into meeting after meeting to discuss the "incident" that her initial apology should have resolved. *Id*. ¶¶ 117–27.

- *Fourth*, the Board required Ms. Mais to meet with Dr. Hairston himself. *Id*. ¶¶ 126–27, 130.

- *Fifth*, in that meeting, he allowed Ms. Avery to further harass Ms. Mais for her slip. *Id*. ¶¶ 156–76.

- *Sixth*, in that meeting, he allowed Ms. Holmstrom to call Ms. Mais's slip an act of racism, to say that white employees should be afraid to speak in training sessions if what they were thinking was not "appropriate," and to further harass Ms. Mais. *Id*. ¶¶ 156–76.

14

- *Seventh*, while Dr. Hairston could compare white parents to rapist slave owners and Ms. Avery and her colleagues could call Ms. Mais a "white racist bitch," the Board required Ms. Mais to give a Board-approved apology, yet again, for an inadvertent slip of the tongue at another staff meeting. *Id.* ¶ 164.

- *Eighth*, Ms. Mais was shut down, bullied, and censored when she presented her draft apology. *Id.* ¶¶ 221–23, 234. Ms. Avery told her she should not discuss her feelings because nobody cared about them, and Ms. Holmstrom told Ms. Mais that by talking about her feelings, Ms. Mais was acting like a typical defensive white person. *Id.* ¶¶ 218–19.

- *Ninth*, at the final apology meeting, which was nothing more than a ritual shaming of Ms. Mais, the Board created a divisive environment by inviting all black teachers' aides but none of the white teachers' aides. *Id.* ¶¶ 226–29.

- *Tenth,* at the apology meeting, the Board permitted a group of black employees, including Ms. Avery, to wear intimidating attire and sit in the front to threaten Ms. Mais. *Id.* ¶¶ 230–32.

- *Eleventh*, at the apology meeting, the Board permitted Ms. Avery to parrot racist talking points from *Courageous Conversations*, baselessly accuse white staff members of mistreating students of color, tell staff members that she was watching them for perceived racist behavior, and insist that staff choose a side between either her or Ms. Mais. *Id.* ¶¶ 235–39. And it allowed Mr. Holstrom to harass white staff members who asked for time to process the events before jumping into the next topic. *Id.* ¶¶ 242–43. Again, the Board condoned rather than corrected this racially divisive behavior. *Id.* ¶ 240.

- *Twelfth*, the Board allowed Ms. Avery to harass and intimidate employees who tried to befriend or express sympathy for Ms. Mais, including watching who came and went from Ms. Mais's office on her last day. *Id.* ¶¶ 245–54.

In short, the conduct alleged is both severe and pervasive, through it need only be one of the two to state a claim. It is severe because the language and epithets hurled at Ms. Mais and at white people generally were severe. Comparing white people to rapist, violent slave owners is about as severe a comparison as the English language will bear. Likewise, in a society that values racial equality,

15

repeatedly labelling someone a racist is severe treatment indeed. As is calling someone a "white racist bitch." *See Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (jokes of a sexual nature by co-workers, though not directed at or about plaintiff, were severe enough for hostile work environment).

The conduct was also pervasive because it occurred over and over for a period of months with no indication that it would ever stop. Between the repeated comments made by co-workers, the meetings called by administrators, and the ritual shaming Ms. Mais was required to endure, being racially harassed became a normal—and pervasive—part of Ms. Mais's employment. *See Spriggs*, 242 F.3d at 184–85 (continuous use of racial slurs and epithets, though not directed at plaintiff, over long period of time constituted hostile work environment). And though "Title VII comes into play before the harassing conduct leads to a nervous breakdown," the Board created an environment that did just that. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). Ms. Mais experienced panic attacks, hyperventilation, and nausea, among other symptoms. Compl. ¶ 182. Recognizing that the severity or pervasiveness of a hostile environment "is quintessentially a question of fact," Ms. Mais has alleged conduct that easily survives a motion to dismiss. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 333 (4th Cir. 2011) (cleaned up).

Indeed, courts have considered much less than what Ms. Mais alleged here as "severe or pervasive" enough to survive a motion to dismiss and even summary judgment. For example, in *Boyer-Liberto*, the court determined that the plaintiff's hostile work environment claim survived summary judgment when she only alleged that she was called an offensive name twice, in one 24-hour period, by the same co-worker. *Boyer-Liberto*, 786 F.3d at 280; *accord Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 232 (4th Cir. 2022) (racial epithet uttered three times by six-year-old sufficient to defeat summary judgment); *Flint v. Action Personnel, Inc.*, No. 7:13-CV-00406, 2013 WL 6729528, at *6 (W.D. Va. Dec. 19, 2013) (repeated

comments over three months sufficient to state claim for harassment); *Weatherly v. Ala. St. Univ.*, No. 2:10CV192-WHA, 2011 WL 6140917, at *13 (M.D. Ala. Dec. 8, 2011) (referring to employee as "white bitch" supported racial harassment claim). And the use of a racial epithet, even when not directed at the plaintiff, also constitutes conduct that is severe or pervasive enough to state a claim. *Spriggs*, 242 F.3d at 185. Ms. Mais has "catalog[ed] numerous factual allegations beyond conclusory recitals of law," and dismissal is therefore inappropriate. *Woods*, 855 F.3d at 652.

