IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

EMILY MAIS,

  Plaintiff,

v.                                                     Case No. 3:22-cv-51

ALBEMARLE COUNTY SCHOOL BOARD,

  Defendant.

## **THE SCHOOL BOARD'S REPLY IN SUPPORT OF MOTION TO DISMISS**

Plaintiff purports the advance ten claims under both state and federal law. Her state law claims fail because they either do not identify a cause of action that exists against governmental entities under Virginia law or Plaintiff has failed to meet the threshold requirements for bringing them. The Court's inquiry, therefore, will necessarily focus on whether Plaintiff has alleged sufficient facts to support her claims under Title VII.

And what will the Court find? First, Plaintiff is primarily attempting to rely on her own objections to the Division's Policy, rather than any statements or conduct directed at her race, to support her Title VII claims. And to the extent Plaintiff does identify any comments regarding her race, they were made by a subordinate to others during the summer and apparently outside of school hours. And even those comments were only made following Plaintiff's use of a racially charged term during a Division-mandated training session in which she participated in her capacity as an elementary school assistant principal.

Plaintiff must show that she experienced an environment so hostile to her race that it changed the terms and conditions of her employment, forced her to resign, and amounted to retaliation for her protected activity of protesting against race-based discrimination. Yet,

1

Plaintiff's allegations actually show that she protested regarding the content of Policy trainings without repercussion, used a racially-charged term that was upsetting to other employees, was asked to participate in a mediation session and resigned three weeks later having experienced no further repercussions other than dissatisfaction with the Division's continued implementation of the Policy. Her allegations describe an environment in which the Division implemented a Policy with which she disagreed, but they do not describe a work environment hostile to her because of her race. Her claims, therefore, should be dismissed with prejudice.

**I.     The School Board has sovereign immunity from Plaintiff's claim under Article I, § 12 of the Constitution of Virginia because that provision is not self-executing.**

As the School Board argued at length in its Brief in Support of Motion to Dismiss, ECF No. 14 at 12-16, Plaintiff's Virginia constitutional claim is barred by sovereign immunity because Article I, § 12 is not self-executing. Plaintiff responds by pointing to a series of Virginia decisions on speech claims and proclaim that she must have a remedy under the Constitution of Virginia. ECF No. 24 at 38. Nearly all of the cases on which Plaintiff relies, however, presented claims under the United States Constitution and 42 U.S.C. § 1983 such that the court engaged in no independent discussion of the Commonwealth's Constitution. Plaintiff further incorrectly articulates the Supreme Court of Virginia's holding in *Robb v. Shockoe Slip Foundation*, 228 Va. 678, 324 S.E.2d 674 (1985) in order to bolster her analysis. According to Plaintiff, a court must find that a constitutional provision is self-executing when just one of five elements enumerated in *Robb* is present. ECF No. 24 at 37. The Supreme Court of Virginia reached no such holding in *Robb* or in any subsequent case.

In *Robb*, the Supreme Court of Virginia discussed four circumstances a court may consider in deciding whether a constitutional provision is self-executing. *Robb*, 228 Va. at 681, 324 S.E.2d at 676. The Supreme Court considered only the first, when a constitutional provision

"expressly [ ] declares" it is self-executing, independently dispositive. *Id.* In contrast, provisions in the Bill of Rights and those "merely declaratory" of common law are "usually" self-executing. *Id.* Finally, provisions that "specifically prohibit[ ] particular conduct" are "generally, if not universally" self-executing. *Id.*

> Contrary to Plaintiffs' assertion, the test the Supreme Court adopted is qualitative:
>
>> A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be employed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law.

*Robb*, 228 Va. at 682, 324 S.E.2d at 676 (quoting *Newport News v. Woodward*, 104 Va. 58, 61-62 (1905)). Accordingly, the Court's focus must be on the existence of an enforceable rule, and no single factor is dispositive.

