# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| EMILY MAIS, | CASE NO. 3:22-cv-51 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| ALBEMARLE COUNTY SCHOOL BOARD, | |
| *Defendant.* | JUDGE NORMAN K. MOON |

Plaintiff Emily Mais has brought federal and state law claims against her former employer, Defendant Albemarle County School Board. She claims the School Board created a racial hostile work environment that resulted in her constructive discharge. She also alleges that her free speech rights were violated and that the School Board retaliated against her for complaining about the School Board's anti-racist policy and its alleged racial discrimination toward her. The School Board moves to dismiss Plaintiff's claims. For the following reasons, the Court will grant the School Board's motion, in part, and dismiss all of Plaintiff's claims except her claims under Title VII of the Civil Rights Act of 1964.

## Background

The following alleged facts are assumed true for purposes of resolving this motion. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016) (reiterating the appropriate standard of review).

Emily Mais worked as an assistant principal at Agnor-Hurt Elementary School from October 2018 to September 2021. Dkt. 1-5 ¶¶ 1, 14. Agnor-Hurt Elementary School is part of

Albemarle County Public Schools. *Id.* ¶ 1. The School Board of Albemarle County is a political subdivision of the Commonwealth of Virginia and derives its authority from the Commonwealth. *Id.* ¶¶ 17–18. It employs all administrators and teachers that work in Albemarle County Public Schools. *Id.* ¶ 19.

On February 28, 2019, the School Board adopted an anti-racism policy with the goal of eliminating all forms of racism in Albemarle County Public Schools. *Id.* ¶¶ 50–51. In November 2020, Mais attended the School Board's mandatory online orientation presentation introducing the policy. *Id.* ¶ 58. During the orientation, the School Board presented various definitions of "racism" and "anti-racism." *Id.* ¶ 59. Dr. Bernard Hairston, the School Board's Assistant Superintendent, stated in the video orientation that "staff needed to think about whether they were on the 'antiracism school bus, or if you need help finding your seat and keeping your seat, or if it's time for you to just get off the bus.'" *Id.* ¶ 64 (quoting Ex. 4).

As part of its anti-racism policy, the School Board required the Agnor-Hurt Elementary School staff to complete a teacher training series based on Glenn Singleton's *Courageous Conversations About Race*. *Id.* ¶¶ 66, 68. After the training began, some Agnor-Hurt staff members complained to Mais "about the racially hostile environment created by the training and the training materials and the hurtful and pejorative comments made by other staff members, which demonized them for being white." *Id.* ¶ 87. Mais expressed these concerns to Ashby Kindler, the leader of the training, but she did not alter the training's structure or content. *Id.* ¶¶ 93–94.

At a School Board meeting on May 27, 2021, several Albemarle County parents raised concerns about the School Board's anti-racism policy, including the *Courageous Conversations About Race* training. *Id.* ¶ 96. On May 28, 2021, Hairston, the Assistant Superintendent in charge

of the anti-racism policy, addressed these concerns at an administrative meeting that Mais attended. *Id.* ¶ 101. He stated that "his ancestors were slaves owned by a wealthy Virginia family" and that "he received the parents' comments as if they were slave owners who had raped his mother and sister, beaten him, and were now telling him not to talk about it." *Id.* ¶¶ 102–03. He also stated that implementing the School Board's anti-racism policy, including the *Courageous Conversations About Race* training, was non-negotiable. *Id.* ¶ 106. Superintendent Matthew Haas and other School Board senior leaders supported his statements. *Id.* ¶ 107.

During the final *Courageous Conversations About Race* training session on June 11, 2021, Mais proposed a way to analyze data regarding racial disparities in School Board staff and "inadvertently used the word 'colored' instead" of people of color. *Id.* ¶ 111–13. Mais immediately "apologized for her slip of the tongue." *Id.* ¶ 114. Sheila Avery, a teacher's aide, ignored her apology and verbally attacked Mais in front of all attendees and accused her "of speaking like old racists who told people of color to go to the back of the bus." *Id.* ¶ 115.

Following the training session, Emily Holmstrom, the school's guidance counselor, emailed Mais, asking if she would like to "unpack" what she said during the session. *Id.* ¶ 117. The School Board's equity specialist also reached out to discuss the matter with Mais. *Id.* ¶ 120. During her conversation with the equity specialist, Mais shared her concerns about Avery's mistreatment toward her and other staff members during the training sessions and the implementation of the anti-racism training. *Id.* ¶¶ 121–24. The School Board ignored her complaints. *Id.* ¶ 125. After the School Board received a complaint about Mais's use of the term "colored," Hairston contacted Mais and Avery and requested that they meet with him. *Id.* ¶¶ 126–27.

