IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

EMILY MAIS,

   Plaintiff,

v.                                     Case No. 3:22-cv-51

ALBEMARLE COUNTY SCHOOL BOARD,

   Defendant.

**BRIEF IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

In February 2019, the Albemarle County School Board (the "School Board") adopted an

Anti-Racism Policy ("Policy") to eliminate and prevent inequities that result from and perpetuate

racism.  In June 2020, the *Courageous Conversations About Race* ("CCAR") training curriculum

was used to help Division employees understand the tenets of the Policy and why the School

Board implemented the Policy, with the hope of identifying inequities within schools.  School

leaders were expected to implement this training with staff in their individual buildings.

Emily Mais ("Mais"), an assistant principal at Agnor-Hurt Elementary, agreed not only

with the Policy and its regulations, but with the concept that educators played a vital role in

reducing racism and inequity.  It is with that backdrop that on June 11, 2021, during the last

CCAR staff discussion at Agnor-Hurt, Mais referred to people of color as "colored" people.

Mais claims it was a "slip of the tongue" and that she apologized.  But her use of the word

"colored" was offensive and she understood that it could be hurtful and considered derogatory to

others.

Nevertheless, Mais has filed suit claiming that *she* was subject to a hostile work environment and constructively discharged because of the response to her use of the word "colored." However, the evidence shows that during the compressed time frame—June 11 to August 22 while school was out of session—Mais agreed to informally resolve the conflict that resulted from her comments. When the situation was not resolved to her liking, she met with the Assistant Superintendent overseeing Human Resources to express her concerns—a conversation Mais characterized as the "first step in addressing a problem." Inexplicably, and without any further incident, Mais submitted her resignation three days later.

## II.    STATEMENT OF MATERIAL UNDISPUTED FACTS

1.      Mais was an Assistant Principal at Agnor-Hurt Elementary School. (Mais Vol I 25:23-26:8.) Sheila Avery ("Avery") was a Teaching Assistant at Agnor-Hurt and reported to Mais and Principal Doug Granger ("Granger"). (Avery 20:3-16, 21:7-18.) Bernard Hairston ("Dr. Hairston") was the Assistant Superintendent for School and Community Empowerment. (Hairston 18:20-23.)

2.      On February 28, 2019, the School Board adopted the Anti-Racism Policy and related Regulations "to eliminate all forms of racism from the Division" and as a reflection of the School Board's commitment to "[e]stablishing and sustaining a school community that shares the collective responsibility to address, eliminate, and prevent actions, decisions and outcomes that result from and perpetuate racism," as well as "[r]especting and championing the diversity of life experiences of all community members." (Mais Vol. I 52:9-16; Ex. E.) One of the reasons the School Board adopted the Policy was to address inequities in student outcomes and remove barriers to give all students the most optimal access to educational opportunity. (C. Keiser 25:2-18, 26:3-10.)

2

3.      Mais respected and agreed with the Policy and did not express concerns with its Regulations.  (Mais Vol. I 54:18:20, 56:8-9, 56:21-23, 57:23-58:9.)

4.      In June 2020, Dr. Hairston met with Division administrators to discuss the CCAR curriculum administrators would be using to conduct training sessions for staff.  (Mais Vol. I 70:10-11, 71:8-10, 72:1-12.)  The aim of this training was to help division employees understand the tenets of the Policy and why the School Board was implementing the Policy.  (Hairston 56:5-14; 65:22-24.) School leaders were responsible for implementing the CCAR training for staff in their building.  (Mais Vol. I 72:1-23.)  The purpose of CCAR training for staff was to build racial consciousness amongst groups to identify inequities that might occur in schools and to have a broader conversation about race—a goal that Mais appreciated. (*Id.* at 112:16-21; 113:15-23.)

5.      Mais spoke with Granger about the tone of the June 2020 meeting, but they did not discuss specifics because did not want to "jump[] to some conclusion." (Mais Vol. I 70:2-6, 72:1-23.) Mais also did not make a formal complaint about any of Dr. Hairston's statements during the meeting.  (*Id.* at 72:24-73:4, 73:17-74:1.)

6.      Mais did not have any concerns about her employment at Agnor-Hurt at the beginning of the 2020-2021 school year.   (Mais Vol. I 60:7-16.)[1] And Mais had a good relationship with Avery.  (*Id.* at 84:23-25, 86:14-17.)

7.      In December 2020, the Agnor-Hurt staff were offered three options for cohort sessions related to CCAR. (Mais Vol. I 78:21-79:3, 79:12-13.)  Mais led one of the cohorts.  (*Id.* at 79:16-21.)   Mais's cohort worked well together, and Mais was unaware of any racial interactions during that time.  (*Id.* at 80:17-22.)

---

[1] With that said, students and teachers were still dealing with the impact of the COVID-19 pandemic in the school setting and the return to school in this environment was overwhelming for Mais.  (Mais Vol. I 62:15-25, 63:15-64:14, 65:10-15, 67:17-10.)

8.      In February 2021, Granger took extended leave to deal with a family tragedy. (Mais Vol. I 87:19-22.)  Mais was the only full-time administrator in the building, as Ashby Kindler ("Kindler")—a retired principal—and others provided part-time assistance.  (*Id.* 87:23-88:17.)  Granger tasked Kindler with leading the remainder of the CCAR training at Agnor-Hurt. (*Id.* at 88:19-25; Kindler 18:1-7; Ex. H.)

9.      The first CCAR session at Agnor-Hurt was held on April 30, 2021.  (Mais Vol. I 87:11-13, 99:13-18.) Sessions were held on Fridays via Zoom, and there were four sessions in total.  (*Id.* at 100:1-7, 108:20-24; Kindler 25:10-21.)  When Mais spoke with Granger about the CCAR curriculum, she expressed uncertainty about how the material would be received.  When she spoke with Kindler about implementing the training, she only expressed concerns about how the conversation could be challenging based on the text.  (Mais Vol. I 77:1-7, 96:4-11.)

