# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

**EMILY MAIS,**

|  |  |
|---|---|
| *Plaintiff,* | Case No. 3:22-cv-51 |
| vs. | Honorable Norman K. Moon |
| **ALBEMARLE COUNTY SCHOOL BOARD,** | |
| *Defendant.* | **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

# Table of Contents

Table of Authorities ...................................................................................................ii

Introduction ........................................................................................................... 1

Facts ...................................................................................................................... 3

      A.     Mais earns "exemplary" reviews as assistant principal, but some
            staff still pre-judged her because of her race. ........................................ 3

      B.     The Board says to "own" the training or "get off the bus." ................... 4

      C.     Mais and parents raise concerns about the CCAR training. ................. 4

      D.     The training creates a racially hostile work environment. ................... 6

      E.     The racial hostility targets Mais. ......................................................... 10

      F.     The harassment and shaming continue. ............................................... 10

      G.     Neither Avery nor Hairston were ever disciplined. ............................. 18

Legal Standard ...................................................................................................... 19

Argument .............................................................................................................. 19

I.     Mais experienced a racially hostile work environment. ................................ 19

      A.     Race motivated Mais's mistreatment. ................................................... 20

      B.     There is ample evidence of severe or pervasive harassment. ............... 23

      C.     The record supports imputing harassment to the Board. ..................... 29

II.    Ms. Mais was constructively discharged. ....................................................... 32

III.   The School Board retaliated against Mais. ..................................................... 34

Conclusion ............................................................................................................ 35

Certificate of Service ............................................................................................ 37

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Applied Business Services*,
2019 WL 7820431 (E.D. Va. Sept. 4, 2019) ...................................................... 34

*Adusumilli v. City of Chicago*,
164 F.3d 353 (7th Cir. 1998) ................................................................................ 19

*Ali v. Worldwide Language Resources, LLC*,
686 F. Supp. 3d 430 (E.D.N.C. 2023) ................................................................. 22

*Amirmokri v. Baltimore Gas & Electric Company*,
60 F.3d 1126 (4th Cir. 1995) ............................................................................... 32

*Artis v. Lyon Shipyard, Inc.*,
2019 WL 13295542 (E.D. Va. Sept. 30, 2019) ................................................... 30

*Bowen v. Missouri Department of Social Services*,
311 F.3d 878 (8th Cir. 2002) ......................................................................... 20, 27

*Boyer-Liberto v. Fontainebleau Corp.*,
786 F.3d 264 (4th Cir. 2015) ........................................................................ 27, 35

*Bryant v. Aiken Regional Medical Centers Inc.*,
333 F.3d 536 (4th Cir. 2003) ............................................................................... 35

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................. 19

*Cepada v. Board of Education of Baltimore County*,
974 F. Supp. 2d 772 (D. Md. 2013) ..................................................................... 22

*Chapman v. Oakland Living Center*,
48 F.4th 222 (4th Cir. 2022) ............................................................................... 27

*Clark v. THI of South Carolina at Moncks Corner, LLC*,
586 F. Supp. 2d 387 (D.S.C. 2007) ..................................................................... 22

*Clay v. United Parcel Service, Inc.*,
501 F.3d 695 (6th Cir. 2007) ............................................................................... 21

*Conner v. Screader-Bridgeport International, Inc.*,
227 F.3d 179 (4th Cir. 2000) ............................................................................... 23

*Dortch v. Cellco Partnership*,
770 F. App'x 643 (4th Cir. 2019) ........................................................................ 22

*EEOC v. Branch Banking & Trust Company,*
571 F. Supp. 2d 682 (E.D.N.C. 2008) ............................................................ 32

*EEOC v. Ecology Services, Inc.,*
447 F. Supp. 3d 420 (D. Md. 2020) ................................................................ 31

*EEOC v. Sunbelt Rentals, Inc.,*
521 F.3d 306 (4th Cir. 2008) ............................................................ 20, 22, 27

*Eller v. Prince George's County Public Schools,*
580 F. Supp. 3d 154 (D. Md. 2022) ................................................................ 33

*Faragher v. City of Boca Raton,*
524 U.S, 775 (1998) ........................................................................................ 29

*Flint v. Action Personnel, Inc.,*
2013 WL 6729528 (W.D. Va. Dec. 19, 2013) ................................................ 26

*Freeman v. Dal-Tile Corp.,*
750 F.3d 413 (4th Cir. 2014) .......................................................................... 22

*Fuelling v. New Vision Medical Laboratories LLC,*
284 F. App'x 247 (6th Cir. 2008) ................................................................... 28

*Green v. Brennan,*
578 U.S. 547 (2016) ........................................................................................ 32

*Guessous v. Fairview Property Investments, LLC,*
828 F.3d 208 (4th Cir. 2016) .................................................................... 20, 23

*Harris v. Forklift Systems, Inc.,*
510 U.S. 17 (1993) .......................................................................................... 23

*Hotchkiss v. CSK Auto, Inc.,*
918 F. Supp. 2d 1108 (E.D. Wash. 2013) ...................................................... 26

*Katz v. Dole,*
709 F.2d 251 (4th Cir. 1983) .......................................................................... 29

*Knudsen v. Board of Supervisors of University of Louisiana System,*
2015 WL 1757695 (E.D. La. Apr. 16, 2015) .................................................. 31

*Lindsay-Felton v. FQSR, LLC,*
352 F. Supp. 3d 597 (E.D. Va. 2018) ....................................................... 29, 33

*Mais v. Albemarle County School Board,*
657 F. Supp. 3d 813 (W.D. Va. 2023) ......................................................... 3, 23

*McDonald v. Santa Fe Trail Transportation Company*,
    427 U.S. 273 (1976) ........................................................................... 22

*McIver v. Bridgestone Americans, Inc.*,
    42 F.4th 398 (4th Cir. 2022) ........................................................... 22

*McLaurin v. Verizon Maryland, Inc.*,
    2015 WL 5081622 (D. Md. Aug. 26, 2015) ...................................... 29

*NAACP v. Button*,
    371 U.S. 415 (1963) ............................................................................. 7

*Okoli v. City of Baltimore*,
    648 F.3d 216 (4th Cir. 2011) ........................................................... 34

*Oncale v. Sundowner Offshore Services, Inc.*,
    523 U.S. 75 (1998) ........................................................................... 27

*Parents Involved in Community Schools v. Seattle School District No. 1*,
    551 U.S. 701 (2007) ............................................................................. 1

*Parker v. Reema Consulting Services, Inc.*,
    915 F.3d 297 (4th Cir. 2019) ........................................................... 27

*Powell v. Susdewitt Management*,
    2021 WL 4420999 (D. Md. Sept. 27, 2021) .................................... 31

*Reeves v. C.H. Robinson Worldwide, Inc.*,
    594 F.3d 798 (11th Cir. 2010) ......................................................... 20

*Rush v. Speedway Buick Pontiac GMC, Inc.*,
    525 F. Supp. 2d 1265 (D. Kan. 2007) ............................................ 32

*Spicer v. Virginia Department of Corrections*,
    66 F.3d 705 (4th Cir. 1995) ............................................................. 30

*Sylvia Development Corp. v. Calvert County*,
    48 F.3d 810 (4th Cir. 1995) ............................................................. 19

*Tabor v. Freightliner of Cleveland, LLC*,
    388 F. App'x 321 (4th Cir. 2010) .................................................... 21

*Villines v. United Brotherhood of Carpenters & Joiners of America, AFL-CIO*,
    999 F. Supp. 97 (D.D.C. 1998) ....................................................... 26

*Ziskie v. Mineta*,
    547 F.3d 220 (4th Cir. 2008) ........................................................... 22

**<u>Other Authorities</u>**

Glenn Singleton, *Courageous Conversations About Race: A Field Guide for Achieving Equity in Schools* (2nd ed. 2014) ......................................................... 1

Ibram X. Kendi, *How to Be an Antiracist* (2019) .......................................................... 1

**<u>Rules</u>**

Fed. R. Civ. P. 56(c) ..................................................................................................... 19

## INTRODUCTION

"The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007). But "antiracists" like Ibram Kendi say, "the only remedy to past discrimination is present discrimination."[1] Another "antiracist," Glenn Singleton rejects colorblindness and trains schools to confront the problems he sees with "whiteness," "white culture," "white talk," and "white racial identity."[2]

In 2020, the Albemarle County School Board aligned with Kendi and Singleton. To further its "Anti-Racism Policy," the Board implemented a training series based on Singleton's book, *Courageous Conversations About Race* (CCAR). In the required orientation, Assistant Superintendent Bernard Hairston told all staff to "own" the training; any who disagreed were "to just get off the bus." App.228. And when white parents questioned CCAR, he slammed them in an administrators' meeting—comparing them to slaveowners who raped his mother and sister, beat him, kept him from learning to read and write, and then ordered him not to talk about it. App.143, 229.

