IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

EMILY MAIS,

   Plaintiff,

v.                                 Case No. 3:22-cv-51

ALBEMARLE COUNTY SCHOOL BOARD,

   Defendant.

## REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

In opposition to summary judgment, Emily Mais ("Mais") makes heroic efforts to reconcile her deposition testimony with her argument—which dangles before the court without support. Despite having no concerns about the School Board's Anti-Racism Policy or regulations, believing that the ideology of *Courageous Conversations about Race* ("CCAR") was worth exploring, and acknowledging that educators need to be able to discuss race in the workplace, Mais attempts to blame CCAR and its implementation for the hostile work environment that she allegedly experienced and her decision to resign her employment as an Assistant Principal at Agnor-Hurt Elementary School.

In reality, Mais was the source of her own discomfort. But for her use of the racially-charged term "colored" at the end of the fourth and final CCAR session at Agnor-Hurt on June 11, 2021, the parties would not be here. It was Mais's use of that term that set-in motion an effort to mitigate the hurt others in the school community felt from her words. This is what Mais now characterizes as a racially-hostile work environment and the cause of her resignation—not her race or any treatment based on her race. When you set aside the hyperbole,

1

opinion, rhetoric, and conclusory assertions, Mais's own testimony demonstrates that there is no genuine issue of material fact, and the School Board is entitled to judgment as a matter of law.

## II.   STATEMENT OF MATERIAL UNDISPUTED FACTS

### A.   Under the proper standard of review, summary judgment is appropriate.

"The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "A fact is material when proof of its existence or nonexistence would affect the outcome of the case, and an issue is genuine if a reasonable jury might return a verdict in favor of the nonmoving party on the basis of such issue." *Northwestern Mut. Life Ins. Co. v. Atl. Research Corp.*, 847 F. Supp. 389, 394 (E.D. Va. 1994) (citing *Anderson*, 477 U.S. at 248). **"The disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict."** *Thompson Everett, Inc. v. National Cable Adver., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (emphasis added). Summary judgment is appropriate if the "evidence is merely colorable" or "is not significantly probative." *Anderson*, 477 U.S. at 249–50. "Where a plaintiff fails to set forth either a prima facie case of discrimination or a 'genuine factual dispute over the employer's legitimate non-discriminatory explanation,' a defendant may prevail on summary judgment." *Tyndall v. Dynaric, Inc.*, 997 F. Supp. 721, 724 (E.D. Va. 1998) (quoting *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316–17 (4th Cir. 1993)).

**B.**     **The School Board objects to the Declarations, and they should not be considered.**

In opposition to the School Board's Motion for Summary Judgment, Mais relies upon declarations from herself, Rebecca Anderson, Anne Fox, Ruby Gordon, Tana Krstich, and Brandy Watson.  The School Board, pursuant to Rule 56(c)(2) of the Federal Rules of Civil Procedure, objects to these declarations, and the Court should not consider them when deciding the School Board's Motion for Summary Judgment.[1]

Rule 56 of the Federal Rules of Civil Procedure provides that "An affidavit or declaration used to support or oppose a motion must be **made on personal knowledge, set out facts that would be admissible in evidence**, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4) (emphasis added).  "[U]nder this rule, statements in affidavits as to opinion or belief are of no effect."  *Saunders v. Sumner*, 366 F. Supp. 217, 219 (W.D. Va. 1973) (citing Barron & Holtzoff, *Federal Practice and Procedure* (Wright ed. 1958)).

> Generally, an affidavit filed in opposition to a motion for summary judgment must present evidence in substantially the same form as if the affiant were testifying in court.  Federal Rule of Civil Procedure 56(e) [now 56(c)(4)] specifically requires that affidavits submitted on summary judgment contain admissible evidence and be based on personal knowledge.  Thus, summary judgment affidavits cannot be conclusory or based upon hearsay.

---

[1] The School Board is objecting the declarations pursuant to Rule 56(c)(2) of the Federal Rules of Civil Procedure, as the evidence in the declarations could never be admissible.  The testimony of the declarants, if offered at trial, would be inadmissible because it lacks foundation, is conclusory, is inadmissible opinions and beliefs, and/or they lack personal knowledge.  *See* Chart of Objections to Declarations, attached as Exhibit X.  The School Board need not file a separate motion to strike these affidavits.  *See* Fed. R. Civ. P. 56 advisory committee note ("Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting.  The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.  **There is no need to make a separate motion to strike.**  If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial" (emphasis added)).

*Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted).   When a party submits affidavits in opposition to summary judgment that do not contain evidence that would be admissible if the affiant were testifying at trial, it is appropriate to strike the affidavits and decline to consider them as part of the summary judgment record.   *See, e.g. Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (holding that it was proper for the district court to decline to consider hearsay statements in an affidavit submitted in opposition to summary judgment); *Hopeman Bros., Inc. v. Cont'l Cas. Co.*, No. 4:16-CV-187, 2018 WL 4169282, at *5 (E.D. Va. Jan. 12, 2018) (granting the defendants' motion to strike portions of a declaration).

The affidavits upon which Mais relies are replete with hearsay, lack foundation and personal knowledge, are conclusory, and contain inadmissible opinions and beliefs.   For example, Anderson's declaration is filled with conclusions and inadmissible opinion and belief that lack factual support:

- Perspectives and opinions were "diminished and chilled through the intimidating comments" of employees "like Sheila Avery"

- "Ms. Avery's racially hostile comments during these sessions were consistent with the racially discriminatory approach of Dr. Hairston's presentation and the ACPS-mandated CCAR materials"

- "The racially discriminatory nature of the CCAR training materials encouraged the types of racially hostile comments that made me and other white employees feel uncomfortable . . ."

(ECF Doc. 107-3, at 62, ¶¶ 16-18.)[2]   The only arguably factual assertion identified in Anderson's declaration is that Avery stated, "You can't know how this feels because you're not black." (ECF Doc. 107-3, at 62, ¶ 19), which is an opinion and not racially discriminatory or hostile.

---

[2] For ease of reference, the School Board adopts the page numbers assigned by this Court's electronic filing system.

Moreover, Anderson's declaration that Avery's conduct was not warranted, (ECF Doc. 107-3, at 63-64), is contradicted by her own email of June 11 to Avery's supervisor, Kelvin Reid.  "SA had every right to draw EM attention to using the wrong term when asking a question.  Just not in front of the entire group."  (ECF Doc. 107-3, at 32.) [3]

The declaration of Anne Fox is similarly filled with conclusory assertions and opinions. For example, "when several employees who were not Black tried to share their perspectives and opinions, they were openly dismissed or discounted because they were coming from a place of 'white privilege'."  (ECF Doc. 107-3, at 67-68, ¶ 12.)  Yet, the only example provided in the declaration is "you don't understand because you are not Black."  (*Id.* at 68, ¶ 13.)[4]

Perhaps the most troubling declaration is that of Mais herself.  The School Board took Mais's deposition on May 8, 2024.  In her declaration, Mais seeks to substantively change her deposition testimony.  This she cannot do.  *See Hannah v. United Parcel Serv., Inc.*, 72 F.4th 630, 638 (4th Cir. 2023) ("[I]t is well established that a party who has been examined at length on deposition [cannot] raise an issue of fact simply by submitting an affidavit contradicting his own

---

[3] While Anderson describes Agnor-Hurt has having "racially diverse" "school staff and faculty," (ECF Doc. 107-3, at 60, ¶ 5), Mais testified that there were two Black teachers, three Black teaching assistants, three Black custodians, and a kitchen staff that was Black or mixed-race, (Mais Vol. I 98:4-99:3.)

