CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

September 09, 2024
LAURA A. AUSTIN, CLERK
BY   s/ S. MELVIN
        DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| EMILY MAIS,<br><br>*Plaintiff,*<br><br>v.<br><br>ALBEMARLE COUNTY SCHOOL BOARD,<br><br>*Defendants.* | Case No. 3:22-cv-51<br><br><br>MEMORANDUM OPINION<br><br><br>Judge Norman K. Moon |

Plaintiff Emily Mais has filed this civil action against Albemarle County School Board alleging that, while working as assistant principal at Agnor-Hurt Elementary School, she was subjected to a hostile work environment, constructive discharge, and unlawful retaliation on the basis of race, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2018). Defendant Albemarle County School Board ("School Board") has moved for summary judgment on all of Mais' claims. For the reasons set forth below, the Court denies the motion for summary judgment as to the claims for hostile work environment and constructive discharge and grants summary judgment as to the retaliation claim.

## I.     Factual Background

Emily Mais was hired as assistant principal at Agnor-Hurt Elementary School in October 2018. Dkt. 91-2 (Mais Dep.) at 2-3.[1,2] Mais was the only assistant principal at the time and

---

[1] For the citations in this opinion, the Court has adopted the following system: "Dkt." refers to the ECF number assigned to the document (e.g., "Dkt. 91-2"), and the pincites refer to ECF pagination stamps at the top of the document.

[2] The facts described are either uncontested or viewed in the light most favorable to Plaintiff, as the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

1

reported to principal Doug Granger. Dkt. 91-2 at 3. Mais had the authority to recommend discipline of staff. Dkt. 107-1 at 16. Sheila Avery was a teaching assistant at Agnor-Hurt, with whom Mais had regular interaction. Dkt. 91-2 at 29. Avery reported to Mais and Granger. Dkt. 91-4 at 3. Bernard Hairston served as Assistant Superintendent for School and Community Empowerment for Albemarle County Public Schools. Dkt. 91-5 at 2.

### A. Adoption of the Anti-Racism Policy and Training Curriculum

On February 28, 2019, the School Board adopted an Anti-Racism Policy and related Regulations "to eliminate all forms of racism from the Division" and as a reflection of the School Board's commitment to "[e]stablishing and sustaining a school community that shares the collective responsibility to address, eliminate, and prevent actions, decisions and outcomes that result from and perpetuate racism," as well as "[r]especting and championing the diversity of life experiences of all community members." Dkt. 91 at 2 (quoting and citing Dkt. 91-6 at 1-5). When the policy was adopted, Mais "respected" and "accepted" the policy on its face. Dkt. 91-2 at 10. She did not initially express concerns with the policy or its regulations. Dkt. 91-2 at 12. The policy stated that "the assistant superintendent for school and community empowerment shall be responsible for implementation" of the anti-racism policy, Dkt. 91-6 at 5, and further required that all staff "shall be trained" on the policy. *Id*. at 4.

In June 2020, Mais learned about the "requirements" placed on administrators for the implementation of the anti-racism policy and the training of staff. Dkt. 107-1 at 10-11. Mais and other administrators attended a meeting hosted by Hairston, in which Hairston explained how Glenn Singleton's book, "Courageous Conversations About Race" (CCAR), included a training toolkit which administrators would use to train staff on the anti-racism policy. Dkt. 91 at 3; Dkt. 91-4 at 3; Dkt. 107-1 at 17. Hairston explained that staff were to "fully embrace this work

without hesitation." Dkt. 91-2 at 21. Mais perceived Hairston at the meeting as "fueled with anger and rage over the incidents that had occurred around the [murder of George Floyd]." Dkt. 107-1 at 17. Mais also had concerns about Singleton's book and the CCAR training curriculum, which she felt "assum[ed] a great deal about groups of people." Dkt. 107-1 at 19. Later that year, the Board showed staff a video of Hairston telling staff to "own" the training and consider whether they were on the "antiracism school bus" or if it was time "to just get off the bus." Dkt. 107 at 10 (quoting Dkt. 107-1 at 234). Mais found the video "threatening." Dkt. 91-2 at 23.

Mais did not file a formal complaint about the rollout of the CCAR program because, she alleges, administrators and staff "were supposed to sit with discomfort, allow people to speak their truths, . . . and accept non-closure" according to the tenets of the program. Dkt. 107-1 at 19. However, Mais spoke with Granger and explained that she was "taken aback" at the tone of the June 2020 meeting and that she had "never witnessed in a professional setting" what she had witnessed in that meeting. Dkt. 91-2 at 22. Mais refrained from "specifics" since the program was "still very new," and she wanted to avoid "jumping to some conclusion." Dkt. 91-2 at 22. But she expressed that the nature of the CCAR text was "divisive" and was concerned about how it would be "received." Dkt. 91-2 at 25. Mais was concerned that administrators' task of implementing the CCAR training for staff "created immeasurable amounts and opportunities for racism to thrive." Dkt. 91-2 at 10. In late 2020 or early 2021, Mais also spoke to Michele Castner, Director of Education and Mais' superior, about her concerns with the leadership training on the CCAR curriculum. Dkt. 91-2 at 26; Dkt. 107 at 11.