### B. The Board constructively discharged Ms. Mais, which violates the VHRA and Title VII.

With respect to the constructive discharge claims, the Board again ignores most of Ms. Mais's allegations. MTD at 28–29. But Ms. Mais has indeed alleged more than sufficient facts to show constructive discharge, which requires two elements: (1) the plaintiff "was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign" and (2) the plaintiff "actually resigned." *Green v. Brennan*, 578 U.S. 547, 555 (2016). Only the first element is in dispute.

The Board discriminated against Ms. Mais by creating a racially hostile work environment. *See supra* I.C. And the alleged facts show that a reasonable person in her position would have felt compelled to resign. Hostility that would make a reasonable person resign "may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts." *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004). Ms. Mais endured all three.

The Board allowed Ms. Mais's co-workers—indeed, her subordinates—to harass her to the point that her job was untenable. First, despite Ms. Mais's immediate apology, Ms. Avery berated Ms. Mais in front of the staff during the June 2021 training session. Compl. ¶ 115. Then, Ms. Avery and her friends called

Ms. Mais vulgar names and made false statements about her to other staff members for months. *Id.* ¶¶ 146–48. After that, Ms. Avery further berated and harassed Ms. Mais in the meeting with Dr. Hairston. *Id.* ¶¶ 156–63. Ms. Holstrom did the same. *Id.* Still later, Ms. Avery and Ms. Holstrom shut down Ms. Mais's attempt to present her draft apology, with Ms. Holmstrom telling her that merely discussing her feelings made her a typical defensive white racist. *Id.* ¶¶ 216–19. And finally, Ms. Avery and her friends wore threatening attire to the final apology meeting, and Ms. Avery continued to berate and threaten Ms. Mais and the white staff members at and after that meeting. *Id.* ¶¶ 230–54.

What's worse, Board administrators approved this co-worker harassment. None of it flew under the radar. Rather, Ms. Kindler witnessed Ms. Avery's harassment during the June 2021 training session and did nothing. *Id.* ¶ 132. Dr. Hairston witnessed Ms. Avery's and Ms. Holmstrom's harassment during the August 2021 meeting and did nothing. *Id.* ¶¶ 156–64. Ms. Mais brought Ms. Avery's and her friends' ugly and false comments to Dr. Irani's attention in real time, and he did nothing. *Id.* ¶¶ 149–53. Dr. Irani watched Ms. Holmstom and Ms. Avery shut down Ms. Mais's attempt to present her draft apology and did nothing. *Id.* ¶ 220. Human resources employees all the way up to an Assistant Superintendent listened to Ms. Mais's complaints about the harassment—even telling her that Dr. Hairston handled the August 2021 meeting inappropriately—but did nothing. *Id.* ¶¶ 186–204. And Dr. Irani and Mr. Holmstrom saw the threatening attire and inappropriate conduct at the final apology session and did nothing. *Id.* ¶¶ 230–54.

It's no wonder the Board did nothing when its official acts promoted a racially divisive ideology. Its own orientation and training materials promoted treating people differently based on their race, and buying into crude stereotypes about how people think, feel, communicate, and act based solely on their skin color. *Id.* ¶¶ 59–61, 71–75. Its Assistant Superintendent felt comfortable comparing people who

18

sincerely disagreed with his approach to rapist slave owners, and he boldly proclaimed that any employees who disagree should "get off the bus" and find somewhere else to work. *Id.* ¶¶ 64, 103.

This combination of unrelenting co-worker harassment, Board approval, and official endorsement of race discrimination was more than sufficient to place Ms. Mais in an objectively impossible situation where she could not effectively perform her job. *Id.* ¶¶ 151, 201–05. There was no end to the harassment in sight. Because of the racial hostility and ritual shaming Ms. Mais experienced, she suffered constant stress and anxiety, leading to mental and physical symptoms that required medical treatment. Compl. ¶¶ 181–85 & Ex. A. It was impossible for Ms. Mais to do her job, especially when one of her subordinates was allowed to publicly harass her—continually. *Id.* ¶¶ 148–53. These facts as Ms. Mais alleged would drive a reasonable person to resign—as it did drive Ms. Mais to resign here. *See Amirmokri v. Balt. Gas and Elec. Co.*, 60 F.3d 1126, 1132 (4th Cir. 1995) (continuous co-worker harassment without employer intervention enough to support constructive discharge).