Applying these principles to Article I, § 12, it does not constitute an express waiver of the sovereign immunity of local governmental entities, such as school boards. As Judge Snukals observed in her opinion in the *Virginia Student Power Network* case, the prohibitions in Article I, § 12 expressly apply only to actions of the General Assembly. *See Virginia Student Power Network v. City of Richmond*, 107 Va. Cir. 137, at*2 (Richmond City Cir. Ct. Jan. 20, 2021). The remainder of Article I, § 12 constitutes merely a broad statement of public policy—a premise with which Plaintiff evidently agrees. *See* ECF No. 24 at 36 ("It's hard to imagine a more basic public policy aimed at protecting personal freedoms than Virginia's public policy in favor of the freedom of speech."). As the Supreme Court of Virginia stated in *Robb*, a provision that merely indicates principles without laying down rules by which those principles may be enforced is not self-executing.

The cases on which Plaintiff relies are consistent with this analysis. For example, she cites *Gray v. Virginia Secretary of Transportation*, 276 Va. 93, 662 S.E.2d 66 (2008), which challenged the constitutionality of an act of Secretary of Transportation, the head of an agency created by the General Assembly in Va. Code § 2.2-228. Plaintiff also purports to rely on a number of cases addressing questions other than declaratory judgment actions, in which Virginia law provided the plaintiff with an independent cause of action. *See Blue Horseshoe Tattoo, V, Ltd. v. City of Norfolk*, 72 Va. Cir. 388 (Jan. 17, 2007) (a petition for a writ of mandamus seeking the issuance of a business license). These cases, therefore, do not support Plaintiff's argument, as they arose in legal actions independent of a constitutional challenge.

At the heart of nearly all the decisions on which Plaintiff relies, however, is the fact that each simultaneously raised federal and state law claims. Because there is no question that plaintiffs can raise federal constitutional questions under 42 U.S.C. § 1983, the courts effectively ignored the state constitutional claims in exclusively applying federal law. In doing so, the courts pointed to the Supreme Court's Virginia's observation that the analysis under Article I, § 12 is co-extensive with federal law. *See*, *e.g.*, *Davison v. Loudoun County Bd. of Supervisors*, 267 F. Supp. 3d 702, 714-15 (E.D. Va. 2017) (citing *Elliott v. Commonwealth*, 267 Va. 464, 473-74, 593 S.E.2d 263 (2004)).

This analogy between the Federal Constitution and the Virginia Bill of Rights further supports the School Board's contention that these provisions are not self-executing. The United States Constitution, including the Bill of Rights, is self-executing as to the United States government and its officers without requiring further action of Congress. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). In contrast, the Bill of Rights did not become actionable as to the states until the adoption of the Fourteenth

4

Amendment and the passage of §1983. So too as to local governmental entities in Virginia. The constitutional provision on which Plaintiff purports to rely is co-extensive with Federal law, and further legislative action by the General Assembly is required to define its applicability to municipal entities and the nature and extent of available remedies.

Even were the Court to conclude, however, that Article I § 12 were self-executing, Plaintiff has nonetheless not stated a claim for a violation of any of her free speech rights. With regard to her claims for compelled speech and viewpoint discrimination, Plaintiff identifies no instance in which she was speaking as a private citizen, rather than in her capacity as an employee of the Division. In *Garcetti v. Ceballos*, 547 U.S. 410, 418, 421 (2006), the Supreme Court held that speech of this kind, which public employees engage in "pursuant to their official duties," is not protected. *Garcetti*, 547 U.S. at 421. When public employees engage in "speech that owes its existence to [their] professional responsibilities," therefore, "the Constitution does not insulate their communications from employer discipline." *Id.* Instead, such discipline "simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* The Supreme Court recently reiterated that, under *Garcetti*, if a public school employee "speaks 'pursuant to his or her official duties,'" "the Free Speech Clause generally will not shield [him] from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022).

Even if this Court rejects the *Garcetti* analysis, Plaintiff's free speech claim would also fail under *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968). Because "the speech of a public-sector employee may interfere with the effective operation of a government office," *Janus v. AFSCME*, 138 S. Ct. 2448, 2473 (2018), *Pickering*

5

and its progeny hold that government employers may restrict employee speech if it is not on a matter of public concern, *see Connick v. Myers*, 461 U.S. 138, 145 (1983). If the employee's speech does touch on matters of public concern, restrictions may nonetheless be justified by "the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Id.* at 150.