Before the meeting with Hairston, several employees told Mais that "Avery and her

friends were openly slandering [] Mais at work, openly cursing about her and calling her vulgar names at work, telling other employees she was a racist and that she intentionally demeaned black people, and trying to turn other employees against her." *Id.* ¶ 146. Some of the comments included calling Mais a "white racist bitch" and a "two-faced racist bitch." *Id.* ¶ 148. Mais complained to her principal, Dr. Mike Irani, about this behavior and the *Courageous Conversations About Race* training. *Id.* ¶ 149. She told him that this was causing "her substantial emotional distress, preventing her from focusing on her job, and making it impossible for her to effectively manage the employees involved in the harassment." *Id.* ¶ 151. Irani took no action to address her concerns. *Id.* ¶¶ 150, 153.

On August 6, 2021, Mais met with Hairston, Avery, Kindler, and Holmstrom. *Id.* ¶ 154. Mais continuously apologized throughout the meeting. *Id.* ¶¶ 159. Avery did not accept Mais's apology for using the term "colored" and chastised her. *Id.* ¶¶ 156–57. Mais explained her concerns about "the detrimental effects of the training sessions on staff morale" and "the racial divisions the training was causing within the school," but the meeting participants dismissed her concerns. *Id.* ¶ 162. Toward the end of the meeting, Hairston stated that "the next logical step in the matter" was for Mais to apologize to the Agnor-Hurt staff and noted that the staff would likely need to repeat the *Courageous Conversations About Race* training. *Id.* ¶¶ 164–65, 168. Mais was uncomfortable addressing the staff because she had already apologized during the training session and made attempts to explain her actions. *Id.* ¶ 166. She also expressed concerns about the staff repeating the training, but her concerns were dismissed. *Id.* ¶¶ 169–70.

On the Monday after the meeting, Mais spoke to her principal, Irani, and told him that she was uncomfortable with how she was treated during the meeting and the racial hostility she had experienced. *Id.* ¶¶ 180–81. She told him that she would need to seek medical treatment

because she was experiencing emotional distress, which had produced numerous physical symptoms. *Id.* ¶ 182. Irani encouraged her to seek such treatment. *Id.* ¶ 183.

Mais also spoke to two human resources employees and Assistant Superintendent Dr. Clare Keiser about how she was mistreated during the August 6th meeting and in the workplace as well as her concerns about the *Courageous Conversations About Race* training. *Id.* ¶¶ 187–201. No action was taken to address her concerns. *Id.*

Mais resigned on August 29, 2021, effective on September 10, 2021, on account of her physical and mental health and because she felt her working conditions would not improve. *Id.* ¶ 205. The School Board asked her to write a letter about her departure to Agnor-Hurt families and requested that she state in the letter that she was leaving for another career opportunity. *Id.* ¶¶ 206–07. Mais "reluctantly agreed" to send a letter stating that she was leaving to be available for her own family. *Id.* ¶ 208.

Mais was asked to offer a public apology at a staff meeting on September 9, 2021. *Id.* ¶ 210. She reluctantly agreed to apologize in order "to remain on good terms" with the School Board and "to enable her to secure a job elsewhere." *Id.* ¶¶ 211–12. On September 8, 2021, Mais met with Irani, Avery, and Holmstrom to discuss what she would say in the public apology. *Id.* ¶ 213. At the meeting, Mais presented her draft apology, which included discussing how difficult the situation had been for her. *Id.* ¶¶ 214–17. Avery told Mais that she should not discuss her feelings in the apology, and Holmstrom added that Mais "was inappropriately acting in a racist fashion like a typical defensive white person" by discussing her feelings. *Id.* ¶¶ 218–19.

At a special meeting on September 9, 2021, Mais gave her apology in front of all the 2021–2022 Agnor-Hurt teachers. *Id.* ¶¶ 223–26. At the meeting, Avery did not accept Mais's apology and instead told staff "that they could either be on her side or Mais's side and that there

was no in-between." *Id.* ¶ 239.

On November 17, 2021, Mais filed a Charge of Discrimination with the Virginia

Attorney General's Office of Civil Rights ("OCR"). *Id.* ¶ 258. The OCR forwarded the Charge to

the U.S. Equal Employment Opportunity Commission ("EEOC") on January 18, 2022. *Id.* ¶ 259.

The OCR told Mais's counsel that it would not process the Charge or issue a Right to Sue letter.