10.     Staff attended three CCAR training sessions before June 11, 2021.  (Mais Vol. I 108:20-24.)  According to Mais, during those sessions, Avery would respond to other staff members' comments dismissively "with a raised tone of voice" and shake her head.  (*Id.* at 124:5-9.)  Avery would respond that the other staff members could not understand or "connect with something" because of their skin color. And, during the first two sessions, Cheryl Brooks-Davis ("Brooks-Davis"), a teacher at Agnor Hurt, would respond supportively to Avery's comments.  (*Id.* at 123:17-124:4; 124:9-13.)  None of Avery's or Brooks-Davis's comments or behavior was directed toward Mais.  (*Id.* at 124:5-13, 123:17-124:4.)  Kindler believed that the CCAR training sessions were productive.  (Kindler 31:18-21.)

11.     Mais told Kindler and Granger about Avery's comments and behavior during the meetings, but Granger was on leave at that time.  (Mais Vol. I 116:14-16, 120:2-5, 120:10-15, 121:16-19, 124:16-20-125:1, 126:16-17.)  Mais did not report the behavior to anyone in the

Human Resources Department ("HR").  (*Id.* at 120:6-9, 121:16-18, 123:2-4.)  And although Mais was an administrator, she did not speak with Avery about Avery's behavior during the meetings. (*Id.* at 110:1-3, 111:13-22, 113:25-114:3, 116:20-22.)

12.     Outside of the three CCAR sessions held on April 30 and before June 11, 2021, only one teacher expressed discomfort working with Avery.  Mais did not report this information to anyone.  (Mais Vol. I 127:24-128:17.)

13.     Between April 30 and before June 11, 2021, Mais was able to perform all of her job duties. (Mais Vol. I 129:3-6, 133:8-11.)  While Mais believed that she suffered "some level" of mistreatment when the CCAR training started, she claims the "bulk of the mistreatment started from the June 11th training session on."  (*Id.* at 60:17-25.)

14.     The last CCAR training session at Agnor-Hurt occurred on June 11, 2021. (Kindler 47:9-12.)  Near the end of the session, the group was discussing hiring within the school district.  (Mais Vol. I 136:19-137:3; Kindler 50:19-51:9.)  In questioning the race of the applicant pool for the schools, Mais referred to certain applicants as "colored" people.  (Mais Vol. I 137:4-5, 137:23-138:1, 138:11-139:12, 143:19-24; Kindler 51:10-16; Avery 97:11-14; Ex. I.)

15.     Avery took offense to Mais using the term "colored" because "Blacks are not colored."  (Avery 96:15, 97:2-4.)  According to Mais, at some point Avery said, "What the f*ck did she say," first softly and then louder a second time.  (Mais Vol. I 140:2, 140:10-11, 141:1-2.) Avery then asked Mais on the Zoom meeting whether Mais used the term "colored."  Mais responded, "Yes, I did."  (Kindler 52:5-9; Mais Vol. I 141:3-4; Avery 98:22-99:1.)

16.     According to Mais, Avery rolled her eyes, shook her head, and loudly and aggressively said that she would expect that sort of language from an 80- or 90-year-old person but not from somebody in Mais's position or Mais's age.  Mais said she was sorry, and Kindler

ended the meeting shortly thereafter.  (Mais Vol. I 144:15-19, 144:25-145:24; Avery 98:23-99:8, 102:15-103:6; Kindler 52:5-16, 53:10-15.)

17.     Avery was offended by Mais's use of the word "colored." (Holmstrom 62:13-18, 70:17-71:7; Mais Vol. II 24:13-20.)  People who did not attend the June 11 CCAR session, but heard about it, were also offended.  (Mais Vol. II 28:11-18.)  Mais agrees that her use of the word "colored" could be hurtful and considered derogatory.  (Mais Vol. I 147:22-148:20.)

18.     Mais did not file a complaint with HR based on Avery's comments and behavior during the June 11 session.  (Mais Vol. I 154:1-4, 7.)  Avery did not file a complaint with HR based on Mais's use of the term "colored."  Instead, she spoke with Dr. Hairston about the need to educate Mais.  (Avery 108:13-20.)  Mais believed it was an issue that she and Avery could have handled informally through conversation.  (Mais Vol. I 151:3-18, 152:6-12.)

19.     Mais learned that other employees were upset by her use of the term "colored." (Mais Vol. I 159:2-10, 12-21.) This information was again relayed to Mais by Dr. Hairston during a phone call at the end of June 2021.  (*Id.* at 176:5-177:5-10.)

20.     On June 16, 2021, Kindler sent out a letter to all staff related to the June 11 incident.  (Mais Vol. I 160:21-24.) Mais believed that Kindler's letter was acknowledging the "awkward[ness]" of the June 11 session and "reiterat[ing] that now [the staff] need[ed] to stop[,] . . . come back together[,] and . . . move forward." (*Id.* at 161:5-15.)

21.     Mais testified that at some point between June 11 and the beginning of July 2021, a teaching assistant who was serving as a stand-in secretary told Mais of "exchanges . . . taking

place" between a group of staff members, including Avery, using terms like "white racist bitch" and "two-face racist bitch" to refer to Mais.  (Mais Vol. I 165:24-166:12, 166:21-167:2.)[2]

22.     Mais did not report these "exchanges" to HR.  (Mais Vol. I 169:5-9, 12-13.)  Mais also did not address the report with Avery, even though Mais was the lead administrator at Agnor-Hurt at the time and had the ability to recommend discipline of staff.  (*Id.* at 169:15-23.)