Assistant Principal Emily Mais of Agnor-Hurt Elementary School saw the problem. CCAR promoted crude racial stereotypes, demonized white people, belittled black people, and fostered racial divisions. App.013, 415. For example, it taught that people of color communicate in "emotional" ways, while white people

---

[1] Ibram X. Kendi, *How to Be an Antiracist* 19 (2019); App.455.
[2] Glenn Singleton, *Courageous Conversations About Race: A Field Guide for Achieving Equity in Schools* (2nd ed. 2014); App.463–509.

communicate in "intellectual" ways. App.415. And it taught black employees that white colleagues are inherently racist. App.431. Black employees were to "speak [their] truth" even if their comments were racially hostile or abusive. App.015, 416–417, 421–422, 435. But whites were told their perspectives didn't matter. App.025–027, 416, 422, 431, 435. Racial hostility pervaded the school. App.416, 419, 431.

Then it got worse. After Mais had a slip-of-the-tongue for which she quickly apologized, her superiors allowed her to be personally attacked, ritually shamed, and run out of the school. App.437, 444. They allowed Sheila Avery, a black TA, to berate and curse at her. App.038–041, 417, 423, 440. When Mais spoke to Hairston about this and the racially hostile environment the training created, he ignored her and allowed Avery to berate her again. App.147. Avery was never disciplined. *Id.* Nor was Hairston for his vile comments about white parents. App.125.

When Mais took her concerns to her principal, he did nothing. Worse, he enabled Avery and other black employees to physically intimidate, deeply humiliate, and publicly shame her, calling her a "white racist bitch." At a faculty meeting where Mais was forced to apologize again, they wore black combat outfits and stared her down. It was so hostile that faculty members left the meeting sobbing. App.430. The racial division undercut Mais's ability to lead. App.010, 419. Even her friends kept their distance for fear of harassment. App.052, 426, 435.

She reported her mistreatment to at least seven of her superiors. But no one stopped the abuse. App.439, 444. Without their backing, Mais had to resign. Any reasonable person in her position would have seen no other choice. So she did.

This suit asserts four claims under Title VII: (1) racially hostile work environment; (2) constructive discharge; (3) retaliatory hostile work environment; and (4) retaliatory constructive discharge. Because there is enough evidence to support the allegations that this Court found sufficient to state Mais's claims and go to a jury, *Mais v. Albemarle Cnty. Sch. Bd.*, 657 F. Supp. 3d 813, 828-30 (W.D. Va. 2023), the Board's motion for summary judgment should be denied.

## FACTS

The Board's Statement of Material Undisputed Facts (SUF) unduly narrows the circumstances relevant here. While SUF paragraphs 1, 2, 7, 15, 31, 32, and 39 are not disputed, even they present a one-sided and incomplete view of the facts they discuss. The following highlights the disputed SUF paragraphs and provides the fuller factual context that will allow the jury to find for Mais.

### A.    Mais earns "exemplary" reviews as assistant principal, but some staff still pre-judged her because of her race.

Mais became assistant principal at Agnor-Hurt in 2018. App.002. Her performance was "exemplary." App.195, 224. She was principal material. App.204, 223. And she capably led the school through various challenges. App.420.

Though the Board claims Mais had a good relationship with Avery (SUF ¶6), Avery testified that she pre-judged Mais from the first time they met as someone who "might not treat Black people well." App.148–149. This was not based on anything Mais had done but based on her "look," which had to do with her race. *Id.* Avery admits that she had no negative interactions with Mais before the April 2021 CCAR training sessions began that would support her prejudgment. *Id.*

3

**B.    The Board says to "own" the training or "get off the bus."**

Before the 2020–21 school year, Agnor-Hurt was racially diverse but not racially divided. App.414. Then, the Board required Agnor-Hurt staff to train on Singleton's CCAR book. App.231, 302, 318, 321. In a June 2020 meeting, Hairston ordered administrators "to embrace [CCAR] without hesitation." App.011, 228. His speech was inflammatory, unprofessional, and "fueled with anger and rage." *Id.*

Later that year, the Board showed staff a Kendi interview to teach them "how to be an anti-racist."[3] App.232, 320, 338. It also showed a video of Hairston telling staff to consider: "You are either a racist or an antiracist." App.126–127, 228. He told staff to "own" the training and consider whether they were on the "antiracism school bus" or if it was time "to just get off the bus." App. 228, 305.

Hairston's video upset teachers and at least one parent. App.208, 415 421. Dr. Clare Keiser, assistant superintendent over HR, found his "tones," "accusations," and "assumptions" disturbing, and not reflective of the Board's anti-racism policy. App.205–07. Though she agreed it could make staff uncomfortable, *id.*, nothing was done, and the video remained on the Board's website. App.202.

**C.    Mais and parents raise concerns about the CCAR training.**

Contrary to Board SUF ¶9, Mais was not just concerned with how the CCAR materials "would be received." App.015. She informed her then-principal, Doug Granger, that she "had never witnessed in a professional setting what [she] felt [she] had witnessed [the] first day learning about" CCAR. App.012. She noted that

---

[3] Ibram Kendi's interview can be viewed online at: https://bit.ly/3GUO2Rc (excerpt from 16:36-18:16).

the text was "divisive." App.015. She also told Michele Castner, then Director of Education and her superior, her concerns with implementing CCAR. App.003, 439.

The Board wrongly suggests in SUF ¶3 that Mais did not harbor or express major concerns with the "antiracism school bus" or CCAR. Because Mais rejects racism, she was concerned the "antiracism school bus" and the CCAR training were taking Agnor-Hurt in the wrong direction. App.006–08, 013, 018. She believed CCAR "created immeasurable amounts [of] opportunities for racism to thrive." App.006–08. And she feared CCAR would stoke racial tensions. App.005, 439.

The Board's SUF ¶¶3–6, 13 are disputed. They paint an incomplete and misleading picture of Mais's concern with the anti-racism policy and CCAR training. The evidence shows that CCAR required employees to: "experience discomfort," "accept non closure," and "[e]xamine the presence and role of 'Whiteness' and its impact on the conversation." App.238. It discouraged complaints by stating that discomfort was intentional. App.013–14, 020–21, 024, 233, 238. Indeed, the roll-out ushered in race-based mistreatment. App.009, 414, 420, 431.

After parents challenged CCAR's approach at a May 27, 2021 Board meeting, Hairston called them "Pops" or "protectors of [racist] practices" during a mandatory administrator's meeting the next day. App.229. He told administrators, including Mais, that he received the parents' comments as if they were spoken by slave owners who had raped his mother and sister, beaten him, and were now telling him not to talk about it. App.143, 229, 325. Superintendent Haas was there and said nothing to correct these vile remarks. App.444–445. So Mais understood that any

5

concerns with CCAR were falling on deaf ears and that any good-faith criticism from a white employee would go nowhere. App.098.

While it is true that Mais remained the only full-time administrator after Granger left in April 2021, App.016–17, the Board's SUF ¶8 downplays Kindler's role. *Id*. She did not merely provide "part-time assistance." Rather, the Board appointed Kindler as an acting principal with the same authority as a regular principal. App.017, 186. The Board assigned Kindler to lead the CCAR training sessions. App.187, 326, 421. Soon after, Mais shared her and other staffs' concerns about the CCAR training with Kindler. App.018–19, 439.