[4] The other Declarations Mais submits suffer from the same deficiencies.

- **Ruby Gordon:** "Avery and her friends would use similar racially charged language on many occasions," (ECF Doc. 107-3, at 75 ¶ 6), but she offers no examples of the "language" that was used or when it was used.

- **Tana Krstich:** training "created racial division and hostility in school . . . pitted black employees against white employees . . . encouraged black employees to treat and view white employees as inherently racist and having 'white privilege'", (ECF Doc. 107-3, at 77, ¶¶ 7-9), but she offers no examples or facts to support these conclusions.

- **Brandy Watson:** "CCAR training materials and sessions were racially divisive and openly hostile towards white employees . . . certain black employees would intimidate white employees from sharing their perspective—which were discounted because the CCAR training materials stereotyped white people as racists . . . I began hearing overtly racist comments about Ms. Mais and other white employees . . .", (ECF Doc. 107-3, at 81, ¶¶ 6-7, 9), but she does not identify the comments.

prior testimony, because to allow that would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."); *Tillery v. Piedmont Airlines, Inc.*, No. 1:15-cv-01256, 2016 WL 5334673, at *6 (E.D. Va. Sept. 22, 2016), *aff'd* 713 F. App'x 181 (4th Cir. 2017) (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("When determining whether a party's evidence is sufficiently credible to survive summary judgment, the court should consider when in the course of discovery a contention first appears.  A party cannot manufacture a genuine issue of material fact such that 'the only issue of fact is to determine which of the two conflicting versions of [the party's] testimony is correct.'")).

For example, in the declaration Mais states, "As discussed in my deposition, I reported my concerns about the way white staff members were being mistreated because of their race to Ashby Kindler.  I was clear in those discussions that the concerns I was escalating related to race-based mistreatment."   (ECF Doc. 107-3, at 85, ¶ 4.)   However, when asked during her deposition about her conversations with Kindler, Mais stated:

- I don't remember giving her warnings about particular people.   I remember just saying I thought this was going to be a topic that would be difficult to grapple with because of the text.

- I remember just, like I said, you know, saying that I thought it was a topic that we could potentially grapple with among staff but not much past that.

- I talked to Ashby about concerns raised by staff members and as a result in the following session I noticed that instead of polling staff members in a way that identified them and their responses, that element was no longer present.

- I did not speak with Ashby about how Courageous Conversations would be implemented, just concerns about how the conversations could be challenging based on the text.

- I reported both Jenny and Ann's concerns as well as Kelly Penn's to Ashby Kindler.[5]
- Ashby and I would talk about what was going on and then—again, I didn't have a part in the planning of each session.  I could see that she was trying to alter things but it was very difficult to keep this from recurring when your norms are the norms as were stated.

(Mais Vol. I 90:13-19, 91:22-24, 95:17-21, 96:8-11, 120:4-5, 121:18-23.)  Mais also claims to have reported sharing with Kindler that Avery said that others cannot understand or connect with something based on the color of their skin and stopped people from sharing and speaking by using a dismissive, raised tone of voice and shaking her head.  (Mais Vol. I 124:5-20.)  Yet Mais never once testified that she reported to Kindler that people were being mistreated based on their race as she now attempts to assert in her declaration.

Further, in the declaration Mais states that during her meeting with Lars Holmstrom ("L. Holmstrom") she "was clear" that her "concern was that the racially divisive nature of the CCAR training made it seem acceptable for black employees like Sheila Avery to mistreat white employees like me, and I thought that was a problem that needed to be dealt with on the district level."  (ECF Doc. 107-3, at 86, ¶ 5.)  When asked about her conversation with L. Holmstrom during her deposition, however, Mais testified that she shared with him, "My real problem is the way in which she responded and the lack of professionalism and how our resources for support as administrators I felt like weren't there because of this work and how it allowed staff to behave in a manner that was not acceptable or had never been until this work came out and how I felt

---

[5]Jenny Sanford informed Mais that she was "really struggling with the Courageous Conversations about Race work."  (Mais Vol. I 118:22-119:16.)   Ann Fox reported "great discomfort for sitting through the meetings and trying to adhere to the norms, but the way it allowed people to speak their truth but in such a manner that was hurtful and caused her anxiety and made her fearful to speak up out of fear for being labeled."  (Mais Vol. I 118:11-21.)  Kelly Penn relayed to Mais a conversation in the break room in which Penn was told that "her children would never have the same experience as a black child no matter whether she is married to a black man or has a mixed-race child it will never be the same."  (Mais Vol. I 115:13-116:13.)  Penn did not file a complaint but came to Mais to "vent."  (Mais Vol. I 116:1-13.)

like it was muddying the waters." (Mais Vol. I 173:3-9.)   Mais testified that her concern was being spoken to in that manner by a subordinate, not race discrimination.

For the first time, Mais states in her declaration that she reported to Mike Irani "the racial division and hostility the CCAR training had wrought", that "Avery had mistreated [her] because of [her] race and the ugly, racist things she and her friends were saying about me, such as calling me a 'white racist bitch' and 'two faced racist bitch,'" that she "made it clear that [she] believed Ms. Avery was engaging in race-based mistreatment with the implicit authorization of the Board."  (ECF Doc. 107-3, at 86, ¶ 6.)  When asked during her deposition what she reported to Irani, Mais testified:

> I had—on his first day in the building I had gone to him right away and informed him of the situation that had taken place on June 11th and the training sessions how they had kind of rolled out over time and how I felt there was growing tension.  I explained to him about this meeting and I also explained to him about how I felt that my making a mistake and apologizing for it, that was bad enough the mistake being made, but that I willingly and quickly apologized and that the way she carried on in that session was completely unprofessional and I felt like the work itself, CCAR, Courageous Conversations about Race, was making it beyond difficult to adequately deal with an incident like this . . . so that he wasn't blindsided by something . . .

(Mais Vol. I 179:24-181:4.)  Curiously absent from Mais' deposition testimony is any reference to the race-based mistreatment of which she now alleges she complained.