In February 2021, Granger took extended leave to deal with a family tragedy. Dkt. 91-2 at 31. Mais remained in her position as assistant principal, while the School Board "brought in other retired principals," including Ashby Kindler, in Granger's absence. Dkt. 91-2 at 31-32.

3

Avery reported to Ashby Kindler. Dkt. 91-4 at 3. The record is unclear as to whether Kindler and the other retired principals were placed in a position superior to or equal to Mais. Granger, however, specifically tasked Kindler with leading the CCAR training sessions that were to occur that spring. Dkt. 107-1 at 193. Mais did not speak with Kindler about how CCAR would be implemented, but she shared concerns about how the conversation could be challenging based on the text. Dkt. 91-2 at 33.

### B. CCAR Training

The first CCAR session at Agnor-Hurt was held on April 30, 2021. Dkt. 91 at 4. Sessions were held on Fridays via Zoom, and there were four sessions in total. *Id.* Before the start of the CCAR training, Mais had a "good relationship" with Avery and had not experienced "any racial tensions at work." Dkt. 91-2 at 30. In the first meeting, Mais states that "Sheila Avery made herself a voice for a group of unnamed staff members, teachers, . . . a group of black people in the building." Dkt. 107-1 at 28. Avery was "their voice" because they were feeling discomfort "around race." *Id*. Avery said "she was representing a group." Dkt. 107-1 at 29. Mais felt that Avery's tone was "questionable at best" and that she was "talking down to the group." Dkt. 107-1 at 30. Avery was "establishing herself in a leadership role . . . in a group session." Dkt. 107-1 at 31.

Mais states that several other staff members were shut down or dismissed by Avery during the series of training sessions. Jessica Wilson was told that her experience in poverty as a non-Black person was not relevant, while Layne Rickabaugh was told that his experience as a non-Black minority was not relevant. Dkt. 107-1 at 31-32. When Tana Krstich, a white employee, said the sessions should be inclusive of all races, including Asians, Avery declared, "They've had their time, it's the Black time now." Dkt. 107-3 at 77. Mais found these events to

4

be occurring in a "racially charged manner" and reported these events to Kindler. Dkt. 91-2 at 49; Dkt. 107-1 at 36. Kindler repeatedly refrained from intervening or correcting Avery. Dkt. 107-3 at 68, 77.

The final CCAR training session was held on June 11, 2021. Dkt. 91 at 5. Toward the end of the session, Mais' cohort, of which Avery was a part, was "going through a series of slides" that discussed racial disparities in hiring practices. Dkt. 107-1 at 41. Mais, noticing the predominance of white people over black people in hiring, made a comment in which she used the term "colored" people instead of "person of color." Dkt. 107-1 at 41. Avery responded, saying something to the effect of "what the f*ck did she say?" Dkt. 107-1 at 44. Avery said she would expect an older person in their 80s or 90s to use that term, Dkt. 107-1 at 194, and, continuing in her response, specifically used the term "racist." Dkt 107-1 at 56. Mais responded, "I am so sorry. That is not at all what I intended to say." Dkt. 107-1 at 46-47. After an "awkward silence," Kindler closed the meeting. Dkt. 107-1 at 47.

### C. Aftermath of the June 11 Meeting

Mais had a flurry of conversations in the wake of her use of the term "colored" during the June 11 training session. Emily Holstrom, an equity specialist at Agnor-Hurt, emailed Mais to ask if she wanted to unpack the incident, which made Mais wary since, in Mais's view, Holstrom may "sound[] helpful" but had a history of being "threatening." Dkt 107-1 at 49. The following Monday, June 14, 2021, Holstrom and Mais spoke. Mais expressed her concern about the building tension, about how Avery had reacted to the situation, and about how Avery's behavior, unrestrained, sent a message to the "entire staff" that such behavior was acceptable according to CCAR's tenets. Dkt. 107-1 at 50-51. Mais also spoke with Lars Holstrom, who worked with Hairston, and proceeded to give "feedback" to L. Holstrom about the CCAR session, including

how Mais felt she was not afforded any grace from Avery and that Avery responded unprofessionally. Dkt. 107-1 at 61-62. Later, in speaking with Michele Castner, Mais was encouraged to just "fall on her sword" and watch what she said so that the situation would pass. Dkt. 107-1 at 54.

Later in the summer, Mais' assistant, Tracey Payne, came to Mais' and shared that other staff members were talking about Mais in a "negative nasty tone" and that it was disturbing to Payne. Dkt. 107-1 at 57-60. Payne said they were using language such as "white racist bitch" and said Avery was one of the persons using this language. *Id*. Payne asked Mais if the two of them (Payne and Mais) could limit their exchanges so as to avoid harm to Payne's reputation. *Id.* Other staff stopped coming to Mais' office entirely. Dkt. 91 at 57. Between June 11 and August 6, Mais had no contract with Avery, in part because Hairston had told Mais not to make contact with Avery. Dkt. 91-2 at 76.

### D. August 6 Meeting

In July 2021, Hairston requested a meeting between Mais and Avery. Dkt. 107-1 at 64-65. In advance of the meeting, Hairston told Mais that there was a "larger group" (outside of Mais' CCAR cohort in front of whom Mais said "colored") who were upset with Mais' word choice; that a husband of a staff member had called and filed a complaint; and that Mais and Avery should refrain from speaking to each other until the meeting. Dkt. 107-1 at 64-65. Mais "did not object" to the meeting, as Hairston was "[her] supervisor." Dkt. 107-1 at 65. Mais sent an email to Kindler asking that she attend, too. Dkt. 107-1 at 65.