### C.   The Board created a retaliatory hostile work environment that violates the VHRA and Title VII.

Ms. Mais has alleged retaliation violating both Title VII and the VHRA. A retaliation claim consists of three elements: "(1) [employee] engaged in protected activity; (2) [employee] suffered an adverse employment action at the hands of [her employer]; and (3) [the employer] took the adverse action because of the protected activity." *Spriggs*, 242 F.3d at 190. The Board challenges only causation and only in cursory fashion. MTD at 32–33.

But the facts alleged are more than sufficient to plausibly plead a causal connection between Ms. Mais's complaints and the Board's treatment of her. The anti-retaliation provision of Title VII "is not limited to discriminatory actions that

affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). Rather, unlawful retaliation can manifest in any number of ways, as it did here when the Board subjected Ms. Mais to a constant stream of humiliation, accusations of racism, and ritual shaming. Further, since Ms. Mais alleged a retaliatory hostile work environment, evidence of the overall environment—and not just her own mistreatment—is relevant. *See Boyer-Liberto*, 786 F.3d at 282 ("[A]n employee is protected from retaliation when she opposes a hostile work environment.").

Here, the Board effectively announced at its Orientation that it would engage in unlawful retaliation. By telling employees that any dissent from the Policy might require they "get off the bus," the Board created an environment rife with retaliatory animus. And by comparing concerned parents to rapist slave owners, Dr. Hairston further emphasized that complaints about the racist nature of the Policy were verboten.

Ms. Mais's own experience further bears out the retaliatory environment. Although employees are "guaranteed the right to complain to their superiors about suspected violations of Title VII," every time Ms. Mais complained, she was subjected to further mistreatment. *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003). For example, when she complained to Mr. Holmstrom shortly after the slip of the tongue, she was immediately called in to meet with Dr. Hairston—even though she'd already repeatedly apologized such that there should have been nothing to discuss. Compl. ¶¶ 120–27. And the meeting with Dr. Hairston was conducted in a retaliatory manner, designed to humiliate and belittle Ms. Mais by again refusing to accept her repeated apologies. *Id.* ¶¶ 156–72. Accordingly, she left the meeting in tears. *Id.* ¶ 176.

For another example, when Ms. Mais explained her concerns in the meeting with Dr. Hairston, instead of taking her concerns seriously—or at least honoring

them as protected activity under Title VII—Dr. Hairston instead retaliated by making her go through another humiliating public apology and threatening to make all the Agnor-Hurt employees be re-trained. *Id.* ¶¶ 164, 168–70, 235–40. And when Ms. Mais raised concerns about this treatment in her draft apology, she was told that she was acting like a defensive white person and not to discuss her feelings or concerns. *Id.* ¶¶ 219–22.

In short, every time Ms. Mais complained, the situation just got worse. These kinds of escalations in response to protected activity are exactly the stuff retaliation is made of, and Ms. Mais's allegations are more than sufficient to suggest causation. *See Bryant*, 333 F.3d at 544 (finding that plaintiff's treatment at work changed after her complaints and this is enough to survive even summary judgment); *Williams v. Cerberonics*, 871 F.2d 452, 457 (4th Cir. 1989) (fact that negative employment consequence resulted after plaintiff engaged in protected conduct "certainly satisfies the less onerous burden of making a prima facie case of causality").

**D.    The Board violated Ms. Mais's free-speech rights by retaliating against her and compelling and restricting her speech based on viewpoint.**

In Virginia, "the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects." Va. Const. art. I, § 12. These protections are "coextensive with the free speech provisions of the federal First Amendment." *Elliott v. Commonwealth*, 593 S.E.2d 263, 269 (Va. 2004). Ms. Mais has stated a claim for violation of her free speech rights in at least three ways. First, the Board unconstitutionally retaliated against her after she engaged in protected speech. Second, the Board both compelled and restricted Ms. Mais's speech. And third, the Board did so in a way that was viewpoint discriminatory.

21

1. **Speech Retaliation**

To state a claim for speech retaliation, the public employee must show: (1) she "was speaking as a citizen upon a matter of public concern"; (2) her "interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public"; and (3) a sufficient nexus between the speech and the retaliatory employment action. *McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998). Ms. Mais has satisfied all three.

First, in raising concerns with the *Courageous Conversations* trainings to administrators, Ms. Mais was speaking as a citizen on a matter of public concern. Contrary to Defendant's assertion, *see* MTD at 25–26, the Supreme Court has been clear that "public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). And in the school context in particular, "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). These rights are presumptively protected when public employees speak on issues of public concern. *Garcetti*, 547 U.S. at 418. And addressing racism in public education is undoubtedly an issue of public concern. *See Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2475–76 (2018) (explaining that issues in education are a prime example of matters of public concern); *see also Cromer v. Brown*, 88 F.3d 1315, 1326 (4th Cir. 1996) ("Of course, the allegations themselves, about racial discrimination within a law enforcement agency, are matters of serious public import.").