Plaintiff cannot avoid the limitations of *Pickering* by alleging that the School Board compelled her speech. While "the *Pickering* framework fits much less well where the government compels speech," it remains true under *Pickering* that, "if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message." *Janus*, 138 S. Ct. at 2473. The *Pickering* framework therefore applies.

Here, Plaintiff, as an administrator and assistant principal at an elementary school, was to participate in and facilitate the implementation of the Anti-Racism Policy and the related trainings, including the *Courageous Conversations* training. Her participation in the Anti-Racism Policy trainings, therefore, was part of her official duties such that speech related to and arising in those trainings was part of her "official duties." She further alleges that she elevated concerns brought to her in her capacity as an assistant principal to others. ECF No. 1-5 ¶¶ 93-95. This action was plainly taken in Plaintiff's capacity as a supervisor and administrator in ACPS.

Plaintiff's assertion that she was speaking as a private citizen is conclusory and ignores the very facts she has alleged in the Second Amended Complaint. Plaintiff was free to object to her interpretation of the Anti-Racism Policy in her capacity as a private citizen, but she does not allege a single instance in which she did so. Plaintiff merely asserts that public employees do not surrender "*all*" of their First Amendment rights" as a result of their public employment

6

without explaining how that principle applies to her circumstances. ECF No. 24 at 30 (quoting *Garcetti*, 547 U.S. at 417).

Similarly, although Plaintiff advances a conclusory argument that she was subjected to retaliation related to her speech regarding the Anti-Racism Policy, her argument in support of that claim does not identify a single instance of retaliation related to her speech. Plaintiff asserts that "[e]ven after [she] continuously brought her concerns to Board staff, her complaints were never addressed." ECF no. 24 at 32. Plaintiff cites no authority for the proposition that a School Board violates its employee's free speech rights by declining to reverse course and immediately agree with the complaining teacher's perspective regarding its policy and curricular decisions. Moreover, as outlined below, *see* § 5, Plaintiff does not show that any alleged retaliation was the result of her protected speech, rather than her use of a racially charged word that many of her colleagues found upsetting.

Accordingly, because Plaintiff's claim under Article I, § 12 of the Virginia Constitution is not self-executing, and because she has not alleged facts to support a free speech-related claim, Count I fails as a matter of law and should be dismissed.

## II.     The School Board has sovereign immunity from Plaintiff's wrongful discharge claim.

In its Brief in Support of Motion to Dismiss, the School Board argued that it has sovereign immunity from Plaintiff's claim for wrongful discharge in Count II because it sounds in tort. ECF No. 14 at 16. Plaintiff appears to have declined to respond to this argument. The Court may, therefore, deem that Plaintiff has conceded it. *See Ameur v. Gates*, 950 F. Supp. 2d 905, 918 n.4 (E.D. Va. 2013) (noting that a plaintiff's failure to respond to arguments is grounds for the Court to deem them conceded).

7

### III. The School Board has sovereign immunity from Plaintiff's claims under the VHRA.

In opposing the School Board's argument that it has sovereign immunity from Plaintiff's claims under the VHRA, Plaintiff relies exclusively on the general definition of "person" supplied by Virginia Code § 1-230 in arguing that the definition of "employer" supplied by the VHRA includes governments and political subdivisions. As the Supreme Court of Virginia explained in *Commonwealth ex rel. Pross v. Bd. of Supervisors of Spotsylvania County*, however, "[i]t is an ancient rule of statutory construction, one consistently applied by this Court for more than a century, that the sovereign is not bound by a statute of general application no matter how comprehensive the language, unless named expressly or included by necessary implication." 225 Va. 492, 494, 303 S.E.2d 887, 889 (1983). The Supreme Court reached this holding in concluding that the Commonwealth was not a "person" bound by a statute of limitations. *Id.*

Plaintiff attempts to distinguish *Pross* by arguing that the statute at issue in that case did not define the word "person." ECF No. 24 at 41. But that is the point—the VHRA also does not define the word "person." Va. Code § 1-230 was included in the 1919 version of the Virginia Code. *See* Va. Code § 5 (1919). If that definition were applicable against the Commonwealth in all contexts, the Supreme Court could not have reached the outcome it did in *Pross*. Instead, the pronouncement in *Doud v. Commonwealth*, 282 Va. 317, 320-12, 717 S.E.2d 124, 125-26 (2011) is as true as ever: a waiver of sovereign immunity "may not be inferred from general statutory language, but must be expressly and explicitly stated."