*Id.* ¶ 260. On May 11, 2022, the EEOC determined that it would not proceed further with any

investigation and issued a Notice of Right to Sue. *Id.* ¶ 261.

In the Second Amended Complaint, Mais asserts ten claims against the School Board.

She alleges the School Board violated her free speech rights under Article I, § 12 of the Virginia

Constitution (Count 1), wrongfully discharged her in violation of public policy (Count 2), and

committed several violations under the Virginia Human Rights Act ("VHRA") (Counts 3–6) and

Title VII (Counts 7–10). *Id.* ¶¶ 264–399.

## Legal Standard

Courts have an independent duty to ensure that jurisdiction is proper. *Arbaugh v. Y&H*

*Corp.*, 546 U.S. 500, 514 (2006). A court "must dismiss" an action if it "determines at any time

that it lacks subject matter jurisdiction." Fed. R. Civ. P. 12(h)(3). "Accordingly, questions of

subject-matter jurisdiction may be raised at any point during the proceedings and may (or, more

precisely, must) be raised *sua sponte* by the court." *Brickwood Contractors, Inc. v. Datanet*

*Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004). "'[A] court finding that a party is entitled to

sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'"

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (quoting

*Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009)); *Montgomery v. Va. Dep't*

*of Soc. Servs.*, No. 3:20-cv-399, 2020 WL 5750897, at *4 (E.D. Va. Sept. 25, 2020) (finding a Commonwealth agency retained its Eleventh Amendment immunity and dismissed the case for lack of subject matter jurisdiction).

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all its allegations taken as true and all reasonable inferences drawn in a plaintiff's favor, *Rubenstein*, 825 F.3d at 212. A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv.*, *LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotation marks omitted). This is not to say Rule 12(b)(6) requires "heightened fact pleading of specifics," instead a plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (providing that "only a complaint that states a plausible claim for relief survives a motion to dismiss").

## Discussion

The School Board moves to dismiss Plaintiff's Second Amended Complaint, claiming

that sovereign immunity bars her state law claims, and that Plaintiff has failed to state a claim of relief for her claims. Dkts. 13, 14.

### A. Alleged Free Speech Violation under the Virginia Constitution

In Count 1, Plaintiff claims that her speech rights were violated under Article I, § 12 of the Virginia Constitution, which states:

> That the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; **that the General Assembly shall not pass any law abridging the freedom of speech or of the press**, nor the right of the people peaceably to assembly and to petition the government for the redress of grievances.

Va. Const. art. I, § 12 (emphasis added). The School Board argues this claim should be dismissed because it is barred by sovereign immunity. Dkt. 14 at 12–16. The Court agrees.

Generally, "the Commonwealth is immune both from actions at law for damages and from suits in equity to restrain governmental action or to compel such action." *Alliance to Save the Mattaponi v. Commonwealth*, 621 S.E.2d 78, 96 (Va. 2005). This immunity extends to the Commonwealth agencies, including local school boards when acting in their governmental capacities. *Rector & Visitors of Univ. of Va. v. Carter*, 591 S.E.2d 76, 78 (Va. 2004); *Kellam v. Sch. Bd. of City of Norfolk*, 117 S.E.2d 96, 97 (Va. 1960) ("The basis for a school board's immunity from liability for tortious injury has been generally found in the fact that it is a governmental agency or arm of the state and acts in a governmental capacity in the performance of its duties imposed by law.").

Commonwealth agencies are generally immune from tort liability "associated with the performance of 'governmental' functions." *Niese v. City of Alexandria*, 564 S.E.2d 127, 132 (Va. 2002). "[A] governmental function involves the exercise of an entity's political, discretionary, or

legislative authority." *Id.* (internal quotation marks omitted). The Supreme Court of Virginia has found that the decision to retain an employee is a governmental function, *id.* at 133, and that sovereign immunity bars a retaliatory discharge claim, *Ligon v. Cnty. of Goochland*, 689 S.E.2d 666, 668 (Va. 2010); *see also Doe by Watson v. Russell Cnty. Sch. Bd.*, No. 1:16-cv-00045, 2017 WL 1374279, at *14 (W.D. Va. Apr. 13, 2017) (noting that maintaining public schools is a governmental function). Unless there is an express constitutional or statutory waiver of sovereign immunity, the Commonwealth and its agencies are immune from liability. *Gray v. Va. Sec'y of Trans.*, 662 S.E.2d 66, 70 (Va. 2008).