23.     After the June 11 CCAR session, Mais was able to perform her summer school-related duties.  (Mais Vol. I 165:1-7.)  She was also able to perform her duties as assistant principal in preparing for the 2021-2022 school year, with some limitations presented by a lack of staff in the office.  (Mais Vol. II 49:23-50:4, 50:14-22; Mais Vol. I, 127:3-5.)  Mais does not recall missing a deadline in preparing for the 2021-2022 school year.  (Mais Vol. I 183:20-25.)  Nor does Mais recall having any interactions with Avery at Agnor-Hurt between June 11 and August 6, 2021.  (*Id.* at 170:19-171:5.)

24.     At the end of June, Dr. Hairston suggested that Mais and Avery meet to reconcile.  (Ex. J.)  That employees other than Avery were angry about Mais's use of the term "colored" contributed to Dr. Hairston suggesting that they meet.  (Mais Vol. I 176:18-177:4.)  Mais did not object to the meeting with Avery and Dr. Hairston, nor was having the meeting in her office at Agnor-Hurt a problem.  (*Id.* at 177:11-19, 179:5-23; Ex. K.)

25.     Ultimately, Mais, Avery, and Dr. Hairston agreed to meet on August 6, 2021.  (Mais Vol. II 6:13-15.)  Mais did not object to the August 6 meeting, nor did she have any concerns with the proposed agenda for the meeting.  (*Id.* at 7:6-10, 7:18-8:4; Ex. L.)  Instead, Mais believed the meeting needed to happen as the "can was being kicked all summer." (Mais

---

[2] These statements are inadmissible hearsay.  By addressing them herein, the School Board does not concede that they are admissible for the purposes of summary judgment or at trial.  *See Tankesley v. Vidal*, No. 1:21-cv-1448, 2023 WL 4273763, at *16 (E.D. Va. June 29, 2023).

Case 3:22-cv-00051-NKM-JCH   Document 91   Filed 07/19/24   Page 8 of 28   Pageid#: 1508

Vol. II 9:8-11.)  Dr. Hairston believed the purpose of the meeting was to process what occurred and come up with strategies for how they could pull the Agnor-Hurt faculty together.  (Hairston 146:2-19.)

26.     On August 6, 2021, Dr. Hairston, Mais, Avery, Kindler, and Emily Holmstrom, an Equity Specialist at Agnor-Hurt, met.  Kindler took minutes for the meeting.  (Mais Vol. II 15:9-21; Kindler 83:15-25, 86:16-21; Ex. M.)

27.     During the meeting, the parties discussed their background and the June 11 CCAR session.  (Mais Vol. II 10:17-23; Kindler 86:10-12; Ex. M.)  Mais apologized during the meeting.  (Hairston 149:6-12.)  Mais hoped that the frustration and anger that brought the parties to the meeting would be resolved, but believed the meeting did more damage because she felt like the June 11 incident was not accurately depicted and Avery did not accept her apology.  (Mais Vol. II 12:6-12, 13:9-20.)  Mais felt that discussions during the meeting "impli[ed] . . . wrongdoing on [Mais's] part" and did not address Avery's behavior.  (*Id.* at 12:6-12, 14:15-18.)  Mais felt like she was being held accountable, but that Avery was not being held accountable for her behavior.  (*Id.* at 14:19-25.)  At the end of the meeting, Mais was crying and upset.  (Kindler 96:15-23; Hairston 150:21-24.)

28.     Dr. Hairston stated during the meeting that it would be a "group effort" to move on from the events of the June 11 CCAR session.  (Mais Vol. II 29:17-24.)  Holmstrom stated that Mais was "courageous" for apologizing, which Mais appreciated.  (*Id.* at 30:17-31:7.)  Additionally, Avery stated during the meeting that she did not want Mais to "think [Mais's] reputation [wa]s ruined," that Avery and others would still speak with Mais, and that they "need[ed] to get past this."  Avery also stated that she "need[ed] to work on [her]self to get past

8

th[e] situation."  (*Id.* at 32:4-10, 32:16-20.) Mais agreed that "we still had a problem to deal with" and that everyone had a role to figure out how to move forward.  (*Id.* at 30:12-16.)

29.     At the end of the meeting, after discussion between the parties, Dr. Hairston stated that the next logical step would be for Avery and Mais to address the staff at Agnor-Hurt. (Hairston 154:9-155:2.)   Indeed, Dr. Hairston believed that the parties "did an excellent job" during the meeting.  (*Id.* at 159:21-24; Ex. N.)  After the August 6 meeting, Dr. Hairston was not involved in further planning on how Avery and Mais would address the staff, as he wanted to empower Mais, as the assistant principal of the school, to be the primary leader of how to move forward.  (*Id.* at 163:6-10, 14-23.)

30.     Mais agreed to address the staff at Agnor-Hurt because "I'm a professional, I was willing to follow my job responsibilities and the directives given by my boss. . . . [N]obody can speak for me.  So I was there addressing the staff . . . ."  (Mais Vol II 33:25-34:6, 34:12-15.)

31.     On August 11, 2021, Mais informed Michael Irani ("Dr. Irani")—the New Principal of Agnor-Hurt—that she would not be at work the following day because of a counseling appointment.  (Irani 36:14-20, 37:17-20.) Mais attended three counseling sessions that week and participated in a total of seven counseling sessions for mental health treatment arising out of this issue.  (Mais Vol. I 50:16-21; Irani at 40:20-41:10.)

32.     On August 15, 2021, after receiving the August 6 meeting minutes from Kindler, Mais left a voice message with Lorna Gerome ("Gerome"), the Division's Director of HR.  (Mais Vol. II 43:1-5, 43:15-44:5.)  Two days later, on August 17, 2021, Mais and Gerome spoke via telephone.  (*Id.* at 45:3-8.)

33.     During the conversation, Mais expressed frustration over the "lack of acceptance" during the August 6 meeting, stated that the CCAR sessions "normalized poor behavior," and

expressed her disapproval of Dr. Hairston's behavior.  (Mais Vol. II 45:13-46:15.)  She also explained issues she had managing anxiety.  (*Id.* at 46:3-5.)  Gerome listened to Mais and was "very supportive."  (*Id.* at 46:16-20.)