### D.    The training creates a racially hostile work environment.

Board SUF ¶10 is disputed. It presents an incomplete and sanitized view of the CCAR training sessions, which began April 30, 2021. App.016. They were openly hostile towards white employees. App. 022–28, 416, 422, 435. White employees were routinely shut down when they tried to participate. App. 026, 416, 421–422, 431, 435. Some became so frustrated they stopped participating or attending altogether. App.422, 431.

From the outset, Avery presented herself as a spokesperson for a group of black employees. App.023, 130. Even Hairston agrees this was inappropriate. App.130, 132–35, 391-393. Racial tensions escalated when Avery and Cheryl Books-Davis, a black teacher, made hurtful, dismissive, and racially charged statements during the sessions. App.029–30. They maintained that white people "can't understand or can't connect with something because of the color of their skin." App.030. The sessions pitted black employees against white employees. App.431.

6

They left white employees afraid to speak. App.416, 422, 431, 435, 439–440.  In one session, Avery even made a white teacher cry for trying to share her perspective as someone who had black family members. App.416, 422. And when Tana Krstich, another white employee, said the sessions should be inclusive of all races, including Asians, Avery loudly declared, "They've had their time, it's the Black time now." App.431. This comment was of a piece with CCAR. App.416, 434, 330. Each time, Kindler failed to correct Avery. App.422, 431. But Mais reported concerns to Kindler about the increasingly racially divisive environment. App.030, 439.

The final CCAR training session occurred on June 11, 2021, during the last week of school. App.033. Mais's and other attendees' accounts of what occurred at this session differ significantly from SUF ¶¶14–16. According to their accounts, toward the end of the session, the slideshow addressed racial hiring disparities. App.034–35, 247, 417, 422. The slides used the term "person of color." App.189, 255. But when Mais expressed interest in looking deeper into the data, she made a slip of the tongue and inadvertently said "colored" instead of "people of color." App.034–37, 176, 191, 417, 422–23. Although Mais understood the word "colored" could be hurtful, that doesn't mean it always is.[4] She clearly misspoke and quickly explained her mistake as various witnesses testified to contra SUF ¶17.

Yet, Avery pounced, "what the fuck did she say?" App.038–39, 150, 422–23. And then loudly: "Did she just fucking say colored?" *Id*. Mais acknowledged she said

---

[4] The Court can take judicial notice of the fact that the National Association for the Advancement of Colored People uses "colored" in its name. *NAACP v. Button*, 371 U.S. 415 (1963).

"colored." App.039, 188. But she quickly apologized and explained that she meant to say "people of color." App.417, 422–23, 435.

Despite the apology, Avery wagged her finger at Mais and said she would expect such a comment from an old white racist. App.040, 049–50, 177, 417. Avery berated and cussed at Mais with no intervention from Kindler, despite Mais looking like she was going to cry. App.417, 423, 435. Kelvin Reid, Avery's supervisor, also attended. App.423. Right after the meeting, Teacher Rebecca Anderson wrote Reid about the "damage" Avery had done, how embarrassed she was for Mais, and Avery's "lack of professionalism." App.386, 417. But rather than say he would correct Avery, Reid reminded Anderson that experiencing discomfort was part of CCAR and that she needed to speak with Avery directly. *Id.*

Contrary to the Board's description (SUF ¶20), the June session was more than just "awkward." Avery's mistreatment of Mais was so palpable that many employees texted Mais to express their shock and disgust. App.394–97. Anne Fox expected follow-up from the administration or Kindler. App.423. But Kindler's only follow-up was to remind staff how "messy" the CCAR could be. App.260–61.

Once Mais apologized and explained her mistake, the matter should have ended. But Avery, whose misconduct warranted discipline, kept pursuing her pound of flesh—with Hairston's active support. App.131. That evening too, Emily Holmstrom—the school's diversity officer—asked Mais to "unpack" her comments. App.178, 282. Mais knew this to be a veiled threat, but she still met with

8

Holmstrom and told her that the sessions were stoking racial animus and empowering Avery's misconduct. App.042–46.

Next, Holmstrom's husband, Lars, who worked directly with Hairston as an Equity Specialist, demanded a meeting. App.055–57, 440. Mais told him about her concerns with the racially divisive nature of the CCAR training, the racial harassment she experienced during the June 11 session, and her concerns about Avery's prior record of mistreatment. *Id.* Meanwhile, Avery, spurred along by E. Holmstrom, continued her campaign against Mais. On June 11, E. Holmstrom called Avery to discuss what happened. App.128, 157, 322, 391-393. Avery admitted that Mais said she meant to say "people of color." App.129. But Avery wasn't satisfied. App.262–263. Despite Mais's apology, Avery "looked at her differently" and purported to know "what is deep down inside of her." *Id.* She wanted to "be heard loud and clear." *Id.* Holmstrom agreed: "action is required." *Id.*

Avery went over Hairston's head and e-mailed Superintendent Haas, accusing Hairston of "push[ing] it under the rug." App.264–65. Haas forwarded the email to Hairston who called Avery. App.322–24. He told her she was "part of the problem," particularly since the conversation with Mais was "resolved." *Id.* He encouraged Avery to be a problem-solver, but she told him she was "not the problem" and "can't solve it so Emily has to fix this not me." App.510-13. She referenced going to the media or flooding Haas's inbox if unsatisfied. *Id.*; App.322. But instead of telling Avery to move on, Hairston called Mais into a meeting and told her not to contact Avery. App.58-59, 131, 136; ECF No. 91-11.

### E.     The racial hostility targets Mais.

After June 11, the racial tension began to boil over. App.435. A group of black employees openly called the white employees racists. App.431. They also called Mais a "white racist bitch" and similar racially charged terms. App.51–54, 428–429. This caused other white employees to limit their interactions with Mais for fear they, too, would be labeled racist. App.435. Mais's assistant, Tracey Payne, made a similar request. App.051 –52. This made it hard for Mais to do her job because Payne "worked alongside [Mais] for everything." App.32. Board SUF ¶23 improperly attributes these limitations on Mais's ability to do her job to "staff shortages."

Contrary to Board SUF ¶21, Payne was not the only one who heard the racially derogatory names and reported them to Mais. Ruby Gordon reported them to Mais, too. App.428–29. Gordon's testimony also rebuts SUF ¶12 which asserts that "only one teacher expressed discomfort with Avery."

The Board asserts that Mais "did not file a complaint with HR based on Avery's comments and behavior during the June 11 session," (SUF ¶18) and that she did not report Avery and other employee's use of racially derogatory language (SUF ¶ 22). But Mais *did* notify her supervisors after June 11 in compliance with its harassment policy. App.439–40. The evidence shows that Mais reported the racially disparaging language to Kindler, App.439, and that Dr. Michael Irani—the new principal of Agnor-Hurt was also aware. App.428, 439–444.

### F.     The harassment and shaming continue.

Despite Mais's reports and caving to Avery's demand for action, Hairston called Mais into a meeting—improperly so, for he did not involve HR. App.058, 136,

197–98, 209, 215, 220–21, 327. Mais disputes SUF ¶ 24's characterization of the August 6 meeting and its purpose. Mais asked for the meeting to be recorded, but Hairston refused out of concern that it could be leaked to the press. App.65, 137, 328–29. Instead, he directed Kindler to take notes, which was a poor substitute, particularly since she actively participated in the meeting. App.065–67, 190, 192. Kindler's active participation belies the Board's SUF ¶26, which characterizes her as just a notetaker. The result was an incomplete summary of what occurred contrary to how Board's SUF ¶27 characterizes her notes. App.070–77.

Even before the meeting was scheduled, Castner warned Mais that it was coming, that Mais should be careful, and that she should "fall on [her] sword." App.047–48. Mais told Kindler that she did not "feel safe being by [herself] with both [Hairston and Avery]" and asked for Kindler to come as support. App.327. This directly contradicts SUF ¶ 25's claim that Mais had no concerns about the meeting.