The changes continue with respect to Mais's recollection of the August 6 meeting, as well as her conversations with Lorna Gerome ("Gerome"), Clare Keiser ("C. Keiser"), and Daphne Keiser ("D. Keiser").  (*Compare* ECF Doc. 107-3, at 87, ¶ 7 *with* Mais Vol. II 16:3-23:21; *Compare* ECF Doc. 107-3, at 87, ¶ 8 *with* Mais Vol. II 45:3-47:24; *Compare* ECF Doc. 107-3, at 88, ¶ 9 *with* Mais Vol. II 50:23-55:24; *Compare* ECF Doc. 107-3, at 88-89, ¶ 10 *with* Mais Vol. II 74:18-75:18.)  Mais even goes so far as to try to amend the dates on which her conversation with D. Keiser took place—on August 20, 2021, "the next day" after she met with C. Keiser on

August 19, 2021—presumably to bolster her hostile work environment and constructive discharge claims. Yet, Mais's Second Amended Complaint alleges that she met with D. Keiser on August 27, 2021—after she had already sent her resignation to C. Keiser on August 22, 2021. So too does Mais's Charge of Discrimination, which she signed under penalty of perjury. And Mais confirmed the August 27, 2021 meeting date under oath at her deposition. (*Compare* ECF Doc. 107-3, at 89, ¶ 11 *with* Mais. Vol. II 58:13-59:9, 71:11-15; ECF Doc. 4-2, at 128, ¶ 196; ECF Doc. 24-1, at 14.)

The School Board also objects to Mais's self-serving statements. Self-serving declarations cannot defeat a motion for summary judgment. *Nat'l Enters., Inc. v. Barnes*, 201 F.3d 331, 335 (4th Cir. 2000). For example, Mais's allegations that she "felt [she] had no other option than to resign" are self-serving opinions without objective corroboration and will not defeat a motion for summary judgment. *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658-59 (4th Cir. 2020) (citing *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)); *Nat'l Enters., Inc.*, 201 F.3d at 335. *Evans.*, 80 F.3d at 962; *see also Blanchard v. Prater*, No. 7:17-CV-00079, 2019 WL 1441629, at *5 (W.D. Va. Mar. 31, 2019) ("Fourth Circuit law is clear on this point—although credibility determinations are not made at the summary judgment stage, parties' differing beliefs about a fact when the plaintiff solely relies on her own self-serving testimony cannot create a genuine dispute of material fact.")

## C.   <u>There are no genuine issues of material fact that preclude summary judgment.</u>

In its opening Brief, the School Board identified 39 undisputed facts. Mais argues that the School Board's "Statement of Material Undisputed Facts (SUF) unduly narrows the circumstances relevant here." (ECF Doc. 107, at 9.) While conceding that "paragraphs 1, 2, 7, 15, 31, 32, and 39 are not disputed," she argues that "even they present a one-sided and

incomplete view of the facts they discuss." (*Id.*)  Mais then purports to "dispute" the remaining 31[6] paragraphs of the School Board's SUF, although the School Board based its SUF almost entirely on Mais's deposition testimony.  Further, Mais's "disputes" do not actually dispute the facts alleged, but merely seek to add additional factual support or context, or lack support in the record entirely.  Importantly, none of the purported disputes are genuine or material.

For example, in SUF ¶ 3, the School Board cited Mais's own deposition testimony regarding her respect for, and agreement with, the Anti-Racism Policy and the fact that she did not express concerns with the Policy's Regulations.  (ECF Doc. 91, at 3, ¶ 3.)  Nevertheless, on brief, Mais argues that she had concerns with the "antiracism school bus" and CCAR.  (ECF Doc. 107, at 11.)  This new fact neither disputes SUF ¶ 3 nor is material.

Mais "disputes" SUF ¶¶ 3-6 and 13 because "[t]hey paint an incomplete and misleading picture of [her] concern with the anti-racism policy and CCAR training," yet the cited portions of the record do not dispute any of the facts asserted in these paragraphs.  (ECF Doc. 107, at 11-12.)  Nor could Mais actually dispute these facts, which were taken directly from her deposition testimony.  *See Hannah*, 72 F.4th at 638.  Instead, Mais's efforts add only additional facts or context that are not material to the issues at hand.

In "disputing" SUF ¶ 6, Mais argues that "the Board claims [she] had a good relationship with Avery" yet "Avery testified that she pre-judged Mais from the first time they met as someone who 'might not treat Black people well,'" and argues that this judgment "had to do with [Mais's] race."  (ECF Doc. 107, at 9.)  First, it was Mais who testified that she had a good relationship with Avery:

> Q:     Did you have a good relationship with [Avery]?

---

[6] Mais does not attempt to address paragraph 11 of the School Board's SUF.  (*See* ECF Doc. 107, at 9- 24.)  Therefore, this paragraph is considered to be admitted.  Fed. R. Civ. P. 56(e)(2).

A:      I did.  I didn't know of any issues with our relationship at all.

(Mais Vol. I 86:14-17.)  As such, it is not the School Board's "claim," it is Mais's own testimony.

Second, Mais takes liberties with Avery's testimony.  While Avery testified that she thought from

the first meeting she had with Mais that Mais might not treat Black people well, she did not base

that opinion on Mais's race.  (Avery 66:21-69:16.)  Mais's assertion is not only unsupported by

the record, but also not material.  Neither Avery nor Mais had any negative interactions with one

another prior to the CCAR book study.  (Avery 68:22-69:12; Mais Vol. I 84:23-86:25.)

With respect to SUF ¶ 8, Mais accuses the School Board of "downplay[ing] Kindler's

role," and argues that Kindler was "an acting principal with the same authority as a regular

principal" and that the School Board "assigned Kindler to lead the CCAR training sessions."

(ECF Doc. 107, at 12.)  The record evidence, however, is that Kindler was one of four retired

principals that provided assistance to Agnor-Hurt, was there two days a week, did not fulfill all

of the duties of principal, and was asked to lead CCAR by Granger.  (Mais Vol. I 87:19-89:25;

Kindler 12:6-14:4; ECF Doc. 91-9.)

Mais attempts to "dispute" SUF ¶ 9 by arguing that she was concerned about more than

how the CCAR material "would be received".  (ECF Doc. 107, at 10.)  She argues that she noted

the text was "divisive" and that she shared with Michele Castner her concerns about

implementing CCAR.  (*Id.* at 10-11.)  Again, Mais takes liberties with the evidence.  During her

deposition, Mais relayed a conversation she had with Castner about why she was considering

moving her children to private school, not a conversation in which she complained of the racial

divisiveness of the CCAR material and training.  (Mais Vol. I, 36:12-39:2.)

Although SUF ¶ 10 is taken directly from Mais's deposition testimony, she "disputes"

this paragraph as presenting "an incomplete and sanitized view of the CCAR training sessions".

(ECF Doc. 107, at 12.)  Instead of providing facts that would dispute SUF ¶ 10 or augment its factual assertions, Mais provides conclusory descriptions and characterizations.  This is insufficient to create a genuine dispute of material fact.

Mais asserts that Ruby Gordon's declaration rebuts SUF ¶ 12.  (ECF Doc 107, at 16.) While Gordon's declaration is inadmissible for the reasons discussed *supra* in Part II.B., that she witnessed "people come in to talk to Irani about Ms. Avery's behavior" does not dispute the assertion in SUF ¶ 12 that only one teacher expressed to Mais a discomfort with working with Avery.  (Mais Vol. I at 127:24-128:17.)