During that same period, Mike Irani became the new principal at Agnor-Hurt. Dkt. 107-1 at 66. On Irani's first day, Mais went to him to explain what happened at the June 11 training and to express her concerns about Avery's behavior and the work environment. Dkt. 107-1 at 66; 68-

69. Mais expressed that there was "growing tension." Dkt. 107-1 at 66. Over email on or around July 9, Mais explained to Irani that the growing tension was both a safety concern and something that would affect staffing assignments; that Payne was concerned about being seen with Mais; and that this was severely affecting Mais' ability to "get work dome" and "adhere to all the deadlines," since Payne was the only "functioning secretary." Dkt. 107-1 at 68-69.

A meeting was scheduled for August 6 between Mais and Avery, with Kindler, Hairston, and E. Holstrom also to attend. Mais had asked for the meeting to be recorded, but Hairston refused out of concern that the recording could be leaked to the press. Dkt. 107-1 at 71. Mais acquiesced to an "intermediate ground" in which Kindler would take notes, despite Kindler also being a participant. Dkt. 107-1 at 71.

Mais had a chance to review the agenda and took no issue with it, but she left the meeting "in shock." Dkt. 107-1 at 73. Mais felt that Hairston continually reminded the participants of their duty to not be complicit in racism and that Holstrom praised Hairston for this in a way that implied Mais was a racist or had exhibited racist conduct. Dkt. 107-1 at 74. Mais felt that her apology in the June 11 meeting was being ignored, and that she was being held accountable despite apologizing, while Avery was allowed to "carry on," despite having not apologized. Dkt. 107-1 at 75. Though not reflected in the meeting minutes, Mais states that she expressed concerns in the meeting that the CCAR training was creating growing tension and racial hostility in the workplace. Dkt. 107-1 at 81. Hairston, meanwhile, suggested that Mais and the rest of the staff repeat the CCAR training. Dkt. 107-1 at 95, 99.

At the end of the meeting, Mais agreed to address the entire staff at a later date, at Hairston's direction. Dkt. 107-1 at 87, 176. Mais states that she agreed to this only because Hairston thought it was necessary as her "professional responsibility," she wanted to follow her

superior's orders, and she felt she could not refuse without creating more problems: "[H]ow would that make me look? . . . [W]ould [refusing to give the address] further make me look like a racist to a group of people who think that I committed a racist act?" Dkt. 107-1 at 87-88. Ultimately, Mais left the meeting feeling that it only did "more damage." Dkt. 107-1 at 74.

### E.  Reporting to HR

On August 8, Mais alerted Irani to the fact that she intended to seek mental health counseling to deal with the effects of the ongoing situation. Dkt. 107-1 at 89. Mais had been recently experiencing panic attacks, trouble sleeping, and other symptoms. Dkt. 107-1 at 89. Mais told Irani that the August 6 meeting triggered something that she was struggling to manage. Dkt. 107-1 at 90.

On or around August 15, Mais called and left a message with Lorna Gerome, the Division's Director of human resources (HR). Dkt. 107-1 at 91. The two later met on August 17 and Mais expressed her concerns to Gerome, including that the CCAR program and the "text itself" caused a "divide" and normalized poor or even threatening behavior. Dkt. 107-1 at 93-94. Gerome appeared reassuring and said that she would relay this information and get back to Mais. Dkt. 107-1 at 94. Mais did not ask to file a formal complaint. Mais felt that by telling Gerome, she "was filing a complaint." Dkt. 107-1 at 94-95.

On August 19, assistant superintendent Clare Keiser, alerted by Gerome, stopped by an open house at the school to speak with Mais. Dkt. 107-1 at 96-99. Mais described her concerns to Keiser at length, including the growing racial tension, Avery's behavior, the effects on other staff members, and the anxiety Mais was experiencing. *Id.* Keiser said that human resources should have been involved "from the start" and that Hairston should not have conducted the August 6 meeting without human resources involved. Dkt. 107-1 at 98. Mais also expressed to Keiser her

discomfort with being directed to later address the entire staff. Dkt. 107-1 at 100. Keiser did not propose any concrete "path forward." Dkt. 107-1 at 101.

By August 22, Mais was feeling "disgusted;" she felt like her complaints and apologies were "falling on deaf ears" or were being "dismissed." Dkt. 107-1 at 104. That day, Mais sent an email to Clare Keiser with the subject line "Letter of Resignation," though it was not processed immediately, reasons for which the record is unclear. Dkt. 107-1 at 102. On or around August 27, Mais met with Daphne Keiser, also of HR. Dkt. 107-1 at 107. Mais expressed to her much of the same concerns about the work environment and its effect on her. Dkt. 107-1 at 108. Mais left the meeting saying that she needed the weekend to "think" about it, and the two did not end the meeting with any action plan. Dkt. 107-1 at 111.