What's more, simply because a teacher is speaking at work or even about her work environment does not mean her rights are not protected. *See Garcetti*, 547 U.S. at 420–21 ("Employees in some cases may receive First Amendment protection for expressions made at work" and "[t]he First Amendment protects some

22

expressions related to the speaker's job."). And even if a teacher chooses to speak privately rather than publicly, her speech is still protected. *Cromer*, 88 F.3d at 1326 ("Public employees do not forfeit the protection of the Constitution's Free Speech Clause merely because they decide to express their views privately rather than publicly."). In fact, "[t]eachers are, as a class, the members of a community most likely to have informed and definite opinions" about issues in their schools. *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 572 (1968). "Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Id*. And the Fourth Circuit has been clear that teachers retain constitutional protection in their "speech related to teaching." *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 694 n.11 (4th Cir. 2007); *see also Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 563 (4th Cir. 2011) (speech by high school teacher); *Piver v. Pender Cnty. Bd. of Educ.*, 835 F.2d 1076, 1081 (4th Cir. 1987) (applying *Pickering* where high school teacher "allowed students to discuss the issue during class time; and he allowed a petition in support of [the issue] to be circulated in his class").

Here, Ms. Mais was not simply speaking about her own personal issues, nor was she speaking pursuant to her official duties. Rather, she "communicated her views concerning the content, structure, and implementation of the *Courageous Conversations* training and the [Board's] broader anti-racism efforts to numerous [Board] officials, including but not limited to her view that the training material promoted racial hostility and divisiveness." Compl. ¶ 266. She took the initiative to raise her broad concerns with no fewer than seven administrators, often in meetings that she initiated. *Id*. ¶¶ 124 (Lars Holmstrom), 149–52 (Mike Irani), 162–63 (Bernard Hairston, Ashby Kindler), 188 (Lorna Gerome), 193 (Claire Keiser), 197 (Daphne Keiser). She likewise raised the complaints of many other white employees about the racial hostility they were experiencing as a result of the *Courageous*

23

*Conversations* training. *Id.* ¶¶ 87–95. All of this is well beyond Ms. Mais's purely personal concern and well outside of her day-to-day duties as an Assistant Principal.[4] *See, e.g.*, *Dunn v. Millirons*, 176 F. Supp. 3d 591, 603–04 (W.D. Va. 2016) (deputy sheriff acted as citizen when he met with sheriff in sheriff's office during work hours to discuss sheriff's management of animal shelter).

Second, Ms. Mais's free speech interest outweighs any Board interest in silencing her. In fact, allowing the racially charged environment to persist actually undermines the Board's ability to effectively provide a public benefit of an equal education to all. As Ms. Mais explained, several teachers had also complained to her about the intolerable and racially divisive environment created by *Courageous Conversations*. Compl. ¶¶ 87–92. In failing to address the issues that Ms. Mais raised, the Board actually compromised its ability to provide a stable environment for teachers and staff to carry out their duty of providing quality public education. The second factor is also easily met.

Finally, as shown, there is a clear nexus between Ms. Mais' speech and her constructive discharge. As detailed in Section I.C, *supra*, every time Ms. Mais spoke up, the Board tightened the screws and came up with a new way to mistreat and humiliate her. Even after Ms. Mais continuously brought her concerns to Board staff, her complaints were never addressed. Instead, the Board perpetuated this intolerable racially hostile work environment by ignoring her complaints, refusing to stop the racial hostility from Ms. Avery and others, and forcing Ms. Mais to

---

[4] The fact that Ms. Mais *also* spoke about her personal mistreatment—itself protected activity under Title VII and the VHRA—as an example of the racial hostility engendered by the Board's Policy is of no moment, as the First Amendment protects speech on a matter of public concern no matter what else the communication involves. *Stroman v. Colleton Cnty. Sch. Dist.*, 981 F.2d 152, 158 (4th Cir. 1992) (holding that letter that raised private and public concerns was protected).

24

undergo a ritual shaming. All of this forced Ms. Mais out of her position. Ms. Mais has therefore demonstrated a sufficient causal nexus. *See Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (causation established when conduct toward plaintiff worsens after expression of speech); *Mills v. Steger*, 64 F. App'x 864, 872 (4th Cir. 2003) (timing between speech and action of employer showed causal nexus).

### 2.  Compelled and Restricted Speech

It is well-established that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Yet, the Board here has attempted to install political orthodoxy in their schools by compelling and restricting Ms. Mais's speech.

Ms. Mais has plausibly pled facts that show the three elements of a compelled-speech claim: (1) speech that (2) the government compels, and to which (3) the speaker objects. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572–73 (1995); *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015). The Board challenges only the compulsion element. MTD at 23–24.