The VHRA lacks the required express waiver of sovereign immunity. The School Board is, therefore, immune from Plaintiff's claims in Counts 3, 4, 5, and 6.

8

### III. Plaintiff has not satisfied the threshold requirements for filing suit under the VHRA.

Plaintiff argues that she should be able to bring her claims under the VHRA because the Office of Civil Rights ("OCR") has "indicated that [it] will take no further action on [her] claims. But that is not the standard. Instead, Plaintiff must show that she "has been provided a notice of [her] right to file a civil action" by the OCR. Va. Code § 2.2-3908(A). Because Plaintiff has not done so, she cannot bring an action under the VHRA.

The Honorable Rebecca Beach Smith of the United States District Court for the Eastern District of Virginia recently reached the same conclusion. In *Jordan v. School Board of the City of Norfolk*, No. 2:22-cv-167, 2022 WL 16835868 (E.D. Va. Nov. 9, 2022), Judge Smith concluded that the plaintiff's receipt of a notice of right to sue from the Equal Employment Opportunity Commission did not satisfy the VHRA's procedural requirement that she obtain a right-to-sue notice from OCR. *Id.* at \*10-\*13. Just as Plaintiff here, the plaintiff in *Jordan* filed a claim with the OCR, which was forwarded to the EEOC without decision by OCR. *Id.* at \*4-5. Judge Smith then analyzed the relevant work-sharing agreement between the agencies and the text of the statute and concluded that the EEOC procedure did not satisfy the procedural requirements of the VHRA.

The School Board has advanced the same argument here. Va. Code § 2.2-3908(A) is unambiguous, and Plaintiff has not satisfied it. She cannot assert claims under the VHRA.

### IV. Plaintiff fails to allege a racially hostile work environment or constructive discharge.

As noted in the School Board's introduction, *supra*, because Plaintiff cannot proceed on any of her state-law causes of action,[1] Plaintiff's Second Amended Complaint necessarily rises and falls on the strength of her allegations supporting her race-based claims under Title VII.

Plaintiff alleges that her subordinate, Avery, on an unspecified number of occasions, outside of school, and not to her face, made two arguably race-based comments about Plaintiff. ECF No. 1-5 ¶ 148. Specifically, Plaintiff claims that Avery referred to her as "That white racist bitch" and "That two-faced racist bitch" in conversations with others during the summer of 2021. *Id.* The School Board focused on these comments in arguing that Plaintiff failed to allege a hostile work environment because they were the only statements or conduct identified in the Second Amended Complaint that were conceivably related to Plaintiff's race. As the School Board pointed out in its Brief in Support, the Division's choice "not to act on Plaintiff's concerns about the Policy and the *Courageous Conversations* curriculum [does not] show that she was personally the victim of racial discrimination. It simply reflects the Division's policy decisions regarding its curriculum and teacher training." ECF No. 14 at 28.

In opposing the School Board's motion, Plaintiff all but concedes that these isolated comments by her subordinate are insufficient to create a hostile work environment by instead emphasizing that the Court should consider "all the circumstances" beyond those comments. ECF No. 24 at 20. And with good reason. *See Shields v. Federal Express Corp.*, 120 Fed. Appx. 956, 961 (4th Cir. 2005) ("As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.") (quoting *Feingold v. New York*, 366 F.3d 138, 150 (2nd Cir. 2004)); *Dortch v. Cellco Partnership*, 770 Fed. Appx.

---

[1] To the extent the Court concludes any of the state claims can survive, the School Board relies on its arguments as to Title VII in response to the analogous state-law claims.