To bring a private cause of action under the Virginia Constitution against a governmental entity, the constitutional provision must be self-executing or have associated legislation that allows for a cause of action. *Robb v. Shockoe Slip Found.*, 324 S.E.2d 674, 676 (Va. 1985); *Gray*, 662 S.E.2d at 70. "A constitutional provision is self-executing when it expressly so declares." *Robb*, 324 S.E.2d at 676. If there is no express self-executing language, constitutional provisions are "usually" considered self-executing if they appear in the Bill of Rights or are provisions of negative character. *Id.* at 676. "A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be employed and protected, or the duty imposed may be enforced." *Id.* (internal quotation marks omitted). But it "is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law." *Id.* (internal quotation marks omitted).

The Supreme Court of Virginia, in narrowly construing waivers of sovereign immunity, has found that a statute waiving sovereign immunity for the Commonwealth or one of its agencies does not waive immunity for another agency unless explicitly stated. *See, e.g.*, *Seabolt v. Cnty. of Albemarle*, 724 S.E.2d 715, 717 (Va. 2012) (finding that a Virginia statute, which

stated a "city or town shall [] be liable in damages," waives sovereign immunity for claims

against cities and towns but not counties); *Rector & Visitors of Univ. of Va.*, 591 S.E.2d at 77

(finding the Virginia Tort Claims Act waives sovereign immunity for the Commonwealth but not

its agencies).

Plaintiff argues that Article I, § 12 is self-executing for her free speech claim and cites a

series of cases in which courts have adjudicated the merits of free speech claims brought under

Article I, § 12. Dkt. 24 at 30; *see, e.g.*, *Adams Outdoor Advert. v. City of Newport News*, 373

S.E.2d 917, 918 (Va. 1988) (considering an Article I, § 12 challenge to a city ordinance); *Lee v.

York Cnty. Sch. Div.*, 418 F. Supp. 2d 816, 835 (E.D. Va. 2006), *aff'd*, 484 F.3d 687 (4th Cir.

2007) (considering an Article I, § 12 challenge to a county school's removal of religious

materials from a teacher's classroom walls); *Blue Horseshoe Tattoo, V, Ltd. v. City of Norfolk*,

No. cl-06–3214, 2007 WL 6002098 (Va. Cir. Jan. 17, 2007) (considering an Article I, § 12

challenge to a city ordinance); *Willis v. City of Virginia Beach*, 90 F. Supp. 3d 597, 607 (E.D.

Va. 2015) (considering government employees' Article I, § 12 challenge to their employer

disciplining them after they alleged gender discrimination).

In these cases, the courts considered state free speech claims alongside federal free

speech claims, rendering any separate state free speech analysis unnecessary because the

freedom of speech protections guaranteed by the Virginia Constitution are construed co-

extensively with the free speech protections in the First Amendment of the U.S. Constitution. *Id.*;

*see McCaffrey v. Chapman*, No. 1:17-cv-937, 2017 WL 4553533, at *5 (E.D. Va. Oct. 12, 2017),

*aff'd*, 921 F.3d 159 (4th Cir. 2019) (finding "no need to predict how the Supreme Court of

Virginia would decide" the issue of whether a cause of action for damages exists under Article I,

§ 12 because the plaintiff's "state and federal constitutional free speech claims rise and fall

together").

Unlike those cases, Plaintiff has not asserted a federal free speech claim, nor has she asked for leave to amend her Second Amended Complaint to add a federal free speech claim. Thus, the Court must determine whether her free speech claim seeking damage relief against the School Board is actionable under the Virginia Constitution. The Supreme Court of Virginia has not settled the scope of an implied right of action under Article I, § 12. *See McCaffrey*, 2017 WL 4553533, at *5 (noting "the Supreme Court of Virginia has never recognized an implied cause of action for damages under Article I, Section 12"). However, two Virginia circuit courts have recently concluded that Article I, § 12 is only self-executing for claims challenging laws or ordinances. *See Va. Student Power Network v. City of Richmond*, No. cl20-2916, 2021 WL 6550451, *1 (Va. Cir. Jan. 20, 2021) (finding Article I, § 12 "limits the right of action to only those circumstances in which a party challenges laws adopted by the General Assembly or ordinances adopted by localities"); *Ibañez v. Albemarle Cnty. School Bd.*, No. cl21001737-00 (Va. Cir. June 1, 2022) (finding the plaintiffs had "not stated a cause of action arising under Virginia law because their claims under the Constitution of Virginia are not self-executing . . .").[1]