34.     On Thursday, August 19, 2021, two days after Gerome and Mais spoke, Dr. Clare Keiser ("Dr. Keiser"), an Assistant Superintendent, met with Mais at Agnor-Hurt.  (Mais Vol. II 48:3-8.)  At the time, Mais was actively engaged in performing her duties as assistant principal. (*Id.* at 49:16-50:4.)   Mais considered her conversation with Dr. Keiser the "first step in addressing a problem."  (*Id.* at 55:20-24.)

35.     Yet, on Sunday, August 22, 2021, three days after her meeting with Dr. Keiser, Mais submitted her letter of resignation. (Mais Vol. II 57:11-20; Ex. P.)  Mais informed the Agnor-Hurt school community of her resignation on August 30, 2021.   (Ex. R; Ex. S.) According to Mais, no matter "what happened with the situation with me over the summer . . . I couldn't morally sit with this knowing the antiracism [sic] policy that is in place . . . ."  (Mais Vol II 66:3-13.)  Mais started looking for other employment as soon as she submitted her letter of resignation.  (Mais Vol. I 27:23–28:1.)

36.     After Mais informed the school community of her resignation, Dr. Irani emailed Avery and Mais to discuss creating a joint statement that could be a powerful and productive moment for staff.  (Ex. T.)  On September 8, 2021, Dr. Irani sent Avery, Mais, and Holmstrom a "script" for the next day's faculty meeting.  (*Ex. U.)  The script identified three topics on which Avery and Mais would be asked to share and provided time limits for each topic: (1) facts remembered from the June 11 CCAR session (2 minutes); (2) reflections on the language used during the June 11 CCAR session (3 minutes); and (3) "a final thought or hope as we move

forward" (30 seconds).  (*Id.*)  Dr. Irani advised Mais and Avery to stick to the time limits because they would be "key in providing a balanced conversation."  (*Id.*)

37.    Mais decided to go forward with addressing the faculty at the next day's meeting even after reviewing the script.  (Mais Vol. II 93:12-14, 93:24-7.)

38.    On September 9, 2021, Mais and Avery addressed the Agnor-Hurt staff at a faculty meeting.  Mais spoke first and addressed her use of the term "colored" during the June 11 CCAR session and "what [her] true intention was."  (Ex. V, at 00:00-02:13.)  Avery discussed Mais's use of the term "colored" and noted it "was not only disruptive and disturbing, but truly hurtful."  (*Id.* 02:29-03:05.)  After Avery concluded, Dr. Irani noted that both Mais and Avery deviated from the proposed script by discussing more than facts during the first part.  (*Id.* 04:53-05:00.)  Nevertheless, Dr. Irani wanted to give both Mais and Avery "an opportunity to share some feelings" and then give all attendees an opportunity to reflect on what they heard.  (*Id.* 05:00-05:12.) Dr. Irani stated that he was proud of Mais and Avery and then asked the attendees to reflect quietly on what they heard and how that will make them and Agnor-Hurt better.  (*Id.* 12:43-13:10.)

39.    Mais's last day of employment with the School Board was September 10, 2021. (Mais Vol. II 105:11-15.)

### III.    STANDARD OF REVIEW

"Summary judgment is warranted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 173 (4th Cir. 2023) (quoting Fed. R. Civ. P. 56(a)). Evidence and reasonable inferences are construed "in the light most favorable to the non-moving party."  *Id.* (quotation omitted).  "Once a [party] makes a properly supported motion for

summary judgment, the burden shifts to the [other party] to set forth specific facts showing that there is a genuine issue for trial." *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 817 (4th Cir. 1995). "The nonmoving party must demonstrate that a genuine issue of material fact exists by offering sufficient proof in the form of admissible evidence instead of relying solely on the allegations of her pleadings." *Lashley*, 66 F.4th at 173 (internal quotation marks and quotation omitted). "[A]n apparent dispute is not 'genuine' . . . unless the non-movant's version is supported by sufficient evidence to permit a reasonable jury to find the fact[s] in [her] favor." *Sylvia Dev. Corp.*, 48 F.3d at 818.

## IV.   ARGUMENT

Four claims remain under Title VII: racially hostile work environment (Count 7), constructive discharge (Count 8); retaliatory hostile work environment (Count 9), and retaliatory constructive discharge (Count 10). Summary judgment should be granted on each claim.

### A.   Mais did not experience a racially hostile work environment (Count 7).

A hostile work environment can exist only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A hostile work environment claim based on race has four elements: "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (quotation, alteration, and quotation marks omitted); *McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 407 (4th Cir. 2022).

1.     __Mais did not experience unwelcome conduct because of her race.__

A plaintiff "must show that but for her race, she would not have been the victim of the alleged discrimination." *McIver*, 42 F.4th at 409 (cleaned up) (quotation omitted).  "[A] plaintiff cannot rely on her own 'conjecture' to impute a racial character to what appears to be neutral harassment." *Id.*; *see Ali v. WorldWide Language Res., LLC*, 686 F. Supp. 3d 430, 450 (E.D.N.C. 2023) (granting summary judgment because "[m]uch of the alleged harassing conduct . . . was not motivated by race . . ., but by discord over" pay discrepancies).

"[H]arassment due to personality conflicts will not suffice." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008).  Additionally, speech is not a characteristic entitled to Title VII protection.  *Lyman v. NYS OASAS*, 928 F. Supp. 2d 509, 523 (N.D.N.Y. 2013) (noting that an alleged hostile work environment could not be premised on the defendants' "dislike of [the plaintiff's] advocacy on behalf of sexual abuse victims and against the Roman Catholic Church's handling of sexual abuse cases").