Mais also contests SUF ¶ 19's assertion that she "learned that other employees were upset by her use of the term 'colored' . . . during a phone call at the end of June 2021" as inadmissible hearsay, since Mais received this information second-hand and does not know if it is true. Mais also disputes the Board's claim at SUF ¶25 that the purpose of the August 6 meeting was to discuss "strategies for how to pull the Agnor-Hurt faculty together." That was not how Mais experienced it. Rather, Hairston demanded the meeting and circulated an agenda to require the use of the CCAR methodology. App.138–39, 266–68. Holmstrom also attended the meeting to support Avery at her request. App.159, 180.

11

The meeting lasted for nearly two hours. App.072. Mais voiced her concerns about the "vulgar and unprofessional" way Avery spoke to her. App.440–41; *see* App.069–71. She made it clear that she believed this treatment was race-based. App.440 –41. When Hairston suggested that Agnor-Hurt repeat the CCAR training, Mais explained to him the severe racial hostility it engendered, including the vulgar and racist things Avery and other staff were saying about Mais and how they were intimidating her staff. App.441.

Mais again apologized for her tongue slip, but Avery refused to accept it. App.68, 79, 140, 161–62, 193, 274. Board SUF ¶ 28 omits key details about the tone and demeanor of the August 6 Meeting. It does not mention that Avery continued to abuse Mais—falsely implying that she used the N-word in private, raising her voice, and continuing to rant about the incident. App.67–69, 71. Avery also disputed that it would be OK for Mais to use the term "people of color," the term used by CCAR. App.71. And she repeatedly gaslighted Mais for not "apologiz[ing] to the whole community," even though Mais apologized in the presence of everyone who heard her tongue-slip. App.78, 269–71, 417, 422–23, 435. Plus, when Mais tried to point out that white people were afraid to share in the CCAR training because of this kind of treatment, Holmstrom said that was a good thing: if white people weren't thinking the right way, they "should be afraid to speak." App.270. She then praised Hairston for his reminder that failing to address a racist act like Mais's tongue slip makes one complicit in racism. App.67–68, 77, 271.

12

At the end, Hairston told Mais she must publicly apologize to the Agnor-Hurt staff, despite all her previous apologies. App.140. By then, Mais was in tears and "physical grief." App.283; *see* App.73, 140–41, 167, 181, 193. The meeting left Mais emotionally distraught. *Id*. She suffered anxiety, panic attacks, and lack of sleep— even hives. App.83–84. On August 11, 2021, she told Irani that she would miss work to seek mental health counseling. App. 167, 289–96. She spoke with a counselor three times in one week because of the crippling stress from the meeting. App.168.

Later that week, Mais spoke with Lorna Gerome, the director of HR. App. 85, 87, 196. Mais disputes SUF ¶ 33 because it omits key details of her reporting race-based harassment that both she and other Agnor-Hurt staff members suffered and mischaracterizes the fact that Gerome failed to give Mais more guidance on how to have her concerns addressed. Mais reported to Gerome that Avery and others had called her racially charged and profane names. App.199, 441. She explained the racially charged way that she was treated during the August 6 meeting. App.441. She told her about missing work to receive medical treatment to manage the emotional abuse. App.88, 200–01. She reported the racially hostile environment and that Avery and her coworkers were intimidating the staff. App.201, 441. Gerome did not provide Mais with any concrete steps on how to address her concerns. App.88.

A few days later, Clare Keiser met with Mais. App.90, 210. Board SUF ¶ 34 omits the entire content of Mais's report to her. During the meeting, Mais explained the growing racial tension caused by the CCAR sessions, the content of the August 6 meeting and her concerns about it, Avery's mistreatment of her, and the anxiety

and distress she suffered. App.92–93, 441–42. C. Keiser said Hairston should not have conducted the August 6 meeting without HR. App.215–16, 91–92. Mais hoped something would happen, but C. Keiser offered no solutions. App.95.

The next day, Daphne Keiser from HR met with Mais in person. App.96–97 225. Mais again detailed the race-based mistreatment she experienced. App.442. She told D. Keiser that her staff was intimidated from interacting with her because of Avery and her coworkers' antics. App.442. She expressed concerns about why she was being required to give another apology when she had already resolved her slip-of-the-tongue in the June 11 meeting by immediately apologizing. App.442. During their meeting, D. Keiser questioned the CCAR training and commented that it was uncharacteristic for Mais to be struggling with her mental health. App.104. Although she encouraged her to stay, D. Keiser provided no concrete steps to address Mais's concerns. App.226–27. At the end of that meeting, the only action item was for Mais to think over the weekend about the entire situation. App.105.

Over the following weekend, Mais felt "dismissed" because her complaints "[fell] on deaf ears." App.98. She had continuously reported her concerns to her superiors for over a year. By the time Mais felt compelled to leave, she had reported her concerns to Castner, Granger, Kindler, Irani, Hairston, L. Holmstrom, E. Holmstrom, Gerome, C. Keiser, and D. Keiser. App. 003–04, 012, 015, 019, 031, 044, 055–56, 060–63, 075, 087–88, 094, 101–103, 439–440. Nothing was done. App.439–444. She was still "struggling immensely and trying to work through all of this in a manner that was healthy and sustainable in [her] position of leadership." App.100.

14

So Mais had no real choice but to resign. App.098–100, 443–44. She emailed a resignation letter to C. Keiser on August 22, 2021, but she did not yet ask her to process it. App.358. Board SUF ¶ 35 mischaracterizes Mais's reason for resigning as discontentment with the anti-racism policy. Not only is this incorrect, but it also contradicts Mais's testimony cited in SUF ¶ 3.

Still, Mais and C. Keiser continued to talk about whether to formalize the resignation, with C. Keiser encouraging her to stay. App.443. On August 26, C. Keiser checked in with Mais. App.218–219, 443. Having had fruitless conversations and meetings with Gerome, C. Keiser, and D. Keiser, Mais asked her to formally process the resignation by sending it to Haas and agreed to a two-week notice period ending on September 10, 2021. App.121, 443. C. Keiser forwarded the resignation to Haas that day. App.361–62.

Even so, the Board still required Mais to address the staff—the direction from Hairston to do this never changed. App.080–081, 170 –172, 273. Mais disputes SUF ¶ 36 to the extent it asserts that Hairston did not require Irani to organize Mais and Avery's joint statement to the faculty. SUF ¶ 36 also omits the fact that Mais prepared her own remarks before a script was provided. Further, the characterization in SUF ¶¶ 30, 37 that Mais willingly agreed to address the staff contradicts the fact that Mais had already apologized many times and that she only addressed the staff because she was directed to by Hairston and Irani. And contrary to the Board's assertion in SUF¶ 29, Mais was not the one pushing for a joint

15

statement to faculty. Hairston demanded it; Irani organized it, determining content and format, and then presiding over the September 9 address. ECF No. 91-23.

In early September, Mais met with Irani, Avery, and E. Holmstrom multiple times to discuss the address to staff. App.275, 286. Mais asked for HR to be involved. App.114 –115. Irani refused. *Id.*

At one such planning session, Mais tried to read her draft remarks, but Avery cut her off, demanding Mais stop talking about her feelings because her "feelings did not matter" and "no one cared about" them. App.111–112. E. Holmstrom accused Mais of acting like "a typical white person does in a defensive mode." App.112. Irani did nothing. App.113. Even E. Holmstrom and Irani feared that the meeting would be harmful. App.172, 287. But no one stopped it.

What happened at the September 9 meeting is also disputed. Board SUF ¶ 38 omits material portions of the content and atmosphere of the meeting. The Board does not mention the evidence that shows that the meeting turned into a racially hostile ritual shaming session. ECF No. 91-23, App. 174, 437. Typically, only licensed teachers came to faculty meetings, but somehow black employees in other positions (e.g., teacher's assistant, custodian) got invited while white employees did not. App.419, 426. No one admits to knowing how. *Id.* A group of black employees wearing combat clothes—camouflage pants, black shirts, and "good trouble" masks sat with Avery, very close to Mais. ECF No. 91-23, App.118–120, 173, 426, 431, 436.