Mais argues that her "and other attendees' accounts of what occurred" at the June 11 CCAR session "differ significantly from SUF ¶¶ 14-16" despite the School Board's reliance on Mais's own testimony to support those facts.  (*Compare* ECF Doc. 107, at 13-14 *with* ECF Doc. 91, at 5-6.)  She argues against her own testimony to "dispute" ¶¶ 17, 18, and 20 as well.  (ECF Doc. 107, at 13-16.)  Again, the evidence in the record to which Mais refers does not create a genuine dispute of material fact when the School Board's undisputed facts are based on her own testimony.  *See Hannah*, 72 F. 4th at 638.

Instead of addressing the hearsay issue the School Board raised on Brief with respect to the allegation that Avery and others referred to Mais as a "white racist bitch" and "two-face racist bitch", (ECF Doc. 91, at 7 n.2, 16 n.3), Mais seeks to amplify her deposition testimony that Tracey Payne (a stand-in secretary) provided her with this information by relying upon the declaration of Ruby Gordon, an Agnor-Hurt Teaching Assistant.  (ECF Doc. 107, at 16.)

Hearsay is an out-of-court statement that is offered "to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Hearsay is not admissible absent an applicable exception.  Fed. R. Evid. 802.  The "opposing party statement" exception permits a party to offer

a statement that "was made by the [opposing] party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). "[T]he subject of the statement must relate to the employee's area of authority." *United States v. McCabe*, No. 2:19-cr-171, 2021 WL 12275317, at \*2 (E.D. Va. Aug. 12, 2021) (quoting *United States v. Bros. Constr. Co.*, 219 F.3d 300, 311 (4th Cir. 2000)). "There is a critical difference between making a statement while one is an employee and having the actual or implied authority to make such a statement on behalf of your employer." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999).

Mais is offering Gordon's statement for the truth of the matter asserted, *i.e.*, that Avery and others called Mais a "white racist bitch." Thus, Gordon's statement is hearsay. Rule 801(d)(2)(D) is typically applied to statements made by a plaintiff's supervisor, rather than a plaintiff's subordinate. *See, e.g.*, *McDaniel v. Loyola Univ. Med. Ctr.*, 606 F. Supp. 3d 776, 786 (N.D. Ill. 2022) (noting that a supervisor's comments were admissible given her supervisory responsibilities over the plaintiff); *Foster v. Univ. of Md. E. Shore*, 908 F. Supp. 2d 686, 692-93 (D. Md. 2012) (noting that a coworker's assessment of plaintiff's work performance was not within the coworker's job responsibilities); *Evans v. Port Auth. of N.Y. & N.J.*, 192 F. Supp. 2d 247, 263 (S.D.N.Y. 2002) (same). In *Green v. Martin Marietta Materials, Inc.*, for example, the court excluded the plaintiff's testimony that Mobley, "a haul truck driver/loader operator," had reported the plaintiff's absences to the plaintiff's supervisor because there was "no indication that Mobley had personnel or supervisory responsibilities." No. 3:22-4548-DCC-SVH, 2024 WL 3326384, at \*4 n.7 (D.S.C. Feb. 27, 2024), *adopted*, 2024 WL 3219185, at \*2 (D.S.C. June 27, 2024); *cf. Quesenberry v. Volvo Grp. N. Am., Inc.*, 267 F.R.D. 475, 483 (W.D. Va. 2010) (excluding an agent's statements because the statements related to "the duration of healthcare

benefits" and the agent was hired to provide "financial predictions about the cost of healthcare benefits").

Gordon's declaration does not state when or where Avery made this purported statement, if Gordon told Mais about the statement, when or where Gordon spoke with Mais, and Mais failed to identify Gordon altogether in her deposition. Gordon states only that Avery and others would refer to Mais as a "white racist bitch" during "[Avery's] conversations with other teacher's assistants." (ECF Doc. 107-3, at 74.) There is no evidence that Gordon had personnel or supervisory authority as a Teaching Assistant. Further, Gordon's declaration is deficient as it does not actually state that Gordon heard the "white racist bitch" comment herself. It is unclear, therefore, how Gordon learned of the statement and how many layers of hearsay are present. Thus, Gordon's statement is inadmissible hearsay.

Mais's testimony based on Payne's alleged statements is likewise inadmissible hearsay. Mais is offering Payne's alleged statements for the truth of the matter asserted. That is, that Avery and others were referring to Mais by derogatory names. Payne was working as a stand-in secretary when she spoke with Mais. (ECF Doc. 107-1, at 38.) As with Gordon, there is no evidence that Payne had personnel or supervisory authority.

Despite her own reliance on inadmissible hearsay, Mais contends that the assertion in SUF ¶ 19 that Mais "learned that other employees were upset by her use of the term colored" is inadmissible hearsay. (ECF Doc. 107, at 17.) This fact is not introduced for the truth of the matter asserted—that other employees were actually upset—but to show Mais's notice of the situation. *See United States v. Ayala*, 601 F.3d 256, 272 (4th Cir. 2010). The Court can consider this evidence.

14

SUF ¶ 22 stated that Mais did not report Avery's use of terms like "white racist bitch" and "two-face racist bitch" to Human Resources or address Avery's conduct directly with Avery. (ECF Doc. 91, at 7.)   Nevertheless, Mais attempts to "dispute" this fact by arguing that she informed Kindler and Irani of this behavior.  (ECF Doc. 107, at 16.)  Mais's attempts to compare apples to oranges does not create a genuine issue of material fact to survive summary judgment.

While Mais argues that her assistant's desire to limit her interactions with Mais "made it hard for Mais to do her job", that does not contradict Mais's own testimony that she was able to perform her duties as assistant principal.  (ECF Doc. 107, at 16; ECF Doc. 91 at 7 (SUF ¶ 23); Mais Vol. I 128:18-129:6, 165:1-7, 183:20-25; Mais Vol. II 49:23-50:4, 50:14-22.)

Mais "disputes" the characterization of the August 6, 2021 meeting and its purpose as identified in SUF ¶¶ 24-25, "disputes" that Kindler was a mere notetaker as asserted in ¶ 26, and argues that Kindler's notes are an incomplete summary with respect to ¶ 27.  (ECF Doc. 107, at 17.)   Again, the School Board's facts were carefully crafted from Mais's own deposition testimony.  (ECF Doc. 91, at 7-8.)  Mais's attempts to augment the facts before the Court do not create a genuine issue of material fact.  Nor are her additional facts material.