### F. Staff Address and Resignation

Once Mais' resignation was processed along with a two-week notice period, Mais' last day was slotted for September 10, 2021. Dkt. 107-1 at 127. Leading up to this date, between late August and early September, Mais and Irani exchanged emails about putting together a joint statement, as originally proposed in the August 6 meeting, in which Mais would address the entire staff of Agnor-Hurt. Dkt. 107-1 at 112-114. Mais alleges that, in doing so, she was "doing what [she] was directed to do." Dkt. 107-1 at 114. She knew she was leaving Agnor-Hurt but she also states that she was "still employed by the county" and that she "did [it] because she was still employed." Dkt. 107-1 at 114.

Mais, Irani, Holstrom, and Avery participated in several "joint statement planning sessions." Dkt. 107-1 at 113. Mais brought her own statement to one of the meetings; she felt that she "needed to be heard." Dkt. 107-1 at 117. Mais alleges that when she read her statement in the meeting, Avery cut her off and said that "no one cared" about her feelings and that's what

she failed to understand. Dkt. 107-1 at 118. She further alleges that E. Holstrom compared her to "singletons" and said Mais was acting like a "typical white person" in defensive mode. Dkt. 107-1 at 118. Mais states that Irani, who was present, did nothing in response and that Mais felt this sent a signal that it was okay to "gang up on somebody." Dkt. 107-1 at 119. In a September 7 planning meeting, Mais alleges that she indicated to Irani that HR should be involved, yet Irani gave a "goofy look," demurred, and implied that it wasn't necessary. Dkt. 107-1 at 120-121. Prior to one of these meetings, Irani sent an email to Mais that contained a proposed script and outlined the format for Mais' remarks at the staff address: two minutes for facts, three minutes for reflections, and thirty seconds for final thoughts. Dkt. 107-1 at 120.

The staff address took place on September 9 at Agnor-Hurt. Several staff members, including Bev Anderson, Cheryl Brooks-Davis, and Pecolia Conner, were dressed in camouflage. Dkt. 107-1 at 124. All staff members were required to wear masks at this time due to the COVID-19 pandemic, and Bev Anderson and Cherly Brooks-Davis wore masks with "good trouble" spelled in rhinestones on their masks. Dkt. 107-1 at 124-125. Mais alleges that she cannot recall whether others wore camouflage or special masks, because she found it to be an "uncomfortable situation" and was avoiding direct eye contact with people. Dkt. 107-1 at 126. At the meeting, Mais delivered a tearful apology, and then Avery angrily berated her as a racist in front of the crowd—to the extent that, once Avery concluded speaking, "eight or nine" staff members ran to Mais to comfort her, while many staff members left the room in tears. Dkt. 107-1 at 171, 189. All of this occurred while Irani presided. Dkt. 107-1 at 179.

## II.   Legal Standard

### A.  Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). The nonmoving party must "show that there is a genuine dispute of material fact . . . by offering sufficient proof in the form of admissible evidence." *Id.* (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Id.* "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

The moving party bears the burden of establishing that summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, then the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant may not rest on allegations in the pleadings; rather, it must present sufficient evidence such that reasonable jurors could find by a preponderance of the evidence for the non-movant. *Celotex Corp.*, 477 U.S. at 322–24; *Sylvia Dev. Corp. v. Calvert Cnty, Md.*, 48 F.3d 810, 818 (4th Cir. 1995). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

A party cannot manufacture a genuine issue of material fact merely by submitting evidence which conflicts with her prior-submitted evidence, such that "the only issue of fact is to

determine which of the two conflicting versions of the [party's] testimony is correct." *Barwick v. Celotex Corp*., 736 F.2d 946, 960 (4th Cir. 1984); *Hannah v. United Parcel Serv., Inc*., 72 F.4th 630, 638 (4th Cir. 2023) ("a party who has been examined at length on deposition [cannot] raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony"). Thus, a party's "self-serving opinion" cannot defeat summary judgment absent objective corroboration. *CTB, Inc. v. Hog Slat, Inc*., 954 F.3d 647, 658-59 (4th Cir. 2020); *Harris v. Home Sales Co*., 499 F. App'x 285, 294 (4th Cir. 2012) (noting that "[a]lthough we do not make credibility determinations at the summary judgment phase, we should also not find a genuine dispute of material fact based solely on [a party's] self-serving testimony"); *Felty v. Graves–Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987) ("Unsupported speculation is not sufficient to defeat a summary judgment motion.").

### B. Summary Judgment and Admissibility of Evidence

Evidence cited to support or oppose summary judgment must be in a form that is admissible at trial, and, if it is not, a party may object that "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Furthermore, Rule 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Thus, summary judgment declarations, as well as other forms of record evidence, cannot be conclusory or based upon hearsay. *Evans v. Techs. Applications & Serv. Co*., 80 F.3d 954, 962 (4th Cir. 1996).

When a party submits affidavits or other evidence in opposition to summary judgment that would be inadmissible if the affiant were testifying at trial, courts should decline to consider

the evidence as part of the summary judgment record. *See, e.g. Sakaria v. Trans World Airlines*,
8 F.3d 164, 171 (4th Cir. 1993). Nonetheless, failure of a party to challenge admissibility at the
summary judgment stage "does not forfeit the right to challenge admissibility at trial" if the case
survives dismissal. *See* Fed. R. Civ. P. 56 (advisory committee note, 2010 amendments).