But under threat of "get[ting] off the bus," or losing her employment, the Board compelled Ms. Mais to accept and affirm its "anti-racist" ideology. Compl. ¶¶ 62–65, 272–73. Ms. Holmstrom confirmed that staff were required to accept the Board's ideology when she explained that white participants *should be afraid* to speak if what they were thinking was not "appropriate," i.e., not in line with the "anti-racist" ideology. *Id.* ¶ 163. This alone establishes Ms. Mais's claim.

Further, the Board compelled Ms. Mais to hide the truth about her departure in her letter to Agnor-Hurt families. They insisted that Ms. Mais say she was leaving to pursue other opportunities when the truth was that Ms. Mais was leaving to escape the intolerable racially hostile work environment that the Board created. *Id.* ¶¶ 206–09.

Finally, the Board both compelled and restricted Ms. Mais's speech when they forced her to address the entire school for yet another apology and dictated what she could and could not say. Simply requiring her to apologize again forced her to convey the message that her prior apologies were somehow ineffective or insincere—a message with which Ms. Mais fundamentally disagreed. *Id.* ¶ 274. Further, Ms. Mais was required to present her draft apology to Dr. Irani, Ms. Avery, and Ms. Holmstrom. *Id.* ¶ 216. Along with a clear apology, this draft also included a discussion of how difficult the incident had been for Ms. Mais, the emotional toll of having her intentions misunderstood and her explanations not accepted, and her concerns with the *Courageous Conversations* training. *Id.* ¶ 217. But Ms. Avery told Ms. Mais she should not discuss her feelings because no one cared about them. *Id.* ¶ 218. Worse, with Dr. Irani's approval, Ms. Holmstrom told Ms. Mais that by discussing her feelings, she was acting in a racist fashion like a typical defensive white person as outlined in the *Courageous Conversations* curriculum. *Id.* ¶¶ 219–20. Thus, Ms. Mais presented a stripped-down apology. *Id.* ¶ 234.

The Board tries to discount all of this compelled and restricted speech because it occurred after Ms. Mais expressed her intent to resign. But Ms. Mais was still employed by the Board, still working, still earning money, and indeed still on-the-clock when she was compelled to speak. So she was still subject to being immediately discharged, which would have cut off her income before her planned resignation and negatively affected her future career. The reason the Board could subject her to this ritual shaming was precisely because she still worked for them.

Thus, the Board compelled Ms. Mais to voice its message rather than her own. And these facts easily state a compelled-speech claim.

### 3.   Viewpoint discrimination

The Board also compelled and restricted Ms. Mais's speech, and retaliated against her, on the basis of viewpoint, which is "presumed to be unconstitutional."

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Official action impermissibly discriminates on viewpoint when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id*. at 829.

Ms. Mais was only harassed and punished because of the content and viewpoint of her speech, specifically her critiques of the *Courageous Conversations* training and the Board's broader "anti-racism" efforts, and her view that the Board's Policy was racist and caused harm. Employees with contrary viewpoints were allowed to speak freely. For example, Dr. Hairston was permitted to compare white parents that expressed concerns with the "anti-racism" ideology to slave owners raping his mother and sister. Compl. ¶¶ 101–03. And Ms. Avery and her colleagues were permitted to call Ms. Mais "that white racist bitch" and "that two-faced racist bitch" and to express their volatile views at the September 9, 2021, apology meeting when Ms. Mais's own apology was censored. *Id*. ¶¶ 148–50, 235–39.

The Board plainly favors certain viewpoints while silencing others. That's unconstitutional. *Rosenberger*, 515 U.S. at 828–29.

### E. The Board wrongfully discharged Ms. Mais in violation of public policy.

The Virginia Supreme Court has been clear that the employment-at-will doctrine "is not absolute" and will not shield employers from liability when the employer discharges an employee in violation of public policy. *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (Va. 1985).

The Board incorrectly characterizes the free-speech protections of the Virginia Constitution as private. The plain language, though, shows the robust protections and the underlying public policy: "the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments." Va. Const. art. I, § 12. The purpose of Virginia's public

policy in favor of free speech is obviously "designed to protect the property rights, *personal freedoms*, health, safety, or welfare of the people in general." *Miller v. SEVAMP, Inc.*, 362 S.E.2d 915, 918 (Va. 1987) (emphasis added). It's hard to imagine a more basic public policy aimed at protecting personal freedoms than Virginia's public policy in favor of the freedom of speech.

Compelling and restricting Ms. Mais's speech, and retaliating against her, on the basis of viewpoint when she complained of the racially hostile work environment plainly contradicts public policy in Virginia as expressed in Va. Const. art. I, § 12. *See also* Va. Code § 15.2-1512.4 (Virginia law does not "prohibit or otherwise restrict the right of any local employee to express opinions to state or local elected officials on matters of public concern, nor shall a local employee be subject to acts of retaliation because the employee has expressed such opinions."). Ms. Mais has alleged sufficient facts to state a claim for wrongful discharge in violation of public policy.