10

643, 645-46 (4th Cir. 2019) (finding that a supervisor did not state a claim for a hostile work environment based on a subordinate's cursing at her because the incident described "an ordinary workplace dispute" and followed the supervisor's having acted unprofessionally); *Fox v. Leland Volunteer Fire/Rescue Dept., Inc.*, 648 Fed. Appx. 290, 293 (4th Cir. 2016) (finding that a subordinate's discourteous, insubordinate, and even "boorish" behavior was not actionable based on sexual animus).

To be sure, relevant considerations include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 272 (4th Cir. 2015). But the "circumstances" or "conduct" on which a plaintiff relies must, nonetheless, be directed to the plaintiff's **race**, and not a plaintiff's mere disagreements over an employer's policy choices. *See*, *e.g.*, *Harris v. New York State Dep't of Correctional Servs.*, 616 Fed. Appx. 453 (2d Cir. June 30, 2015) (disagreement over security policy did not create a hostile work environment based on sex); *Oppedisano v. Southern Connecticut State Univ.*, No. 3:07-cv-1693, 2013 WL 5658244 (D. Conn. Oct. 15, 2013) (disagreements about academic policies did not create a hostile work environment based on sex).

Here, the "circumstances" to which Plaintiff points to bolster her hostile work environment claim exclusively involve her objections to her own interpretation of the School Board's Anti-Racism Policy. And even those objections are constructed upon alleged source materials for the Anti-Racism Policy and not the Policy itself. For example, Plaintiff asserts that the School Board's Policy encourages "overt racism" by saying things like "different [racial] groups will be treated differently." ECF No. 24 at 21. But the portions of the Second Amended

11

Complaint on which Plaintiff relies for this allegation cite to a secondary source, not the Anti-Racism Policy. ECF No. 1-5 ¶¶ 54-57. Plaintiff similarly objects to certain discussion materials from the *Courageous Conversations* curriculum and argues they encouraged "pejorative" racial stereotypes of multiple races that were to be discussed in "unmoderated" breakout sessions.[2] ECF No. 24 at 21. Plaintiff argues that, as an educator, being asked to discuss "white privilege" with her colleagues created a racially hostile environment. *Id.* Plaintiff maintains she elevated concerns brought to her by others about the content of this curriculum but that her expression of concern led to no change. *Id.* These concerns, however, again addressed the broader effects of the Policy rather than conduct directed to Plaintiff because of her race.

Plaintiff further points to the Board's alleged failure to discipline Dr. Hairston following comments he made regarding parents who objected to the Anti-Racism Policy. ECF No. 24 at 21. Again, Plaintiff misses the point. Although Plaintiff does not so allege in her Second Amended Complaint, ECF No. 1-5 ¶¶ 96-110, she now invites the Court to assume that all of the parents who expressed objections to the Anti-Racism Policy were white and that Dr. Hairston specifically directed his comments at those parents for that reason. ECF No. 24 at 21. Even as alleged in the Second Amended Complaint, however, Dr. Hairston's comments focused on the parents' objections to the Policy, not on their race. ECF No. 1-5 ¶¶ 96-110.

Plaintiffs' allegations regarding the Board's approach to Avery and her own treatment following her use of the racially-charged word "colored" are similarly unavailing. Plaintiff alleges that her subordinate, Avery, "berated" Plaintiff following her use of the racially charged term and that Avery was never disciplined. ECF No. 24 at 22. But "[w]orkplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded

---

[2] Plaintiff's assertion that these sessions were unmoderated is remarkable, because it was her role as a supervisor and administrator to moderate them.

12

feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life. Thus, complaints premised on nothing more than rude treatment by coworkers are not actionably under Title VII." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008) (internal quotation omitted). Moreover, even Avery's statements to Plaintiff—which Plaintiff does not specify—were apparently targeted at Plaintiff's use of a racially charged term, not at her race.

Finally, Plaintiff points to events that followed her use of the word "colored" in arguing that she was subject to a hostile environment based on her own race. The environment she described—in which she "briefly" met with an equity specialist, ECF No. 1-5 ¶ 121, and was asked to participate in a mediation session by an Assistant Superintendent—describes neither severe nor pervasive conduct such that the conditions of her employment changed. Moreover, these meetings were motivated, again, not by Plaintiff's race but by her use of a racially charged term.