---

[1] This Court has previously considered whether Article I, § 12 is self-executing. *See Draego v. City of Charlottesville, Virginia*, No. 3:16-cv-00057, 2016 WL 6834025, at *22 (W.D. Va. Nov. 18, 2016) (finding that Article I, § 12 is part of Virginia's Bill of Rights and prohibits abridgment of the freedom of speech and petition and that cases "recognize Section 12 as an actionable right"); *Delk v. Moran*, No. 7:16-cv-00554, 2019 WL 1370880, at *5 (W.D. Va. Mar. 26, 2019) (noting that Article I, § 12 is "Virginia's self-executing analogue to the First Amendment," but that the Supreme Court of Virginia has "never clearly established the scope of relief of self-executing provisions of the Virginia Constitution"); *Jackson v. Castevens*, No. 7:18-cv-362, 2020 WL 1052524, at *4 n.6 (W.D. Va. Mar. 4, 2020) (finding "claims under Article I, Sections 9 and 12 of the Virginia Constitution, fail because those provisions are not self-executing and thus do not provide an independent basis for a private right of action"). However, the issue of self-executing was not dispositive in those cases.

Assuming Plaintiff has alleged enough to state a claim for relief under the Virginia Constitution, the Court agrees with the Virginia circuit courts and finds that Article I, § 12 is only self-executing for claims challenging laws or ordinances. The Court notes that Article I, § 12 is in Virginia's Bill of Rights and is of a negative character, which "usually" means a constitutional provision is self-executing. *Robb*, 324 S.E.2d at 676. Additionally, the plain language of Article I, § 12 states that the Virginia General Assembly may not pass any laws infringing on free speech. *See* Va. Const. art. I, § 12 (providing "the General Assembly shall not pass any law abridging the freedom of speech . . ."). Because of this explicit language, the Court concludes that Article I, § 12 is self-executing for challenges against laws or ordinances that purportedly infringe on free speech rights.

However, this conclusion does not mean that Article I, § 12 waives sovereign immunity for all types of free speech claims against Commonwealth agencies, nor does it mean that a private party may seek any type of relief. *See Seabolt*, 724 S.E.2d at 717 (finding that a statute waiving sovereign immunity for the Commonwealth or one of its agencies does not waive immunity for another agency unless explicitly stated); *Rector & Visitors of Univ. of Va.*, 591 S.E.2d at 77 (same). Article I, § 12 does not mention Commonwealth agencies, nor does it state that a party may recover damages, which is Plaintiff's requested relief in this case. *See* Dkt. 1-5 at 49. Besides prohibiting the Virginia General Assembly from passing laws that infringe on free speech rights, Article I, § 12 declares general principles of protecting free speech rights without providing any "rules by means of which those principles may be given the force of law." *Robb*, 324 S.E.2d at 676; *see, e.g.*, Va. Const. art. I, § 12 (stating "the freedoms of speech and of the press are among the great bulwarks of liberty"). Thus, further legislative action appears necessary to define the applicability of Article I, § 12 to local school boards and the availability

of remedies.

Because Plaintiff is not challenging the constitutionality of a law or ordinance and is instead trying to bring a free speech claim for damage relief against the School Board, the Court finds that her claim is barred by sovereign immunity and will dismiss it without prejudice. *See Cunningham*, 888 F.3d at 649;  *Montgomery*, 2020 WL 5750897, at *4.[2]


### B.  Alleged Violations under the VHRA

Plaintiff brings several claims under the VHRA, which prohibits an employer from discriminating because of an individual's race. *See* Va. Code § 2.2-3905(B). The School Board argues these claims are barred because the VHRA does not contain an explicit waiver of sovereign immunity. Dkt. 14 at 17. The Court agrees.

To sue the School Board, there must be a "legislative waiver by which [the Commonwealth agency] consents to be[ing] sued," and this waiver "may not be inferred from general statutory language, but must be expressly and explicitly stated." *Doud v. Commonwealth*, 717 S.E.2d 124, 125–26 (Va. 2011). Commonwealth agencies are "not bound by statutes of general application '*no matter how comprehensive the language,* unless named expressly or included by necessary implication.'" *Cuccinelli v. Rector, Visitors of Univ. of Va.*, 722 S.E.2d 626, 630 (Va. 2012) (quoting *Commonwealth ex rel. Pross v. Bd. of Supervisors of Spotsylvania*

---

[2] This interpretation is not inconsistent with the Supreme Court of Virginia construing Article I, § 12's right to freedom of speech under the Virginia Constitution as co-extensive with the First Amendment's right to freedom of speech under the U.S. Constitution. The Fourteenth Amendment incorporated the First Amendment's right to freedom of speech to the states, *see Fiske v. Kansas*, 274 U.S. 380, 385 (1927), and 42 U.S.C. § 1983 creates a civil action for damages to redress violations of federal constitutional rights, including free speech violations, by persons acting under color of state law, *see Monroe v. Pape*, 365 U.S. 167 (1961). So, while the federal and Virginia *right* to freedom of speech are construed co-extensively, Virginia, unlike at the federal level, has no corresponding statute creating a cause of action for damages to redress violations of Article I, § 12's right to freedom of speech by Commonwealth agencies.