In *Ziskie*, for example, much of the harassment of which the plaintiff complained was not related to her gender, but to the fact that her colleagues thought that she was gratuitously tracking them. *Ziskie*, 547 F.3d at 227. While this behavior may be hostile, "it is a far cry from the obviously sex-related conduct." *Id.*

Here too, the "hostile work environment" about which Mais complains ultimately stems from her use of the racially-charged term "colored" during the June 11 CCAR session, not her race. (Mais Vol. I 144:10-25.) To that end, Mais testified that she incurred some purported mistreatment once CCAR training began, but the "bulk" of it occurred after the June 11 session. (Mais Vol. I 60:17-23.)  As Mais concedes, she did not have any concerns about her employment at the beginning of the 2020-2021 school year, she had a good relationship with Avery, and her

CCAR cohort worked well together without any noticeable racial interactions.  (*Id.* at 60:7-16, 80:17-22, 84:23-25, 86:14-17.)

The reason Mais experienced the "bulk" of the purported mistreatment after the June 11 CCAR session is obvious.  Avery, and others, took offense to Mais using the word "colored"—a word that Mais acknowledges could be hurtful and considered derogatory.  (Mais Vol. I 147:22-148:20.)  That word is even more hurtful when uttered by an administrator tasked with fostering a culturally inclusive learning and working environment regardless of whether it was a "slip of the tongue."  (*See id.* at 54:25-55:8.)

While Mais asserts that she was characterized as a "racist," thus constituting a hostile work environment, her concerns about this portrayal arise out of the word she used, not her race. Indeed, the August 6 meeting—a meeting she acknowledges needed to occur and about which she now complains—was to address her choice of words during the June 11 CCAR session.  But Mais's speech is not a protected characteristic entitled to protection under Title VII.  *Lyman*, 928 F. Supp. 2d at 523.  Mais cannot cry foul when her own comment was derogatory and offensive to others.  *See, e.g.*, *Cepada v. Bd. of Educ. of Balt. Cnty.*, 974 F. Supp. 2d 772, 785 (D. Md. 2013) (holding that where administrators found plaintiff's comments derogatory and offensive *toward them,* rather than the other way around, plaintiff could not show discrimination based on race); *cf. Dortch v. Cellco Partnership*, 770 F. App'x 643, 646 (4th Cir. 2019) (concluding that a subordinate's use of an explicative during an altercation was "an ordinary workplace dispute" because it was in response to the plaintiff's own unprofessional behavior).

Simply put, Mais cannot prove that but for her race, rather than the words she used in the June 11 CCAR training, she would not have been the victim of the alleged discrimination.

**2.      Any unwelcome conduct was not sufficiently severe or pervasive.**

Whether conduct is sufficiently severe or pervasive requires a plaintiff to show that the harassment was severe or pervasive as to her personally and objectively abusive to a reasonable person in the plaintiff's position. *Briggs v. Waters*, 484 F. Supp. 2d 466, 485-86 (E.D. Va. 2007) (citing *Ocheltree v. Scollon Prods, Inc.*, 335 F.3d 325, 331 (4th Cir. 2003)).    Circumstances relevant to this determination include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Boyer-Liberto*, 786 F.3d at 277.    The status of the harasser is also a "significant factor" to be considered; harassment by a supervisor tends to be more serious, while harassment by a co-equal is less serious. *McIver*, 42 F.4th at 408.

Plaintiffs must "clear a high bar" to satisfy this element. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019) (quotation omitted).    "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal quotation omitted).    "The mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Id.*    And "rude treatment from coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor are not actionable under Title VII." *Id.*  (citation omitted).    Title VII does not act as a civility code for the workplace and incidents that give rise to bruised or wounded feelings will not satisfy the severity requirement. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008).

The conduct of which Mais complains is neither pervasive nor severe. Mais has attempted to widely cast the CCAR training as divisive, but she agreed with the School Board's Anti-Racism Policy and the goals of CCAR training. (*See* Mais Vol. I 54:18:20; 56:8-9, 56:21-23, 57:23-58:9; Mais Vol. II, 63:21-64:8.) Mais also agreed that educators in Albemarle County Public Schools played a vital role in reducing racism and inequity among students. (Mais Vol. I 54:21-24.) And again, Mais did not have any concerns about her employment at the beginning of the 2020-2021 school year. (Mais Vol. I 60:7-16, 80:17-22, 84:23-25, 86:14-17.) While Mais expressed some discomfort with the CCAR sessions, she did not file a complaint about the sessions with HR. In fact, while there were uncomfortable conversations about race, Mais successfully navigated the four CCAR sessions until she used the word "colored" in the final minutes of the last session.

After the June 11 CCAR session and comments, Mais—at best—experienced unpleasant and crude behavior when she heard indirectly on one occasion that subordinate employees, including Avery, were referring to her as a "white racist bitch" and "two-faced racist bitch." (Mais Vol. I 166:9-13, 167:5-8.)[3] These comments were not made to Mais nor did Mais work with Avery between June 11 and August 6. *See Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (4th Cir. 2022) (noting that "remarks that are stated directly to the plaintiff weigh heavier than when a plaintiff hears them secondhand"). Moreover, although she was the school leader and supervisor, Mais did not feel the need to address these comments—despite having the authority as a supervisor to recommend discipline of staff. *See McIver*, 42 F.4th at 408 (The status of the harasser is also a "significant factor" to be considered). Instead, she believed that the

---

[3]A statement made by one employee that is then repeated by another employee is hearsay outside of the Rule 801(d)(2)(D) exception. *Tankesley*, 2023 WL 4273763, at *16. As such, the Court should not consider these alleged statements when evaluating this claim.

issue was one she and Avery could have handled informally through conversation. (Mais Vol. I 61:18-24, 151:3-18, 152:6-12.)