Before turning the floor over to Mais and Avery, Irani delivered a scripted introduction. App.277. As Mais stood before the faculty, she tearfully delivered her

16

remarks, including yet *another* apology—while Avery delivered her remarks angrily, berating Mais and white staff members. ECF No. 91-23, App.117, 425, 436. Irani stopped Mais's comments at two minutes, then allowed Avery to stand up and walk around in front of Mais. App.425. Avery accused the group of "fostering an[] environment" where saying the word colored was "acceptable," even though no one contended that. ECF No. 91-23. She ranted about their implicit biases not being an excuse for "recklessly" using the wrong word and lectured Mais and the group for the connotations of a word Mais didn't even intend to say. *Id.*  She effectively accused the white teachers of mistreating black kids and said she'd be watching them. *Id.*, App.432. She called out how many white people were in the room, told them that they didn't have any idea of what the word "colored" meant to her, and accused them all of being "privileged." ECF No. 91-23, App.425. After the recording ended, she loudly told staff they were either on her side or Mais's—even though Mais had just apologized again. App.444.

The meeting was so intense that some attendees threatened to leave because they could not handle it. App.436. Irani allowed Avery to attack Mais and humiliate her in front of the entire faculty. App.425, 436–437. Then as Avery's remarks ended, at least "eight or nine" staff members ran to Mais to comfort her, while many staff members left crying or sobbing. App.165, 183 –184, 431, 436. Rather than end the staff meeting, or even address Mais's and other employees' emotional state, Irani simply moved on with the agenda. App.425–426, 431–432. A black teacher cried out, "this is not appropriate." App.425, 436. Another attendee recalls that "no one was

17

given time later in the meeting to talk about how inappropriate it all was." App.425. When a white faculty member protested, L. Holmstrom said it was just the same discomfort blacks had felt for years and that was a good thing. App.444.

After the meeting, Avery and several other black employees stood outside of Mais's office in the hallway, causing staff members to avoid Mais. App. 378–383, 426, 437. Other than shaming Mais, the meeting accomplished nothing. App.432, 437. In the immediate aftermath, many staff members texted Mais with their support for her and disgust at what had taken place. App.394–97, 413, 444. Even Irani addressed the lingering racial hostility in the days after the meeting. App.297.

The next day was Mais's last. App.121. During that day, Avery stood outside of Mais's office, seemingly monitoring who was interacting with Mais. App.122–123, 378–383. She interrogated, stalked, and wagged her finger in the face of staff members who appeared teary-eyed and upset. App.432.

The Board's public relations staff decided to alter the official reason for Mais's resignation in a public statement. App.106. The Board asked to add some "fluff" rather than the real reason she was resigning. *Id.*, App.361–362.

## G. Neither Avery nor Hairston were ever disciplined.

No one ever disciplined Avery for any of her racially hostile conduct. App.147. Nor for anything at all. *Id.* And Hairston was also never disciplined. App.125. Not for his racially inflammatory orientation video, for his racially hostile comparison of concerned parents to rapist slaveowners, for conducting the August 6 meeting without HR's knowledge, or for adopting and promoting the racially discriminatory CCAR training that racially divided Agnor-Hurt. *Id.*

18

## LEGAL STANDARD

Summary judgment is inappropriate when there is a genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). To survive summary judgment, Mais need only "present sufficient evidence such that 'reasonable jurors could find by a preponderance of the evidence' for [her]." *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995) (cleaned up). She easily meets this burden. This standard must be applied "with particular care in employment discrimination cases, where intent and credibility are critical." *Adusumilli v. City of Chicago*, 164 F.3d 353, 360-61 (7th Cir. 1998).

## ARGUMENT

This case goes to the jury because there is record evidence that the Board created an environment rife with racial hostility. Plus, no matter how much Mais tried to get her superiors' attention, nothing happened. The only reasonable course was to leave a job she loved. That is more than enough for a reasonable jury to find a racially hostile work environment and constructive discharge. And since every time Mais complained, the treatment only got worse, there is more than enough evidence for the jury to find retaliation.

## I.    **Mais experienced a racially hostile work environment.**

The elements of a hostile environment claims are: "(1) unwelcome conduct; (2) that [was] based on [her race]; (3) which [was] sufficiently severe or pervasive to alter [her] conditions of employment and . . . create[d] an abusive work environment; and (4) which [was] imputable to the employer." *Guessous v. Fairview*

*Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016). Here, the Board challenges the latter three, but there is record evidence supporting each one.

### A.    Race motivated Mais's mistreatment.

The record is chock-full of evidence that race motivated Mais's harassment. *First*, Avery and others *specifically mentioned* Mais's race while mistreating her. In the June 11 training, Avery compared her to an older 80, 90-year-old white racist. App.040, 049–50, 177, 417. Then Avery and other employees were referring to Mais as a "white racist bitch." App.051–54, 428–429. As the Eighth Circuit has held, the epithet "white bitch" is "explicitly racial," carries "clear racial overtones," and "permit[s] an inference that racial animus motivated" all of Avery's conduct toward Mais. *Bowen v. Mo. Dep't of Soc. Servs.*, 311 F.3d 878, 884 (8th Cir. 2002); *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314, 317-18 (4th Cir. 2008) (calling a Muslim "towel head"); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811-12 (11th Cir. 2010) (calling a woman "whore" or "bitch").

What's more, Avery ranted about white teachers and recklessly suggested that they mistreated black students. App.229, 425, 432.  E. Holmstrom told Mais she was acting "like a typical white person does in a defensive mode." App.112. Consider if she instead told Avery she was acting like a "typical angry black woman." No one would doubt that race motivated that comment—and rightly so. The same is true here.

*Second*, a jury comparing how the Board handled Mais's tongue-slip with its handling of intentionally racist language and behavior by black employees could easily conclude that the speaker's race is the difference. *Clay v. United Parcel Serv.*,

*Inc.*, 501 F.3d 695, 707 (6th Cir. 2007) (citing differential treatment); *Tabor v. Freightliner of Cleveland, LLC*, 388 F. App'x 321, 322 (4th Cir. 2010) (same). To be sure, Mais accidentally said "colored," but she quickly apologized and explained her mistake. App.417, 422–423, 435. Nonetheless, as detailed above, the Board put her through the wringer and refused any sensible resolution. *See* pages 12 –17, *supra.*

Hairston, on the other hand, compared white parents who disagreed with him to rapist slave owners—in front of the superintendent no less—and the Board did not discipline him. App.125, 143, 325. Unlike Mais, he wasn't told to apologize, much less forced to "unpack" his comments, sit through multiple meetings, or give an apology to the whole staff. App.042, 140, 142, 178, 285–286. In fact, the Board did not discipline him for *anything*: not his inflammatory CCAR orientation video; not accusing concerned white parents of acting like rapist slaveowners; not conducting the August 6 meeting without HR's knowledge or overseeing Mais's abuse in that meeting; not forcing Mais to apologize again to the staff. App.125.

Avery, too, engaged in rampant racial harassment without consequence. Indeed, nothing she did seemed to get her into trouble. She mistreated her white coworkers, saw and reported racism around every corner, cussed at and attacked Mais during the June 11 CCAR session; called Mais a "white racist bitch" and a "two-faced racist bitch;" continuously abused Mais during the August 6 meeting, told Mais her feelings didn't matter, responded nastily to Mais's public apology, told employees they were either on Mais's side or hers and that she'd be watching, and harassed any employee who seemed to close to Mais. *See* pages 16–18, *supra*. A jury

21

could easily conclude that race motivated the difference between these situations. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282-83 (1976); *see also Clark v. THI of S.C. at Moncks Corner, LLC*, 586 F. Supp. 2d 387, 401 (D.S.C. 2007).

 *Third,* all this fits into an overall environment poisoned with Board-sanctioned racial hostility. *See* pages 10–18, *supra.* This evidence is all part of the picture to establish "an abusive atmosphere." *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014); *see also Sunbelt Rentals, Inc.*, 521 F.3d at 317-18.