Mais asserts that SUF ¶ 28 "omits key details about the tone and demeanor of the August 6 Meeting" but then provides only characterizations and conclusory statements unsupported by the record.  (ECF Doc. 107, at 18.)  For example, she accuses Avery of "gaslighting" her by saying she had not apologized to the whole community when she had apologized in the presence of everyone on June 11.  (*Id.*)  Nevertheless, Mais testified in this case that she understood Avery was asking her to apologize to others who were not in the meeting.  (Mais Vol. II 26:18-25.) Mais argues that Avery "disputed that it would be OK for Mais to use the term 'people of color'" when the record evidence to which Mais cites is that Avery "said she wasn't certain how that

term made her feel." (ECF Doc. 107, at 18 (citing App. 071).) Mais also attributes to Emily Holmstrom ("E. Holmstrom") a statement that "if white people weren't thinking the right way, they 'should be afraid to speak'" and that this was a good thing. (*Id.*) The evidence—that Mais cites—is that when the topic of "people" saying they were afraid to talk was addressed, E. Holmstrom responded that "maybe those people should be afraid to speak if what they are thinking is not appropriate." (ECF Doc. 91-14, at 2.) There was no reference to race or that this was "a good thing."

SUF ¶¶ 29-30, 36, and 37 address the lead-up to the September 9, 2021 meeting in which Mais and Avery addressed the Agnor-Hurt Staff. Mais's purported "disputes" with these paragraphs are not material. (ECF Doc. 107, at 21.) She asserts that she did not "willingly" address the staff because it was required of her by superiors, that she prepared a statement before Irani provided his script, and that Hairston directed Irani to organize the event. (*Id.*) This does not create a genuine issue of material fact and directly contradicts her own testimony. (*See e.g.*, Mais Vol. II 94:3-7.)

As explained *supra* in Part II.B., Mais seeks to change and amplify her deposition testimony—upon which SUF ¶¶ 33-34 are based. She cannot do this in an attempt to overcome summary judgment. Uncorroborated self-serving statements do not survive summary judgment. *See Hannah*, 72 F.4th at 638; *Evans*, 80 F.3d at 962; *Blanchard*, 2019 WL 1441629, at *5.

Although SUF ¶ 35 quotes directly from Mais's August 22, 2021 resignation email, she amazingly argues that it mischaracterizes the reason for her resignation. (ECF Doc. 107, at 21.) Again, Mais cannot rise above her own evidence. *See Hannah*, 72 F.4th at 638.

Finally, Mais "disputes" SUF ¶ 38 because it "omits material portions of the content and atmosphere of the meeting." (ECF Doc. 107, at 22.) It is hard to understand how that could be

possible when the audio of the meeting was made part of the record for the Court to review. Moreover, Mais's "dispute" again relies upon conclusory characterizations.

### III.    ARGUMENT

**A.    Mais did not experience a racially hostile work environment.**

**1.    Mais did not experience unwelcome conduct because of her race.**

Mais does not demonstrate that the alleged harassment was motivated by her race, rather than *her* use of the term "colored."   The examples of alleged harassment directed at her specifically all resulted from her use of the term "colored"—Avery's statements to Mais during the June 11 CCAR training sessions are just one example.[7]  And as the School Board noted in its Brief in Support, speech is not a protected characteristic.  *Lyman v. NYS OASAS*, 928 F. Supp. 2d 509, 523 (N.D.N.Y. 2013).

Perhaps recognizing this, Mais now argues that there is evidence of a disparate response to her use of the term "colored" and the response to black employees' allegedly "racist language and behavior," relying primarily on Avery's and Hairston's alleged conduct and statements. (ECF Doc. 107, at 26-27.)   Mais relies on cases that recognize that a plaintiff can support a discrimination claim under the *McDonnell Douglas* framework by showing that she was disciplined more severely than her coworkers for engaging in comparable misconduct.  (*Id.* at 26-28.)

For example, in *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 706-07 (6th Cir. 2007), the Sixth Circuit Court of Appeals concluded that the plaintiff created an inference that race was the motivating reason behind the alleged harassment.  In so concluding, the court noted that the

---

[7] And to the extent Mais argues that the CCAR program created a hostile work environment based on *her* race, Mais's testimony states the opposite.  (*See* Mais Vol. I 54:18-55:25, 112:16-21, 113:15-23.)

supervisor yelled at the plaintiff—who was black—but did not yell at her coworkers for the same conduct. *Id.* "Given that [the plaintiff] was the only black employee in her work area and that she alleges [her supervisor] disciplined her for things for which he did not discipline her co-workers, [the plaintiff] created an inference, sufficient to survive summary judgment, that race was the motivating reason behind [the supervisor's] behavior." *Id.* at 707.[8]

While courts within the Fourth Circuit have acknowledged that "[a]nimosity may be shown by 'differential treatment of similarly situated . . . employees,'" *Prosa v. Austin*, No. ELH-20-3015, 2022 WL 394465, at *36 (D. Md. Feb. 8, 2022) (quoting *Causey v. Balog*, 162 F.3d 795, 801-802 (4th Cir. 1998)), there is no evidence that Mais was treated differently than similarly situated employees, *see Goode v. Central Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619, 626 (4th Cir. 2015) (noting that "similarly situated employees" are the comparator), *abrogated in part on other grounds by Bing v. Brivo Sys., LLC*, 959 F.3d 605, 611-12 (4th Cir. 2020). A plaintiff must "provide evidence that the proposed comparators are not just similar in *some* respects, but 'similarly-situated *in all* respects.'" *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024) (emphasis in original) (quotation omitted). Thus, "the plaintiff must prove that she and the comparator 'dealt with the same supervisor, were subject to the same standards[,] and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (quotation omitted).

Here, Mais seeks to compare herself to Avery and Hairston. She is not similarly situated to either so as to establish an inference of race-based harassment. Avery was a teaching assistant

---

[8] Mais's reliance upon *Tabor v. Freightliner of Cleveland, LLC*, 388 F. App'x 321 (4th Cir. 2010), for this proposition; however, is misplaced. *Tabor* did not involve a hostile work environment claim, but instead asserted a disparate treatment discriminatory discharge claim. *Id.* at 321.

and Hairston was an Assistant Superintendent.   Mais, however, was an Assistant Principal. These individuals did not deal with the same supervisor and, as such, cannot be comparators. *See Trusty v. Maryland*, 28 F. App'x 327, 329 (4th Cir. 2002) (holding that a plaintiff and her subordinate are not similarly situated); *Watson v. Shenandoah Univ.*, No. 5:14-cv-22, 2016 WL 8619550, at *14 n.21 (W.D. Va. Nov. 14, 2016), *report and recommendation adopted* 2017 WL 1181029 (W.D. Va. Mar. 29, 2017), *aff'd* 699 F. App'x 262 (4th Cir. 2017) (holding that plaintiff's supervisor and subordinator were not true comparators).

Moreover, Mais, Avery, and Hairston did not engage in the same conduct.   Mais attempts to paint everything with the same wide brush, but the circumstances in which statements were made are very different.   Mais, as the Asisstant Principal of a diverse school, used the term "colored" during the June 11 CCAR session attended by her staff.   Avery told Mais during the June 11 CCAR session that she would expect that language "from an 80 or 90 year-old white person, certainly not somebody in [Mais's] position or [Mais's] age at this point in time."   (Mais Vol. I 144:10-19.)   Avery then allegedly referred to Mais as a "white racist bitch" and "two-face racist bitch"—not directly to Mais—but purportedly in conversations with others.[9]   Hairston made statements in an administrative leadership team meeting about how he received comments from certain parents made during a School Board meeting.   (Hairston 177:24-184:6.)   These circumstances are different and do not render Avery and Hairston similarly-situated such that the purported differential treatment gives rise to an inference that Mais was subjected to unwelcome conduct based on her race.