### III.    Discussion

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating
against any individual with respect to his "compensation, terms, conditions, or privileges of
employment" on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–
2(a)(1); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Plaintiff Mais, in her Second
Amended Complaint, alleges Title VII violations in the form of (1) racially hostile work
environment, (2) constructive discharge based on race, (3) retaliatory hostile work environment,
and (4) retaliatory constructive discharge. Dkt. 1-5. Defendant School Board has moved for
summary judgment on each claim. Dkt. 91.

The Court, viewing the evidence in the light most favorable to non-movant Mais, finds
that Mais has adduced evidence that raises a genuine dispute of material fact as to hostile work
environment and constructive discharge, which would allow a reasonable jury to conclude in her
favor. However, the Court finds that Mais has not adduced evidence to raise an issue of material
fact as to her claim of retaliation. Therefore, the Court denies the School Board's motion for
summary judgment as to Mais' claims of hostile work environment and constructive discharge,
and it grants the School Board's motion for summary judgment as to Mais' claims of retaliation.

### A.  Hostile Work Environment Claim

A hostile work environment under Title VII exists when "the workplace is permeated
with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment."

*McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 407 (4th Cir. 2022) (internal quotation

marks omitted) (quoting *Harris*, 510 U.S. at 21). To present a Title VII *racial* hostile work

environment claim, a plaintiff must show that "there is (1) unwelcome conduct; (2) that is based

on [her race]; (3) which is sufficiently severe or pervasive to alter [her] conditions of

employment and to create an abusive work environment; and (4) which is imputable to the

employer." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016) (internal

quotation marks omitted).

Here, the School Board concedes that unwelcome conduct occurred but argues that the

conduct was not based on Mais' race, was not sufficiently severe or pervasive, and is not

imputable to the School Board. Dkt. 91 at 12-19. The Court finds against the School Board on

each front.

### 1. *Unwelcome Conduct Based on Race*

"To establish that harassment was based on race, [the plaintiff] must show that but for her

race, she would not have been the victim of the alleged discrimination." *McIver*, 42 F.4th at 409

(quoting *Gilliam v. S.C. Dep't of Juv. Justice*, 474 F.3d 134, 142 (4th Cir. 2007)). Here, the

School Board argues that Mais experienced unwelcome conduct due to her own actions—her use

of the word "colored"—and not due to her race. Dkt. 91 at 14. While the record does suggest that

the bulk of Mais' mistreatment occurred after Mais used the term "colored" on June 11, that does

not change the fact that the mistreatment occurred *because* Mais used the term *as a white person*.

Mais alleges that she apologized, yet in all future interactions, Avery, Hairston, E. Holstrom, and

others seemed to ignore or minimize her apology and instead piled on the implications (or

outright accusations) that Mais was a white racist. *See, e.g.*, Dkt. 107-1 at 74 (Mais alleging that

she felt silenced and attacked during August 6 meeting). Therefore, a reasonable jury could conclude that not only was race the undercurrent that contextualized the entire situation (i.e., the effort by the School Board to develop anti-racism awareness through its policy and regulations, *see* Dkt. 91-6 at 1-5), but that Mais' race and position as a white person permeated each of her interactions therefrom, attracting or engendering the hostility and dismissal that make up her claim for harassment.

### 2. *Severe or Pervasive*

For conduct to be considered severe or pervasive, it must be both objectively and subjectively "hostile" and "abusive." *McIver*, 42 F.4th at 408; *Harris*, 510 U.S. at 21–22 (requiring the plaintiff to prove "the environment would reasonably be perceived, and is perceived, as hostile or abusive"). This is a "high bar" for plaintiffs to clear: bruised or wounded feelings, rude treatment from coworkers, callous behavior by one's superiors, routine difference of opinion, or personality conflicts are not actionable under Title VII, without more. *See Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019) (*citing E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008).

Objective analysis of whether a workplace is hostile and abusive turns on the totality of the circumstances, especially "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *McIver*, 42 F.4th at 408 (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc)). "[N]o single factor is" dispositive, *Harris*, 510 U.S. at 23, since the true effect of workplace behavior often depends on a "constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical

15

acts performed." *Sunbelt Rentals, Inc*., 521 F.3d 306, 316 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998)).

At bottom, the ultimate inquiry is whether the conduct is so extreme that it changes the "terms and conditions" of the plaintiff's employment. *McIver*, F.4th 398 at 409 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). But "[t]he phrase 'terms, conditions or privileges of employment' in Title VII is an expansive concept." *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 331 (4th Cir. 2018) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)). Generally, the inquiry into objectively severe or pervasive abusive conduct "must focus on the events that the plaintiff personally experienced," though conduct directed at others is relevant if the plaintiff was aware of the conduct. *McIver*, 42 F.4th at 409 (citing *EEOC v. Sunbelt Rentals, Inc*., 521 F.3d 306, 315 (4th Cir. 2008)). Psychological injury may be relevant, but it is not required. *Harris*, 510 U.S. at 22. If events within a period are sufficiently linked in time, the "entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id*. Finally, the status or position of the harasser is also a "significant factor" to be considered; harassment by a supervisor tends to be more serious, while harassment by a co-equal is less serious. *McIver*, 42 F.4th at 409 (citing *Boyer-Liberto*, 786 F.3d at 278). Given the constellation of factors, "[t]his is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22.