## II.   The Board's technical defenses fail.

In response to Ms. Mais's state-law claims, the Board asserts three non-merits defenses: sovereign immunity (all state-law claims), failure to exhaust administrative remedies (VHRA only), and an argument that the VHRA does not prohibit retaliation (VHRA retaliation only). None of these defenses succeed.

### A.   The Board does not have sovereign immunity here.

The Board contends that all of Ms. Mais's state-law claims are barred by sovereign immunity.[5] This is wrong because the free-speech provision of the Virginia Constitution and the VHRA waive sovereign immunity.

---

[5] To be clear, sovereign immunity does not bar Ms. Mais's federal claims, as Title VII validly abrogates state sovereign immunity. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976).

1.    **The Free Speech Clause of the Virginia Constitution is self-executing and waives sovereign immunity.**

The Board claims that it is irrelevant whether they have violated Ms. Mais's right to the freedom of speech. Although the Virginia Constitution expressly protects that right, the Board argues that teachers have no recourse against school officials who violate it. But the Virginia Supreme Court has long held that the provisions of the Virginia Bill of Rights are self-executing, *see, e.g.*, *Gray v. Va. Sec'y of Transp.*, 662 S.E.2d 66, 72–73 (Va. 2008), and "should never be construed as dependent for [their] efficacy and operation upon legislative will," *Swift & Co. v. City of Newport News*, 52 S.E. 821, 824 (Va. 1906). And Virginia courts have often adjudicated the merits of claims brought under the same constitutional provision invoked by Ms. Mais here. *See, e.g.*, *Adams Outdoor Advert. v. City of Newport News*, 373 S.E.2d 917, 918, 927 (Va. 1988) (free-speech provision). School officials may not violate teachers' rights with impunity.

According to the Virginia Supreme Court, a constitutional provision is self-executing when it meets *one* of the following conditions: (1) it "expressly so declares"; (2) it appears in the Bill of Rights; (3) it is "merely declaratory of common law"; (4) it "specifically prohibit[s] particular conduct"; or (5) it is "of a negative character." *Robb v. Shockoe Slip Found.*, 324 S.E.2d 674, 676 (Va. 1985) (cleaned up). Under this test, the Virginia Supreme Court has held that numerous constitutional provisions are self-executing, from the requirement of just compensation for the taking of private property, *see Swift*, 52 S.E. at 824, to various separation-of-powers provisions, *see Gray*, 662 S.E.2d at 73 (determining that Art. I, § 5, Art. III, § 1, and Art. IV, § 1, are self-executing). Even the "right to uniform government" in Article I, Section 14, is self-executing. *See DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 371 (Va. 2011). It would be strange indeed if these provisions regarding the structure of the Commonwealth's

29

government were self-executing, but the individual rights enshrined in the Bill of Rights and asserted by Ms. Mais here were not.

Applying the Supreme Court's test makes clear that the free-speech provision is self-executing. First, the free-speech provision is in the Bill of Rights. *See Robb*, 324 S.E.2d at 676. Second, it is "of a negative character" and prohibits the Commonwealth from restraining the freedom of speech or of the press. *Id.* (cleaned up); *see also Gray*, 662 S.E.2d at 73. Third, "no additional legislation is needed to carry into effect the clear mandate" of this section and it provides "a sufficient rule by which the duty imposed may be enforced." *Gray*, 662 S.E.2d at 72–73. Its prohibition could not be clearer: "the General Assembly shall not pass any law abridging the freedom of speech." Va. Const. art. I, § 12. Like the due-process and equal-protection provisions, the free-speech provision "provides a sufficient rule by which the duty imposed may be enforced." *Gray*, 662 S.E.2d at 73.

Not surprisingly, then, many courts, including the Virginia Supreme Court and this court, have for decades adjudicated the merits of free-speech claims brought under Article I, Section 12. *See, e.g., Draego v. City of Charlottesville*, No. 3:16-CV-00057, 2016 WL 6834025, at *22 (W.D. Va. Nov. 18, 2016) (Moon, J.) (holding free-speech provision is self-executing); *Globe Newspaper Co. v. Commonwealth*, 570 S.E.2d 809, 811 (Va. 2002) (right-of-access); *Adams Outdoor Advert.*, 373 S.E.2d at 918 (unconstitutional billboard ordinance); *Blue Horseshoe Tattoo, V, Ltd. v. City of Norfolk*, 72 Va. Cir. 388 (2007) (tattoo ordinance); *Scarborough v. Frederick Cnty. Sch. Bd.*, 517 F. Supp. 3d 569, 576-77 (W.D. Va. 2021) (declining to dismiss viewpoint-discrimination claims); *Willis v. City of Va. Beach*, 90 F. Supp. 3d 597, 612–13 (E.D. Va. 2015) (denying motion to dismiss free-speech claim); *Davison v. Loudoun Cnty. Bd. of Supervisors*, 267 F. Supp. 3d 702, 723 (E.D. Va. 2017) (free speech); *Lee v. York Cnty. Sch. Div.*, 418 F. Supp. 2d 816,

834-35 (E.D. Va. 2006) (teacher free speech). Those merits adjudications are evidence that the free-speech provision is self-executing.