The School Board, therefore, did not concede that *all* of Plaintiff's allegations involved conduct directed to her because of her race. Rather, the School Board focused on the only allegations Plaintiff advanced in support of her hostile work-environment claim that actually related to Plaintiff's race, rather than her objections to the Policy or her own conduct. Because all of these additional allegations do not describe hostile conditions based on Plaintiff's race, they have no relevance to the Court's evaluation of the sufficiency of Plaintiff hostile work environment claims.

Moreover, Plaintiff's allegations regarding events that followed her resignation have no relevance to the Court's evaluation of her hostile work environment claim. Plaintiff must show that the alleged harassment she experienced "was sufficiently pervasive to alter [her] terms and

conditions of employment and create[ ] an abusive working environment." *Kwarteng v. Morgan State University*, 128 Fed. Appx. 301, 302 (4th Cir. 2005). Plaintiff can hardly assert that events following her resignation materially altered the terms and conditions of a job from which she had already resigned. These events include Plaintiff's decision to draft a letter to families at the school where she had served as an assistant principal, as well as her participation in a faculty meeting at which she allegedly offered an "apology." These events occurred after and as a direct result of Plaintiff's altering the terms and conditions of her employment by resigning. They do not support her hostile work environment claim.

The irrelevance of these events to Plaintiff's constructive discharge claim is even clearer. Events that happened **after Plaintiff resigned** could not have caused a constructive discharge. Plaintiff's strenuous reliance on these events—including alleged objections to her draft apology, "intimidating" outfits worn to the final meeting, and Avery's actions on the final day of Plaintiff's employment—are entirely irrelevant to Plaintiff's constructive discharge claim. *See* ECF No. 24 at 26, in which Plaintiff purports to rely on all of these events to support her claim.

And so what remains of Plaintiff's claims? The allegations on which the School Board focused in its Brief in Support—that is, Avery's isolated statements to others, never directly to Plaintiff, apparently over the summer months when school was not in session. Acknowledging that these isolated allegations are insufficient, Plaintiff attempts to glom her general objections to the Policy onto events that allegedly related to her race in hopes of constructing a Title VII claim. But the School Board's decision to "ignore" Plaintiff's objections was not directed at Plaintiff's race. It is, as the School Board has already stated, a reflection of the School Board's policy decision regarding the Anti-Racism Policy. Plaintiff, therefore, does not state a cause of action for a hostile work environment, and her claims in Counts 7 and 8 should be dismissed.

### V.     Plaintiff fails to allege a retaliatory hostile environment or constructive discharge.

Finally, in Counts Nine and Ten of the Second Amended Complaint, Plaintiff maintains that she was subject to retaliation related to her complaints of a hostile work environment. As argued in the School Board's Brief in Support, however, Plaintiff was not engaged in protected activity during her alleged conversations with various individuals about the Policy. ECF No. 14 at 33. She was, instead, elevating the concerns of other teachers, ECF No. 1-5 ¶ 93, that the Policy and related trainings were "teaching that racism is only perpetrated by white people against people of color." *Id.* ¶ 95. These general concerns about the propriety of the Policy and trainings are not complaints protected by Title VII regarding specific instances of employment discrimination, but rather general concerns about a Policy that Plaintiff believed to be ill-advised. Protected activities do not include opposition to policies divorced from specific instances of discrimination actionable under Title VII. *See Benner v. St. Paul Pub. Sch., I.S.D. #625*, 380 F. Supp. 3d 869, 906 (D. Minn. 2019) ("As is perhaps evident from the preceding section, Benner's Title VII retaliation claim here must fail because Benner did not oppose SPPS's "racial equity" policy on grounds that it was an illegal *employment practice* under Title VII. Rather, Benner opposed the policy because it treated African-American *students* differently than students of other races. (*See supra* at 897–81, 881–82*supra* at 897–81, 881–82.) As Defendants succinctly point out in their brief: "The alleged impact of the District's student discipline policies did not discriminate against any employee based on [the employee's] race. It impacted all teachers, regardless of their race.").