*Cnty.*, 303 S.E.2d 887, 889 (Va. 1983)) (emphasis in original). This statutory construction rule

"has been consistently applied by [the Supreme Court of Virginia] for more than a century." *Id.*

The VHRA does not expressly waive sovereign immunity for any Commonwealth

agency. *See Patel v. Commonwealth*, No. cl21-6527 (Va. Cir. July 2, 2021) (finding no waiver of

sovereign immunity in the VHRA); *see generally Doud*, 717 S.E.2d at 126. However, Plaintiff

argues that the School Board's sovereign immunity is waived because of Virginia Code § 1-230,

which provides general rules of construction and definitions to be applied to Virginia's statutes.

*See* Dkt. 24 at 32–33. This Code Section defines a "Person" as "any individual . . . government,

[or] political subdivision." Va. Code. § 1-230. Thus, according to Plaintiff, Virginia Code § 1-

230 waives sovereign immunity for any political subdivision, including the School Board, in the

VHRA because the VHRA's definition of employer includes "person."[3] *See* Dkt. 24 at 32–33.

The Court finds that Virginia Code § 1-230 cannot serve as an explicit waiver of

sovereign immunity for the VHRA because it is a statute of general application. *See generally*

*Cuccinelli*, 722 S.E.2d at 630. Indeed, the Supreme Court of Virginia did not rely on Virginia

Code § 1-230 to define a "person" for another Virginia statute. *See id.* at 633 (concluding after

extensive analysis that the University of Virginia, a Commonwealth agency, was not a "person"

under the Fraud Against Taxpayers Act). Moreover, the Virginia General Assembly has

"demonstrated throughout the Code its ability to define the term 'person' to include

governmental bodies when it so intended." *Id.* at 631 (citing several code sections as examples).

---

[3] The VHRA defines "Employer" as "a person employing (i) 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person or (ii) one or more domestic workers . . . for purposes of unlawful discharge under subdivision B 1 on the basis of race, color, religion, national origin, military status, sex, sexual orientation, gender identity, marital status, disability, pregnancy, or childbirth or related medical conditions including lactation, 'employer' means any person employing more than five persons or one or more domestic workers . . ." Va. Code § 2.2-3905(A).

The Virginia General Assembly thus could have defined "employer" or "person" in the VHRA to include Commonwealth agencies but chose not to do so.

In addition, general principles of statutory construction support this finding. "[I]t is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (internal quotation marks omitted). "[W]hen one statute speaks generally on an issue and another addresses the same issue in a more specific manner, the two should be harmonized, if possible, and where they conflict, the latter prevails." *Chesapeake Hosp. Auth. v. State Health Comm'r*, 872 S.E.2d 440, 447 (Va. 2022) (internal quotation marks omitted). Applying these principles, the Court finds that the VHRA's specific definition of "employer," which does not include Commonwealth agencies, prevails over the Virginia Code's general definition of "person." *Compare* Va. Code § 2.2-3905(A) *with* Va. Code § 1-230.

Accordingly, Plaintiff's VHRA claims will be dismissed because the VHRA does not contain an explicit waiver of sovereign immunity for Commonwealth agencies, nor does it create a private cause of action against the School Board. *See Cunningham*, 888 F.3d at 649; *Montgomery*, 2020 WL 5750897, at *4.


**C.  Alleged Wrongful Discharge in Violation of Public Policy**

In Count 2 of the Second Amended Complaint, Plaintiff alleges that the School Board's constructive discharge of Plaintiff violated public policy in Article I, § 12 of the Virginia Constitution. Dkt. 15 ¶¶ 288–295.