Mais points to no other events during this time frame to support her hostile work environment claim and she acknowledges that she was able to continue performing her job duties as assistant principal.  These facts are a far cry from the frequency required to prevail on a hostile work environment claim.  *Cf.*, *Lindsay-Felton v. FQSR, LLC*, 352 F. Supp. 3d 597, 605 (E.D. Va. 2018) (noting that a supervisor's mistreatment occurred "over the course of several months and occurred every time [the supervisor] was in [the plaintiff's] store").  Nor are they of sufficient severity.  *See, e.g., Fuelling v. New Vision Med. Lab'ys LLC*, 284 F. App'x 247, 259–60 (6th Cir. 2008) (being referred to as "the white bitch" by fellow black employees did not establish a hostile work environment); *McLaurin v. Verizon Md., Inc.*, No. JKB-14-4053, 2015 WL 5081622, at *4 (D. Md. Aug. 26, 2015) (the plaintiff did not allege an actionable hostile work environment claim despite allegations that one co-worker called the plaintiff a "bitch," another co-worker "urinated in front of her," and a supervisor "cursed" at her).

Mais's next complaint is about the August 6 meeting and how that left her feeling like she alone was being held accountable and was being accused of wrongdoing.  First, Mais did not object to participating in this meeting. (Mais Vol. I 177:11-19, 179:5-23.)  And second, having a difficult conversation about a situation in which a supervisor offended subordinates does not rise to the level of a hostile work environment.  Indeed, that is the responsibility of a leader of others and Mais agreed that everyone had a role to address the issue.

While Mais contends, for example, that discussions during the August 6 meeting with Dr. Hairston, Avery, Kindler, and Holmstrom "impli[ed] . . . wrongdoing on [her] part," (Mais Vol. II 14:15-18), implied wrongdoing is not the stuff of hostile work environment claims.  Other

comments during the meeting also negate Mais's hostile work environment claim. Dr. Hairston stated that it would be a "group effort" to move on from the events of the June 11 CCAR session. (Mais Vol. II 29:17-24.) Holmstrom noted that Mais was "courageous" for apologizing. (*Id.* at 30:17-31:3.) And Avery said that Mais should not think that her reputation was ruined or that Avery and others would not speak with her. (*Id.* at 32:4-10.) Avery also stated that she needed to "work on [her]self to get past th[e] situation." (*Id.* at 32:16-20.) Moreover, Mais ended the meeting asking Avery how she felt about addressing the staff and they left thinking it would be in person. (*Id.* at 81:2-14.)

After the minutes of the meeting were circulated, Mais missed a couple of days of work the week of August 15, 2021, to participate in counseling sessions as a result of anxiety; however, it was Mais's reaction to the situation in which she found herself after making a racially-charged comment that impacted her ability to work, not the conduct to which she was subjected.

Finally, any statements and conduct during the September 9 faculty meeting—which Mais voluntarily participated in after she submitted her resignation and announced her resignation to the school community—fall far short of violating Title VII.[4] Both Mais and Avery had an opportunity to present their own version of events during, and reflections from, the June 11 CCAR session. Avery directed her reflections toward attendees generally, not to Mais specifically. (*See, e.g.*, Ex. V, at 02:29-03:05, 03:30-03:41.) Additionally, an attendee stated that staff had to "stick together," and Dr. Irani noted that he was proud of Mais and Avery. (*Id.*

---

[4] Mais acknowledges that she could have said she did not want to be part of the September 9, 2021, staff meeting because she had resigned and was leaving the next day, but chose not to do so. (Mais Vol II 82:8-24.)

at 08:42-08:50, 12:46-13:10.) The evidence does not support Mais's characterization of the meeting as a "ritual shaming."

In the end, while Mais subjectively believes that she was subject to a hostile work environment, she cannot satisfy the objective prong of this test.

### 3.   Any unwelcome conduct is not imputable to the School Board.

When a subordinate or coworker is the source of harassment, a plaintiff must show that her employer "knew, or should have known, about the harassment and failed to take action reasonably calculated to stop it." *Bazemore v. Best Buy*, 957 F.3d 195, 201 (4th Cir. 2020) (citations omitted).

Mais told Granger and Kindler about *other* staff members' concerns with Avery's behavior and comments during the CCAR sessions, but Granger was on leave at that time and Kindler was the training facilitator, not an administrator. (Mais Vol. I 120:10-15, 124:16-20, 124:23-25.) Mais did not report Avery's comments and behavior to anyone in HR. (*Id.* at 120:6-9, 121:16-18, 123:2-4.) And although Mais was an administrator, she did not speak with Avery about Avery's comments and behavior during the sessions despite having the ability to recommend discipline. (*Id.* at 110:1-3, 111:13-22, 113:25-114:1-3, 116:20-22.) To that end, an employer will not be liable for the harassment of a supervisor by a subordinate employee where the supervisor-plaintiff had the ability to stop the harassment and failed to do so—as Mais did here. *Powell v. Susdewitt Mgmt., LLC*, No. CV CCB-20-2343, 2021 WL 4420999, at *6 (D. Md. Sept. 27, 2021); *Knudsen v. Bd. of Sup'rs of Univ. of Louisiana Sys.*, No. CIV.A. 14-382, 2015 WL 1757695, at *4–5 (E.D. La. Apr. 16, 2015). Further, while Mais purports to have notified Dr. Irani at the beginning of July that staff members were referring to Mais by derogatory terms, there is no evidence that the use of the derogatory terms continued in Agnor-Hurt after that point.

The evidence shows that School Board employees acted with the information they had to appropriately address the tension caused by Mais's use of the term "colored."  On June 16, five days after the June 11 CCAR session, Kindler sent a letter to all staff.  (Mais Vol. I 160:21-24.) Mais believed the letter was acknowledging the "awkward[ness]" of the June 11 session and "reiterat[ing] that now [the staff] need[ed] to stop[,] . . . come back together[,] and . . . move forward." (*Id.* at 161:5-15.)  Moreover, to the extent Mais contends that Dr. Hairston should have reported the matter to HR, neither Avery nor Mais believed the matter should have been escalated to HR.  Indeed, Mais believed that a meeting was necessary and that the issue could be resolved informally. (*Id.* at 151:3-18, 152:6-12.)