 None of the Board's cases are to the contrary. *McIver* had no evidence of differential treatment, and no recent evidence of racial animus. *McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 409 (4th Cir. 2022). *Ali*, likewise, lacked any evidence of differential treatment and scant evidence about national origin. *Ali v. Worldwide Language Res., LLC*, 686 F. Supp. 3d 430, 451 (E.D.N.C. 2023). And *Ziskie* didn't involve differential treatment and yet the court reversed the grant of summary judgment for the employer anyway. *Ziskie v. Mineta*, 547 F.3d 220, 227 (4th Cir. 2008). *Cepada* is just as irrelevant because it lacked evidence of any race-based comments from the defendants' employees. *Cepada v. Bd. of Educ. of Balt. Cnty.*, 974 F. Supp. 2d 772, 784–85 (D. Md. 2013). And *Dortch* is even more off-point, as it involved a single incident of an employee saying a non-racial cuss word to another. *Dortch v. Cellco P'ship*, 770 F. App'x 643, 646 (4th Cir. 2019).

 Here, we have explicit references to Mais's race and an outsized reaction to a tongue-slip set against an assistant superintendent comparing white parents to

rapist slave owners without consequence. App.325. That is more than enough for a reasonable jury to find that race motivated Mais's harassment.

**B.    There is ample evidence of severe or pervasive harassment.**

This Court has already held that Mais "alleged enough facts to allow a jury to determine if the alleged harassment was 'severe or pervasive.'" *Mais*, 657 F. Supp. 3d at 828–29 (quoting *Guessous*, 828 F.3d at 221). Discovery only confirmed the Court's ruling: Mais can present evidence supporting each of the allegations on which this Court relied. That alone defeats the Board's motion.

What's more, whether harassment is "severe or pervasive" is "quintessentially a question of fact." *Conner v. Screader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 199-200 (4th Cir. 2000) (citation omitted). So a jury must determine whether the Board's misconduct created an environment "that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

***Motion to Dismiss Ruling***. The record supports each factual allegation this Court cited in denying the Board's motion to dismiss. They are:

- Avery verbally attacked Mais during the June 11 session. App.038, 040, 049–50, 422-23, 417.

- She did it again in the August 6 meeting with Hairston. App. 067 –69, 071, 078, 269–71.

- The Board failed to act when Mais complained about Avery's misconduct. App.444.

- Avery and other staff called Mais names at work, such as "white racist bitch" and "two-faced racist bitch." App. 428-29, 051-52, 053, 054.

- Mais and other employees complained to Irani about the racially hostile work environment, and he did nothing. App. 440, 418, 432, 438.

23

- Mais also complained to Assistant Superintendent Clare Keiser, and no action was taken. App. 441–42, 444, 210–16.

- Mais told Irani she was experiencing severe mental and emotional distress from the hostile environment. App.084, 167.

Because these allegations were sufficient on a motion to dismiss, having evidence of them is necessarily sufficient to survive summary judgment.

***The Harassment Was Severe or Pervasive***. With the benefit of a full record, it is even clearer that the Board subjected Mais to severe or pervasive mistreatment. For instance, evidence in the record shows:

- *First*, the Board fostered a racially hostile environment with the CCAR training that stoked racial hostility. App. 006–08, 022–028, 416, 422, 435. As Dr. Yancey's report makes clear, it is foreseeable that the CCAR training would have this effect. ECF No. 94-4.

- *Second*, when Mais reported that white employees were being mistreated in those training sessions, Kindler and the Board did nothing. App.018, 019, 439, 444.

- *Third*, Hairston, who'd already told employees who disagreed with him to "get off the bus," compared white parents who challenged the CCAR approach to slave owners who beat him, raped his mother and sister, kept him from learning to read, and ordered him not to talk about it. App.228

- *Fourth*, when Mais had a slip-of-the-tongue, Avery cussed at her, compared her to an old white racist, and berated her in front of the staff, even though Avery herself admits that Mais quickly apologized, and the Board's own witnesses agree she explained that she meant to say "people of color." App. 038, 040, 049 –50, 417, 422–23, 435.

- *Fifth*, Avery was never disciplined for her behavior. App.147.

- *Sixth*, Avery and her group regularly called Mais a "white racist bitch" and a "two-faced racist bitch." App.428–29, 051–54. They intimidated white staff members from associating with Mais. App.432, 435. Avery was again not disciplined. App.147.

- *Seventh*, rather than recognizing that the matter was resolved—at least by Mais's apology and explanation—the Board made her meet with Lars and

Emily Holmstrom, and ultimately Hairston. App.044, 045–46, 055–58, 136, 440–41.

- *Eighth*, while waiting to meet with Hairston, the Board ordered Mais to have no contact with Avery. App.058–59.

- *Ninth*, Hairston failed to involve HR to ensure the meeting was handled properly, instead pioneering his own CCAR-based protocol. App. 266–68, 197-98, 209, 215, 220–21, 138–39.

- *Tenth*, in the meeting, Hairston allowed Avery to keep berating Mais, even though Mais again apologized. App. 067–69, 071, 079.

- *Eleventh*, Avery still refused to accept her apology. App.068, 079.

- *Twelfth*, at the August 6 meeting, E. Holmstrom again labeled Mais's tongue-slip a "racist act." App.067–68.

- *Thirteenth*, Avery falsely insinuated that Mais used the "N" word in her private interactions. App.068–69.

- *Fourteenth,* Avery raised her voice and used an aggressive manner. App.071.

- *Fifteenth*, Mais left the meeting sobbing and in such distress that she had to miss work and seek counseling. App. 067, 077, 083, 167, 289–96, 168.

- *Sixteenth*, following the meeting, the Board directed Mais—who had now apologized twice without Avery's acceptance—to apologize again to the entire staff. App.107, 109.

- *Seventeenth*, Mais asked Irani to involve HR, since HR ought to have been involved in the August 6 meeting, but Irani refused. App.114–15.

- *Eighteenth,* at a meeting to discuss the upcoming staff address, Mais tried to read her draft remarks, but Avery interrupted her saying that Mais's "feelings did not matter" and "that no one cared about [her] feelings throughout this." App.110–12.

- *Nineteenth*, E. Holmstrom accused Mais of acting like "a typical white person does in a defensive mode." App.112.

- *Twentieth*, the September 9 faculty meeting only worsened the racial divisiveness at Agnor-Hurt. ECF No. 91-23, App. 425–26, 437.

- *Twenty-First*, Mais was so terrified that other staff would suffer the same racially hostile treatment she faced that she even asked some to stay out of the room so they would not be associated with her. App.419. She told

25

another employee not to hug her for fear that she would face the same vitriol. *Id*.

- *Twenty-Second*, As Mais stood before the Agnor-Hurt faculty, she tearfully delivered her scripted remarks, including yet another apology—while Avery delivered her remarks angrily. ECF No. 91-23, App. 117, 174, 425, 436.

- *Twenty-Third*, Avery, having been given an open floor to trash Mais in front of the entire staff, ranted about Mais's tongue-slip, never accepted her apology, went on and on about white staff members' biases, and even effectively accused them of mistreating black children. ECF No. 91-23, App. 117, 436, 425, 432, 444.

- *Twenty-Fourth*, During the meeting, black employees dressed in combat outfits and "good trouble" masks—physically intimidated Mais. App.118–120, 173, 426, 431, 436.

- *Twenty-Fifth*, Avery warned white employees she'd be watching them and said that they were either on her side or Mais's side. App.432, 444.

- *Twenty-Sixth*, when a white employee asked for more of a break after the first session, L. Holmstrom declined, telling the white employees that their discomfort was something that blacks had faced for many years. App.444.

- *Twenty-Seventh*, At the meeting, Mais was so emotionally distraught that at least "eight or nine" staff members went to comfort her. App.165.

- *Twenty-Eighth*, Mais couldn't even spend her last day in peace as Avery was lurking by her office to supervise who would interact with her and interrogating staff who appeared upset at Mais's resignation. App.122-23, 378–85, 432.

- *Twenty-Ninth*, Avery targeted employees that she thought were too close to Mais or comforted, labeling them as racists. App.419, 426, 432.