Because Mais has not shown that she was similarly situated to black employees in all relevant respects, Mais has not shown that any differential treatment is meaningful here.

_____

[9] This is inadmissible hearsay and should not be considered.  *See supra* Part II.C.

Accordingly, Mais cannot establish that any allegedly unwelcome conduct was based on her race.

### 2.   <u>Any unwelcome conduct was not sufficiently severe or pervasive.</u>

Courts in this Circuit regularly grant summary judgment on the severe or pervasive element of a hostile work environment claim.  *E.g.*, *McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 410 (4th Cir. 2022); *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207-09 (4th Cir. 2019); *Cuthbertson v. First Star Logistics, LLC*, 638 F. Supp. 3d 581, 592-93 (W.D.N.C. 2022); *Bouknight v. S.C. Dep't of Corr.*, 487 F. Supp. 3d 449, 461 (D.S.C. 2020).

Mais attempts to stave off summary judgment by citing various pieces of evidence and a handful of cases.  (ECF Doc. 107, at 30-33.)  Much of the evidence Mais relies on, however, does not support her contention that she experienced objectively severe or pervasive harassment. According to Mais, her alleged hostile work environment did not begin until the first CCAR training session on April 30, 2021, and she did not experience any racial tensions at work until that point. (Mais Vol. I 86:18-21, 87:2-14; *See also* ECF Doc. 4-2, at 113, ¶ 70.)  Thus, the evidence predating April 30, 2021, is irrelevant to Mais's claim.[10]  Additionally, much of the evidence cited by Mais could not be construed as harassment, including bullet points 1, 3, 5, 7, 8, 9, 11, 13, 14, 15, 17, 20, 21, 22, 26, and 27. (ECF Doc. 107, at 30-32.)  Given the dearth of evidence relevant to an objectively severe or pervasive environment, the cases cited by Mais are inapposite.

In *Hotchkiss v. CSK Auto Inc.*, 918 F. Supp. 2d 1108, 1116 (E.D. Wash. 2013), for example, the plaintiff (who was gay) alleged that during a two-month period a subordinate stated

---

[10] Additionally, Mais testified that discomfort was expected during the CCAR sessions and that she believed CCAR was "worth exploring to keep balanced and consider all viewpoints," although the book did not leave her feeling good about herself.  (Mais Vol I. 92:5-7; Mais Vol. II 64:2-11.)

that the plaintiff "sounded like a queer on the phone"; called the plaintiff a "queer" and a "faggot"; and responded, "What are you going to do about it, faggot?" when the plaintiff asked the subordinate to perform a task. A shift supervisor also told the plaintiff that "[a]ll faggots should be shot." *Id.*

When stripped of its hyperbole and inconsistencies,[11] Mais's admissible evidence only supports that:

- after Mais said "colored" during the **June 11, 2021** CCAR training session, Avery loudly and aggressively said that she would expect that sort of language from an 80- or 90-year-old racist person, (ECF Doc. 107-1, at 44, 46, 56);

- after not having contact with Avery for almost two months, Mais met with Avery, Hairston, Kindler, and E. Holmstrom on **August 6, 2021**, and Mais believed Avery implied during the meeting that Mais was racist, (ECF Doc. 107-1, at 64-65, 69);

- Mais then voluntarily agreed to apologize to the Agnor-Hurt staff on **September 9, 2021**, (ECF Doc. 107-1, at 113-115; *see* ECF Doc. 91-3, at 17-18); and

- some black employees were wearing camouflage during the **September 9, 2021** staff meeting, and two of the employees wore COVID-19 masks with "good trouble" in rhinestones on them, (ECF Doc. 107-1, at 124-25).

These events over a three-month span pale in comparison to the severity and frequency of the statements to the plaintiff in *Hotchkiss*.

Even if the Court were to accept, over the School Board's hearsay objection, the allegation that Avery referred to Mais as a "white racist bitch" and "two-faced racist bitch," the evidence is that these comments were made before July 1, 2021, they were not made directly to

---

[11] For example, Mais's Opposition relies on a declaration of Brandy Watson, a Special Education Teacher at Agnor-Hurt who allegedly was present for the September 9, 2021 staff meeting. (ECF Doc. 107-3, at 80-84.) Watson states, "After Ms. Mais started to apologize, Ms. Avery interrupted her and began to berate her and yell at her." (*Id.* at 82, ¶ 16.) That assertion is belied by the recording of the staff meeting. (*See* ECF No. 91-23.)

Mais, there is no evidence that they were repeated, and Mais had no interaction with Avery between June 11 and August 6, 2021.  As such, even considering these comments, the evidence does not establish severe or pervasive harassment.[12]  *See, e.g.*, *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (4th Cir. 2022) ("remarks that are stated directly to the plaintiff weigh heavier than when a plaintiff hears them secondhand"); *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019) ("Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment").  "The focus must be on personal experience, not second-hand comments." *Tillery*, 2016 WL 5334673, at *9 (citing *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190 (4th Cir. 2004)).  "Comments made outside the plaintiff's presence cannot independently sustain a hostile work environment claim." *Id.* (citing *Dawson v. Rumsfeld*, No. 1:05-cv-1270, 2006 WL 325867, at *4 (E.D. Va. Feb. 8, 2006)).  Moreover, "minor incidents, even in the aggregate, do not merit relief." *Mayo v. Smith*, No. 1:15-cv-0029, 2016 WL 2894871, at *8 (E.D. Va. May 16, 2016).

### 3.      Any unwelcome conduct was not imputable to the School Board.

Mais's argument about the *Ellerth/Faragher* affirmative defense is a red herring.  (*See* ECF Doc. 107, at 35.)  The evidence does not show that a supervisor harassed Mais.  *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir. 2001) ("The affirmative defenses . . . allows an employer to avoid strict liability for a supervisor's . . . harassment of an employee if no tangible employment action was taken against the employee.") (citation omitted).  At most, Mais

---

[12]  Further, as noted above, Gordon does not state in her declaration that she informed Mais that Avery referred to her as a "white racist bitch" nor does Mais testify that Gordon made her aware of this information.  As such, "racially offensive statements to co-workers that [plaintiff] did not know about do not create a genuine issue of material fact." *Perkins*, 936 F.3d at 210 (experiences of third parties about which a plaintiff was unaware should not be considered in evaluating a hostile work environment's severe or pervasive requirement.)

points to Hairston's statements during a prerecorded November 2020 orientation—about seven months before the June 11, 2021 CCAR session—and a May 28, 2021 administrators' meeting that Mais attended remotely.  (Mais Vol. I 129:7-17.)  However, Mais testified that but for CCAR training sessions from April 30, 2021 to June 11, 2021, there was no hostile work environment.  (Mais Vol. I 60:17-23, 86:18-21; 87:2-13.)  As such, these actions by Hairston, or CCAR in general, do not support her claim.