Here, Mais has adduced evidence which would allow a reasonable jury to conclude that the unwelcome conduct she experienced was sufficiently severe or pervasive. The record suggests that Mais experienced far more than bruised or wounded feelings, rude treatment from coworkers, callous behavior by one's superiors, or personality conflicts. *See Evans*, 936 F.3d at 192. To the contrary, Mais experienced serious psychological repercussions, including panic

16

attacks, sleeping problems, and generalized anxiety. Dkt. 107-1 at 89. Mais' suffering arose

directly from racially-charged, divisive interactions which left Mais feeling "ganged up" on,

based on race, and with the persistent feeling that her complaints and apologies were "falling on

deaf ears." Dkt. 107-1 at 119, 104. The events were "pervasive" in both duration and intensity,

beginning in earnest in late April 2021 (or at least June 2021), when the first CCAR training

sessions began, in which Mais alleges Avery began shutting down staff in a racially charged

manner with no repercussions; Dkt. 107-1 at 31-32, 36; Dkt. 107-3 at 77; Dkt. 91-2 at 49;

continuing into July and August, when Mais both reported her concerns to people like Irani to no

avail and was called into a meeting which only did "more damage;" Dkt. 107-1 at 74; and

extending into September 2021, when Mais was directed by her superiors to address the staff and

was subsequently berated for being a racist after she had apologized once more. Dkt. 107-1 at

124-126. Although the brunt of the harassment may have been spearheaded by Avery, Mais' co-

worker (if not someone Mais had authority to discipline), the harassment was presided over at

multiple points by several people superior to Mais, including Hairston and Irani. *See, e.g.,* Dkt.

107-1 at 74. Viewing this evidence in the light most favorable to non-movant Mais, a reasonable

jury could well conclude that Mais' treatment was abusive and hostile to her subjectively and

would be equally abusive and hostile to the objective person in her position.

   3.   *Imputable to the School Board*

Because the final element of a hostile work environment claim requires a plaintiff to

prove that the harassment is imputable to the employer, the employer's liability "may depend on

the status of the harasser," i.e., whether the harassment was caused by a co-worker or a

supervisor. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). If caused by a co-worker of the

plaintiff (or a third party), an employer is liable "if it knew or should have known about the

17

harassment and failed to take effective action to stop it by responding with remedial action reasonably calculated to end the harassment." *Pryor v. United Air Lines, Inc*., 791 F.3d 488, 498 (4th Cir. 2015) (internal quotation marks omitted) (cleaned up). If the harassment is caused by a supervisor, then the employer may be either strictly or vicariously liable for the supervisor's actions, depending on whether the supervisor took a tangible employment action against the plaintiff. *Strothers v. City of Laurel*, Maryland, 895 F.3d 317, 332–33 (4th Cir. 2018). "If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." *Vance*, 570 U.S. at 424. "But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.* "[A] supervisor is an individual who has been empowered 'to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Strothers*, 895 F.3d 333.

Here, Mais' allegations and record evidence would allow a reasonable jury to conclude that racial harassment occurred at the hands of Mais' co-worker, Avery, but that Mais' superiors were aware of the ongoing race-based harassment and "failed to take effective action to stop it by responding with remedial action reasonably calculated to end the harassment." *See Pryor*, 791 F.3d at 498. The School Board essentially argues that Mais did not intervene herself and did not adequately report her concerns to superiors. *See* Dkt. 91 at 19-20 (arguing that Mais did not attempt to speak with Avery; Mais only left a "general" voicemail for Gerome; and that Mais

reported her concerns to Kindler and Granger, "but Granger was on leave."). The School Board also argues that HR was beginning to respond but that Mais, by resigning, undermined HR's effort to cure the situation. Dkt. 91 at 20.

But the record suggests otherwise, indicating that Mais repeatedly communicated her concerns to supervisors well before she resigned and that HR's response was feeble at best. Mais reported her concerns about racial tension and mistreatment to several people, including Irani, Kindler, Hairston, Castner, Gerome, and C. Keiser—all of whom had some degree of superiority over Mais, responsibility for the CCAR program, or connection to HR. On Irani's first day as the new principal, for instance, Mais went to him to explain what happened at the June 11 training and to express her concerns about Avery's behavior and the racially charged work environment. Dkt. 107-1 at 66; 68-69. Over email on or around July 9, Mais explained to Irani that the growing tension was a safety concern. Dkt. 107-1 at 68-69. Later, on August 8, Mais alerted Irani to the fact that she intended to seek mental health counseling to deal with panic attacks, trouble sleeping, and other symptoms she was experiencing due to the ongoing situation. Dkt. 107-1 at 89. This is enough for a jury to conclude that Mais' supervisors were on notice about the race-based harassment Mais was experiencing, well before Mais decided to resign.

The record further suggests the School Board and its agents failed to act to respond effectively to the situation. In speaking with Castner, for instance, Mais was encouraged to just "fall on her sword" and watch what she said so that the situation would pass. Dkt. 107-1 at 54. After Mais spoke with Gerome, HR took no tangible action to resolve the situation, other than C. Keiser coming out to speak with Mais and proposing no concrete path forward. Dkt. 107-1 at 101. In fact, Keiser acknowledged that, so far, the situation had been *mishandled*—stating that Hairston was wrong to conduct the August 6 meeting without HR. Dkt. 107-1 at 98. Nothing

19

improved, to the extent that even Mais' last two days at the school were permeated with ongoing

harassment, a far cry from an effective response by HR or the School Board to put an end to it.