The Board analyzes none of that precedent, relying instead on *Virginia Student Power Network v. City of Richmond*, 107 Va. Cir. 137 (2021), a state trial-court decision that is unpersuasive for two reasons. First, while the court noted that "Section 12 appears in the Bill of Rights and contains provisions of a negative character," it failed to recognize these factors as dispositive. *Id*. at *2. Instead, it incorrectly decided that Article I, Section 12, applies only to statewide laws or local ordinances, *see id.*, even though it has been applied more broadly, as discussed above. Under that court's reasoning, most governmental actors are free to violate the free-speech provisions of the Virginia Constitution. It cited no precedent for that surprising principle. Second, the *Virginia Student Power Network* court erred by leaning too heavily on the analogy to 42 U.S.C. § 1983. Because the Virginia Supreme Court has held that the Virginia Bill of Rights is self-executing, *see Robb*, 324 S.E.2d at 676, a state-law analogue to § 1983 is unnecessary, *see Va. Student Power Network*, 107 Va. Cir. 137, at *3. And the Virginia Supreme Court's adoption of the substantive standard for First Amendment claims does not suggest otherwise. *See id.* (citing *Elliott*, 593 S.E.2d at 268–69). The free-speech provision in Article I, Section 12, is self-executing.

And because the free-speech provision is self-executing, it also waives sovereign immunity. *Gray,* 662 S.E.2d at 73. That is because "[t]o give full force and effect to the provisions as self-executing, a person with standing must be able to enforce them through actions against the Commonwealth." *Id.* The Board has violated Ms. Mais's free speech rights, and the Constitution does not allow them to hide behind sovereign immunity here.

This waiver applies to Ms. Mais's wrongful discharge claim, too. To state a claim for wrongful discharge, a plaintiff must show that her termination violated

laws that "explicitly state a public policy" or laws "design[] to protect the property rights, personal freedoms, health, safety, or welfare of the people in general." *City of Va. Beach v. Harris*, 523 S.E.2d 239, 245 (Va. 2000) (cleaned up). The free-speech provision of the Virginia Constitution does both: it proclaims free speech is "among the great bulwarks of liberty, and can never be restrained except by despotic governments," and it protects the personal freedom of Virginia citizens to speak freely. Va. Const. art. I, § 12. And since that provision is self-executing and waives sovereign immunity, it follows that a wrongful discharge claim based on that provision is permissible as well. Thus, sovereign immunity bars neither Ms. Mais's direct constitutional claim nor her wrongful discharge claim.

### 2.   The VHRA waives sovereign immunity.

The VHRA prohibits the Board from discriminating against Ms. Mais. Under the Act, discharging an employee based on race is an "unlawful discriminatory practice." Va. Code § 2.2-3905(B).

The Act defines "employer" broadly to include "a person employing 15 or more employees." Va. Code § 2.2-3905(A). And "'[p]erson' includes any individual, corporation, partnership, association, cooperative, limited liability company, trust, joint venture, *government, political subdivision*, or any other legal or commercial entity and any successor, representative, agent, agency, or instrumentality thereof." Va. Code § 1-230 (emphasis added). The Code was amended specifically to "adopt[] the broadest possible definition of person." Va. Code Comm'n, *HD10 - The Revision of Title 1 and Title 7.1 of the Code of Virginia* (2005), bit.ly/3WA50Na. Under the plain language of the statute then, the Board is an employer subject to the statute because it employs more than 15 employees.

Including government entities in the class of regulated employers is a clear waiver of sovereign immunity that is "expressly and explicitly stated." *Doud v. Commonwealth*, 717 S.E.2d 124, 125–26 (Va. 2011). The definition of "person" in the

32

statute explicitly includes "government" and "political subdivision." Va. Code § 1-230. This distinguishes the VHRA from the statutes at issue in *Ligon* and *Pross*, the cases the Board cites. In *Ligon*, the statute did not define the term "employer," and thus did not expressly include government entities in that definition. *Ligon v. County of Goochland*, 689 S.E.2d 666, 669 (Va. 2010). Similarly, in *Pross*, the statute at issue did not define the word "person," and so there was no clear indication that the Commonwealth was a "person" under that statute. *Commonwealth ex rel. Pross v. Bd. of Supervisors of Spotsylvania Cnty.*, 303 S.E.2d 887, 889 (Va. 1983). Here, however, the VHRA "named expressly" both governments and political subdivisions. *Id.* That means when the General Assembly used the word "person" to define "employer" under the VHRA, it intended that a "government" or "political subdivision" would be an "employer" subject to the statute. To hold otherwise would be in blatant contradiction of the plain language of the text. Thus, the VHRA waives sovereign immunity.[6]

**B.    Ms. Mais has exhausted all of her administrative remedies under the VHRA.**

The Board contends that Ms. Mais has failed to exhaust her administrative remedies under the VHRA. But the administrative process has concluded.