Even were Plaintiff to have engaged in a protected act, however, the allegations in her complaint fail to establish that her "protected acts" were the "but for" cause of any retaliation she allegedly experience. *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338,

15

362-63 (2013).  Instead, all of the incidents[3] Plaintiff identifies as "retaliatory" followed Plaintiff's own use of the racially charged word "colored."  These include the alleged meeting with Dr. Hairston and the alleged public apology.  Plaintiff identifies no incidents of "retaliation" independent of her use of this term.  In fact, Plaintiff alleges that on the single instance in which she voiced concerns about the Policy prior to her use of the word colored, she was not subjected to any retaliation.  ECF No. 1-5 ¶¶ 93-95.  Plaintiff cannot maintain that her complaints regarding the Policy were the "but for" cause of any retaliation when she complained about the Policy prior to using the word "colored" without repercussion, and allegedly experienced retaliation only after having done so.

Finally, many of Plaintiff's allegations revolve around meetings with Division administrators and staff at which Plaintiff believes her complaints were either "ignored" or inadequately addressed.  Plaintiff asserts that the School Board "tightened the screws and came up with a new way to mistreat and humiliate her" after each of these meetings.  But choosing not to act on Plaintiff's concerns about the Anti-Racism Policy, or even about specific interactions she had with other employees, does not amount to an adverse employment action sufficient to state a retaliation claim.  *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (stating that an adverse action is one that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.").

Because Plaintiff does not allege facts supporting the existence of a hostile work environment, and because she has not demonstrated that her complaints regarding discrimination

---

[3] Plaintiff does attempt to rely on Dr. Hairston's comments regarding parents who objected to the Policy.  Plaintiff, however, has not alleged that these comments were in response to any protected activity on her part.

were the "but for" cause of any adverse action she sustained, Plaintiff has not stated a claim in Counts IX and X of the Second Amended Complaint.  They should be dismissed with prejudice.

## CONCLUSION

For the reasons stated above, as well as those outlined in Plaintiff's Brief in Support of Motion to Dismiss Second Amended Complaint, the Second Amended Complaint does not state a claim and should be dismissed with prejudice.

**ALBEMARLE COUNTY SCHOOL BOARD**

By Counsel

/s/
David P. Corrigan (VSB No. 26341)
Jeremy D. Capps (VSB No. 43909)
Melissa Y. York (VSB No. 77493)
Blaire H. O'Brien (VSB No. 83961)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com
myork@hccw.com
bobrien@hccw.com

## **C E R T I F I C A T E**

I hereby certify that on the 18th day of November, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

>Tyson C. Langhofer, Esq.
>VSB No. 95204
>Alliance Defending Freedom
>44180 Riverside Parkway

Lansdowne, VA 20176
571-707-4655 - Phone
tlanghofer@ADFlegal.org

Ryan Bangert, Esq.
Alliance Defending Freedom
440 First Street, NW
Suite 600
Washington, DC 20001
202-393-8690 - Phone
rbangert@ADFlegal.org

Kate Anderson, Esq.
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
480-444-0020 - Phone
kanderson@ADFlegal.org

Henry W. Frampton, IV
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
480-444-0020 - Phone
hframpton@ADFlegal.org

Rachel A. Csutoros, Esq.
VSB No. 97783
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
571-707-4655 - Phone
rcsutoros@ADFlegal.org

David A. Cortman, Esq.
44180 Riverside Parkway
Lansdowne, VA 20176
571-707-4655 - Phone
Hailey M. Vrdolyak, Esq.
44180 Riverside Parkway
Lansdowne, VA 20176
571-707-4665 - Phone
Christopher P. Schandevel, Esq.
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176

18

571-707-4655 - Phone
571-707-4656 - Fax
cschandevel@ADFlegal.org

s/Jeremy D. Capps
David P. Corrigan (VSB No. 26341)
Jeremy D. Capps (VSB No. 43909)
Melissa Y. York (VSB No. 77493)
Blaire H. O'Brien (VSB No. 83961)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com
myork@hccw.com
bobrien@hccw.com