The Commonwealth "strongly adheres to the employment-at-will doctrine." *Lockhart v. Commonwealth Educ. Systems Corp.*, 439 S.E.2d 328 (Va. 1994). The Supreme Court of

Virginia permits a "narrow exception" to the doctrine. *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (Va. 1985). One such exception is when an employee claims she has been discharged in violation of an established public policy. *Id.* However, "termination of an employee in violation of the policy . . . does not automatically give rise to a common law cause of action for wrongful discharge." *City of Virginia Beach v. Harris*, 523 S.E.2d 239, 245 (Va. 2000). A public policy is sufficient to allow a wrongful discharge claim to proceed under two instances: (1) "laws containing explicit statements of public policy" and (2) "laws that do not explicitly state a public policy, but instead are designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general." *Id.* (internal quotation marks omitted). "Even if a specific statute falls within one of these categories, an employee must also be a member of the class of individuals that the specific public policy is intended to benefit in order to state a claim for wrongful termination in violation of public policy." *Id.*

Several courts have found that the Virginia Constitution cannot serve as the source for a wrongful discharge claim. *See Baldwin v. Baker*, No. cl16-220, 2016 WL 11663756, at 8 (Va. Cir. Feb. 2, 2016) ("Article I, Section 12, does not provide an explicit right for a narrow class of persons . . . to exercise their right of free speech. Article 1, Section 12, has no provision for employee rights and does not create a class of persons directly entitled to protection . . . "); *Glaser v. Titan Corp.*, No. 159607, 1997 WL 1070646, at *2 (Va. Cir. July 16, 1997) (finding that the Virginia "Constitution is not a permissible source of a public policy basis for an allegation of wrongful termination"); *Vaughan v. Dyncorp*, No. 126349, 1994 WL 1030997, at *2 (Va. Cir. Jan. 5, 1994) (holding that "the general [Virginia] Constitutional provisions cited by [the plaintiff] . . . do not support a *Bowman* claim") (emphasis added); *see also Carmack v. Virginia*, No. 1:18-cv-00031, 2019 WL 1510333, at *11 (W.D. Va. Apr. 5, 2019) (finding "no

basis in Virginia law for expanding the scope of *Bowman* by allowing for claims to be brought pursuant to broad pronouncements in the Virginia Constitution").

The Court agrees with these decisions and finds no reason to expand the scope of *Bowman* to include claims alleging violations of public policy in Article I, § 12. Thus, Count 2 will be dismissed for failure to state a claim upon which relief can be granted.

### D.  Alleged Violations under Title VII

Plaintiff brings several claims under Title VII, which prohibits employment discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). The School Board moves to dismiss her Title VII claims for failure to state a claim for relief.

#### 1.  Alleged Racial Hostile Work Environment

A hostile work environment under Title VII exists "when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 407 (4th Cir. 2022) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To state a Title VII racial hostile work environment claim, Plaintiff must show that "there is (1) unwelcome conduct; (2) that is based on [her race]; (3) which is sufficiently severe or pervasive to alter [her] conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016) (internal quotation marks omitted). The School Board only challenges the third element. Dkt. 14 at 27.

"The severe or pervasive element of a hostile work environment claim has both subjective and objective components." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th

Cir. 2008) (internal quotation marks omitted). Harassment is severe or pervasive if the workplace is "pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate." *Id.* at 316. A court's objective analysis of whether a workplace is hostile looks "at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks omitted). Indeed, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Plaintiff has alleged enough facts to allow a jury to determine if the alleged harassment was "severe or pervasive." *Guessous, LLC*, 828 F.3d at 221. She alleges that Avery "verbally attacked" her for using the term "colored" during a training session and criticized her in a meeting with Hairston. Dkt. 1-5 ¶¶ 115, 157–64. She claims no action was taken by the School Board after she complained about Avery's conduct. *Id.* ¶¶ 121–25. Plaintiff also claims that several employees told Plaintiff that Avery and her friends were calling her names at work, such as a racist, "white racist bitch," and "two-faced racist bitch." *Id.* ¶¶ 146–148. While she complained about this behavior to her principal and told him that it was "preventing her from focusing on her job," no action was taken. *Id.* ¶¶ 149–51. She spoke to an assistant superintendent and HR employees about "the racially charged mistreatment she had experienced" but the School Board took no action. *Id.* ¶¶ 186–204. And she claims that she told her principal that she was experiencing severe mental and emotional distress from the hostile work environment. *Id.* ¶¶ 179–85. Considering the alleged repeated race-based comments, the School Board's lack of intervention, and Plaintiff's emotional and mental distress, Plaintiff has

alleged a plausible racial hostile work environment claim under Title VII, which will survive the School Board's motion to dismiss.