When Mais finally contacted HR on August 15, she left a general voice message for Gerome.  Gerome and Mais spoke two days later, and discussed the August 6 meeting, Mais's concerns with the CCAR sessions, and Mais's feelings about Dr. Hairston.  (Mais Vol. II 43:20-44:12, 45:3-46:15.)  Gerome listened to Mais and was "very supportive."  (*Id.* at 46:16-20.)  On August 19, two days after Gerome and Mais spoke, Dr. Keiser met with Mais at Agnor-Hurt. (*Id.* at 48:3-8.)  Mais considered her conversation with Dr. Keiser the "first step in addressing a problem." (*Id.* at 55:20-24.) Mais, however, submitted her letter of resignation three days later, on August 22, before any action could be taken. (*Id.* at 57:11-20; Ex. P.)

The evidence shows that the complained-of conduct, if any, was not imputable to the School Board.


**B.**     **Mais was not constructively discharged because of her race (Count 8).**

A constructive discharge claim has two elements: (1) "a plaintiff must show that [her] working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign" and (2) "a plaintiff must actually resign because of those conditions." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211-12 (4th Cir. 2019) (quotation and quotation marks omitted).

Under the first element, "the plaintiff must show 'something more' than the showing required for a hostile work environment claim." *Evans*, 936 F.3d at 193 (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). A plaintiff must demonstrate that "'she was discriminated against by her employer to the point where a reasonable person in her position would have felt compelled to resign' and that she actually resigned." *Id.* (brackets omitted) (quoting *Green v. Brennan*, 578 U.S. 547, 555 (2016)). Said differently, the plaintiff must show that a reasonable person in her position would have felt that she had "*no choice* but to resign." *Id.* (emphasis in original) (quotation omitted).

"A feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) (citing *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360-61 (2nd Cir. 1993)). An employee is not guaranteed a working environment free of stress. *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985). "[C]onstructive discharge claims are held to a high standard, and even truly awful working conditions may not rise to the level of constructive discharge." *Lindsay-Felton*, 352 F. Supp. 3d at 606 (quotation omitted).

In assessing intolerability, the frequency of the conditions at issue is important. *Evans*, 936 F.3d at 193. "The more continuous the conduct, the more likely it will establish the required intolerability. On the other hand, when the conduct is isolated or infrequent, it is less likely to

establish the requisite intolerability." *Id.* Allegations of ostracization and even required counseling are insufficient to support a claim for constructive discharge. *Id.* (citing *Munday v. Waste Mgmt. of N. Am.*, 126 F.3d 239, 244 (4th Cir. 1997)).

When Mais used the racially-charged term "colored" during the June 11 CCAR session, Avery rolled her eyes, shook her head, and loudly and aggressively told Mais—over Zoom—that Avery did not expect someone Mais's age or in Mais's position to use that term.  (Mais Vol. I 144:10-19.)  After that—on one occasion—a teaching assistant told Mais that subordinate employees, including Avery, were referring to Mais as a "white racist bitch" and "two-faced racist bitch."  (*Id.* at 166:9-13, 167:5-8.)  There is no evidence that a subordinate employee used those terms in Mais's presence.  Additionally, Mais's primary complaint about the August 6 meeting with Dr. Hairston, Avery, Kindler, and Holmstrom was that the discussions "impli[ed] . . . wrongdoing on [Mais's] part" and did not address Avery's behavior.  (Mais Vol. II, 14:15-18.)  These events simply do not rise to the level of intolerable working conditions required for a constructive discharge claim.  *Compare Lindsay-Felton*, 352 F. Supp. 3d at 606, *with Eller v. Prince George's Cnty. Pub. Schs.*, 580 F. Supp. 3d 154, 176 (D. Md. 2022). Moreover, Mais readily admits she was able to continue to perform her job and was in fact getting ready for the new school year when she met with Dr. Keiser.

Additionally, Mais stated in her letter of resignation that she was "most appreciative for [her] time with ACPS as [she] ha[d] learned a great deal" and "care[d] a great deal for every at Agnor-Hurt."  (Ex. Q, at 2.)  And, according to Mais, she could no longer "morally" continue with her employment knowing the School Board's Anti-racism policy was in place. (Mais Vol II 66:3-13.)  These statements undermine Mais's claim that she had no choice but to resign. *See Evans*, 936 F.3d at 194 (noting that the plaintiff's statements in her resignation letter that her

employment had been "on the whole, satisfying and productive" and a "great experience" undercut her assertion that she had no choice but to resign).

Mais cannot demonstrate a genuine dispute of material fact as to her constructive discharge claim under Count 8 and the School Board is entitled to summary judgment.

## C.   <u>The School Board did not retaliate against Mais (Counts 9 and 10).</u>

Title VII's anti-retaliation provision "prohibits employers from 'discriminat[ing] against' an employee for 'oppos[ing] any practice' made unlawful by" Title VII.  *Alberti v. Rector & Visitors of the Univ. of Va.*, 65 F.4th 151, 156 (4th Cir. 2023) (quoting 42 U.S.C. § 2000e-3(a)).

To prevail on a claim of a retaliatory hostile work environment (Count 9), Mais must first show that she engaged in activity protected by Title VII's antiretaliation provision, *i.e.*, she opposed discrimination prohibited by Title VII or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  *Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022).  If Mais makes this threshold showing, she must then prove all of the elements of a hostile work environment.  *Id.* at 218.

To prevail on a claim of retaliatory constructive discharge (Count 10), Mais "must make out an actionable claim of retaliation and show the elements of a constructive discharge claim." *Walker v. Regan*, No. 1:21-cv-312 (RDA/WEF), 2023 WL 6224635, at *3 (E.D. Va. Sept. 22, 2023).

Finally, under either theory, Mais's protected activity must be the "but-for cause" of the retaliatory conduct.  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

For the reasons stated *supra* in Parts IV.A. and IV.B., there is no genuine issue of material fact as to the claims for hostile work environment and constructive discharge.  Thus, the

School Board is entitled to summary judgment for Counts 9 and 10 as well.  Furthermore, Mais did not engage in protected activity, which is fatal to her claims of retaliation.

Mais does not contend that she "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII while employed by the School Board.  Thus, she must demonstrate that she complained of discrimination prohibited by Title VII.  *Laurent-Workman*, 54 F.4th at 212.  "Protected activity under Title VII includes complaints of discrimination based upon race, color, religion, sex or national origin."  *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021) (quotation and internal quotation marks omitted).  Protected activity does not include opposition to "all unlawful practices" or "practices the employee simply thinks are somehow unfair"; the employee must have "actually opposed employment practices made unlawful by Title VII."  *McNair v. Computer Data Sys., Inc.*, No. 98-1110, 1999 WL 30959, at *5 (4th Cir. Jan. 26, 1999).

"Merely complaining in general terms of discrimination or harassment without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."  *Young v. HP Enterprise Servs., LLC*, No. 1:10-cv-1096, 2011 WL 3901881, at *5 (E.D. Va. Sept. 6, 2011).  Where there is no evidence that the plaintiff complained of discrimination prohibited by Title VII, she cannot establish that she engaged in protected activity.  *See Richardson v. Richland Cnty. Sch. Dist.*, 52 F. App'x 615, 617 (4th Cir. 2002) (holding that a plaintiff could not show that she engaged in protected activity because she did not present evidence that she informed her employer that her complaints were based on race or age discrimination); *Ghebreab v. Inova Health System*, No. 1:16-cv-1088, 2017 WL 1520427, at *8 (E.D. Va. Apr. 26, 2017) (holding that complaints of "discrimination" and "unfair treatment" were not protected activity because they did not reference race or national origin).

24

When the School Board adopted the Policy in February 2019, Mais did not express any concerns with the Policy or its Regulations.  (Mais Vol. I 56:8-9, 56:21-23, 57:23-58:9.)  After the June 2020 meeting in which Dr. Hairston notified administrators that they would be training staff using the CCAR curriculum, Mais raised no concerns.  And as Mais worked through CCAR, she would speak with Granger about how the material would be received, not that the text engaged in discrimination prohibited by Title VII.  (Mais Vol. I 77:1-7.)

When staff came to Mais with concerns over the CCAR sessions and Avery's comments and behavior during those sessions, Mais reported their concerns to Kindler (the training facilitator) and sometimes Granger (although Granger was on leave at the time).  (Mais Vol. I 116:14-16, 120:2-5, 120:10-15, 121:16-19, 124:16-20, 124:23-125:1, 126:16-17.)  Mais did not report the concerns to the HR.  (*Id.* at 120:6-9, 132:5-6, 132:24-133:2.)  Mais also did not file a complaint with HR based on Avery's response to Mais using the term "colored" during the June 11, 2021 session. (*Id.* at 154:1-4, 7.)  When Mais learned that staff members were referring to her by derogatory terms, she did not report the issue to HR.  (Mais Vol. I, 169:5-9, 12-13.)  And Mais—as the lead administrator at Agnor Hurt—failed to address any of these issues with Avery before the August 6 meeting.  (*Id.* at 169:15-23.)

Indeed, it appears the first time in which Mais potentially engaged in protected activity was when she spoke with Gerome on August 17, 2021.  (Mais Vol. II 45:3-8.)  But even during that conversation, Mais did not complain of race-based discrimination or other conduct prohibited by Title VII.  She instead expressed frustration over the "lack of acceptance" during the August 6 meeting, stated that the CCAR sessions "normalized poor behavior," and expressed her disapproval of Dr. Hairston's behavior.  (Mais Vol. II 45:13-46:15.)  This is not protected activity under Title VII.

## VI.      <u>CONCLUSION</u>

For all of the foregoing reasons, the Albemarle County School Board, by counsel, respectfully requests that the Court grant its Motion for Summary Judgment and enter judgment in its favor as a matter of law.

**ALBEMARLE COUNTY SCHOOL BOARD**

By Counsel

<u>s/Jeremy D. Capps</u>
David P. Corrigan (VSB No. 26341)
Jeremy D. Capps (VSB No. 43909)
Melissa Y. York (VSB No. 77493)
Blaire H. O'Brien (VSB No. 83961)
Counsel for Albemarle County School Board
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com
myork@hccw.com
bobrien@hccw.com

# C E R T I F I C A T E

I hereby certify that on the 19th day of July, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Katherine L. Anderson
Henry W. Frampton, IV
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
480-444-0020 - Phone
kanderson@ADFlegal.org
hframpton@ADFlegal.org

David A. Cortman
Alliance Defending Freedom
1000 Hurricane Shoals Rd. NE
Suite D1100
Lawrenceville, GA 30043
770-339-0774 - Phone
dcortman@ADFlegal.org

Christopher P. Schandevel
Vincent P. Wagner
Mallory B. Rechtenbach
Noel W. Sterett
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
773-519-4872 - Phone
571-707-4656 - Fax
nsterett@ADFlegal.org
vwagner@adflegal.org
mrechtenbach@adflegal.org

s/Jeremy D. Capps
David P. Corrigan (VSB No. 26341)
Jeremy D. Capps (VSB No. 43909)
Melissa Y. York (VSB No. 77493)
Blaire H. O'Brien (VSB No. 83961)
Counsel for Albemarle County School Board
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com
myork@hccw.com
bobrien@hccw.com