A reasonable jury could find these many incidents in just over three months severe or pervasive enough. *See, e.g.*, *Flint v. Action Pers., Inc.*, No. 7:13-CV-00406, 2013 WL 6729528, at *6 (W.D. Va. Dec. 19, 2013) (three months enough); *Villines v. United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 999 F. Supp. 97, 104 (D.D.C. 1998) (four incidents in three months enough); *Hotchkiss v. CSK Auto, Inc.*, 918 F. Supp. 2d 1108, 1118 (E.D. Wash. 2013) (four comments in two months enough).

26

From June 11, 2021 until her last day, the outsized, race-based reaction to Mais's tongue-slip was "all-consuming," "humiliating," and incredibly distressing. *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 305 (4th Cir. 2019).

The racially charged language hurled at Mais and white employees in general was odious, particularly in the "social context" of a school where civility is the norm. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Indeed, it's hard to imagine many comparisons more severe than comparing white people to violent, rapist slave owners. App.229, 325. And repeatedly gaslighting Mais by calling her a white racist—something Dr. Yancey affirms as one of the most potent insults in our society—no matter how many times she apologized is severe. ECF No. 94-4. Plus, the "physically threatening" behavior of wearing black combat clothes to the final apology session added to the severity. App.426; *Sunbelt Rentals, Inc.*, 521 F.3d at 315; *see also Bowen*, 311 F.3d at 885 (physical intimidation is severe). The "real social impact" of this Kafkaesque system—where no apology is ever enough because of your race—is "not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale*, 523 U.S. at 82. Even isolated incidents like this would be enough to count as severe or pervasive, but Mais's mistreatment was repeated. *See, e.g.*, *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015) (en banc) (isolated use of racial slur sufficient); *Chapman v. Oakland Living Ctr.*, 48 F.4th 222, 231 (4th Cir. 2022) (same).

The Board's arguments are unavailing. First, they contend that Mais thought the issue with Avery could have been resolved through informal conversation. But it

was the Board—not Mais—that took that option off the table by demanding Mais meet with Hairston and ordering her to have no contact with Avery. App.136, 057–59. And regardless, the Board chose to handle the matter by repeatedly chastising Mais rather than allowing an informal resolution—or simply directing Avery to drop the matter in view of Mais's apologies and explanation. App.067–68, 109, 112.

Next, the Board faults Mais for not "objecting" to participating in the meeting with Hairston. This is puzzling, as Hairston was her superior—an assistant superintendent. She couldn't very well refuse to meet with him. App.059. But she did ask that the meeting be recorded, which the Board refused, and she did communicate her apprehension to other administrators. App.047-48, 065, 137. And the meeting turned out to be just as she feared—she was berated, reduced to tears, and falsely accused of using the "N" word and engaging in acts of racism. App.68-69.

Finally, the Board says nothing that happened at the September 9 meeting or the pre-meeting counts because Mais could have declined to participate. But she was still employed on September 9, and her supervisors ordered her to participate. App.81, 272. That direction didn't change even though she said she didn't want to. App.93–94, 442. Indeed, the Board cites no cases saying an employer has no liability when the employee could have just not done her job and thereby avoided the harassment. Such a defense would effectively end harassment law as we know it.

The Board's cases fare no better. *Fuelling* involved bare name-calling by coworkers, and *McLaurin* involved only one instance of that. *Fuelling v. New Vision Med. Lab'ys LLC*, 284 F. App'x 247, 250 (6th Cir. 2008); *McLaurin v. Verizon*

*Maryland, Inc.*, No. JKB-14-4053, 2015 WL 5081622, at *1 (D. Md. Aug. 26, 2015). But here, the racist name-calling was just part of a much larger pattern of misconduct directed by the Board to treat Mais as a poster-child white racist and put her through multiple official meetings to shame her. App.40, 49–54, 58, 112, 117–18, 120, 136, 152, 163–64, 173–74, 182, 188, 437. Likewise, while factual differences exist between this case and *Lindsay-Felton*, the latter doesn't set a floor for severe or pervasive harassment. *Lindsay-Felton v. FQSR, LLC*, 352 F. Supp. 3d 597, 601 (E.D. Va. 2018). And what's common between the cases is "multiple instances of race-based harassment during the relevant timeframe." *Id.* at 604. So none of the Board's cases undercut Mais's claims.

### C.   The record supports imputing harassment to the Board.

Under Title VII, harassment by a supervisor is imputed to the employer unless the employer proves an affirmative defense showing that (a) the employer exercised reasonable care to prevent and correct unlawful harassment and (b) the employee unreasonably failed to avail herself of such opportunities. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). But the Board failed to plead, much less prove, any such defense. ECF No. 38 at 31 (listing affirmative defenses). So all the misconduct and inaction by Mais's superiors is imputable. That alone precludes summary judgment on this element.

Further, coworker harassment is imputable by actual or constructive knowledge. *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983). This may include "complaints directed to [the plaintiff's] superiors," *id.*, or simply evidence that "a reasonable employer, intent on complying with Title VII, would be aware of the

conduct," *Spicer v. Va. Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995). And when a superior witnesses the harassment, that's sufficient. *See Artis v. Lyon Shipyard, Inc.*, No. 2:17cv595, 2019 WL 13295542, at *1 (E.D. Va. Sept. 30, 2019).

Here, nearly all of Mais's mistreatment occurred in the presence of a superior. Kindler attended the sessions where white employees were mistreated, and she heard Avery's vulgar and racially charged tirade at the June 11 CCAR session. App.187, 421–22, 431. Hairston and Kindler were at the August 6 meeting. App.136, 190. Irani saw the immediate aftermath when Mais left sobbing. App.167. He also presided over the September pre-meetings and the September 9 apology session. App.169, 275, 285–86. These incidents are all imputed.

And Mais reported the other instances of harassment—such as Avery's and other employees' racist comments about her—to her superiors. App.3–4, 12, 15, 19, 31, 44, 55–56, 60–63, 75, 87–88, 94, 101–03, 439–43. Indeed, Mais reported all the mistreatment in various forms to at least seven people above her at the Board. *Id.* That's plenty for a jury to impute.

The Board's arguments do not undercut this conclusion. First, they contend that Mais should have reported everything earlier to HR. But the Board's own harassment policy says otherwise: it allows employees to report harassing behavior to their principal (like Kindler or Irani), immediate supervisor (same people), or a department head (like Hairston), who then must pass it along to the Title IX coordinator for investigation. App.363–77. Mais reported to all these people, yet no investigation occurred. App.439–41, 444. And the policy says that oral reports, like

the ones she made, are fine. App.366 –75, 437. So the Board can hardly fault Mais for doing what its policy required. *EEOC v. Ecology Servs., Inc.*, 447 F. Supp. 3d 420, 452 (D. Md. 2020). Plus, even when Mais reported the conduct to HR, nothing happened; no one was investigated or disciplined. App.441–44.

Equally spurious, the Board faults Mais for not disciplining Avery herself. But Mais lacked that authority. App.10. Irani, who she told, had that authority and did nothing. App.440, 444. And the Board directed her not to have contact with Avery anyway. App.58–59. Plus, with Avery's behavior, no rational supervisor would impose discipline unilaterally; they'd report the behavior to their superiors for further handling, which Mais did, and no one cared. *Id.* The Board's cases reinforce the point: in *Powell* and *Knudsen*, which the Board cites, a superior's harassment claim against a subordinate survived because the superior reported the conduct up. *Powell v. Susdewitt Mgmt.*, No. CCB-20-2343, 2021 WL 4420999, at *6 (D. Md. Sept. 27, 2021); *Knudsen v. Bd. of Supervisors of Univ. of La. Sys.*, No. 14-382, 2015 WL 1757695, at *4–5 (E.D. La. Apr. 16, 2015). The same is true here.

Finally, the Board claims that Mais didn't give HR time to deal with her concerns. If anything, that's a jury question. There is record evidence that HR should have been involved immediately but for Hairston avoiding them. App.91–92. And though Mais informed her supervisor, Irani, the harassment continued. Even after Mais informed HR, no one stopped the September 9 ritual shaming session; indeed, Irani expressly refused to involve HR. App.114–15. So there is plenty of evidence that the Board had time to address the problem and failed.

31

## II.    Ms. Mais was constructively discharged.

An employee suffers a constructive discharge when the discrimination is so bad that "a reasonable person in [her] position would have felt compelled to resign." *Green v. Brennan*, 578 U.S. 547, 555 (2016). The hallmark is futility: the harassed employee has good reason to believe her situation will not improve. And when there is record evidence of such futility, "it is a question of fact whether a reasonable person" in the plaintiff's position would feel their only viable option was to resign. *EEOC v. Branch Banking & Tr. Co.*, 571 F. Supp. 2d 682, 685 (E.D.N.C. 2008).

For example, in *Amirmokri v. Baltimore Gas & Electric Co.*, what made the racial harassment intolerable was that the employer wouldn't address it, so the plaintiff reasonably "felt his situation was hopeless." 60 F.3d 1126, 1129 (4th Cir. 1995). The same was true in *Branch Banking & Trust*, where a hearing-impaired employee resigned after the employer denied three requests to be transferred out of a position her disability prevented her from doing well. 571 F. Supp. 2d at 685. Same for *Rush v. Speedway Buick Pontiac GMC, Inc.*, where the employee promptly complained of sexual harassment to her supervisor, "yet [the] conduct continued unabated." 525 F. Supp. 2d 1265, 1278 (D. Kan. 2007). The employer tried to blame the employee for not reporting to upper management. *Id.* But the court rejected that and allowed the constructive discharge claim to proceed. *Id.*

Here, the futility is palpable. For months, Mais tried to get someone's attention—Kindler, Lars Holmstrom, Irani, Gerome, Hairston, C. Keiser, D. Keiser. App.439–43. Rather than taking her seriously, Mais was told to "fall on [her] sword," that her feelings didn't matter, and she was acting like a typical defensive

white person. App.47–48, 112. She suffered severe emotional distress, and there was no end in sight. App.83–84, 86–87, 99–100. At no point—not even after she left—did the Board address how she and others were mistreated. App.418, 432, 438.

The Board minimizes Mais's evidence. They ignore the severity of Avery's conduct, App.38–41, 49–50, 417, 423, how Mais's coworkers called her names and kept her from interacting with white staff members, App.51–54, 426, 428–29, 435, the ugliness of the August 6 meeting with Hairston, App.67–69, 71, the abuse during the pre-meetings for the September 9 session, App.110–12, and the naked hostility she and other white employees experienced at the September 9 meeting itself, App.117–20, 425–26, 431–32, 436, ECF No. 91-23. And they ignore how the Board buried its head and took no action. App.444.

With this extensive record, the Board's key case, *Lindsay-Felton*, lacks relevance. There, the employee did not allege explicit racial comments. 352 F. Supp. 3d at 607. Not so here. App. 40, 49–54, 152, 188, 428–29. And there, the employee's situation was not futile, as there are only passing references to any complaint about the alleged misconduct and no indication that the company failed to handle them. 352 F. Supp. 3d at 608. Here, by contrast, Mais complained frequently to no avail.[5]

Finally, the Board argues that the constructive discharge claim fails because Mais said some nice things in her resignation letter. But those comments refer to

---

[5] The Board also cites *Eller v. Prince George's County Public Schools*, where a constructive-discharge claim survived summary judgment, suggesting the facts here are less severe. 580 F. Supp. 3d 154 (D. Md. 2022). But *Eller* doesn't set the floor for such claims. While *Eller* involved physical violence not present here, the futility theme is the same: the plaintiff complained and nothing happened. *Id.* at 176. Plus, here Avery and other staff did physically intimidate Mais with their attire and manner.

the time *before* the CCAR training, not once the Board began harassing her. The Board also says she resigned because she couldn't "morally" engage in the CCAR training. But that's not the point: if the Board continued to allow employees like Avery to run amok and employees like Mais to be ritually shamed, then of course Mais couldn't continue—that's what made the conditions intolerable in the first place. In any case, interpreting these statements are quintessential jury questions. *See Adams v. Applied Bus. Servs.*, No. 2:18cv559, 2019 WL 7820431, at *2 (E.D. Va. Sept. 4, 2019) (juries decide the meaning of statements).

## III.   The School Board retaliated against Mais.

Mais is also entitled to a jury trial on her retaliation claims because the Board amped up the hostility of her environment with each passing complaint, creating a hostile work environment and ultimately constructively discharging her.

In response, the Board argues that Mais did not engage in protected activity. But she did, many times over: to Kindler, her acting principal, App.439, to Lars Holmstrom, an equity specialist, App.440, to Irani, her principal, *id.*, to Hairston, App.440–41, to Gerome, App.441, to C. Keiser, App.441–42, and to D. Keiser, App.442–43. Each time, she reported that her concern involved race-based hostility.

Title VII does not require magic words to report racial harassment. The employee "need not label the events '[race-based] harassment' to place an employer on notice of the offending behavior." *Okoli v. City of Balt.*, 648 F.3d 216, 224 n.8 (4th Cir. 2011) (cleaned up). In her many reports to superiors, Mais clearly expressed concerns about the race-based treatment that she and other employees suffered because of the CCAR sessions. App.439–43. She complained of: employees speaking

34

in a "racially charged manner," App.30; *see* App.439, "racial tension that stemmed from [CCAR] meetings," App.63, "growing tension in the workplace [that] was becoming racially hostile as a result" App.75, including "staff members being shut down," App.102, false accusations that Mais used the "N" word in private, App.68–69, reporting that Avery called her offensive names including a "white racist bitch," App.52, 92–93, 428, and her feeling that she "was being labeled a racist for a mistake that [she] apologized for," App.103. Others made similar complaints. App.418, 424, 429, 432. That's more than enough.

Nor does it matter that Mais did not immediately go to HR. She went to her acting principal during the training itself and her permanent principal as soon as he began work. Under the Board's own harassment policy, this was sufficient. App.363–77. And she did ultimately go to HR, with no success. App.441–44. All of this satisfies the protected activity element. *See Boyer-Liberto*, 786 F.3d at 281 (citing *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543-44 (4th Cir. 2003) (complaining to supervisor sufficient). And since that is the only element the Board challenges, Mais's retaliation claims should go to trial.

## CONCLUSION

The Board made Emily Mais, a white employee who made an innocent slip of the tongue, a sacrificial lamb to its "antiracist" agenda. No apology she made was ever good enough. No complaint she made of racial hostility was taken seriously. At every turn, it just got worse. The Board oversaw a pattern of race-based shaming and humiliation that left her with no reasonable choice but to leave the job that she loved. The Board's motion should be denied, and this case should go to trial.

Respectfully submitted this 16th day of August, 2024.

s/Henry W. Frampton, IV

David A. Cortman
GA Bar No. 188810*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

Katherine L. Anderson
AZ Bar No. 033104*
Henry W. Frampton, IV
SC Bar No. 75314*
ALLIANCE DEFENDING FREEDOM
15100 N 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kanderson@ADFlegal.org
hframpton@ADFlegal.org

Christopher P. Schandevel
VA Bar No. 84412
Vincent N. Wagner
VA Bar No. 98663
Noel W. Sterett
IL Bar No. 6292008*
Mallory B. Rechtenbach
NE Bar No. 27129*
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cschandevel@ADFlegal.org
vwagner@ADFlegal.org
nsterett@ADFlegal.org
mrechtentbach@ADFlegal.org

*Admitted *Pro Hac Vice*

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record who are registered users of the ECF system:

> David P. Corrigan (VSB No. 26341)
> Jeremy D. Capps (VSB No. 43909)
> Melissa Y. York (VSB No. 77493)
> Blaire H. O' Brien (VSB No. 83961)
> Harman, Claytor, Corrigan & Wellman
> P.O. Box 70280
> Richmond, Virginia 23255
> (804) 747-5200
> dcorrigan@hccw.com
> jcapps@hccw.com
> myork@hccw.com
> bobrien@hccw.com

<u>s/ Henry W. Frampton, IV</u>

Henry W. Frampton, IV
SC Bar No. 75314
Alliance Defending Freedom
15100 N 90th Street
Scottsdale, AZ 85260
(480) 444-0020
hframpton@ADFlegal.org

*Counsel for Plaintiff*

37