Mais then cites *Artis v. Lyon Shipyard, Inc.*, No. 2:17cv595, 2019 WL 13295542, at *1 (E.D. Va. Sept. 30, 2019), for the proposition that "when a superior witnesses the harassment, that's sufficient."  (ECF Doc. 107, at 36.)  But *Artis* does not state this.  And even if it did, *Artis* involves distinguishable facts.  There, the plaintiffs (black and Hispanic employees) alleged that over the "course of multiple years," several supervisors *themselves* used the "n-word" and other racial slurs like "boy," "black-ass," "money," "wetbacks," and "lazy spies"; told racist jokes; displayed the confederate flag; gave white employees preferential job assignments; and terminated nonwhite employees that complained about discrimination. *Artis*, 2019 WL 13295542, at *1.[13]

While Kindler attended the CCAR sessions, she was not Mais's supervisor.  (Kindler 11:19-14:4.)  Moreover, neither Mais nor any supervisor witnessed the offensive comments Avery allegedly made about Mais to others.

Mais contends that the School Board cannot "fault" Mais for following the School Board's nondiscrimination policy and cites *EEOC v. Ecology Services, Inc.*, 447 F. Supp. 3d 420,

---

[13] Moreover, there is support for the opposite proposition.  Merely witnessing allegedly harassing behavior is insufficient to impute liability to the employer.  *See, e.g. Conatzer v. Medical Professional Bldg. Serv., Inc.*, 225 F. Supp. 2d 1259, 1269-70 (N.D. Okla. 2003) (distinguishing between a supervisor merely witnessing behavior the plaintiff later characterized as harassing and being told by the plaintiff that she was being harassed).

452 (D. Md. 2020), in support.  (ECF Doc. 107, at 37.)  Mais does not explain the relevance of

*Ecology Services, Inc.*, however.  Mais did not report the conduct of which she now complains to

HR until, at best, August 17, 2021.  (Mais Vol. II 45:3-8.)  To overcome this failure, Mais argues

that she reported it to Kindler, Irani, and Hairston.  (ECF Doc. 107, at 36.)  Kindler was not

Mais's supervisor.  (Kindler 11:19-14:4.)  While Irani was her supervisor, he began at Agnor-

Hurt in early July 2021, at which time Mais and Avery were not having contact with one another.

As such, there was no action to be taken, nor did Mais ask that Irani take action.  (Mais Vol. I

179:24-181:4; 181:24-182:3).  Finally, Hairston did address the situation between Avery and

Mais in the August 6 meeting—a meeting that Mais believed needed to happen and one that she

was involved in planning.  (Mais Vol. II 9:8-11; ECF Doc. 91-12.)  Then, within days of HR

learning about Mais's concerns, Mais resigned, leaving HR with no opportunity to take action.

Mais further contends that she lacked the authority to discipline Avery.  (ECF Doc. 107,

at 37.)  But Mais's did not testify that she lacked the authority to discipline staff.  Instead, Mais

testified that she "could be brought in [to discipline] at any time," that she only "periodically"

consulted with Granger about disciplining, and that she had the right to recommend discipline of

staff.  (Mais Vol. I 61:15-62:4.)  Thus, *Powell* and *Knudsen* support the School Board's

argument.  The evidence in *Powell* and *Knudsen* indicated that the plaintiffs did not have the

authority to discipline the harassing subordinate, which distinguish them from the case at bar.

*Powell v. Susdewitt Mgmt., LLC*, No. CCB-20-2343, 2021 WL 4420999, at *6 (D. Md. 2021);

*Knudsen v. Bd. of Sup'rs of Univ. of La. Sys.*, No. 14-382, 2015 WL 1757695, at *5 (E.D. La.

2015).

Here there is simply no evidence that the School Board knew or should have known about alleged harassment and failed to take action calculated to stop it. *See Bazemore v. Best Buy*, 957 F.3d 195, 201 (4th Cir. 2020).

**B.     Mais was not constructively discharged.**

Mais largely fails to address the purported intolerability of her working conditions, instead opting to focus almost entirely on whether she reasonably believed her situation would not improve.  (ECF Doc. 107, at 38-39.)  In doing so, Mais contends, without support, that futility is the "hallmark" of a constructive discharge claim.  Mais's position completely ignores the focus that courts have placed on whether a plaintiff can clear intolerability's "high bar."  *See Gaines v. Balt. Police Dep't*, 657 F. Supp. 3d 708, 741 (D. Md. 2023).  Mais has not shown that she suffered a hostile work environment for the reasons stated *supra* in Part III.A.  Mais's constructive discharge claim fails for this reason alone.  *Perkins*, 936 F.3d at 212 (noting that a plaintiff who fails to show a hostile work environment cannot show constructive discharge); *Evans*, 936 F.3d at 192 (To establish a hostile-environment constructive discharge claim, a plaintiff must show the requirements of both a hostile work environment and a constructive discharge claim).

Regardless, Mais's offered evidence does not demonstrate that she experienced an intolerable work environment.  *See, e.g.*, *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (evidence that the plaintiff's supervisors "yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back" could not survive summary judgment); *Lindsay-Felton v. FQSR, LLC*, 352 F. Supp. 3d 597, 606 (E.D. Va. 2018) (a reasonable juror could not conclude that the plaintiff's supervisor "yelling at her and repeatedly calling her stupid or dumb" over several months was

the "functional equivalent of termination"). *Compare Amirmokri v. Baltimore Gas & Electric Co.*, 60 F.3d 1126, 1131, 1132 (4th Cir. 1995) (evidence that over six months the plaintiff's supervisor and coworkers called him racial epithets on an almost-daily basis and tried to embarrass the plaintiff in public was sufficient to survive summary judgment); *Eller v. Prince George's Cnty. Pub. Schs.*, 580 F. Supp. 3d 154, 176 (D. Md. 2022) (evidence that over five years a teacher was physically assaulted, physically threatened multiple times with "rape and arson," and "repeatedly" called derogatory names by students and parents was sufficient to survive summary judgment); *Rush v. Speedway Buick Pontiac GMC, Inc.*, 525 F. Supp. 2d 1265, 1269 (D. Kan. 2007) (evidence that over an eight-month period, a former supervisor retained as a consultant subjected the 18-year-old plaintiff to repeated vulgar commentary each time they had contact).[14]

These cases may not set the floor for constructive discharge claims, but they demonstrate what evidence is required to survive summary judgment. As noted above, Mais's admissible evidence identifies four events over the course of three months. *See supra* Part III.A.2. No reasonable juror could conclude that Mais experienced objectively intolerable working conditions based on this evidence. Mais may *feel* that her working conditions were intolerable, but that is irrelevant. Intolerability is assessed objectively. *Perkins*, 936 F.3d at 212.[15]

Mais argues that "for months" she "tried to get someone's attention" and no one came to her aid. (ECF Doc. 107, at 38-39.) Not only is this belied by the admissible evidence in this case, it ignores the fact that nothing that happened after August 6 played a role in Mais's decision to resign. On August 22, 2021, at 6:34 a.m., Mais stated:

---

[14] Mais relies on *Amirmokri* and *Rush* in her Opposition. (ECF Doc. 107, at 38.)

[15] To that end, Mais testified she thought the ideology in *Courageous Conversations About Race* was worth exploring to keep balanced and consider all viewpoints, but that she did not like the way it made her feel. (Mais Vol. II 63:15-64:11.)

I have given this a lot of thought and it has been a very difficult decision to make. I am asking to be released from my contract without penalty and in good standing. I fully understand the needs of our building and am well aware that this decision could have been made prior to signing my contract.  With that being said our contracts came out later and the meeting that took place on August 6th was postponed a number of times for one reason or another.  As a result I am going out on a limb and sharing courageous thoughts.  **Had the meeting occurred before signing my contract I likely would not have signed it.**

(ECF Doc. 91-18 (emphasis added); Mais Vol. II 62:1-63:10.)  There is nothing that Gerome, C. Keiser, or D. Keiser—all of whom learned of Mais's situation after August 6—could have done to address the situation.   (Mais Vol. II 60:14-19.)   Indeed, despite acknowledging that the meeting with C. Keiser was the "first step in addressing the problem", Mais resigned three days later without any intervening conduct.[16]   (Mais Vol. II 55:17-24; 59:10-19.)   Moreover, Mais testified that it was not the alleged lack of action that led her to resign.  (Mais Vol. II 60:20-61:6.)

## C.   <u>The School Board did not retaliate against Mais.</u>

Mais contends that the School Board is challenging only Mais's failure to engage in a protected activity.  (ECF Doc. 107, at 41.)  Not so.  The School Board specifically addressed the other elements of Mais's retaliation claims by reference to the arguments addressing Mais's hostile work environment and constructive discharge claims, both of which Mais must prove to prevail on her retaliation claims.  (ECF Doc. 91, at 23-24.)  The School Board argued that, in addition to those reasons, the retaliation claims fail because Mais did not engage in protected activity.

---

[16] In fact, Mais testified that she "did not ask [C. Keiser] specifically to do something."  (Mais Vol. II 56:19-24.)  Mais also testified that she did not ask for additional time to think about her August 22 resignation, did not ask to be placed in a different building because of her concerns with CCAR work, and did not consider discussing an alternative to resignation.  (Mais Vol. II 66:16-67:14; 70:22-25.)  Additionally, she started looking for alternate employment as soon as she sent her email to C. Keiser.  (Mais Vol. I 27:23-28:1.)

In an effort to cure the fact that the record is devoid of any evidence to establish that she engaged in protected activity, Mais seeks to amplify and amend the record through a self-serving declaration in opposition to summary judgment. As explained *supra* in Part II.B., this is insufficient to survive summary judgment.

A review of Mais's testimony makes clear that she did not complain about racial discrimination or harassment, or conduct prohibited by Title VII, she complained of the manner in which subordinate employees were permitted to speak and conduct themselves. In Mais's opinion the balance of power had been upturned.

- My real problem is the way in which she [Avery] responded and the lack of professionalism and how our resources for support as administrators I felt like weren't there because of this work and how it allowed staff to behave in a manner that was not acceptable or had never been up until this work came out and how I felt like it was muddying the waters.

- This is an example of no control in a situation where my job once afforded me some sort of control.

- And I gave her the example of the 'N' word but also throughout the entire process, the—the text itself and the—the implications, the struggle that it put administrators—the bind that it put us in in terms of muddying the water between ranks, the norms, how they almost set the stage in a manner that normalized poor behavior, which I felt I had witnessed from start to finish.

- And that wasn't—and what I reiterated to her was because of the way Sheila responded in the moment on the July—the June training session, how that kind of behavior we were normalizing and the how the norms of the Courageous Conversations About Race work limited our ability if we're supposed to let people speak their truth and sit with discomfort and expect and accept nonclosure . . .

(Mais Vol. I 174:3-9; Mais Vol. II 19:25-20:2, 45:20-46:2, 53:6-13.)

Moreover, even if Mais's conversations with Kindler, L. Holmstrom, Irani, Hairston, Gerome, C. Keiser, and D. Keiser could possibly be construed as protected activity, the evidence

establishes those conversations were not the "but for" cause of Mais's resignation and the allegedly hostile work environment.

First, there is no evidence that Avery knew Mais spoke with these individuals and perpetuated the alleged harassment because of those complaints.  Nor is there evidence that Hairston—even if he could be construed as a harasser, which he cannot—knew that Mais allegedly complained and persisted in his treatment of her for that reason.  As such, Mais cannot prevail on her claims of retaliation.  *See, e.g. Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111, 124 (4th Cir. 2021) ("In this Circuit, we have consistently required proof of a decisionmaker's knowledge of protected activity to support a Title VII retaliation claim . . . a plaintiff must show that the decision maker was aware of the protected activity at the time the alleged retaliation occurred.").

Second, the alleged hostile work environment and Mais's resignation letter predate her purported protected activity.  As such, any purported protected activity could never be the "but for" cause of the allegedly hostile work environment or her claimed constructive discharge.

The School Board is entitled to summary judgment on Mais's retaliation claims.

## IV.    CONCLUSION

Mais's situation is a product of her own doing—her use of the racially-charged term "colored" on June 11, 2021.  Any treatment Mais experienced was not based on her race, but her use of this term.  She cannot transform her circumstance into a hostile work environment or constructive discharge claim under Title VII or a claim of retaliation.  The School Board is entitled to summary judgment.

**ALBEMARLE COUNTY SCHOOL BOARD**

By Counsel

s/Jeremy D. Capps
David P. Corrigan (VSB No. 26341)
Jeremy D. Capps (VSB No. 43909)
Melissa Y. York (VSB No. 77493)
Blaire H. O'Brien (VSB No. 83961)
Counsel for Albemarle County School Board
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com
myork@hccw.com
bobrien@hccw.com

# C E R T I F I C A T E

I hereby certify that on the 23rd day of August, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Katherine L. Anderson
Henry W. Frampton, IV
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
480-444-0020 - Phone
kanderson@ADFlegal.org
hframpton@ADFlegal.org

David A. Cortman
Alliance Defending Freedom
1000 Hurricane Shoals Rd. NE
Suite D1100
Lawrenceville, GA 30043
770-339-0774 - Phone
dcortman@ADFlegal.org

Christopher P. Schandevel
Vincent P. Wagner
Mallory B. Rechtenbach
Noel W. Sterett
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
773-519-4872 - Phone
571-707-4656 - Fax
nsterett@ADFlegal.org
vwagner@adflegal.org
mrechtenbach@adflegal.org

s/Jeremy D. Capps
David P. Corrigan (VSB No. 26341)
Jeremy D. Capps (VSB No. 43909)
Melissa Y. York (VSB No. 77493)
Blaire H. O'Brien (VSB No. 83961)
Counsel for Albemarle County School Board
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com
myork@hccw.com
bobrien@hccw.com