Dkt. 107-1 at 124-125. A reasonable jury could therefore conclude that the race-based

harassment Mais experienced is imputable to the School Board.

Accordingly, Mais has adduced evidence on each element of a hostile work environment

claim that presents a triable issue for the jury.

## B. Constructive Discharge Claim

A constructive discharge claim is a claim "distinct from the underlying discriminatory

act," such as a hostile work environment, *Green v. Brennan*, 578 U.S. 547, 559 (2016). It

requires the plaintiff to "show something more" than a hostile work environment. *Evans*, 936

F.3d at 193 (citing *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). Constructive discharge

has two elements: (1) "a plaintiff must show that [her] working conditions became so intolerable

that a reasonable person in the employee's position would have felt compelled to resign" and (2)

"a plaintiff must actually resign because of those conditions." *Perkins v. Int'l Paper Co*., 936

F.3d 196, 211-12 (4th Cir. 2019) (quotation and quotation marks omitted) (citing *Green,* 578

U.S. at 555).

In evaluating intolerability, courts consider "the frequency of the conditions at issue,"

finding that "[t]he more continuous the conduct," the more likely it will establish the required

intolerability, compared to conduct which is "isolated or infrequent." *Evans*, 936 F.3d at 193.

Intolerability is not a question of whether resigning would have been the employee's most

reasonable or understandable choice, but whether a "reasonable person in the employee's

position would have felt compelled to resign, . . . that is, whether [she] would have had *no choice*

but to resign." *Evans*, 936 F.3d at 193 (emphasis in original). "Unless conditions are beyond

'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." *Evans*, 936 F.3d at 193 (internal quotations omitted) (quoting *Suders*, 542 U.S. at 147).

Due to this high bar, courts find that "difficult or unpleasant working conditions," without more, are insufficient to establish intolerability. *Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (employee chastised and told she was a poor manager in front of customers did not create conditions so intolerable as to compel a reasonable person to resign); *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 273 (4th Cir. 2001) (ostracization and required counseling for turning in an inaccurate time card did not make the workplace intolerable); *Munday v. Waste Management of North America*, 126 F.3d 239, 244 (4th Cir. 1997) (being ignored by co-workers and top management was insufficient to establish constructive discharge); *Carter v. Ball*, 33 F.3d 450, 459–60 (4th Cir. 1994) (being unfairly criticized, losing supervisory responsibilities, and having one's supervisor display a poster that may have been offensive to African Americans was insufficient to establish constructive discharge).

Here, Mais has adduced evidence that would allow a reasonable jury to conclude that, due to the ongoing and unresolved harassment, she had "no choice" but to resign and that she did resign as a result. As noted above, Mais repeatedly—as early as the CCAR sessions in April-June 2021—expressed her complaints to supervisors and to HR personnel (which suffices under the School Board's reporting policy, *see* Dkt. 107-3 at 9), and Mais reasonably viewed such conversations as the equivalent of "filing a complaint." Dkt. 107-1 at 94-95. Yet no events occurred that would give the reasonable person a belief that resolution was coming. Instead, in the series of conversations and meetings that occurred between the August 6 meeting and the September 9 staff address, Mais alleges that she was consistently dismissed, ignored, or outright

attacked. She was told that it was her "professional responsibility" to address the entire staff, though her address was either to be scripted or confined by a set structure. Dkt. 107-1 at 120. By August 22, the date of her resignation, Mais was feeling "disgusted." Dkt. 107-1 at 104. She had been told to "fall on her sword." Dkt. 107-1 at 54. Her own secretary was afraid of being seen with her, severely affecting Mais' ability to "get work done" or meet deadlines. Dkt. 107-1 at 68-69. And all the while, any recourse she sought, other than resigning, fell on "deaf ears," since no person had provided any semblance of an action plan that would attempt to resolve the hostility without fostering it further. Dkt. 107-1 at 104. These factors suggest that, for Mais, continuing in her position was futile, as harassment would escalate or at least go unresolved. For these reasons, a jury could reasonably conclude that Mais' decision to resign was not merely a preference or an understandable choice, but one she was forced to take due to the hostile and impracticable working conditions which she reasonably concluded would have no end.

### C. Retaliatory Hostile Work Environment and Retaliatory Constructive Discharge

The anti-retaliation provision of Title VII makes it unlawful for an employer to "discriminate against" employees because they have opposed discrimination or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the Act. *Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022). The purpose of this provision is to "protect employees who complain about real or perceived discrimination" from being retaliated against for speaking up. *Id*. To prove a prima face case of retaliation, a plaintiff must show that (1) she engaged in a **protected activity**, (2) her employer took an **adverse action** against her, and (3) a **causal link** exists between the two events. *Id*. (citing *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016)). To satisfy the second element, "a plaintiff must show that a reasonable employee would have found the challenged

action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Laurent-Workman v. Wormuth*, 54 F.4th 201, 213 (4th Cir. 2022) (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Here, Mais alleges that she engaged in protected activity by reporting her concerns to superiors and to human resources; that the School Board "amped up the hostility of [Mais'] environment with each passing complaint;" and that, therefore, the School Board retaliated against her by "creating a hostile work environment and ultimately constructively discharging her." Dkt. 107 at 34. The School Board argues that Mais did not engage in a protected activity because her reports to superiors did not sufficiently implicate a Title VII protected class, i.e., race, and that, in any case, Mais fails to satisfy the elements of hostile work environment or constructive discharge which underpin the claims for retaliatory constructive discharge and retaliatory hostile work environment. Dkt. 91 at 23-24.

Given the Court's conclusions above—that Mais has produced a jury issue on her hostile work environment and constructive discharge claims—the only remaining argument made by the School Board on Brief is that Mais' complaints were not a protected activity under Title VII because they did sufficiently implicate *racial* harassment. As explained below, the Court disagrees, finding that Mais' complaints of racial harassment were protected activity. However, the Court further finds that Mais has not adduced evidence sufficient to raise an issue of material fact on the second or third elements of retaliation. Mais, in other words, has not adduced evidence to show that her employer took an adverse action against her *in response* to her complaints. Because Mais has not raised a jury issue on the second and third elements, the Court grants summary judgment as to Mais' claim of unlawful retaliation under Title VII.

*1. Protected Activity under Title VII*

"Protected activities fall into two distinct categories: participation or opposition." *Laughlin v. Met. Wash. Airports*, 149 F.3d 253, 259 (4th Cir. 1998) (citing 42 U.S.C. § 2000e-3(a)). Participation activities include making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a). Oppositional activities include "staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities," but "only when an employee has an objectively reasonable belief in light of all of the circumstances that a Title VII violation has happened or is in progress." *McIver*, 42 F.4th at 411.

Thus, "[e]mployees engage in protected oppositional activity when, *inter alia*, they complain to their superiors about suspected violations of Title VII. *Boyer-Liberto*, 786 F.3d at 281. The alleged Title VII violation, such as a hostile work environment, may be "complete," or it may be "in progress." *Id*. However, "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Ghebreab v. Inova Health System*, 2017 WL 1520427, at *8 (E.D. Va. Apr. 26, 2017). Where there is no evidence that the plaintiff complained of discrimination prohibited by Title VII, she cannot establish that she engaged in protected activity. *See Richardson v. Richland Cnty. Sch. Dist*., 52 F. App'x 615, 617 (4th Cir. 2002) (holding that a plaintiff could not show that she engaged in protected activity because she did not present evidence that she informed her employer that her complaints were based on race or age discrimination). Nonetheless, there is no "magic words requirement" for registering a Title VII complaint with an employer. See *Johnson v. Glob. Lang. Ctr*., 2023 WL 3645055 (4th Cir. May 25, 2023) (citing *Okoli v. City of Baltimore*, 648 F.3d 216, 224 n.8 (4th Cir. 2011)).

24

Here, the School Board's argument that Mais' complaints did not implicate racial harassment is similar to its argument that the unwelcome conduct was not due to Mais' race. It is true that Mais never used "magic words" in her complaints to supervisors and HR, i.e., she did not label her emails "Title VII concerns" or specifically ask her superiors to initiate a Title VII investigation. However, Mais did far more than "[m]erely complain[] in general terms of discrimination or harassment." *Ghebreab*, 2017 WL 1520427, at *8. Instead, she "indicat[ed] a connection to a protected class," i.e., race, and/or provided facts sufficient to "create that inference." *Id*. Instead, each of her complaints stemmed from the racially hostile environment, brought about by an anti-racism training and her use of the racially-charged term "colored." The content of her complaints often explicitly called attention to the racial nature of the tension and hostility she and others were experiencing. *See, e.g.,* Dkt. 107-1 at 81 (Mais stating in August 6 meeting that the CCAR training was creating racial hostility in the workplace); Dkt. 107-1 at 96-99 (Mais described her concerns to Keiser at length, including the growing racial tension). In fact, Mais specifically expressed her concern that she "was being labeled a racist for a mistake that [she] apologized for." Dkt. 107-1 at 73.

These facts evince far more than generalized complaints. Mais adduces evidence to allow a reasonable jury to conclude that she either explicitly referenced race-based harassment to her superiors or provided facts that would create an inference of race-based harassment for her superiors to act on, thereby supporting the conclusion that Mais engaged in Title VII protected activity.

### 2. *Adverse Action and Causal Relationship*

Mais appears to argue that retaliation occurred when the School Board "amped up the hostility of [Mais'] environment with each passing complaint," and that, therefore, the School

Board retaliated against her by "creating a hostile work environment and ultimately constructively discharging her." Dkt. 107 at 34. However, these arguments are circular. The Court has acknowledged that Mais has adduced evidence to raise a jury issue on hostile work environment and constructive discharge, but Mais adduces little to no distinct evidence to show that the School Board cultivated the hostile working environment, constructively discharged her, or took any other *adverse action* against her *in response* to her complaints. To the contrary, much of Mais' argument is devoted to showing that the School Board *did not respond* to her complaints. Without more, Mais fails to demonstrate that a reasonable jury could conclude that the School Board retaliated against Mais in response to her protected activity.

## IV.    Conclusion

In an order that will accompany this memorandum opinion, the Court will deny Defendant School Board's motion for summary judgment as to hostile working environment and constructive discharge, and it will grant the motion as to unlawful retaliation, Dkt. 90.

The Clerk of Court is directed to send this opinion to all counsel of record.

Entered this 9th day of September 2024.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

26