On November 17, 2021, Ms. Mais filed a Charge of Discrimination with the Virginia Office of Civil Rights. Compl. ¶ 258. On January 18, 2022, the Office of Civil Rights closed its file, forwarded the Charge to the EEOC under its worksharing agreement, and confirmed to Ms. Mais's counsel that it would not further process the Charge or issue a Right to Sue letter. Compl. Exs. 7 & 8.

---

[6] The Board also cites a Virginia lower court case for the proposition that sovereign immunity applies under the VHRA. But in that case, the plaintiffs never even argued that the VHRA waived sovereign immunity, so it is inapplicable here. *See Patel v. Commonwealth,* No. CL21-6527 (Norfolk Cir. July 2, 2021) (opinion).

On May 11, 2022, the EEOC ended its investigation and issued a Notice of Right to Sue. Compl. Ex. 9. All investigations are concluded, and Ms. Mais has exhausted her administrative remedies. Compl. Exs. 8 & 9.

Ms. Mais has followed the correct procedure, and both the OCR and the EEOC have indicated that they will take no further action on Ms. Mais's claims. Therefore, the only way to vindicate her rights is to bring a civil action. *Grimes v. Canadian Am. Transp.*, 72 F. Supp. 2d 629, 633 (W.D. Va. 1999) (merely filing with the VCHR exhausts state remedies); *see also Smith v. Center Ford, Inc.*, 71 F. Supp. 2d 530, 536–37 (E.D. Va. 1999) (worksharing agreements valid).

### C.    The VHRA prohibits retaliation.

The Board also contends that the VHRA does not prohibit retaliation. But retaliation is part and parcel of race discrimination, which the VHRA undeniably prohibits. Va. Code § 2.2-3905(B)(1). The Board cannot get away with discriminating against Ms. Mais by retaliating against her simply because the statute did not spell out every possible way racial discrimination could occur. In this way, the VHRA is similar to 42 U.S.C. § 1981 and to Title IX, both of which prohibit discrimination without specifically mentioning retaliation. But the Supreme Court has held that both statutes prohibit retaliation because it is a species of race or sex discrimination. *See, e.g., CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451 (2008) (precedent "lead[s] us to conclude that the view that § 1981 encompasses retaliation claims is indeed well embedded in the law"); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) ("Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action.").

The VHRA is the same. By prohibiting discrimination on the basis of race, it necessarily prohibits retaliation for complaining about race discrimination. Retaliation "is a form of 'discrimination' because the complainant is being subjected

34

to differential treatment." *Jackson*, 544 U.S. at 174. And it is "discrimination 'on the basis of [a protected characteristic]' because it is an intentional response to the nature of the complaint: an allegation of [protected characteristic] discrimination." *Id.* Thus, the plain text of the VHRA prohibits retaliation.

## CONCLUSION

Ms. Mais has submitted a detailed, specific set of allegations demonstrating the Board's responsibility for subjecting her to a racially hostile work environment, constructively discharging her, retaliating against her for complaining about race discrimination, squelching her free-speech rights, and wrongfully constructively terminating her. These allegations easily state plausible claims for relief. And none of the Board's technical defenses change that fact. Accordingly, the Board's motion to dismiss should be denied.

Respectfully submitted this 4th day of November, 2022.

s/ Henry W. Frampton, IV

David A. Cortman
GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

Hailey M. Vrdolyak
IL Bar No. 6333515
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
hvrdolyak@ADFlegal.org

Katherine L. Anderson
AZ Bar No. 033104
Henry W. Frampton, IV
SC Bar No. 75314
ALLIANCE DEFENDING FREEDOM
15100 N 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kanderson@ADFlegal.org
hframpton@ADFlegal.org

Christopher P. Schandevel
VA Bar No. 84412
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cschandevel@ADFlegal.org

*Counsel for Plaintiff*

### CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record who are registered users of the ECF system:

David P. Corrigan (VSB No. 26341)
Jeremy D. Capps (VSB No. 43909)
Melissa Y. York (VSB No. 77493)
Blaire H. O' Brien (VSB No. 83961)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200
dcorrigan@hccw.com
jcapps@hccw.com
myork@hccw.com
bobrien@hccw.com

s/Henry W. Frampton, IV

Henry W. Frampton, IV
SC Bar No. 75314
Alliance Defending Freedom
15100 N 90th Street
Scottsdale, AZ 85260
(480) 444-0020
hframpton@ADFlegal.org

*Counsel for Plaintiff*

36