> ## 2. *Alleged Constructive Discharge*

For a constructive discharge claim under Title VII, a "plaintiff must show 'something more' than the showing required for a hostile work environment claim." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 131 (2004)). A plaintiff must show two elements: (1) she was "discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign" and (2) that she actually resigned. *Green v. Brennan*, 578 U.S. 547, 555 (2016). The School Board only contests the first element.

For the first element, courts access "whether a reasonable person in the employee's position would have felt *compelled* to resign,' [] that is, whether [s]he would have had *no choice* but to resign." *Evans*, 936 F.3d at 193 (internal quotation marks omitted) (emphasis in original). "The more continuous the conduct, the more likely it will establish the required intolerability," and "when the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability. *Id.* However, "difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign." *Id.*; *see Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994).

Assuming all of Plaintiff's allegations are true, as the Court must at this stage of the litigation, the Court finds that Plaintiff has alleged sufficient facts to state a plausible constructive discharge claim. Plaintiff alleged that she experienced repeated race-based comments that caused her mental and emotional distress, Dkt. 1-5 ¶¶ 146–48, 179–85, that the School Board did not intervene, or act, to address these comments, *id.* ¶¶ 149–51, 179–204, and

that she was asked to give an apology in front of school staff, *id.* ¶¶ 164–65. The accumulation of these allegations sufficiently supports that a reasonable employee in Plaintiff's position could have felt compelled to resign. *See Evans*, 936 F.3d at 193. Thus, her Title VII constructive discharge claim will survive the School Board's motion to dismiss.

3. *Retaliatory Hostile Work Environment and Retaliatory Constructive Discharge*

In her Second Amended Complaint, Plaintiff asserts retaliatory hostile work environment and retaliatory constructive discharge claims against the School Board. Dkt. 1-5 ¶¶ 377–99. Title VII's anti-retaliation provision serves to "'prevent[ ] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees.'" *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006)) (alterations in original). To establish a prima facie case of retaliation, Plaintiff must show (1) she engaged in protected activity; (2) she suffered an adverse employment action by the School Board; and (3) the School Board took the adverse action because of the protected activity. *Bryant v. Aiken Reg'l Med. Centers, Inc.*, 333 F.3d 536, 543 (4th Cir. 2003); *see Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). The School Board only challenges the causation element. It argues that to the extent Plaintiff experienced actions targeted at her, they followed her use of the term "colored," not her protected activity. Dkt. 14 at 33.

Causation can be shown by alleging (1) "the adverse act bears sufficient temporal proximity to the protected activity," or (2) "the existence of facts that suggest that the adverse action occurred because of the protected activity," or (3) a combination of the two. *Laurent-Workman v. Wormuth*, 54 F.4th 201, 218 (4th Cir. 2022) (internal quotation marks omitted). "Temporal proximity between an employer's knowledge of protected activity and an adverse

employment action may establish causation only if it is very close." *Id.* (internal quotation marks omitted) (cleaned up).

Here, Plaintiff has sufficiently alleged that her protected activity—namely, complaining that the anti-racist training created a hostile work environment and that the School Board racially discriminated against her—could plausibly be the *but for* cause of the hostile conduct and constructive discharge. *See* Dkt. 1-5 ¶¶ 380, 390. She alleges that the School Board's retaliatory actions occurred shortly after she exercised her protected activity. For example, Hairston requested a meeting with Plaintiff shortly after she discussed her concerns about the alleged racial hostile work environment. *Id.* ¶¶ 121, 126–28, 154–78. After Plaintiff expressed her concerns about the racial hostile work environment at that meeting, Hairston asked Plaintiff to give a public apology to school staff. *Id.* ¶¶ 163. Additionally, several staff employees allegedly called Plaintiff racial names after she expressed concerns about the racial hostile work environment, and the School Board took no action to address Plaintiff's complaints about these comments. *Id.* ¶¶ 121, 146–53.

Considering the short temporal proximity between her alleged protected activity and the alleged adverse employment actions, Plaintiff has alleged enough facts to support a plausible inference that the School Board retaliated against her because of her protected activity. Accordingly, the Court will allow her retaliation claims to proceed.

## Conclusion

For the above reasons, the Court will grant the School Board's motion to dismiss, in part, and dismiss without prejudice Plaintiff's free speech claim (Count 1) and dismiss with prejudice her wrongful discharge claim (Count 2) and her VHRA claims (Counts 3–6). The Court will

allow Plaintiff's Title VII claims (Counts 7–10) to proceed.

The Clerk of Court is directed to send this Memorandum Opinion to all counsel of record.

Entered this 21st day of February, 2023.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE